EXHIBIT

**H**

RG

**From:** **Russell Greer** RussMark@gmail.com
**Subject:** Amended Production of Document Request Response
**Date:** January 14, 2025 at 5:25 AM
**To:** Matthew Hardin matthewdhardin@gmail.com

Good morning,

Searching through my phone, on my iCloud and my Microsoft Word app, here are documents related to past lawsuits I filed. It is not every document because I don't have each and every document. Nor do I have the original complaints of lawsuits. I'm sorry, I don't keep files that old because I don't have lots of space.

Because I was evicted last summer, I lost both of my laptops and so I cannot search in those.

Also attached is a litigation history document.

Thank you



**Greer v Moon 2022-10-20 Reply Brief_vFINAL.pdf**
362 KB

**greer v fremantle preliminary injunction.pdf**
279 KB

**Litigation history .pdf**
97 KB

Sent from my iPhone

No. 21-4128
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
_____

RUSSELL G. GREER,

*Plaintiff-Appellant*,

v.

JOSHUA MOON, KIWI FARMS,

*Defendant-Appellees*.

On Appeal from the United States District Court
for the District of Utah
No. 2:23-cv-00647-TC
Hon. Tena Campbell, United States District Judge
_____

## APPELLANT'S REPLY BRIEF
_____

[Oral Argument Requested]

Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew@DigitalJusticeFoundation.org

*Attorney for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................3

SUMMARY OF ARGUMENT ...............................................................4

ARGUMENT .........................................................................................7

I.     GIVEN THE ANSWERING BRIEF'S RHETORIC ABOUT DEFERENCE, IT'S WORTH REITERATING THAT A DISMISSAL UNDER RULE 12(B)(6) IS REVIEWED DE NOVO. ...................................................................7

II.    THE ORIGIN OF THIS COPYRIGHT DISPUTE STEMS FROM A WILLFUL REFUSAL TO COMPLY WITH CONGRESS' NOTICE-AND-TAKEDOWN PROCEDURES. ...........................................................................9

III.   THE ANSWERING BRIEF DOES NOT MEANINGFULLY DISPUTE THAT THE COMPLAINT ALLEGED FACTS OF MATERIAL CONTRIBUTION UNDER ESTABLISHED DOCTRINE. ......................................................15

     A.   The Answering Brief overlooks that the complaint stated a claim under a straightforward application of the Tenth Circuit's standards for contributory infringement. ...................16

     B.   Contrary to the Answering Brief's views, the Ninth Circuit's Napster and Perfect 10 decisions are straightforward applications of longstanding principles. ...................21

     C.   Grokster did not narrow the scope of contributory infringement, or impose additional elements, as the Answering Brief mistakenly suggests.......................24

     D.   Fair use is an affirmative defense not raised below, not developed by the Answering Brief, and not seriously at issue in this case. ...................................................28

IV.   THE ANSWERING BRIEF IS INCORRECT TO ASSERT THAT A PRO SE COMPLAINT MUST NOT ONLY STATE FACTUAL ALLEGATIONS BUT ALSO ARTICULATE AND CLARIFY LEGAL THEORIES. ...........................31

1

V.    THE ANSWERING BRIEF IGNORES THAT *PRO SE* LITIGANTS SHOULD
BE AFFORDED A CHANCE TO CORRECT PURPORTED DEFECTS IN AN
INITIAL COMPLAINT. ...........................................................................35

VI.    THE ANSWERING BRIEF DOES NOT MEANINGFULLY ADDRESS THE
IMPORTANT POLICY CONSIDERATIONS THAT ARISE FROM WILLFUL
DEFIANCE OF NOTICE-AND-TAKEDOWN. ...........................................37

CONCLUSION ...........................................................................................42

CERTIFICATE OF COMPLIANCE ......................................................................43

CERTIFICATE OF SERVICE ...............................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Diversey v. Schmidly,
   738 F.3d 1196 (10th Cir. 2013). ............................................... 7, 8, 16, 17, 19

Ornelas v. United States,
   517 U.S. 690 (1995)...................................................................................8

Syrus v. Bennett,
   455 F. App'x 806 (10th Cir. 2011)...........................................................8

U.S. Bank N.A. v. Vill. at Lakeridge, LLC,
   138 S. Ct. 960 (2018)..................................................................................8

United States v. Regan,
   627 F.3d 1348 (10th Cir. 2010)..................................................................7

**Statutes**

17 U.S.C. § 1502.............................................................................................12

17 U.S.C. § 1504.............................................................................................12

17 U.S.C. § 512...................................................................................... 10, 11, 12, 14

28 U.S.C. § 1338.............................................................................................12

**Other Authorities**

Farokhmanesh, Megan, "The End of Kiwi Farms, the Web's Most Notorious
   Stalker Site,"
   Wired, (Sept. 8, 2022). ...................................................................................9

Prince, Matthew, "Blocking Kiwifarms,"
   Cloudflare: the Cloudflare Blog (Sept. 3, 2022). ...........................................9

## SUMMARY OF ARGUMENT[1]

I.    Given the Answering Brief's rhetoric about deference to the District Court, it's worth reiterating that this Court conducts de novo review of an order granting a Rule 12(b)(6) motion.  On de novo review, the Court of Appeals does not "defer" to the decision below, as Defendants suggest on occasion in the Answering Brief.

II.   The origin of this lawsuit is Defendants' willful defiance and weaponization of the notice-and-takedown procedure.  Few suits like this arise because most website operators readily comply in good faith with notice-and-takedown requests.  Contrary to what the Answering Brief says, Defendants didn't comply with notice-and-takedown.  That left Mr. Greer no other option but a federal lawsuit, given exclusive federal jurisdiction over copyrights.  In turn, the Answering Brief is asking this Court to stray from longstanding principles of contributory liability and fashion for these Defendants what is functionally a *judicially-created* safe harbor, when they could have easily complied with Congress' *statutory* safe harbor but willfully chose not to do so.

---

[1] All emphasis is supplied, unless otherwise indicated.  Internal quotations, brackets, and citations are often removed without further indication.

III.   The Answering Brief claims that ruling for Mr. Greer would require adopting out-of-Circuit authority.  That's false.  The Opening Brief amply showed that a straightforward application of this Court's law supports Mr. Greer's claims of contributory infringement.  Moreover, there is no tension between the Ninth Circuit's Napster/Perfect 10 cases and this Court's doctrine of contributory infringement.  Indeed, Napster and Perfect 10 amount to straightforward applications of principles this Court has already endorsed.  Thus, the Answering Brief gives no meaningful reason to reject and depart from such persuasive authorities.  Moreover, the Supreme Court's Grokster decision imposes no barrier to Mr. Greer's claims.  Grokster created a new theory of secondary liability but did not foreclose existing theories, like contributory liability.  Grokster does not undermine Mr. Greer's viable claims of contributory infringement.

IV.   The operative complaint includes factual allegations alleging direct and vicarious copyright infringement, although it does not mention those legal theories by name.  It didn't need to, especially for a *pro se* complaint, as Tenth Circuit and Supreme Court authority have made clear.

V.   The Answering Brief's only response to the request for *pro se* leave to amend an initial complaint is to cite a case that involved a corporate plaintiff—not a

*pro se*.  Ultimately, the dismissal of an initial *pro se* complaint without opportunity to amend—where amendment would not be futile—is contrary to the spirit, purpose, and letter of the Federal Rules.

VI.    There are fundamental policy interests at stake.

## ARGUMENT

**I.    GIVEN THE ANSWERING BRIEF'S RHETORIC ABOUT DEFERENCE, IT'S WORTH REITERATING THAT A DISMISSAL UNDER RULE 12(b)(6) IS REVIEWED DE NOVO.**

The District Court issued an order granting a Rule 12(b)(6) motion to dismiss.  Add. 1-13.

As the Opening Brief stated, the standard of review for a "Fed. R. Civ. P. 12(b)(6) dismissal is **de novo**."  Opening Br. 29 (quoting Diversey v. Schmidly, 738 F.3d 1196, 1199 (10th Cir. 2013)).  Notably, the Answering Brief also *agrees* that the standard of review for a Rule 12(b)(6) dismissal is de novo.  Answering Br. 16.

Yet, at times, the Answering Brief suggests a heightened standard.  E.g., Answering Br. 10 ("abuse its discretion"), 29 ("afforded substantial deference"), 30 ("should defer to").

For example, the Answering Brief cites United States v. Regan, 627 F.3d 1348 (10th Cir. 2010).  Answering Br. 16.  Regan is inapposite.  Regan was a criminal-sentencing appeal, an appeal where the standard was *not* de novo.  Id. at 1354.  And, Regan involved issues the criminal defendant "did *not* raise" to the trial court.  Id. ("[W]e cannot hold that the district court abused its discretion by failing to consider an argument that Regan did *not* raise.").

7

By contrast, this appeal concerns a Rule 12(b)(6) dismissal of copyright-infringement claims.  Opening Br. 31-59.

The issues on appeal *were* raised below.  1 App. 83-86.  These issues *were* ruled upon by the District Court.  Add. 4-5.  And, the standard of review *is* de novo.  Diversey, 738 F.3d at 1199 ("de novo" review of Rule 12(b)(6) dismissal of "complaint for copyright infringement"); Syrus v. Bennett, 455 F. App'x 806, 808 (10th Cir. 2011) (same).

Moreover, contrary to the Answering Brief's rhetoric, de novo review is not deferential.  Rather, de novo review invites this Court "to expound on the law, particularly by amplifying or elaborating on a broad legal standard."  See U.S. Bank N.A. v. Vill. at Lakeridge, LLC, 138 S. Ct. 960, 967 (2018).  In the process of de novo review, "applying the law involves developing auxiliary legal principles of use in other cases"—by applying the core doctrines of contributory infringement to this case.  See id.

Appellate courts simply do not owe trial courts deference on de novo review, as the Answering Brief suggests.  Answering Br. 29-31.  That suggestion overlooks "appellate courts' institutional advantages in giving legal guidance[.]"  See id.; Ornelas v. United States, 517 U.S. 690, 697-698 (1995) (De novo review "tends to unify precedent" and give "a defined set of rules[.]").

The central issues here on appeal are reviewed de novo.

## II.    THE ORIGIN OF THIS COPYRIGHT DISPUTE STEMS FROM A WILLFUL REFUSAL TO COMPLY WITH CONGRESS' NOTICE-AND-TAKEDOWN PROCEDURES.

The Opening Brief discussed at some length both the origins of this dispute and the important policy incentives undergirding the notice-and-takedown system. Opening Br. 10-25. It emphasized that this litigation originated in Mr. Moon's refusal to comply with Congress' notice-and-takedown procedures. Opening Br. 20-22, 20 n.4.

The Answering Brief, however, suggests that Mr. Moon was compliant with notice and takedown. See, e.g., Answering Br. 1. That suggestion is both false and obfuscates the origins of this suit.

Mr. Moon owns and operates a notorious site that is "known to single out transgender and neurodivergent people in particular" and has caused death on multiple occasions. Megan Farokhmanesh, "The End of Kiwi Farms, the Web's Most Notorious Stalker Site," Wired, (Sept. 8, 2022).

In September, KiwiFarms was temporarily taken down when one of its Internet-service providers ceased service due to KiwiFarms' imminent threats to human life. See Matthew Prince, "Blocking Kiwifarms," Cloudflare: the Cloudflare Blog (Sept. 3, 2022); Farokhmanesh, "The End of Kiwi Farms" (detailing criminal acts).

Mr. Greer has been the target of this site for years due to his serious physical and developmental disabilities.  The targeting went well beyond Mr. Greer being "criticized"—and well beyond being "ruthlessly" criticized—as the Answering Brief euphemistically characterizes KiwiFarms' course of conduct.  <u>See</u> Answering Br. 1.

Relentlessly targeting not just Mr. Greer but also those who associate with him, KiwiFarms has used criminal means and misinformation to get Mr. Greer fired, evicted, and ostracized.  <u>See</u> Opening Br. 19.  KiwiFarms is not shy about this fact: <u>*in its own words*</u> KiwiFarms is dedicated to "exploitation of the mentally handicapped for amusement purposes[.]"  1 App. 190.

Perhaps unsurprisingly, KiwiFarms' users did not respect Mr. Greer's registered copyrights.  Instead, they posted links to his copyrighted works and his copyrighted works themselves to KiwiFarms.  1 App. 17-21 ¶¶ 37-60; 1 App. 197, 199.

In response, Mr. Greer made informal requests that his works be taken down.  1 App 18 ¶ 43.  Mr. Moon rebuffed those.  <u>Id.</u>  So, Mr. Greer did what Congress instructed in such a situation.  He sent a formal notice-and-takedown.  1 App. 201; 17 U.S.C. § 512(c)(3)(A)(i)-(vi).  Notice-and-takedown is precisely the procedure that Congress has ordained to allow creators to get infringements taken down without need for litigation.

The Answering Brief admits, as it must, that Mr. Greer sent DMCA notice-and-takedown requests.  Answering Br. 1 ("Mr. Greer sent Mr. Moon a takedown request pursuant[.]").  Their Brief is admitting that Mr. Greer did what he was supposed to do.

Mr. Moon and KiwiFarms simply refused to comply.  1 App. 259-260.  They blatantly refused to honor the notice-and-takedown process that Congress created to get online disputes of this sort expeditiously resolved out of court.  See id.

The notice-and-takedown process obligated Mr. Moon and KiwiFarms, "upon notification of _claimed_ infringement" via Mr. Greer's notice-and-takedown "to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."  17 U.S.C. § 512(c)(1)(C).  That didn't happen.

Instead, Mr. Moon and KiwiFarms made clear that they would not comply.  A clear indicator that Mr. Moon wasn't trying to comply is that Mr. Moon waived the operation of Congress' safe harbors, which are the very incentive for website operators to comply with notice and takedown.  1 App. 259-260.  ("In this specific instance, I will waive whatever safe harbor protections I have and personally burden liability for posting it.").

This wasn't a huge surprise.

11

Mr. Moon is quite clear about his disregard for notice-and-takedown. 1 App. 209 ("If you still want your **garbage legal letters** to end up in **the dumpster**, send them to legal@kiwifarms.net.).

Mr. Moon didn't stop there. Instead, he weaponized notice-and-takedown—the very legal machinery meant to mitigate these kinds of online-infringement disputes—by using the takedown to draw additional attention to the infringement. See 1 App 31 ¶ 126-127. Mr. Moon used Congress' *mitigation* procedure to *exacerbate* this dispute.

Notice-and-takedown requires a website operator "*expeditiously* to remove" the infringing material, 17 U.S.C. § 512(c)(1)(C), but here, Mr. Moon disregarded the legal procedure, waived limitations on liability, doubled down on the wrongful acts, and called attention to the infringement en masse. Then, he dared Mr. Greer to sue. 1 App. 23 ¶ 71.

At that point, suing was Mr. Greer's only option. Specifically, a *federal* lawsuit was his only option because subject-matter jurisdiction over copyrights is *exclusively* federal. 28 U.S.C. § 1338(a).[2]

---

[2] When this suit was filed (Sept. 16, 2020), Congress hadn't yet created an "alternative forum" for small-claims copyright disputes. See 17 U.S.C. § 1502(a) (made law on Dec. 20, 2020). Moreover, this alternative small-claims tribunal *cannot* grant injunctive relief, 17 U.S.C. § 1504(e)(2), so it would be unable to provide the remedy of a takedown of infringing material, an essential remedy here, see 1 App. 62-67.

In short, the origin of this suit is open defiance of the law and of the very legal procedures meant to mitigate this type of dispute; a follow-on weaponization of those very procedures to entrench and expand the infringement; and then the taunting of a disabled person and daring him to exercise his only remaining option: to come to court.

* * * * *

After this dispute ended up in court, Mr. Moon and KiwiFarms now complain about the scope of contributory infringement.  <u>See</u>, <u>e.g.</u>, Answering Br. 4 ("sweeping"), 27 ("Sweeping").

They're asking this Court to refuse a straightforward application of the doctrine of contributory infringement by fashioning an unsupported exception *for them*.  They ask for this after they willfully refused to comply with Congress' statutory limiting principle—the safe-harbor immunity offered in return for good-faith compliance with notice-and-takedown.

Applying the doctrine in a straightforward fashion here wouldn't be sweeping.  It would be table stakes.  Nearly the entire Internet, just about every website, simply complies with Congress' notice-and-takedown in return for a safe harbor.

By contrast, refusing to apply contributory liability here would be highly disruptive.

An opinion affirming here would function as an invitation for websites to disregard notice-and-takedown on the thought that the safe harbor isn't needed. Such a result would undermine Congress' safe harbors by rending them functionally superfluous. After all, such a ruling would undermine the very incentives for website operators to comply with Congress' notice-and-takedown and, as a result, undermine the key legal mechanism that frequently keeps these kinds of disputes out of court.

Boiled down, what's going on here is quite simple. This litigation originates in a willful refusal to comply with notice-and-takedown, and the weaponization of that very procedure.

Through its enactment of the notice-and-takedown safe harbor in §512(c), Congress offered Mr. Moon and KiwiFarms conditional immunity. Yet, Mr. Moon and KiwiFarms rejected Congress' offer. They abused Congress' dispute-resolution tools to exacerbate a dispute.

## III.    THE ANSWERING BRIEF DOES NOT MEANINGFULLY DISPUTE THAT THE COMPLAINT ALLEGED FACTS OF MATERIAL CONTRIBUTION UNDER ESTABLISHED DOCTRINE.

Despite what the Answering Brief argues, this Court should reverse and remand as to contributory liability.

Reversal would not require adoption of out-of-Circuit authority.  <u>See</u> Section III.A, *infra*.  Moreover, the Answering Brief gives no persuasive reason to diverge from Ninth Circuit applications of well-established principles of contributory liability.  <u>See</u> Section III.B, *infra*.  In addition, the Answering Brief profoundly misreads <u>Grokster</u>.  <u>See</u> Section III.C, *infra*.  Finally, the issue of fair use was not raised below, is not developed on appeal, is waived, and is not seriously at issue in this case.  <u>See</u> Section III.D, *infra*.

**A.** **The Answering Brief overlooks that the complaint stated a claim under a straightforward application of the Tenth Circuit's standards for contributory infringement.**

The Answering Brief claims that the Opening Brief's arguments on contributory infringement depend upon the District Court's failure "to adopt Ninth Circuit authority." Answering Br. 9.

That's inaccurate. The Answering Brief overlooks that the Opening Brief relied upon _Tenth Circuit law_ to support Mr. Greer's claims of contributory infringement.

Both sides _agree_ that this Court's Diversey opinion sets out the elements of contributory infringement. Opening Br. 31 (quoting Diversey); Answering Br. 19 (same). The Opening Brief cited Diversey repeatedly. Opening Br. iv (TOA). Thus, the Answering Brief is wrong to suggest that the Opening Brief hangs its hat on out-of-Circuit authority at the expense of Tenth Circuit law.

There is simply no need to "adopt" new law to find that Mr. Greer stated a claim for contributory infringement under _this Court's law_. See Answering Br. 27. That's because, under _existing_ Tenth Circuit law, "contributory liability attaches when the defendant [1] causes or materially contributes to another's infringing activities and [2] knows of the infringement." Diversey, 738 F.3d at 1204 (**10th Cir.** 2013).

Here, there's no dispute that Defendants knew of the infringements.  The District Court held as much.  Add. 4 (citing, e.g., 1 App 18 ¶¶ 40-41).  And, the Answering Brief does not, and could not seriously, dispute such knowledge by Defendants.  See Answering Br. 24 ("The District Court found that Mr. Greer sufficiently alleged [...] Mr. Moon knew about the infringement.").  Their knowledge is undisputed.

Thus, the only disputed element on appeal regarding whether the complaint stated a claim for contributory infringement under Tenth Circuit law is whether Mr. Greer has alleged that Mr. Moon and KiwiFarms "cause[d] **or** materially contribute[d] to" direct infringements of Mr. Greer's copyrights.  See Diversey, 738 F.3d at 1204.

Mr. Greer has.  The operative complaint identified  a slew of actions here by Mr. Moon and KiwiFarms that "cause[d] **or** materially contribute[d] to" direct infringements.  See Diversey, 738 F.3d at 1204.  Specifically:

(1)    Mr. Moon shared links to the precise Internet locations of the infringing materials—thereby enabling and contributing to further infringement.  E.g., 1 App. 23 ¶¶ 70-74, 1 App. 203 (Ex. T).

17

(2)    Mr. Moon drew the attention of would-be infringers and harassers of Mr. Greer to the fact of infringement and the fact that Mr. Greer was bothered by it.  1 App. 23 ¶¶ 70-74, 1 App. 203 (Ex. T).

(3)    Mr. Moon publicly posted and publicly disparaged Mr. Greer's takedown requests on KiwiFarms, encouraging users to disregard and discount Mr. Greer's federal property rights online.  E.g., 1 App. 18 ¶ 44, 1 App. 22 ¶ 67, 1 App. 203 (Ex. T).

(4)    Mr. Moon knowingly chose to continuing distributing and displaying the infringing materials through his website while actively refusing to take these infringing materials down despite repeated requests.  1 App. 11 ¶ 2; 1 App. 18 ¶ 43; 1 App. 23 ¶ 70.

(5)    With Mr. Moon's knowledge and after Mr. Moon was put on notice, the infringements on KiwiFarms have been used  to spread the infringements of Mr. Greer's works across the Internet.  1 App. 18 ¶ 60 ("Mr. Moon's users, with Moon's knowledge, have spread Greer's song across different sites").

Mr. Greer's complaint included allegations that amply demonstrated how Mr. Moon caused and contributed to infringements.

When made aware of the infringements, Mr. Moon actively refused to remove them from his website and chose to persist his website's involvement in publicly and globally disseminating infringing content.  1 App. 23 ¶ 70 ("Mr. Moon then went onto explain that he […] would not be removing Greer's copyrighted materials."); 1 App. 29 ¶ 110 (Defendant has "deliberately disregarded Greer's notifications of infringement.").

Perhaps it is unsurprising that, following Defendants' contributing actions, "KiwiFarm users have uploaded more of Mr. Greer's songs without his consent." Add. 2 (citing 1 App. 22-23 ¶¶ 67-71, 74).  Those follow-on infringements are a clear sign of Mr. Moon's and KiwiFarms' contributions _to_ infringements as alleged in the complaint.

Thus, contrary to undeveloped assertions of the Answering Brief, Mr. Greer's _pro se_ complaint did sufficiently allege contribution to and inducement of infringements—and did so under the standards adopted _by this Court_.  Mr. Moon "caused" and "materially contributed" to infringements through these acts.  Thus, Mr. Greer has stated a claim under _Tenth Circuit law_.  See Diversey, 738 F.3d at 1204.

In the face of this standard, the Answering Brief nowhere engages why these factual allegations don't count as contributory infringements under Tenth Circuit case law that _both_ sides cite, _i.e._, under Diversey.

19

Any of the following actions certainly seem like material contributions—publicly disparaging and flouting legal requests to stop infringement; drawing the attention of a group of known would-be infringers and harassers to precise locations to infringe; consciously choosing to continue hosting and linking to infringing material.

The Answering Brief never tells why these acts that led to infringements didn't contribute to them. Likely, it's because the Answering Brief has no serious answer. These willful and blatant choices were consciously intended to infringe and to harm Mr. Greer, so it's hard to conjure up an explanation why they didn't contribute to what they naturally led to—*and what was intended by a bad-faith actor*.

Despite all the ink spilled in the Answering Brief about Ninth Circuit law, the truth here is that a straightforward application of Tenth Circuit law (<u>Diversey</u>) stating the well-established principles of contributory infringement would find that a claim of contributory copyright infringement was stated in Mr. Greer's operative complaint.

This Court should reverse and remand.

**B.    Contrary to the Answering Brief's views, the Ninth Circuit's <u>Napster</u> and <u>Perfect 10</u> decisions are straightforward applications of longstanding principles.**

The District Court and the Answering Brief are absolutely correct that the trial courts within the Tenth Circuit are not bound by Ninth Circuit law.  <u>See</u>, <u>e.g.</u>, Add. 5 n.3;Answering Br. 30.

It is entirely within the power and authority of a District Court to refuse to apply persuasive authority *ipse dixit*.  Yet, that's not very helpful to the process of appellate review.

Here, the persuasive authority cited from the Ninth Circuit is not a different standard but rather a straightforward application of established principles of contributory infringement that are shared by both the Ninth and Tenth Circuits alike.  If the authority isn't persuasive to the District Court, it would be helpful to know why.  We don't.

The Ninth Circuit, in <u>Perfect 10</u> and <u>Napster</u>, articulated a straightforward application of contributory infringement in "the context of cyberspace[.]"  <u>Perfect 10, Inc. v. Amazon.com, Inc.</u>, 508 F.3d 1146, 1171 (9th Cir. 2007); <u>A&M Records v. Napster, Inc.</u>, 239 F.3d 1004, 1022 (9th Cir. 2001).

That's true here.

Here, Mr. Moon could have taken simple steps to take down the infringing materials but instead actively refused to remove them.  1 App. 11 ¶ 2; <u>see Perfect</u>

21

10, 508 F.3d at 1172.  The Answering Brief argues that the District Court was "within its discretion to decline to apply Ninth Circuit precedent." Answering Br. 29.  That's true but it doesn't justify affirmance.

While it is true that the District Court is not *bound* by persuasive appellate authority, even Defendants acknowledge that Ninth Circuit law is "entitled to great weight[.]" Answering Br. 35.  Yet, the District Court gave the Ninth Circuit authority *no* weight—and without supplying any reason to do so.  Here, on appeal, Mr. Moon gives no meaningful reason to diverge from it.

After all, a website operator who knows of infringement and willfully chooses to do nothing about it is contributing to further infringements by ensuring that the infringement will continue to be "distributed world-wide" via that website. Napster, Inc., 239 F.3d at 1022.

Moreover, it's not just the Ninth Circuit.  As the Opening Brief pointed out, leading copyright treatises agree that contributory infringement's inducement element is satisfied by an active refusal of the website operator to remove content from a website.  GOLDSTEIN ON COPYRIGHT §8.0 (3rd Ed., 2022-1 Supp.); 3 NIMMER ON COPYRIGHT § 12.04[A] (2022).

There's no dispute that Mr. Moon consciously, actively, and willfully refused to take down infringing materials from his website.  By the same token, that means he was consciously, actively, and willfully continuing to use his

website control to facilitate ongoing infringing publicly copying, distributions, performances, and displays of Mr. Greer's works.  17 U.S.C. § 106(1), (3)-(5) (exclusive rights violated).

_That's_ contribution to infringement—under this Court's law.  Likewise, it's also contribution to infringement under a straightforward application of the same principles of law already used in the Tenth Circuit.

**C.**    **<u>Grokster</u> did not narrow the scope of contributory infringement, or impose additional elements, as the Answering Brief mistakenly suggests.**

The Answering Brief argues that the Supreme Court's <u>Grokster</u> decision favors affirmance.  Answering Br. 32-39.

Specifically, the Answering Brief states that contributory liability is foreclosed here because the "evidence the Supreme Court used to support the inference of unlawful behavior" in <u>Grokster</u> "simply does not exist in this case." Answering Br. 34; <u>see also</u> <u>id.</u> at 36. ("major difference between this case and <u>Grokster</u>").

The Answering Brief overlooks that <u>Grokster</u> did **<u>not</u>** narrow the scope of contributory liability.  Rather, <u>Grokster</u> was creating a *new*, *alternative* path to secondary liability.  Therefore, all the Answering Brief points out is that the complaint did not allege facts stating a claim under <u>Grokster's</u> new, alternative legal theory of inducement liability.

The complaint didn't need to.

After all, the Supreme Court was "**<u>not</u>** displac[ing] other theories of secondary liability." <u>MGM Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 934 (2005).  Rather, <u>Grokster</u> was "enunciating a **new theory**" of copyright liability.  3 NIMMER ON COPYRIGHT § 12.04 [A][2][b][ii] (2022).

24

Before Grokster, there were *two* theories of secondary liability: "copyright law recognized [1] vicarious liability and [2] contributory infringement[.]" 3 NIMMER COPYRIGHT § 12.04[5][A].

Grokster "created an additional branch" of secondary liability. 3 NIMMER ON COPYRIGHT § 12.04[5][A]; GOLDSTEIN ON COPYRIGHT § 8.0 (3d ed. 2011 Supp.) (discussing "inducement branch"). Grokster introduced "a *new sub-species* of copyright infringement[.]" Goldstein v. Metro. Reg'l Info. Sys., 2016 U.S. Dist. LEXIS 106735, *17 (D. Md. Aug. 11, 2016).

Yet Grokster's new theory "did **not** displace" other theories like contributory infringement. Grokster, 545 U.S. at 934. Grokster simply "did **not** [...] reject a material contribution theory of liability." BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc., 149 F. Supp. 3d 634, 671 (E.D.V.A. 2015).

Grokster does not mean that "the *inducement* theory of contributory liability is the *only* theory of contributory liability[.]" Perfect 10, Inc. v. Giganews, Inc., 2014 U.S. Dist. LEXIS 183590, *17-18 (C.D. Cal Nov. 14, 2014). Rather the "*inducement theory*" is "an **alternative** to the '*material contribution' theory* of contributory liability.'" Id.

Indeed, "the Supreme Court in Grokster did **not** suggest that a court must find inducement in order to impose contributory liability under common law principles." Perfect 10, 508 F.3d at 1171 n.11.

25

That's why, even after Grokster "courts have continued to articulate **both inducement** and *material contribution* theories" of secondary infringement. BMG, 149 F. Supp. 3d at 671.

The Answering Brief simply misunderstands Grokster. It's not foreclosing prior legal theories of infringement but opening new doors and avenues to new theories. Mr. Greer did not need to rely on Grokster's new, alternative theory of secondary liability to state a viable claim for contributory infringement because he relied upon preexisting ones.

* * * * *

The Answering Brief's mistakes compound when it supposes that Grokster and Sony requires a "copyright owner to prove that the particular use was harmful or that if it became widespread it would negatively affect the market for the product[.]" Answering Br. 37.

Neither Sony nor Grokster imposed any such obligation in order to *state a claim* of contributory infringement. Neither Grokster nor Sony imposed additional elements to state a claim. Rather the elements enumerated in this Court's Diversey decision remain good law and are compatible with Grokster and Sony. See Diversey, 738 F.3d at 1204 (discussing elements and postdating Grokster).

Here, those elements are satisfied.

* * * * *

26

Defendants misconstrue Grokster. Grokster did not foreclose traditional theories of contributory liability. Nor did Grokster impose any additional elements to state a claim of contributory infringement.  Rather Grokster simply announced new, alternative "sub-species" of secondary liability.

Accordingly, Grokster imposes no barrier to Mr. Greer's claims of contributory infringement here.

### D.    Fair use is an affirmative defense not raised below, not developed by the Answering Brief, and not seriously at issue in this case.

The Answering Brief alludes to the *affirmative defense* of fair use for the very first time on appeal.  Answering Br. 35-37.  This issue should be easily addressed.

*First*, fair use was **not** raised below.  1 App. 51-60 (no fair-use argument in Rule 12(b)(6) motion).  Accordingly, whether fair use applies here is waived at least for this appeal.  See, e.g., Cummings v. Norton, 393 F.3d 1186, 1190 (10th Cir. 2005) ("[I]ssues not raised below are waived on appeal.").

*Second*, the Answering Brief does not conduct a fair-use analysis, but rather merely alludes to the defense.  See generally Answering Br. generally (nowhere addressing 17 U.S.C. § 107's four mandatory factors of a fair-use analysis but simply alluding to the defense).

Yet, "undeveloped issues perfunctorily adverted to in an appellate brief are waived[.]"  E.g., United States v. Kirk, 528 F.3d 1102, 1104 n.2 (8th Cir. 2008).  The "*settled appellate rule*" is that issues not developed in a brief "are deemed waived."  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); Wagner v. Teva Pharms. USA, Inc., 840 F.3d 355, 360 (7th Cir. 2016) ("waived").

*Third*, there is no serious argument to be made that these uses are fair uses.

As an affirmative defense, Defendants bear the burden.  E.g., Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994) ("[F]air use is an affirmative defense[.]").  Nothing in the complaint points to fair use.  Instead, it points to the opposite.

The first factor on the purpose and character of the use decisively weighs against a finding of fair use.  See 17 U.S.C. § 107(1).

The infringements here were done to harass and torment Mr. Greer.  The KiwiFarm community's purpose—"exploitation of the mentally handicapped"—is not a fair use. 1 App. 190.  Pointedly, these infringers' "bad faith" weighs "against" fair use.  Brammer v. Violent Hues Prods., LLC, 922 F.3d 255, 265 (4th Cir. 2019).  After all, "*fair* use presupposes good faith and fair dealing." Harper & Row, Publrs. v. Nation Enters., 471 U.S. 539, 562 (1985).

The other factors weigh against fair use as well.  See 17 U.S.C. § 107(2)-(4). Under the second factor, a "use is less likely to be deemed fair when the copyrighted work is a creative product."  Stewart v. Abend, 495 U.S. 207, 237 (1990).  Under the third factor, using the "entire" work "weighs strongly" against fair use.  Diversey, 738 F.3d at 1204.

Under the fourth factor, the record reveals overt attempts interfere with the "potential market" or "value" of the work.  17 U.S.C. § 107(4), see 1 App. 199 Ex. R ("**Upload it here so no one else accidentally gives Russell money.**").

29

The uses here are not remotely fair uses and, regardless, if Defendants want to raise this argument, they can do so on remand. For the purposes of the appeal, they have waived this point.

## IV.    THE ANSWERING BRIEF IS INCORRECT TO ASSERT THAT A *PRO SE* COMPLAINT MUST NOT ONLY STATE FACTUAL ALLEGATIONS BUT ALSO ARTICULATE AND CLARIFY LEGAL THEORIES.

The Opening Brief demonstrated that the operative complaint stated not only claims of _contributory_ copyright infringement, Opening Br. 31-52 (Section I.A), but _vicarious_ copyright infringement and _direct_ copyright infringement as well, Opening Br. 53-60 (Section I.B).

The Answering Brief, however, thinks that acceptance of sufficient _factual_ allegations to state a claim without a clear statement of the pertinent _legal_ theory would amount to "being a pro se litigant's ally and advocate."  Answering Br. 4, 13 ("sweeping role of advocate"), 43-44 (same in Section I.B).  Yet, the Answering Brief is incorrect.

In fact, the Answering Brief is betraying a basic misunderstanding of Twombly and Iqbal.  Twombly is about "_[f]actual_ allegations"—not statements of legal theories.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Twombly makes clear that stating "a claim requires a complaint [have] enough _factual_ matter"—not legal matter.  Id. at 556.  The same is true of Iqbal: it's about whether the pleading contains "sufficient _factual_ matter" to state a claim—not whether a legal theory has been pleaded.  Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).

31

The Supreme Court made this inescapably clear in <u>Johnson v. City of Shelby</u>, 574 U.S. 10 (2014) (per curiam).

In <u>Johnson</u>, the Fifth Circuit had affirmed a dismissal because of a lack of certain legal citation—"for failure to invoke […] §1983." <u>Id.</u> at 10. The Supreme Court "summarily reverse[d]." <u>Id.</u> at 11. That's because:

> Federal pleading rules call for "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. Rule Civ. Proc. 8(a)(2); **they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted**.

<u>Id.</u>

Likewise, <u>Johnson</u> confirmed that <u>Twombly</u> and <u>Iqbal</u>, the purported bases for dismissal concern factual allegations, not sufficient invocation of precise legal theories:

> Our decisions in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U. S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and <u>Ashcroft v. Iqbal</u>, 556 U. S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), are not in point, for they concern the *factual* allegations a complaint must contain to survive a motion to dismiss. A plaintiff, they instruct, must plead facts sufficient to show that her claim has substantive plausibility. Petitioners' complaint was not deficient in that regard. Petitioners stated simply, concisely, and directly events that, they alleged, entitled them to damages from the city. Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim.

<u>Id.</u> at 12 (italics in original). Mr. Greer, having informed Mr. Moon the factual basis for the complaint did not need to give legal theories in the pleadings as well.

32

Thus, the operative question is not whether the complaint expressly stated the words "vicarious" or "direct" copyright infringement but whether the operative claim stated factual allegations to that effect.  And, we don't need to guess hard. The District Court alluded to the fact that the complaint had stated a claim of vicarious infringement: "Mr. Greer may well have had a plausible cause of action under the Digital Millennium Copyright Act, or even a claim for vicarious copyright infringement."  Add. 19.

There's no real question that the facts of vicarious infringement—direct infringement, control, and profit—were alleged.  Opening Br. 53-60.  Thus, the only problem is that Mr. Greer did not expressly state that his *copyright infringement* claims included legal theories of vicarious infringement as well as contributory infringement.

He didn't need to.  The <u>Diversey</u> decision, relied upon extensively by the Opening Brief and Answering Brief tells us as much:

> We also liberally construe Diversey's pro se pleadings.  <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991).  Thus, if we 'can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, [we] should do so despite the plaintiff's failure to cite proper legal authority [and] his confusion of various legal theories[.]

<u>Diversey</u>, 738 F.3d at 1199 (internal brackets, quotations removed).  Thus, this Court should reverse and remand the District Court's requirement that a *pro se* invoke "proper legal authority" and clarify complex "legal theories."

33

## V.   THE ANSWERING BRIEF IGNORES THAT *PRO SE* LITIGANTS SHOULD BE AFFORDED A CHANCE TO CORRECT PURPORTED DEFECTS IN AN INITIAL COMPLAINT.

The Opening Brief cited a key aspect of procedural fairness owed to *pro se* litigants: "**pro se litigants are to be given reasonable opportunity to remedy the defects in their pleadings**."  Hall v. Bellmon, 935 F.2d 1106, 1110 n.3 (10th Cir. 1991); Opening Br. 60-61.

That never happened below.

Instead, the District Court entered judgment *without* giving an opportunity to amend.  Compare Add. 13 (order on motion to dismiss on Sept. 21, 2021) with Add. 14 ("dismiss[al] *with prejudice*" same day).  By simultaneously granting the motion to dismiss *and* entering judgment with prejudice, the District Court never gave a chance to remedy (what it viewed) as pleading defects.

The Answering Brief relies upon Tool Box, Inc. v. Ogden City Corp., 419 F.3d 1084, 1087 (10th Cir. 2005).  Answering Br. 46.  Yet, Tool Box, Inc. is plainly inapposite.  That case says nothing about *pro se* litigants and their procedural rights.  Of course it doesn't: Tool Box, **Inc.** involves a **corporate** plaintiff who, by its very nature, cannot appear *pro se*.  Thus, Tool Box, Inc. was not issuing holdings as to *pro se* procedural rights.

35

Rule 1 seeks to "secure the just, speedy, and inexpensive determination of every action[.]"  Fed. R. Civ. P. 1.

There's nothing just about dismissal without an opportunity to amend an initial *pro se* complaint.  Moreover, if Rule 15**(a)(2)** was intended to require a *motion*, that provision of the Rules would so state.  It doesn't.  By contrast, Rule 15**(d)** *does* require a motion.  Fed. R. Civ. P. 15(d) ("*On motion* and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading[.]").  Yet, Rule 15(a)(2) has no such motion requirement.  Fed. R. Civ. P. 15(a)(2) (nowhere mentioning motion).

Instead, Rule 15(a)(2) gives a clear command to the trial court: "**The court should freely give leave when justice so requires.**"  Fed. R. Civ. P. 15(a)(2).  That command was overlooked for an initial *pro se* complaint where amendment would not be futile.  This Court should reverse and remand with instructions to grant leave to amend.

36

## VI.    THE ANSWERING BRIEF DOES NOT MEANINGFULLY ADDRESS THE

IMPORTANT POLICY CONSIDERATIONS THAT ARISE FROM WILLFUL

DEFIANCE OF NOTICE-AND-TAKEDOWN.

This case may seem trivial.  It's a federal appeal about a couple of obscure

copyrighted works.

*First*, why is it here?  As explained above, see Section II, *supra*, this dispute

originates from willful defiance and weaponization of the notice-and-takedown

procedure.  In turn, that willful defiance left no other forum for this dispute—and

no other option for resolution than a *federal* lawsuit because of the federal courts'

exclusive subject-matter jurisdiction over copyright litigation.  28 U.S.C.

§ 1338(a).

*Second*, the doctrines here do not turn upon the significance of the works at

issue.  Nothing that in the doctrines of contributory infringement, vicarious

infringement, or direct infringement turn upon the popular significance and

salience of the works in question.

Yet, given its potential precedential importance, this appeal is remarkably

low stakes.  That's because there are several key limiting principles here that

would allow this Court to issue a narrow, published opinion that provides

important guidance to website operators.

37

This Court could reiterate and reaffirm robust incentives to comply with notice and takedown, without upsetting the applecart.  Indeed, it's the appeal's unique facts that function as limiting principles:

- Nearly all website operators scrupulously comply in good faith with notice-and-takedown requests, so a holding that reaffirms the scope of contributory liability here would not affect them due to their immunity from suit under the statutory safe harbor.

- On the flip side, almost no websites actively weaponize notice-and-takedown requests to exacerbate infringement, meaning that reversal here would be of almost no relevance to any site other than those that weaponize notice-and-takedown.  (Even those that *ignore*, negligently or intentionally, takedown requests wouldn't be implicated.)

Ultimately, the highly unique facts at issue here operate as clear limiting principles that this Court could employ to rule narrowly, *i.e.*, to reaffirm the importance of notice and takedown and to provide clarity on the scope of contributory and vicarious liability, without opening Pandora's Box.

The uniqueness of the facts and the relatively low stakes of the case make this case an ideal vehicle to reaffirm and reiterate the important policy incentives that undergird good faith behavior online.

38

*Third*, the notice-and-takedown procedure is vitally important.  Congress'
notice-and-takedown procedure isn't flawless.  It's by no means perfect.  Yet, it's
been remarkably successful at its core objectives:

- Notice-and-takedown's safe harbor has successfully **limited liability** for
  website operators that comply in good faith with the procedure of notice-
  and-takedown.

- Notice-and-takedown's takedown process has successfully **limited online
  infringements**, protecting vulnerable creators who need works taken offline
  to make a living.

- Notice-and-takedown's out-of-court process has successfully **limited** what
  might otherwise be a deluge of exclusively **federal litigation** seeking
  preliminary and permanent injunctions against the millions of infringements
  that occur online.

If one considers Congress' policy objectives—and also considers a counterfactual
reality where notice-and-takedown hadn't been put into law—it should hopefully
become clear that notice-and-takedown is a fundamentally important aspect of
copyright policy in the Digital Age.

Ultimately, the Answering Brief's relative silence on this issue speaks
volumes.  The Answering Brief takes positions that are at odds with the
fundamental goals of notice-and-takedown.

39

*Fourth*, in asking this Court to apply the elements of contributory liability in a radically different fashion than the Ninth Circuit has applied those very same elements, the Answering Brief is overlooking important national policy interests in copyright.

In copyright, national uniformity is especially important.

The Supreme Court has clarified that uniformity in copyright, like in patent, is a key reason they are creatures of federal law, not of state law.  See Bonito Boats v. Thunder Craft Boats, 489 U.S. 141, 162 (1989) ("fundamental purposes" underlying Constitution's Patent and Copyright Clauses to "promote national uniformity in the realm of intellectual property").

The Answering Brief doesn't give any such reasons.  Indeed, the Answering Brief is wholly bereft of reasons to think that the Ninth Circuit is wrong as a matter of law or that its longstanding application of well-established principles has been bad as a matter of policy.

* * * * *

Ultimately, the undersigned agrees that "This Court Should Not Adopt Sweeping Precedent in This Case[.]"  See Answering Br. 27.  Yet, the undersigned disagrees that reversal would be "Sweeping."  Reversal would merely entail a straightforward application of contributory-liability principles adopted by this Court.

40

By contrast, affirmance would be a sizeable disruption to longstanding policies undergirding notice-and-takedown.

## CONCLUSION

This Court should reverse and remand, with instructions to grant Mr. Greer leave to amend.

Date: October 21, 2022                    Respectfully submitted,

                                          */s/ Andrew Grimm*
                                          Andrew Grimm
                                          DIGITAL JUSTICE FOUNDATION
                                          15287 Pepperwood Drive
                                          Omaha, Nebraska 68154
                                          (531) 210-2381
                                          Andrew@DigitalJusticeFoundation.org

                                          *Attorney for Appellant*

## CERTIFICATE OF COMPLIANCE

This Reply Brief contains **6,487** words.

This Reply Brief was prepared in Microsoft Word using Times New Roman 14-point font.

Date: October 21, 2022                    Respectfully submitted,

*/s/ Andrew Grimm*
Andrew Grimm

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by submitting through the appellate CM/ECF.

Opposing counsel have been served by the notice of docketing activity they will receive through the system.


Date: October 21, 2022          Respectfully submitted,

                                */s/ Andrew Grimm*
                                Andrew Grimm

Russell Greer
PO BOX 46602
LAS VEGAS, NV 89114
801-895-3501
russellgreer30business@gmail.com
Pro Se Litigant

---

### IN THE UNITED STATES DISTRICT COURT FOR

### THE DISTRICT OF NEVADA

---

| | |
|---|---|
| **RUSSELL GREER,** an individual | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiff | |
| v. | |
| **Fremantle,** | Case No.: |
| Defendants | |
| | Judge |

## TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT ........................................................................................3

II.     STATEMENT OF FACTS ...........................................................................................3

III.    ARGUMENT .................................................................................................................4

        A.      Plaintiff Meets the Standards for a Preliminary Injunction. ....................................4

                1.      Plaintiff Has a Reasonable Likelihood of Success on the Merits. ...............4

                2.      Plaintiff will Suffer Irreparable Harm if the Injunction
                        is Not Granted. .............................................................................................20

                3.      The Equities Weigh Heavily in Favor of Granting the Requested
                        Relief…………………………………………………………………20

                4.      Granting the Preliminary Injunction Will Advance the Public
                        Interest ..........................................................................................................22

        B.      Plaintiff Should Not Be Required to Post a Bond. ................................................22

IV.     CONCLUSION .............................................................................................................22

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiff Russell Greer respectfully submits the following memorandum of law in support of his motion for a preliminary injunction requiring Defendant Fremantle Productions North America, Inc and Marathon Productions  to allow him onto the 2022 season of the television show, *America's Got Talent,* which begins filming in April 2022.

## I.                           NATURE OF THE MATTER

This is a case about whether the Americans with Disabilities Act allows a disabled man to request a modification of a rejection policy in order to participate in a reality television show. The summary of the matter is whether a Plaintiff can succeed on his claims and if he will be harmed by not having this injunction granted.

## II.                          STATEMENT OF FACTS

On February 08, 2021, Plaintiff Russell Greer, a man with a significant facial disability (termed "moebious syndrome") auditioned for the reality TV show, *America's Got Talent* (hereafter referred to as "AGT"). This audition was made after a year of preparation, in which Greer worked with a producer to record the song Greer would do for the show, which said recording took place in February of 2020. The song cost about 600 dollars to produce, including production, vocals and mixing.

Greer then spent the rest of 2020 practicing said song, with his sights set on February 2021 as his targeted audition date. He even purchased a keytar, which is a keyboard shaped like a guitar that you strap over your shoulders and play like a guitar, for his audition to stand out. Because of Greer's disability, he cannot audition by himself or sing his song. So he needed to hire accommodations to be his voice and to help showcase his song because that is his talent: writing pop music. Now if Greer were a classical musician, he wouldn't need to invest in an accommodation, as that doesn't require help, just piano playing and maybe a backing track. Or if he were a dancer, he wouldn't need an accommodation, just a backing track. But since Greer is a

3

pop songwriter, that requires vocals and given his paralysis, he cannot clearly sing or express himself in general. For example, he has been denied jobs in law firms because lawyers claimed they needed assistants who "can speak clearly."

Greer looked in various places in Utah and was not finding talented individuals or people he felt comfortable paying to act as his accommodation. So September 2020, he made a plan of moving out of Utah and to Las Vegas, Nevada. December 2020, he moved to Vegas to help him find accommodations because Vegas is one of the "Entertainment Capitals of the World" and because AGT offers its winner a show in Vegas and so Greer wanted to be close to Vegas on the chance he won the show or on the chance, he made a Vegas connection from the show.

The end of December 2020, Greer retained a talented singer, a drummer and a back up dancer that were all designed to accommodate Greer's act to help him convey his talent as a pop songwriter. At no point were they retained to form an actual band. They were retained to help convey Greer's talent.

February 8th, 2021, the band auditioned over a Zoom audition. The producer liked the audition and encouraged Greer to submit online videos. Greer did. Greer was so optimistic he would be selected. But he never was. He was severally hurt emotionally by the rejection and was hurt that everyone at Fremantle ignored his modification requests, which said requests were made in a six month period.

## III.                                   <u>ARGUMENT</u>

### A. **Plaintiff Meets the Standards for a Preliminary Injunction.**

The ADA authorizes injunctive relief to remedy acts of discrimination against persons with disabilities. *42 U.S.C. §121888(a)(1).* To obtain a preliminary injunction, plaintiff must demonstrate that he is likely to succeed on the merits and suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in his favor and a preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 374 (2008). As

4

established below, Plaintiff has made the requisite showing for issuance of the requested preliminary injunction.

1. **Plaintiff Has a Substantial Likelihood of Success on the Merits.**

   A. <u>Plaintiff's Title III Claim Will Succeed Because Plaintiff Can Successfully Prove All Four Elements of Claim to Prevail</u>

The ADA was created to protect disabled Americans in all facets of life, hence why Title III's protections range from movie theaters to restaurants to entertainment entities. Although there are no cases quite like Plaintiff's, where a disabled contestant asked for modification of a rejection, the ADA was meant to apply to all situations. "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'" *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206 (1998).

To prevail on a Title III reasonable modification ADA claim, Plaintiff must show: "(1) he is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability." *Fortyune v. American Multi-Cinema Inc*, 364 F.3d 1075 (9th Cir. 2004).

There is already controlling Supreme Court law that mirrors the present case: *PGA Tour, Inc v. Martin,* 532 U.S. 661 (2001). In that case, a golfer with a leg abnormality requested a modification to use a golf cart in his golfing tournament. The Supreme Court found that allowing carts didn't fundamentally alter the tournament. Plaintiff relies heavily on Martin, as the facts are nearly identical in a lot of ways: both plaintiffs wanted to compete in tournaments, but were disadvantaged in relevant ways that were important in competing in the game.

5

Although the facts are identical in many ways, the two cases do differ as well. Imagine if *Martin's* facts were changed to match the present case. What if Martin had purchased a golf cart specifically for the tournament, before writing requests to PGA, and showed up and explained he needed the cart, and although he was told he was talented at golfing by PGA reps, PGA never invited him back and left him in the dark and he spent the next several months trying to get reconsideration and trying to explain to PGA that he went through a lot of effort buying his cart for the tournament? What if the question at the heart of the case of PGA shifted from: "can the walking rule be excepted to allow carts, per the ADA?" to "is it discrimination under the ADA for a PGA rep to overlook that Martin invested in his cart to help him compete and not return his requests for modification to join the competition?" Of course. Respectfully, there is no reason this Court should find otherwise with the present case.

### 1. Plaintiff Has a Disability that the ADA Covers

The term "disability" means, with respect to an individual – a physical or mental impairment — "that substantially limits one or more major life activities of such individual. " *42 U.S.C. § 12102(1)(A)*. "For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, **eating**, sleeping, walking, standing, lifting, bending, **speaking**, breathing, learning, reading, concentrating, thinking, **communicating**, and working." Id. *§ 12102(2)(A)*.

Per the above cited statute, Greer has a disability because it substantially limits his speaking, eating and being in public. The official term for his disability is "moebious syndrome". Essentially, Greer's 7th cranial facial nerves are paralyzed and so he can't close his mouth, which makes his communication slurred and makes being out in public difficult because strangers stare at him like he's a circus exhibit. Additionally, eating is hard, as is swallowing. The paralysis also affects his eyes and he can't move them sideways. He also can't smile. His face is essentially frozen in a droopy, open position. He often drools, which he can't help. He slurps when he talks.

6

There is no argument that his disability doesn't put him at a disadvantage with expression and communication. *Moebious Syndrome Foundation.* (2021). ([https://moebiussyndrome.org/who-we-are/mission-and-history/](https://moebiussyndrome.org/who-we-are/mission-and-history/)).

Therefore, Greer has a disability, per the ADA, that put him at a disadvantage with auditioning.

### 2. Defendants Maintain a Private Entity & a Public Accommodation

Fremantle and Marathon are places of public accommodation within the meaning of Title III because Defendants operate a "place of exhibition or entertainment". 42 U.S.C. § 12181(7)(C). *Rendon v. Valleycrest Productions, Ltd.*, 294 F.3d 1279 (11th Cir. 2002). Even though the audition was not done at a physical location that Fremantle owns or leases or operates, the Zoom session created a nexus to the physical public accommodation and its privileges that are at the heart of the case. *Id. National Federation of the Blind v. Target Corp,* 452 F. Supp. 2d (2006). ("Courts have held that a plaintiff must allege that there is a "nexus" between the challenged service and the place of public accommodation.").

Therefore, Defendants qualify as a public accommodation.

### 3. Defendants Employed a Discriminatory Practice

As Greer stated in his Second Amended Complaint, his contention lies with the discriminatory actions and practices of the producers for not following established anti-discrimination policies, previously created with the Department of Justice, and that were apparently in existence as a broad company policy. (Doc 4, Paragraphs 79-85). Said policies stated that Defendant production companies would allow disabled contestants equal access and equal participation and equal opportunities. The producers discriminatory practice in this instance was overlooking the accommodations Greer put in with this audition and not affording Greer equal opportunities to the privileges and advantages that AGT was offering.

The rejection had a disparate impact on him because unlike other contestants who were rejected (or selected), Greer had to put in extra effort to even be on equal footing. Greer's modification request letter, written by the attorney, even argues disparate impact[1]. This disparate impact is even backed up by *Martin,* which uses disparate impact language. "The other golfers have to endure the psychological stress of competition as part of their fatigue; Martin has the same stress plus the added stress of pain and risk of serious injury. As he put it, he would gladly trade the cart for a good leg. To perceive that the cart puts him—with his condition—at a competitive advantage is a gross distortion of reality." PGA v. Martin, 532, US 661 (2001). The pain Greer suffers from coping with his disability and a rejection is "undeniably greater than the fatigue his able-bodied competitors endure from walking the course." *Id*., at 1251.

As stated in paragraph 90 of Doc 4: what good is it that disabled contestants can go to preliminary auditions, but few ever advance? That seems to be a very narrow view of participation for Defendants to allow only preliminary participation. Sure, Defendants can point to a handful of disabled contestants who have been on their show, the last 16 seasons of AGT, but, "The fact that [a company] employs fifteen epileptics is not necessarily probative of whether he or she has discriminated against a blind person." *Prewitt v. United States Postal Service* (5th Cir. 1981). Most importantly, those contestants, although disabled in their own way, could still communicate clearly, which is what Greer's disability limits: communication and what is essential for a show like AGT.

When Greer wrote that he had a disability on the informational forms he was given to fill out at the audition and when he wrote that his act was to accommodate his disability, that should have triggered a deeper analysis by the producers of ensuring that their policies for disabled people to go on the show and participate were met. That should have tipped them off that his act was not a regular act, but rather that of a disabled person and strived to ensure he had equal

---

[1] The attorney referred to it as "indirect discrimination" on page 13 of the Second Amended Complaint.

opportunities to compete in front of the celebrity judges. This is a similar concept to employment law cases where employers are required to conduct a deeper analysis for an applicant with a disability. "Employer bears responsibility for the 'breakdown' in the interactive process." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir.1996). (Plaintiff triggered the interactive process when he informed Edison of his need for an adjustment by indicating that he was hard of hearing on his application.) *Id*.

Nothing said by Defendants indicated that they knew his efforts were to put him on equal footing. If they did know and ignored it, again, it went against their policy of providing equal opportunities for disabled contestants. It's useless to have stated anti-discrimination policies and not implement them. ("It is well established that it is insufficient for an employer simply to have in place anti-discrimination policies; it must also implement them." *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 517 (9th Cir.2000)). How is not following this policy any different than a company that says it will hire more women or more racial minorities and doesn't or companies that deprive minorities of opportunities? *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743-44 (7th Cir. 1999) (holding that it's unlawful to deprive employment opportunities by limiting, segregating, or classifying employees because of race). Looking to race cases for ADA claims is helpful because the ADA "echoes and expressly refers to Title VII, and because the two statutes have the same purpose. Courts confronted with ADA claims have also frequently turned to precedent under Title VII." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001).

To further prove a discriminatory practice, AGT's network, NBCUniversal, has stated in May 2021 that it will strive to bring on more disabled contestants. *NBCUniversal vows auditions for actors with disabilities.* AP News. (2021). (https://apnews.com/article/technology-entertainment-a94d133c11d45d048970816f92e1667b). NBC's Executive VP has stated, "The company is committed to creating content that authentically reflects the world we live in, and

9

increasing opportunities for those with disabilities is an integral part of that." The producers for Marathon and Fremantle went against their own network's strive for inclusion and denied Greer an opportunity when he clearly showed he had a good and unique act.

By not following policies of affording opportunities to disabled contestants, per their policy, the producers indirectly discriminated against Greer and it had a disparate impact, as shown. Therefore, Greer has shown a discriminatory practice.

### 4. Defendants Failed to Make a Reasonable Modification that Was Necessary

The statutory text of § *12182(b)(2)(A)(ii)* contemplates three distinct inquiries for determining whether a requested modification to a public accommodation's procedures is required: (1) whether the requested modification is "reasonable"; (2) whether the requested modification is "necessary" for the disabled individual; and (3) whether the requested modification would "fundamentally alter the nature" of the public accommodation. *A.L.* , 900 F.3d at 1293 (quoting *Martin* , 532 U.S. at 683 n.38, 121 S.Ct. at 1893 ).

As stated in Greer's complaint, the requested modification that Greer wanted, that Fremantle ignored, was to be let onto the celebrity audition round of the show without preliminary auditioning again. The modification was reasonable, necessary and it wouldn't create an unfair advantage.

### I.      Modification Is Necessary

To show whether a modification is necessary, "[p]ublic accommodations must start by considering how their facilities are used by nondisabled guests and then take reasonable steps to provide disabled guests with a like experience comparable to that of nondisabled patrons." *Baughman v. Walt Disney World Co* ., 685 F.3d 1131 (9th Cir. 2012).

This holding fits right in with Greer's complaint because Defendants did not consider that disabled contestants may have to use extra accommodations to audition; that a contestant with a

10

facial disability, who has to invest in musical accommodations to help him, isn't the same as a band that's been together for years. Reasonable steps would have been Defendants seeing how Greer used his band as an accommodation for him to audition and seeing that he actually had talent for him to proceed onto the celebrity audition round. But that scenario has long past and that is why Greer approached Fremantle with a modification request when his attorney wrote them a letter of April 2021 and it went unanswered..

The modification was necessary because the accommodations he put forth would have allowed him to compete on the show with "equal footing" and so the modification to the policy to allow Greer to proceed to the celebrity audition round would be necessary to allow Greer equal participation and opportunities at obtaining the privileges and advantages that Defendants was offering, per their policies. As stated, a preliminary audition seems to be a very narrow view of equal opportunities and equal participation. This modification was necessary because it would be redundant to make Greer gather his accommodations and audition once again without any assurance that he can proceed on the show. The modification would be necessary because he isn't in the same financial position to audition again. As stated, an injunction would give assurance to Greer's accommodations that he can go on the show for them to help him.

While letting some disabled contestants advance onto the celebrity audition round may seem preferential, the 9th Circuit has addressed this concern. For example, unlike non-disabled patrons, disabled individuals are permitted to bring service animals into public accommodations. Such concessions, while certainly "preferential" in the sense that they confer upon disabled patrons a benefit denied to others, are not only contemplated by the ADA, they are required. *Fortyune* v. American Multi-Cinema, Inc., 364 F.3d 1075 (9th Cir. 2004). Or in the case of *Fortyune*, when a disabled patron sued AMC's policy to sit next to his companion. While every movie theater attendee knows that not sitting next to your spouse or partner is bound to happen, the relief the patron sought was necessary.

The relief Plaintiff sought was necessary as well. There has been a historic exclusion of disabled people from places of public accommodation and places of participation and based on the effort he put in as a disabled songwriter and the fact that Defendants have stated they will provide opportunities for disabled contestants, it was necessary to let him advance to the audition round in front of the judges. To not do so, just like not letting a disabled person sit next to their companion in a theater seat or letting a disabled person have a service animal in a store or not letting a disabled golfer use a golf cart, was a discriminatory practice by the producers of AGT.

Further, the modification was necessary because as stated, opportunities for disabled contestants are rare. Whereas an able-bodied contestant can have unlimited try outs and auditions by trying out for various shows, having a facial paralysis limits Greer's opportunities. As stated in the complaint, AGT was probably the only musical show Greer could use his accommodation because most other shows are single contestants and not groups. If other shows existed that were similar to AGT, Greer admits he would try out for those shows. But AGT has the market for group talent shows. Without a modification allowing Greer to compete on the show with his accommodations, Greer would be denied the privileges of auditioning on any reality show.

The ADA's implementing regulations are designed "to place those with disabilities on an equal footing, not to give them an unfair advantage." *Kornblau v. Dade County*, 86 F.3d 193, 194 (11th Cir. 1996). See also *Riel v. Elec. Data Sys. Corp*., 99 F.3d 678, 681 (5th Cir. 1996) (noting that "an employer who treats a disabled employee the same as a non-disabled employee may violate the ADA"). That is precisely what Greer's injunction accomplishes. Because Greer's sought-after remedy merely gives force to a reasonable accommodation, any protestation that the injunction is unduly preferential would fail as a matter of law.

2.      **Modification Is Reasonable**

Reasonableness is generally a fact-specific inquiry, asking whether the specific modification is "reasonable under the circumstances." *Martin* , 532 U.S. at 688, 121 S.Ct. 1879.

A modification is reasonable if it is reasonable on its face, i.e., "ordinarily or in the run of cases."

*J.D. ex rel. Doherty v. Colonial Williamsburg Foundation* , 925 F.3d 663, 674 (4th Cir. 2019).

 The modification was reasonable because Greer was only asking for the modification to be applied as to him, on a case-by-case basis, and not generally to all disabled people who audition. The statute even allows for modifications for "individuals with disabilities" and not for all people or for class actions. This is backed up by *Martin,* which pointed to the lack of lawsuits asking for carts on the fields. Further, the *Martin* court states: "nowhere in *§ 12182(b)(2)(A)(ii)* does Congress limit the reasonable modification requirement only to requests that are easy to evaluate." *Id* at footnote 53.

Since Fremantle made the agreement with the DOJ in 2011, there have been zero lawsuits filed by disabled contestants suing for modifications for contestants to be placed on Defendants shows. It is unlikely and highly doubtful that granting this modification will open a flood gate of litigation. If that were true, lawsuits would have been filed after the 2011 agreement.

The modification request would be reasonable because groups frequently audition on the show. Contrast this case with Murphy, where a skier's modification to have her husband accompany her was not necessary to provide her with equal enjoyment. Murphy v. Bridger Bowl , 150 F. App'x 661, 663 (9th Cir. Oct. 5, 2005) (holding that cognitively-disabled skier's requested modification for ski resort to allow her husband to accompany her on a ski bike was not "necessary" to provide her with full and equal enjoyment of facility). See also Logan v. Am. Contract Bridge League, 173 Fed.Appx. 113, 117 (3d Cir.2006) (citing *Martin* and stating that "Logan admits that the Logan Deck is not necessary to give him access to ACBL competitive bridge; he merely claims that without it, he `can't play to the maximum of [his] potential.' ... Logan has failed to set forth a meritorious claim"). Both cases differ from Greer's because the modification is necessary and reasonable for Greer to convey his talent as a songwriter, and without his modification, he cannot compete on the show, as a modification request would assure

13

his accommodations they can help him without thinking their time will be wasted, where both cases could still compete by themselves or with a regular deck of cards.

Further, it's reasonable to allow Greer's modification request, as he clearly had talent, clearly showed effort and had an awesome story to boot. While each disabled person may feel their story and hardship warrants a modification exception to go on the show, each request should be analyzed on a case by case basis. His efforts are clearly distinguishable from an individual with a disability who auditions by himself, in a dark room and one can clearly tell there is no effort on the auditioner's part. As *Martin* states: requests should be made on an individualized basis. "Martin's claim thus differs from one that might be asserted by players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity. In such cases, an accommodation might be reasonable but not necessary." *Id* at 682.

 Greer has shown why his modification is both reasonable and necessary.

### 3.  Modification Would Not Create an Unfair Advantage

 Title III of the ADA "requires without exception that any policies, practices, or procedures of a public accommodation be reasonably modified for disabled individuals as necessary to afford access unless doing so would fundamentally alter what is offered." *Martin* , 532 U.S. at 688, 121 S.Ct. at 1896. The defendant operator of the facility or public accommodation bears the burden of proof on the "fundamental alteration" inquiry. A "fundamental alteration" is a "modification to an essential aspect of a public accommodation's program." *Halpern v. Wake Forest Univ. Health Scis .*, 669 F.3d 454, 464 (4th Cir. 2012).

The only possible fundamental alteration argument Fremantle could possibly raise is Greer being allowed to bypass the cattle call audition. But as stated in Greer's Second Amended Complaint, on page 22, footnote 6, couldn't it be argued that Defendants' producers themselves are fundamentally altering the competition by allowing acts to bypass the preliminary auditions? By them allowing acts to bypass preliminary auditions, that fact alone belies the notion that

14

preliminary auditioning is an essential element of the show. See DOJ's Amicus Brief in support of *Martin*. (https://www.justice.gov/crt/martin-v-pga-tour-inc). (Says: "Moreover, the PGA itself permits competitors to use carts in some of its tournaments, including the senior tournaments and the early rounds of the qualifying tournament. **That fact alone belies** *t*he notion that walking is an essential element of competitive golf.").

    It is common knowledge that Fremantle's producers frequently bring contestants on without preliminary auditioning. Season 2 AGT country singer Julienne Irwin told Radar Online: "When I made it to the Top 20, I couldn't believe I was the only one that really came from an open call audition. I was the only one that hadn't been a professional performer." *Proof America's Got Talent is Totally Fake.* (2017).*(* https://www.nickiswift.com/28827/reasons-americas-got-talent-totally-fake/?utm_campaign=clip). In a book titled, '*Inside AGT: The Untold Stories of America's Got Talent'* (2013), many of the show's former contestants claimed that contestants were recruited before the start of the show's much-touted audition season. Thus, although the show tries to give audiences the impression that it holds open and fair auditions, in reality, even the contestant selection process is predetermined. https://thecinemaholic.com/americas-got-talent-real-or-scripted/. Not only are some contestants recruited from YouTube and comedy clubs, but they are sometimes cross over from the other international branches of the show. For example, the act, Sacred Riana was in Season 2 of Asia's Got Talent and recently appeared on Season 13 of America's Got Talent. *Id.*

    Further proof that a modification bypassing the preliminary audition would not fundamentally alter the show is that Fremantle has already made agreements that it would allow modifications and exceptions to allow disabled people to become contestants on their shows, e.g. TPIR. The Price is Right (TPIR). Settlement Agreement Under the ADA Between USA, Fremantle and CBS. ADA.gov (2011). (https://www.ada.gov/price-is-right.htm). With Fremantle agreeing that it would allow contestants to make exceptions to go on one of their shows to

15

compete, there is no fundamental reason or no fundamental alteration that that policy can't be applied equally to Fremantle's other shows. Since Marathon is a subsidiary, they would follow said policies. Further, the show's network NBC has said they would strive for more disabled people.

The Supreme Court held in *Martin* that the use of carts, or waiver of the "walking rule," was not inconsistent with the "fundamental character" or "essential attribute" of the game of golf which was "shotmaking—using clubs to cause a ball to progress" to a "hole some distance away with as few strokes as possible" based on historical references to the rules of golf dating back centuries, none of which referenced motorized carts until the 1950s as a means of speeding up play and generating revenue. Id. at 683-85, 532 U.S. at 683, 121 S.Ct. at 1893-95. In addition, the Supreme Court rejected the defendant-tournament's "outcome affecting" argument because there was a lack of evidence that the "walking rule" caused more fatigue for the average pro player in a tournament, with rests and refreshments, than for plaintiff Martin, who "endure[d] greater fatigue even with a cart." Id. at 686-88, 532 U.S. at 687, 690, 121 S.Ct. at 1895-97.

Likewise, the modification Greer is seeking is not inconsistent with the policies and agreements Fremantle has previously established. These policies have established a "fundamental character" that Fremantle understands the plights of disabled contestants and is open to making exceptions and modifications. A modification to go onto the celebrity audition round of the show, without having to go through the preliminary audition again, is completely in line with these previously agreed upon policies.

Further, there is no "outcome affecting" concerns because Greer would be starting at the same audition spot as every other contestant brought onto the show, whether those contestants are recruited by Defendants or selected at the cattle call audition. There is no outcome affecting concern because the celebrity round is essentially a second audition. The judges buzz off those acts they don't like and allow the acts they do like to proceed onto the other rounds of the show.

16

It's not giving Greer a head start or an unfair advantage because he would be starting at the same position as every other contestant. Greer would still be allowed to be buzzed off and still be allowed to abide by any other rule the other contestants have to follow.

As stated previously in points 1 & 2, allowing Greer onto the celebrity audition round would be giving Greer a chance to compete for the show's privileges and advantages, in accordance to Defendants' policies. With it being shown that the modification is necessary, the modification is reasonable and that there is no fundamental alteration, Greer has successfully shown he has satisfied a Title III discrimination claim.

**2.        Plaintiff will Suffer Irreparable Harm if the Injunction is Not Granted.**

Irreparable harm may be presumed when the offending party engages in acts or practices prohibited by federal statute that provides for injunctive relief. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Smallwood v. National Can Co*., 583 F.2d 419, 420 (9th Cir. 1978) ("[T]his is an injunction issued in response to a statutory provision, and irreparable harm is presumed from the fact of the violation of the Act."). The ADA explicitly provides for injunctive relief. *42 U.S.C. § 12188(a)*. (ADA incorporates the remedies and procedures set forth in the Civil Rights Act of 1964).

Furthermore, Plaintiff can demonstrate that he has and will continue to suffer irreparable harm. As was the case with the plaintiff in *Enyart v. National Conference of Bar Examiners*, in the absence of a preliminary injunction, he would "lose the time [he] had invested in preparation, [would] suffer a serious setback in [his] efforts to practice [his] chosen profession, [would] face the prospect of taking and preparing for the exam a third time, and [would] suffer the professional stigma of failure because of [his] medical disability." *Enyart v. National Conference,* 630 F.3d 1153 (9th Cir. 2011)

Likewise, Plaintiff Greer would lose the money and time he invested in his audition and the accommodations he hired to help him. Greer would suffer a serious setback in his efforts to get

17

into his desired profession of the entertainment industry. Greer would face the prospect of preliminary auditioning again with no guarantee of going onto the show. Lastly, Greer would suffer stigma of failure because of his disability. Of knowing his accommodations he put in weren't enough to get him onto AGT.

### 3.    The Equities Weigh Heavily in Favor of Granting the Requested Relief.

The harm an injunction would cause Defendants is non-existent. As shown, no previous people have sued Defendants to go on their shows. Defendants have already formed an agreement with the DOJ that it would seek to have more disabled contestants on their shows. There is no cost of allowing Greer on the show as compared to a non-disabled contestant. In fact, Defendants are putting up more money fighting this lawsuit than any money that would go towards allowing a modification. So Defendants suffers no harm and thus the equities weigh in favor of Plaintiff.

### 4.    Granting the Preliminary Injunction Will Advance the Public Interest.

Congress has made clear in enacting the ADA that the public interest lies in the eradication of discrimination against persons with disabilities, declaring that the ADA's purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004). In the context of preliminary injunctions, courts have found that "[t]he public interest is clearly served by eliminating the discrimination Congress sought to prevent in passing the ADA." *See* 42 U.S.C. § 12101.

Furthermore, the ADA is intended to address the various forms of discrimination encountered by individuals with disabilities, including "the failure to make modifications to existing facilities, policies and practices". Accordingly, granting the injunctive relief requested by Greer is consistent with the anti-discrimination mandate of the ADA and therefore serves the public interest.

Finally, although Greer is not challenging the speech or casting of AGT, only their failure to make a modification, it is still important to bring up that diversity on television is a compelling public interest. Since reality TV is a reflection of what the American viewership perceives to be reality, granting the injunction will advance the public interest of having diversity on television and will show the American public that people with facial deformities have talent. People "use television to acquire values, beliefs, concepts, attitudes, and basic socialization patterns," which means that negative stereotypes about…minorities or the simple exclusion of said minorities from depictions of "normal" life on television can harm "minorities' self-concept." Brigitte Vittrup & George W. Holden, *Exploring the Impact of Education TV and Parent-Child Discussions on Children's Racial Attitudes,* 11 ANALYSES Soc. IsSUES & PUB. POL'Y 82, 85 (2011). NBC and Defendants seem to agree with this public interest, given their prior established policies.

**B. Plaintiff Should Not Be Required to Post a Bond.**

This Court has the discretion to issue a preliminary injunction without requiring Plaintiff to post bond. Plaintiff respectfully submits that no bond should be required in this case, given his individual situation and the minimal expense (if any) that would be incurred by the Defendants pending the outcome of this case.

**Conclusion**

Plaintiff concludes that he has shown that he has met all four standards for a preliminary injunction. He has shown that the public has an interest in this injunction. He has shown he will suffer greater harm than Defendants.

For the foregoing reasons, Greer respectfully requests that the Court grant his Motion for Preliminary Injunction, which enjoins Fremantle to allow Russell Greer on the 17th Season of AGT to audition in front of the celebrity judges, which said filming starts in April 2022.

Respectfully

DATED:  January 28th, 2022

Respectfully submitted,

By:

Russell Greer

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing AMENDED PRELIMINARY INJUNCTION with the Clerk of the Court by using email.

I certify that the following participants in this case are registered electronic filing systems users and will be served electronically.

Served are:

Joel Schwarz: joel@h1lawgroup.com

Molly Lens: mlens@omm.com

Zachary Dekel: zdekel@omm.com

Counsel for Fremantle and Marathon.

# Russell Greer's Litigation History Document:

2015:

Greer v. Walters: Reno Small Claims

Outcome: Court sided with defendant because witness did not show up to court to verify a document witness had signed was his to prove fraud on the part of defendant.

2016:

Greer v. Swift: SLC Small claims.

Outcome: dismissed Based on jurisdiction and duty issues.

2017:

Greer v. Grande:

Outcome: dismissed on jurisdiction and duty.

2018:

Greer v. Moon (ex parte motion for restraining order): Third District Court.

Outcome: jurisdiction and third party conduct issues. Not pursued fully.

Greer v. Swift (II) (middle district of Tennessee)

Outcome: dismissed for failure to serve.

2020:
Greer v. Swift (iii) (middle district of Tennessee)

Outcome: could not serve, plaintiff walked away from the case because he realized suing Swift was hurting his career and he needed to move on with his life.

2020: Greer v. Moon (district of Utah)

Outcome: ongoing

2022: Greer v. Fremantle (district of Nevada)

Outcome: dismissed because of arbitration agreement in place that prevented
litigation.  Parties agreed to not pursue appeals or other costs.

2023: Greer v. Gilman (Humboldt, Nevada District Court)

Outcome: dismissed for standing

Plaintiff had also filed motions for protective orders against Kiwi Farms users, but
because they are cowards hiding behind fake names, he could never serve them.