EXHIBIT
B

No. 24-171

IN THE

# Supreme Court of the United States

COX COMMUNICATIONS, INC., *et al.*,

*Petitioners,*

*v.*

SONY MUSIC ENTERTAINMENT, *et al.*,

*Respondents.*

**ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE FOURTH CIRCUIT**

## BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, AMERICAN LIBRARY ASSOCIATION, THE ASSOCIATION OF RESEARCH LIBRARIES, AND RE:CREATE IN SUPPORT OF PETITIONERS AND REVERSAL

MICHAEL BARCLAY
  *Counsel of Record*
MITCHELL L. STOLTZ
BETELHEM Z. GEDLU
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
michael@eff.org
(415) 436-9333

*Attorneys for Amici Curiae
  Electronic Frontier Foundation,
  American Library Association,
  the Association of Research Libraries,
  and Re:Create*

383536



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

*i*

## TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . . iv

STATEMENT OF IDENTITY AND INTEREST
    OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . .1

INTRODUCTION AND SUMMARY OF
    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

I.   THE COURT SHOULD APPLY
     TRADITIONAL PATENT LAW
     DOCTRINES TO DEFINE AND
     LIMIT SECONDARY LIABILITY IN
     COPYRIGHT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    A.  The Copyright Statute Does Not
       Include Provisions for Secondary
       Liability, So This Court Has Historically
       Looked to The Patent Statute for
       Guidance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    B.  Contributory Infringement Requires
       More Than a "Material Contribution.". . . . .5

    C.  Actively Inducing Infringement Also
       Has Limitations. . . . . . . . . . . . . . . . . . . . . . . .9

*ii*

*Table of Contents*

*Page*

    1.  Limitations On Active Inducement
Where the Product or Service
Has Substantial Noninfringing
Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    2.  Other Limitations on Active
Inducement . . . . . . . . . . . . . . . . . . . . . . . 12

  D.  There Is No Statutory Framework
for Imposing Statutory Damages in
Secondary Liability Cases Under
Either the Patent or Copyright
Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.  THE COURTS OF APPEALS
HAVE IMPROPERLY EXPANDED
CONTRIBUTORY COPYRIGHT
INFRINGEMENT BEYOND ANY
CONGRESSIONAL INTENT . . . . . . . . . . . . . 16

  A.  The Fourth Circuit Decision and
Previous Circuit Court Opinions Have
Gotten Contributory Infringement
Entirely Backwards . . . . . . . . . . . . . . . . . . 16

  B.  The Courts of Appeals Have
Improperly Usurped Congress's Role
in Ensuring That Copyright Serves
Its Constitutional Purpose. . . . . . . . . . . . . 19

*iii*

*Table of Contents*

*Page*

III. IMPOSING LIABILITY ON INTERNET SERVICE PROVIDERS FOR PROVIDING INTERNET ACCESS UNDER CIRCUMSTANCES SUCH AS THIS CASE WOULD CAUSE DISPROPORTIONATE HARM TO THE PUBLIC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

   A.  The Fourth Circuit's Rule Would Result in Innocent and Vulnerable Users Losing Essential Internet Access . . . . . . .22

   B.  Losing Internet Access Is an Extreme Public Harm . . . . . . . . . . . . . . . . . . . . . . . . . . .29

      1.  Internet Access Is Essential to Participation in Economic, Cultural, and Social Activity . . . . . . . . . . . . . . . . .29

      2.  The Consequences of Losing Internet Access Are Severe and Disproportionate . . . . . . . . . . . . . . . . . .30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

*iv*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*ACCO Brands, Inc. v.*
  *ABA Locks Manufacturer Co., Ltd.,*
  501 F.3d 1307 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . .11

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
  377 U.S. 476 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.,*
  881 F.3d 293 (4th Cir. 2018) . . . . . . . . . . . . . . . . .18, 23

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
  539 U.S. 23 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Digital Sin, Inc. v. Does 1–176,*
  279 F.R.D. 239 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . .25

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
  363 F.3d 1263 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . .12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Flava Works, Inc. v. Gunter,*
  689 F.3d 754 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . .19

*Fogerty v. Fantasy, Inc.,*
  510 U.S. 517 (1994) . . . . . . . . . . . . . . . . . . . . . . . . .20, 21

*v*

*Cited Authorities*

*Page*

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
  76 F.3d 259 (9th Cir. 1996)........................17

*Fortnightly Corp. v. United Artists Television, Inc.,*
  392 U.S. 390 (1968)...........................21

*Fujitsu Ltd. v. Netgear Inc.,*
  620 F.3d 1321 (Fed. Cir. 2010)...................12

*Gershwin Publ'g Corp. v.*
*Columbia Artists Mgmt., Inc.,*
  443 F.2d 1159 (2d Cir. 1971) ...........9, 17, 18, 19

*Global-Tech Appliances, Inc. v. SEB S. A.,*
  563 U.S. 754 (2011)..........................9, 13

*Kalem Co. v. Harper Brothers,*
  222 U.S. 55 (1911)...........................16, 17

*Limelight Networks v. Akamai Techs.,*
  572 U.S. 915 (2014)............................21

*Lowry's Reps., Inc. v. Legg Mason, Inc.,*
  302 F. Supp. 2d 455 (D. Md. 2004) ...............15

*Metro-Goldwyn-Mayer Studios Inc. v.*
*Grokster, Ltd.,*
  545 U.S. 913 (2005)...............5, 7, 9, 11, 13, 19

*vi*

*Cited Authorities*

*Page*

*Mirror Worlds, LLC v. Apple Inc.,*
  692 F.3d 1351 (Fed. Cir. 2012). . . . . . . . . . . . . . . . . . .12

*Oak Indus., Inc. v. Zenith Elecs. Corp.,*
  697 F. Supp. 988 (N.D. Ill. 1988). . . . . . . . . . . . . .10, 12

*Packingham v. North Carolina,*
  582 U.S. 98 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984). . . . . . . 5, 6, 7, 13, 17, 18, 19, 21, 22

*Tegal Corp. v. Tokyo Electron Co.,*
  248 F.3d 1376 (Fed. Cir. 2001)  . . . . . . . . . . . . . . .12, 13

*Twentieth Century Music Corp. v. Aiken,*
  422 U.S. 151 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*UMG Recordings, Inc. v.*
*Grande Commc'ns Networks, LLC,*
  384 F. Supp. 3d 743 (W.D. Tex. 2019). . . . . . . . . 23, 26

*United States v. Ellis,*
  984 F.3d 1092 (4th Cir. 2021). . . . . . . . . . . . . . . . . . . .29

*United States v. Hamilton,*
  986 F.3d 413 (4th Cir. 2021). . . . . . . . . . . . . . . . . . . . .29

*United States v. LaCoste,*
  821 F.3d 1187 (9th Cir. 2016). . . . . . . . . . . . . . . . .29, 30

*vii*

*Cited Authorities*

*Page*

*Warner-Lambert Co. v. Apotex Corp.,*
   316 F.3d 1348 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . .11

*Zomba Enters., Inc. v. Panorama Recs., Inc.,*
   491 F.3d 574 (6th Cir. 2007). . . . . . . . . . . . . . . . . .14, 15

## Constitutional Provisions

U.S. Const., art. I, § 8, cl. 8 . . . . . . . . . . . . . . . . . . . . . . .19

## Statutes

17 U.S.C. § 102(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

17 U.S.C. § 111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

17 U.S.C. § 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

17 U.S.C. § 504(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

35 U.S.C. § 154 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

35 U.S.C. § 271(b). . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 9, 10

35 U.S.C. § 271(c) . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 6, 9, 10

35 U.S.C. § 284 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

35 U.S.C. §§ 131-134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

47 U.S.C. § 1701(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*viii*

*Cited Authorities*

*Page*

**Legislative Materials**

H.R. Rep. No. 82-1923 (1952) . . . . . . . . . . . . . . . . . . . . . . . .9

S. Rep. No. 82-1979 (1952) . . . . . . . . . . . . . . . . . . . . . . . . .9

**Other Authorities**

*2020 Broadband Deployment Report*,
   35 FCC Rcd. 8986 (Apr. 24, 2020) . . . . . . . . . . . .27, 28

*AT&T Copyright Alert Program*, AT&T Bus.. . . . . . . .23

*Bridging the Digital Divide for Low-Income
   Consumers*, 34 FCC Rcd. 10886 (Nov. 19, 2019) . . . . . .28

Cierra Noffke, *My Internet Provider Is a
   Monopoly and Yours Probably Is Too. Here's
   What it Means for Your Broadband Bill*,
   CNet (May 29, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . .27

Colby Leigh Rachfal, Cong. Rsch. Serv.,
   *COVID-19 and Broadband: Potential
   Implications for the Digital Divide* 2 (2020) . . . . . .30

*Comcast's DMCA Repeat Infringer Policy for
   Xfinity Internet Service*, Xfinity . . . . . . . . . . . . . . . .23

*Communications Marketplace Report*,
   39 FCC Rcd. 14116 (Dec. 31, 2024). . . . . . . . . . . . . .27

*ix*

*Cited Authorities*

*Page*

*Copyright/DMCA*, T-Mobile (Mar. 21, 2021) . . . . . . . . .23

*Data Caps in Consumer Broadband Plans*,
    39 FCC Rcd. 11752 (Oct. 15, 2024). . . . . . . . . . . .27, 29

*Does Your State Need More Broadband?*, Benton
    Inst. For Broadband & Soc'y (Apr. 30, 2021) . . . . . .28

Fed. Commc'ns Comm'n, *What People Are
    Saying About Data Caps* (2024). . . . . . . . . . . . . . . .27

*Fixed Wireless Access Growth Disrupts U.S.
    Telecom Market*, FitchRatings (Mar. 26, 2025). . . .22

*Internet Service Providers in Virginia*,
    BroadbandNow. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*Internet, Broadband Fact Sheet* (Figure 4),
    Pew Rsch. Ctr. (Nov. 13, 2024) . . . . . . . . . . . . . . . .24

*ISP Cox Hands Six Month Internet Ban to
    Alleged Repeat Infringer*, TorrentFreak
    (July 12, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

Karl Bode, *AT&T Will Kick Internet Users
    Offline for Piracy*, Vice (Nov. 6, 2018). . . . . . . . . . .23

Kellen Browning, *Seniors Seeking Vaccines
    Have a Problem: They Can't Use the Internet*,
    N.Y. Times (Feb. 28, 2021) . . . . . . . . . . . . . . . . . . . .31

*x*

*Cited Authorities*

*Page*

*Lifeline and Link Up Reform & Modernization*,
30 FCC Rcd. 7818 (June 18, 2015) . . . . . . . . . . . . . . .29

*More Than a Third of Americans Have Access to
One or No Broadband Provider*, Benton Inst.
for Broadband & Soc'y (Jan. 4, 2025) . . . . . . . . . . . .27

Natalie C. Benda et al., *Broadband Internet
Access Is a Social Determinant of Health*,
110 Am. J. Pub. Health 1123 (2020) . . . . . . . . . . . . . .31

Natasha Singer, *Learning Apps Have
Boomed in the Pandemic. Now Comes the
Real Test.*, N.Y. Times (Mar. 17, 2021). . . . . . . . . . . .30

Natasha Singer, *Online Schools Are Here to Stay,
Even After the Pandemic*, N.Y. Times
(Apr. 11, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*NTIA Data Explorer*, Nat'l Telecomm'ns &
Info. Admin. (June 6, 2024). . . . . . . . . . . . . . . . 24, 26

Pamela Samuelson & Tara Wheatland, *Statutory
Damages in Copyright Law: A Remedy in Need
of Reform*, 51 Wm. & Mary L. Rev. 439 (2009) . . . .15

Press Release, Fed. Commc'ns Comm'n, *FCC
Waives Rural Health Care and E-Rates
Program Gift Rules to Promote Connectivity
for Hospitals and Students During
Coronavirus Pandemic* (Mar. 18, 2020) . . . . . . . . . .31

*xi*

*Cited Authorities*

*Page*

Public Library Ass'n, *Public Library Association Technology Survey* (2023)..........24

*Public Library Survey (PLS)*, Inst. of Museum & Library Servs. (2023) ..................... 24, 25

Rachel Cohen Booth, *Why Americans Are Moving in with Strangers Twice Their Age*, Vox (Feb. 24, 2025)............................26

Reply All: *#118 A Pirate in Search of a Judge* (Apple Podcasts Mar. 15, 2018)................25

Richard Fry, *The Shares of Young Adults Living with Parents Vary Widely Across the U.S.*, Pew Rsch. Ctr. (Apr. 17, 2025) ..........26

Richard Fry, *Young Adults in U.S. Are Much More Likely than 50 Years Ago to Be Living in a Multigenerational Household*, Pew Rsch. Ctr. (July 20, 2022) ..................26

Sarah Gottlieb, *What Internet Speed Do You Need to Work From Home?*, BroadbandNow (Jan. 13, 2025)...............................27

Skip Descant, *A Lack of Competition Among ISPs Can Cause Ripple Effects*, GovTech (Sept. 26, 2024)...........................26, 27

*Cited Authorities*

*Page*

*Studies and Data Analytics on Broadband
and Health*, FCC (Jan. 26, 2024) . . . . . . . . . . . . . . .31

*The Comcast DMCA Policy*, Xfinity
(last updated Feb. 1, 2021) . . . . . . . . . . . . . . . . . . . .23

Vincent Le & Gissela Moya, *On the Wrong Side
of the Digital Divide: Life Without Internet
Access, and Why We Must Fix it in the Age
of COVID-19*, Greenlining Inst. (June 2, 2020). . . . .28

1

## STATEMENT OF IDENTITY AND
## INTEREST OF AMICI CURIAE[1]

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization with over 30,000 dues-paying members that has worked for 35 years to protect consumer interests, innovation, and free expression in the digital world. EFF and its members have a strong interest in ensuring that copyright law fulfills its purpose of promoting progress, and in helping the courts and policymakers ensure that copyright law serves the interests of creators, innovators, and the general public.

The American Library Association and the Association of Research Libraries represent the interests of over 100,000 libraries employing more than 250,000 librarians and other personnel. Libraries provide a wide range of services such as enabling internet access for over 100 million Americans; lending copyrighted works billions of times each year; and making available devices such as photocopiers, scanners, and 3-D printers. These services are overwhelmingly used for lawful purposes. However, the incorrect standard for contributory copyright infringement liability could force libraries to restrict these services.

Re:Create is a coalition of non-profits dedicated to balanced copyright and a free and open internet, including

---

1. No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae, or their counsel, made a monetary contribution intended to fund its preparation or submission. Websites cited in this brief were last visited on August 29, 2025.

2

libraries, civil libertarians, online rights advocates, start-ups, consumers, and technology companies of all sizes. For more than a decade, Re:Create and its members have fought for a copyright law that serves its Constitutional purpose: "to promote the Progress of Science." An overly expansive doctrine of secondary liability would crush the open internet and throw the copyright system wildly out of balance, harming Re:Create's members and their constituencies.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

If there was ever a case where the Court should act cautiously before expanding the scope of copyright contributory liability, it's this one. Here, Defendant Cox is an Internet Service Provider (ISP), upon which millions of innocent users rely for internet access, a vital service in today's society. Adopting Plaintiffs' expansive view of copyright contributory liability would likely cause ISPs to terminate their customers' internet access upon the flimsiest of accusations—especially since ISPs would face billion-dollar statutory damages awards if they didn't do so.

The Fourth Circuit imposed contributory liability based on the so-called "material contribution" test. That test originated with a 1971 Second Circuit decision that essentially made it up—that court didn't cite either any statutory provisions that support the test, or any prior case law.

Indeed, the Copyright Act doesn't define contributory liability (or any secondary liability). But the Patent Act

3

does contain such statutory definitions. The Court should resolve this case by doing what it has done in two previous cases: applying the patent laws to determine secondary liability in copyright. Doing so precludes contributory liability for providing access to the internet, a service used overwhelmingly for noninfringing uses. ISPs also don't advertise, suggest, or instruct their customers to use their internet access for infringement, eliminating any possible liability for active inducement.

The patent laws don't impose contributory infringement liability merely for providing a "material contribution" to a situation. Here, the Fourth Circuit's application of the material contribution theory gets the contributory infringement standard entirely backwards: It purports to create liability for a product or service that is capable of *infringing* use (a "material contribution"), but in fact there is liability only if the product is *in*capable of *noninfringing* use. Pet. App. 26a-28a.

Even if the existing copyright statutes are unclear, this Court has repeatedly cautioned against expanding copyright liability to cover new technologies in a way that could inhibit lawful commerce, holding that courts should not create such liability unless Congress has elected to impose it.

Finally, imposing liability on an ISP for the acts of its users raises enormous public policy concerns. Every use of the internet, be it for political organizing, access to government services and healthcare, commerce, research, education, finding and forming community, or simply entertainment, requires the services of an ISP. Terminating that service means withdrawing an essential

4

tool for participation in daily life. Moreover, terminating an ISP account doesn't just cut off an allegedly infringing subscriber. It potentially cuts off every household member or—in the case of a school, library, or business—every student, faculty member, patron, and employee who shares the internet connection. And with little or no competition among broadband ISPs in many areas of the country, those users may have no other way to connect. An expansion of ISPs' liability that raises the risk of billion-dollar penalties for failing to terminate users' accounts upon the slightest alleged violation would multiply these harms.

## ARGUMENT

## I.  THE COURT SHOULD APPLY TRADITIONAL PATENT LAW DOCTRINES TO DEFINE AND LIMIT SECONDARY LIABILITY IN COPYRIGHT.

### A.  The Copyright Statute Does Not Include Provisions for Secondary Liability, So This Court Has Historically Looked to The Patent Statute for Guidance.

Determining the proper boundaries of contributory copyright infringement begins with a fundamental problem: The Copyright Act does not define secondary liability at all. By contrast, the Patent Act contains express provisions for both contributory infringement, 35 U.S.C. § 271(c), and actively inducing infringement, 35 U.S.C. § 271(b). Not wanting to let bad actors off the hook for secondary liability, courts have created judicial doctrines such as "contributory" copyright infringement.

5

But creating a tort in the absence of any congressionally authorized statute has led to a host of problems (as this case illustrates). Courts have struggled with the definition of contributory copyright infringement, and the proper scope and limits of liability on that basis. Twice, this Court has analogized to the patent laws to try to establish rules for copyright. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). However, those cases were constrained by the facts before the Court and the inability of any court to do what Congress can do, that is, draft a statute. The result is a confusing array of judicial doctrines—such as trying to figure out what constitutes a "material contribution" to an infringement— resulting in uncertainty in this and other cases.

The Court has observed that it is "settled that the protection given to copyrights is wholly statutory." *Sony*, 464 U.S. at 431. Thus, Congress should preferably take the lead and enact statues for contributory and other forms of secondary copyright liability. Absent Congressional enactments, this Court should use the statutes that are available and extend what it did in *Sony* and *Grokster*: apply well-established patent law doctrines to define and limit liability in the copyright arena. Two such doctrines are relevant here.

### B.  Contributory Infringement Requires More Than a "Material Contribution."

The patent infringement statute provides:

> Whoever offers to sell or sells within the United States or imports into the United

6

> States a component of a patented machine,
> manufacture, combination or composition, or
> a material or apparatus for use in practicing
> a patented process, constituting a material
> part of the invention, knowing the same to be
> especially made or especially adapted for use in
> an infringement of such patent, and not a staple
> article or commodity of commerce suitable for
> substantial noninfringing use, shall be liable as
> a contributory infringer.

35 U.S.C. § 271(c).

*Sony*'s discussion of this statute shows how its principles apply to copyright. *Sony*, 464 U.S. at 439-42. First, the Court observed that any vicarious liability imposed on the Betamax manufacturer would need to "rest on the fact that it has sold equipment with constructive knowledge of the fact that its customers may use that equipment to make unauthorized copies of copyrighted material." *Id*. at 439. That's essentially how the Fourth Circuit found Cox liable here. Pet. App. 26a-27a. But in *Sony*, the Court *rejected* such reasoning, saying "[t]here is no precedent in the law of copyright for the imposition of vicarious liability on such a theory." 464 U.S. at 439.

Citing the "historic kinship" between patent law and copyright law, the Court then discussed some of the limits placed on contributory infringement liability. *Id*. at 440-41. Contributory patent infringement "is confined to the knowing sale of a component especially made for use in connection with a particular patent." *Id*. at 440. Thus, "the sale of a 'staple article or commodity of commerce suitable for substantial noninfringing use' is not contributory

7

infringement." *Id.* Warning against the anticompetitive
effects of an overly expansive contributory infringement
doctrine, the Court held that in both patent and copyright:

> [T]he contributory infringement doctrine is
> grounded on the recognition that adequate
> protection of a monopoly may require the courts
> to look beyond actual duplication of a device or
> publication to the products or activities that
> make such duplication possible. The staple
> article of commerce doctrine must strike a
> balance between a copyright holder's legitimate
> demand for effective—not merely symbolic—
> protection of the statutory monopoly, and the
> rights of others freely to engage in substantially
> unrelated areas of commerce. Accordingly,
> the sale of copying equipment, like the sale of
> other articles of commerce, does not constitute
> contributory infringement if the product is
> widely used for legitimate, unobjectionable
> purposes.

*Id.* at 441-42; *see also Grokster*, 545 U.S. at 932-33 (for
contributory infringement, "the doctrine absolves the
equivocal conduct of selling an item with substantial lawful
as well as unlawful uses, and limits liability to instances of
more acute fault than the mere understanding that some
of one's products will be misused").

Thus, the patent laws have never imposed contributory
infringement liability just for knowingly providing
a "material contribution" to someone else's direct
infringement. This distinction is even starker in
copyright. Unlike patents, copyrights apply instantly

8

and automatically to all qualifying works of authorship, without any formalities or administrative action. *Compare* 17 U.S.C. § 102(a) *with* 35 U.S.C. §§ 131-134. Copyrights last over seventy years, while patents generally last no more than twenty. *Compare* 17 U.S.C. § 302 *with* 35 U.S.C. § 154. And copyrights, unlike patents, can carry statutory damages that may be hundreds or even thousands of times greater than the actual harm suffered, *see* Section I.D below. Given these differences, Congress's silence on secondary liability in copyright cannot be interpreted to authorize a *broader* test for such liability than that explicitly provided for in the Patent Act.

Applying those principles to this case, it's undisputed that Cox's ISP services are overwhelmingly directed to noninfringing uses. *See* Trial Tr. vol. 11 (A.M. Portion) 2781:17-2782:5 (Tregillis), ECF No. 672 (57,600 users accused of infringement); Trial Tr. vol. 4 (P.M. Portion) 881:11-12 (Trickey), ECF No. 640 (six million customer accounts). Cox's services are therefore a "staple article," not an actionable contribution to infringement.

Contributory infringement also requires a high level of intent, that is, "a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964). This is relevant to Question Presented #2 as formulated by the Solicitor General: Willfulness requires a showing that an alleged infringer knows that its own conduct is unlawful, as opposed to its users'. Brief Amicus Curiae of United States at I, No. 24-171 (May 27, 2025); *id.* at 16-19.

9

Congress knew what it was doing when it enacted the contributory infringement statute with the above limitations. The Senate and House reports on the 1952 Patent Act remarked that § 271(c) "is much more restricted than many proponents of contributory infringement believe should be the case." H.R. Rep. No. 82-1923, at 9 (1952); S. Rep. No. 82-1979, at 8 (1952). Any expansion of contributory copyright infringement should be left to Congress.

## C. Actively Inducing Infringement Also Has Limitations.

Plaintiffs did not bring this case under an explicit inducement theory. Nevertheless, some discussion of the issue is necessary, because the case law has mixed up and combined the two concepts of contributory infringement and actively inducing infringement. *See*, *e.g.*, *Grokster*, 545 U.S. at 930 (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) ("[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement"). As with contributory infringement, the Court should look to patent law as "sensible" guidance for inducement. *Grokster*, 545 U.S. at 936.

The relevant patent statute is 35 U.S.C. § 271(b), which provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." The word "actively" in § 271(b) is not surplusage. *Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U.S. 754, 760 (2011) ("The addition of the adverb 'actively' suggests that the inducement must involve the taking of affirmative steps to bring about the desired result.").

10

**1.    Limitations On Active Inducement Where
the Product or Service Has Substantial
Noninfringing Uses**

Where a party is liable for contributory infringement because of the knowing sale of non-staples, § 271(b) adds little—the party is already secondarily liable. Where the party provides products or services having substantial noninfringing uses, inducement liability might attach—but only in limited circumstances.

A district court has helpfully explained the interplay between § 271(c) and § 271(b) as follows:

> *It is, perhaps, an unwarranted extension of § 271(b) to use it as a basis for ascribing liability in the absence of active solicitation.* The same conduct—sale of material or apparatus which can only be used in an infringement—is contributory infringement under § 271(c). The supplier of a staple will be liable for active inducement if it tells its purchaser, "Here is how we can help you infringe." It is liable if it sells a compound containing the staple when that compound can only be used effectively to practice a patented method, and it so intends, and § 271(c) so provides. *The supplier is not liable if it merely makes that staple available, even though it knows that some purchasers will use it to infringe, and § 271(c) makes that distinction.*

*Oak Indus., Inc. v. Zenith Elecs. Corp.*, 697 F. Supp. 988, 994 (N.D. Ill. 1988) (emphases added), *cited with*

11

*approval in Grokster*, 545 U.S. at 936. Patent doctrine thus makes a distinction based on whether the product or process has substantial noninfringing uses. If such uses are present, a heightened standard applies and a party is liable for inducement only if it takes additional, affirmative steps to ensure direct infringement by the customer. *See Grokster*, 545 U.S. at 936-37 (holding that only "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."). Those steps must evince "an affirmative intent that the product be used to infringe," such as by "advertising an infringing use or instructing how to engage in an infringing use." *Id*. at 936. Thus, the *Grokster* defendants engaged in advertising that targeted users of another service that was overwhelmingly used for infringing purposes, indicating a deliberate encouragement of infringing uses with advertising. *Grokster*, 545 U.S. at 939. No such deliberate targeting is present in this case, nor for ISPs generally.

By contrast, "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability. Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves." *Id*. at 937. *See also ACCO Brands, Inc. v. ABA Locks Manufacturer Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) (defendant only instructed its users on noninfringing methods, so neither direct infringement nor inducement could be presumed); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003) ("[W]here a product has substantial noninfringing uses,

12

intent to induce infringement cannot be inferred even
when the defendant has actual knowledge that some users
of its product may be infringing the patent.").

### 2.   Other Limitations on Active Inducement

Patent law contains several other limitations on active
inducement liability:

- A party is liable for inducement only where it
  offers *specific* instructions to the user to infringe.
  *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351,
  1360-61 (Fed. Cir. 2012) (defendant was not liable
  for inducement where its manuals did not teach all
  of the steps necessary to infringe the patent); *see
  also Oak Indus.*, 697 F. Supp. at 993.

- Where there are substantial noninfringing uses,
  inducement liability is limited to those *specific*
  instances of direct infringement *actually caused*
  by the defendant's acts. *Dynacore Holdings Corp.
  v. U.S. Philips Corp.*, 363 F.3d 1263, 1274, 1275-77
  (Fed. Cir. 2004); *see also Fujitsu Ltd. v. Netgear
  Inc.*, 620 F.3d 1321, 1328-30 (Fed. Cir. 2010)
  (limiting liability for inducement to only those four
  sales where customer service records showed that
  Netgear's staff advised customers to practice the
  infringing claims); *Oak Indus.*, 697 F. Supp. at 993.

- Patent law does not impose liability for mere
  omissions. In *Tegal Corp. v. Tokyo Electron Co.*,
  for example, the plaintiff's theory was that the
  defendant "had an affirmative obligation" to
  police its affiliates. 248 F.3d 1376, 1378 (Fed. Cir.

13

2001). The court held that inducement "requires an affirmative act of some kind," so inducement could not be "premised on an omission" or based on "evidence of mere inaction." *Id*. at 1378-79. *See also Grokster*, 545 U.S. at 939 n.12 ("Of course, in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses. Such a holding would tread too close to the *Sony* safe harbor.").

- A very high level of intent is required to establish inducement. *Global-Tech Appliances*, 563 U.S. at 766 (liability for inducing infringement attaches only if the defendant knew of the patent and knew that "the induced acts constitute patent infringement").

In this case, Cox not only didn't take active steps to induce its users to infringe, it took active steps to prevent infringement. Cox was the first ISP to create a graduated response process to deal with potential copyright infringement by its users. Trial Tr. vol. 5 (P.M. Portion) 1053:5–20 (Trickey), ECF No. 642; Trial Tr. vol. 9 (A.M. Portion) 2080:2-2085:6 (Cadenhead), ECF No. 657. Cox even licensed the process to other ISPs—at no charge—so they could use it. Trial Tr. vol. 7 (P.M. Portion) 1604:22-1605:20 (Carothers), ECF No. 654. At worst, Cox didn't terminate certain users as quickly as Plaintiffs would have liked, which is far short of *Grokster*'s requirement of promoting infringement. Trial Tr. vol. 2 (A.M. Portion) 251:9-252:16 (McMullan), ECF No. 629

14

(believing that an ISP should terminate subscribers after three infringement notices, and that Cox "fell down on that responsibility entirely").

### D. There Is No Statutory Framework for Imposing Statutory Damages in Secondary Liability Cases Under Either the Patent or Copyright Statutes.

Patent law supplies another significant limitation applicable here. Patent law does not allow statutory damages—not for contributory or inducement liability, and not even for direct infringement. Under 35 U.S.C. § 284, damages are tied to proof of harm: lost profits or, if those cannot be shown, a reasonable royalty. Enhanced damages for willfulness are reserved for egregious cases and capped at three times actual damages. *Id.* Congress deliberately tethered remedies to evidence of economic injury, avoiding windfalls untethered from proof.

By contrast, 17 U.S.C. § 504(c) authorizes statutory damages for direct copyright infringement, but the Copyright Act is silent on secondary liability. Nothing in § 504(c) (or elsewhere in Title 17) specifically authorizes imposing statutory damages on parties who did not themselves commit direct acts of infringement.

Statutory damages in copyright are not required to be calibrated to actual harm or gain, and when multiplied across works—particularly against non-direct infringers—they frequently yield excessive, arbitrary results. Courts already struggle to calibrate such awards in direct infringement cases. *See*, *e.g.*, *Zomba Enters., Inc. v. Panorama Recs., Inc.*, 491 F.3d 574, 586-88 (6th

15

Cir. 2007); *Lowry's Reps., Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455 (D. Md. 2004). Applying such awards to secondary liability magnifies the risk of disproportionate, culpability-insensitive penalties. Untethered from actual harm and scalable across works, statutory damages can reach orders of magnitude beyond any cognizable injury, raising constitutional concerns and chilling innovation. *See* Pamela Samuelson & Tara Wheatland, *Statutory Damages in Copyright Law: A Remedy in Need of Reform*, 51 Wm. & Mary L. Rev. 439, 441 (2009) ("Awards of statutory damages are frequently arbitrary, inconsistent, unprincipled, and sometimes grossly excessive."). In the ISP context, the threat of massive exposure would predictably induce providers to terminate users' internet access on thin accusations to avoid unpredictable liability.

This case proves the point. Plaintiffs sued Cox for infringement committed by Cox's subscribers, not Cox itself. Cox merely provided internet access, a lawful and essential service. Pet. App. 8a. Yet the jury imposed $1 billion in statutory damages by multiplying a flat per-work amount across more than 10,000 alleged subscriber infringements. Pet. App. 10a-11a, 39a. The award was untied to any proof of harm caused by Cox or to any gain Cox realized. Actual damages would have been at most $692,000—over a thousandfold lower. Trial Tr. vol. 11 (A.M. Portion) 2810:23-2812:15 (Tregillis), ECF No. 672. Even that figure reflects gross revenue from song sales, not profits; and under patent law principles, damages turn on lost profits or a reasonable royalty, not gross revenue.

If Congress wishes to authorize enhanced damages against secondary actors, it can do so expressly and with limits, as it did when codifying contributory and

16

inducement liability in patent law. But the lack of such a statutory framework in copyright is another reason why the Court should not extend secondary liability to cases such as this one.

## II. THE COURTS OF APPEALS HAVE IMPROPERLY EXPANDED CONTRIBUTORY COPYRIGHT INFRINGEMENT BEYOND ANY CONGRESSIONAL INTENT.

With the above principles in mind, it's helpful to analyze where the so-called "material contribution" theory came from, and how decisions such as the one below have incorrectly expanded and distorted that theory beyond any statutory authority or precedent.

### A. The Fourth Circuit Decision and Previous Circuit Court Opinions Have Gotten Contributory Infringement Entirely Backwards.

In limited circumstances, both patent and copyright impose vicarious liability where one person is responsible for the acts of another: employer-employee and principal-agent relationships, for example. Historically, copyright cases started addressing circumstances where the relationship of two different actors went beyond traditional vicarious liability situations.

One of the first such cases was *Kalem Co. v. Harper Brothers*, 222 U.S. 55 (1911). Defendant Kalem produced a movie based on the book "Ben Hur" without authorization from the book's owner. Kalem didn't publicly exhibit the movie itself, but sold the movie to jobbers who did (the jobbers apparently were not Kalem's employees or agents).

17

The court found Kalem liable for the jobbers' exhibition, for having "contribute[d] to the infringement." *Id.* at 62-63.

Although Kalem was found liable, Justice Holmes noted that "mere supposition or knowledge on the part of the seller" that a buyer is "contemplating . . . unlawful use is not enough to connect him with the possible unlawful consequences." *Id.* at 62. Years later, *Sony* discussed *Kalem*, 464 U.S. at 435-38, and rejected the proposition that liability for copyright infringement is established merely by supplying the "'means' to accomplish an infringing activity." *Id.* at 436.

*Kalem* used the verb "contribute" but did not use or define the term "material contribution." The first case to use the phrase "materially contributes" appears to be *Gershwin*, 443 F.2d at 1162. In a jumbled mashup of contributory and inducement language, *Gershwin* stated that "Similarly, one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Id.* (footnote omitted).

*Gershwin* didn't cite any statutes for this proposition (there are none, of course), nor any prior case law or common law doctrine. In effect, *Gershwin* just made the standard up. But numerous later cases relied on the *Gershwin* formulation, such as one case calling it the "classic statement of the doctrine." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996). The Fourth Circuit relied on *Gershwin* here. Pet. App. 20a-21a. In their opposition to Cox's petition for certiorari, Plaintiffs referred to the "*Gershwin* standard," BIO 14, and made clear that they brought this case as a "material

18

contribution" case that didn't meet the requirements for
actively inducing infringement. BIO 18.

The Fourth Circuit (and other cases) have used the
so-called "*Gershwin* standard" to stretch theories of
liability beyond any reasonable definition of contributory
infringement or active inducement. Here, the lower court
wrote:

> Cox makes two principal objections. The
> first rests on the contention that it cannot be
> liable for materially contributing to copyright
> infringement because the internet service it
> provides is capable of substantial lawful use
> and not designed to promote infringement.
> We rejected that argument in *BMG*: "In fact,
> providing a product with 'substantial non-
> infringing uses' *can* constitute a material
> contribution to copyright infringement." . . .
> But supplying a product with knowledge that
> the recipient will use it to infringe copyrights
> is exactly the sort of culpable conduct sufficient
> for contributory infringement.

Pet. App. 26a-27a (emphasis in original).

This formulation of the contributory infringement
standard is entirely backwards, as it would impose liability
for a product or service being merely capable of *infringing*
use (a "material contribution"). Under the patent law
and *Sony*, liability arises only if the product is *in*capable
of *noninfringing* use. Indeed, *Sony* cautioned that
imposing contributory liability for an article adapted for
noninfringing uses "would block the wheels of commerce."
464 U.S. at 441.

19

*Gershwin*'s "material contribution" standard has been criticized as "unhelpful." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 757 (7th Cir. 2012) (Posner, J.) (asking "what exactly does 'materially contribute' mean?"). And *Gershwin* didn't have the benefit of this Court's subsequent decisions in *Sony* or *Grokster*. Rather than affirm the Fourth Circuit's use of *Gershwin*'s made-up formulation, the Court should extend its reasoning in *Sony* and *Grokster* and apply traditional patent law principles of contributory and actively inducing infringement to resolve this case. And in any event, the Court should defer to Congress before greatly expanding liability in this area of the law, as we now discuss.

## B. The Courts of Appeals Have Improperly Usurped Congress's Role in Ensuring That Copyright Serves Its Constitutional Purpose.

The Fourth Circuit found Cox liable by ignoring the fundamental purpose of copyright. The Constitution empowers Congress "[t]o promote the progress of Science and useful Arts by securing for limited times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art. I, § 8, cl. 8. As the Court has explained, that "exclusive right" is deliberately circumscribed so as to best serve the overall public interest:

> The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must

20

> ultimately serve the cause of promoting broad
> public availability of literature, music, and the
> other arts.
>
> The immediate effect of our copyright law is to
> secure a fair return for an 'author's' creative
> labor. But the ultimate aim is, by this incentive,
> to stimulate artistic creativity for the general
> public good. 'The sole interest of the United
> States and the primary object in conferring
> the monopoly,' this Court has said, 'lie in the
> general benefits derived by the public from the
> labors of authors.' *When technological change
> has rendered its literal terms ambiguous, the
> Copyright Act must be construed in light of
> this basic purpose.*

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156
(1975) (emphasis added) (footnotes and citations omitted).

This theme appears throughout the Court's copyright
decisions, such as *Feist Publ'ns, Inc. v. Rural Tel. Serv.
Co.*, 499 U.S. 340, 349-50 (1991) (citations omitted):

> The primary objective of copyright is not to
> reward the labor of authors, but "[t]o promote
> the Progress of Science and useful Arts." To
> this end, copyright assures authors the right to
> their original expression, but encourages others
> to build freely upon the ideas and information
> conveyed by a work.

Similarly, in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994),
the Court reiterated that "the monopoly privileges that

21

Congress has authorized, while 'intended to motivate the creative activity of authors and inventors by the provision of a special reward,' are limited in nature and must ultimately serve the public good." *Id.* at 546-27 (citing *Sony*, 464 U.S. at 429).

In order to promote the public good, courts confronted with new technologies should afford them breathing space by erring on the side of limited copyright. In *Sony*, the Court observed that where "Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests." 464 U.S. at 431. Thus, the Court held that time-shifting of television programs was fair use, and left it to Congress to decide otherwise: "It may well be that Congress will take a fresh look at this new technology, just as it so often has examined other innovations in the past. But it is not our job to apply laws that have not yet been written." *Id.* at 456. *See also Limelight Networks v. Akamai Techs.*, 572 U.S. 915, 922-23 (2014) ("[C]ourts should not create liability for inducement of noninfringing conduct where Congress has elected not to extend that concept."); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-34 (2003) (rejecting an attempt to over-extend the Lanham Act to confer copyright-like protection, noting that when "Congress has wished to create such an addition to the law of copyright," it does so with "specificity").

Historically, when courts have declined to expand copyright protection, Congress has often responded by enacting appropriate legislation. For example, in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 401-02 (1968), the Court held that CATV

22

operators do not perform the programs they receive and carry. Congress responded by enacting a detailed statutory scheme regulating cable TV. 17 U.S.C. § 111. There are many other examples, including piano rolls, library copying, and the audio tape recorder. *Sony*, 464 U.S. at 430-31 & n.11.

This Court should follow its own sound precedents and reject the Fourth Circuit's judicial expansion of copyright. If there is any doubt whether it serves copyright's purpose to extend a copyright monopoly to cover an ISP's provision of internet access in circumstances such as those here, Congress must resolve that doubt.

### III. IMPOSING LIABILITY ON INTERNET SERVICE PROVIDERS FOR PROVIDING INTERNET ACCESS UNDER CIRCUMSTANCES SUCH AS THIS CASE WOULD CAUSE DISPROPORTIONATE HARM TO THE PUBLIC.

#### A. The Fourth Circuit's Rule Would Result in Innocent and Vulnerable Users Losing Essential Internet Access.

While ISPs are secretive about their repeat-infringer policies, available information suggests they would respond to new and unpredictable liability by increasing account terminations. For example, Comcast, among the country's largest fixed broadband access providers,[2] appears to have revised its policy from "reserv[ing] the right" to consider an account with multiple notifications as violating its policy to treating any such account as a

---

2. *Fixed Wireless Access Growth Disrupts U.S. Telecom Market*, FitchRatings (Mar. 26, 2025), https://perma.cc/EK78-JQCB.

23

repeat infringer by default.[3] As rightsholders file more cases against ISPs, those ISPs predictably terminate subscribers more readily. *See UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 755 (W.D. Tex. 2019) (after being sued for contributory infringement, ISP began terminating accounts for the first time in six years).

Both Plaintiffs here and the plaintiff in the earlier litigation against Cox wanted ISPs to terminate more accounts more rapidly in response to accusations of infringement. Trial Tr. vol. 2 (A.M. Portion) 251:9-252:16 (McMullan); *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 300, 304 (4th Cir. 2018). The Fourth Circuit also implied that avoiding liability under the test it announced would require more and faster terminations. *BMG Rts. Mgmt.*, 881 F.3d at 303-04; Pet. App. 28a.

More aggressive termination policies punish the innocent and the guilty alike. Multiple users in organizations or households share ISP subscriptions. For example, the record in this case shows many instances of alleged

---

3. *Compare The Comcast DMCA Policy*, Xfinity (last updated Feb. 1, 2021), https://perma.cc/3LJQ-4SSY, *with Comcast's DMCA Repeat Infringer Policy for Xfinity Internet Service*, Xfinity, https://web.archive.org/web/20171207141949/https://www.xfinity.com/support/articles/comcast-dmca-compliance-policy. *See also AT&T Copyright Alert Program*, AT&T Bus., https://perma.cc/J74V-EW6V ("It is AT&T's policy to terminate customers who continue to violate copyright law."); *Copyright/DMCA*, T-Mobile (Mar. 21, 2021), https://perma.cc/5ECY-XFNG ("T-Mobile will suspend or terminate services of any subscriber, account holder, or user who is deemed to be a repeat infringer of copyrights."); Karl Bode, *AT&T Will Kick Internet Users Offline for Piracy*, Vice (Nov. 6, 2018), https://perma.cc/F3AB-E3X8.

24

infringement associated with accounts for universities, hospitals, local government agencies, and, in the case of subcontracted services, entire municipalities. *See*, *e.g.*, Trial Tr. vol. 5 (P.M. Portion) 1044:12–22 (Trickey), ECF No. 642; Trial Tr. vol. 4 (P.M. Portion) 861:5–13 (McCabe), ECF No. 640; Trial Tr. vol. 7 (A.M. Portion) 1473:18–25, 1474:1–19 (Beck), ECF No. 653; Trial Tr. vol. 10 (P.M. Portion) 2510:19–25, 2511:1–25, 2512:1–21 (Jarchow), ECF No. 660. These institutions provide internet access to millions. The same holds true for school, academic, public, tribal and other types of libraries, where reliable internet access is a core service that these institutions provide their patrons and broader community. An estimated 20% of U.S. households do not subscribe to home internet,[4] for reasons such as "not available in area" and "too expensive;"[5] public libraries are therefore crucial for un- and underconnected households. Universally, public libraries provide broadband access and computer stations[6]

---

4. *Internet, Broadband Fact Sheet* (Figure 4), Pew Rsch. Ctr. (Nov. 13, 2024), https://perma.cc/45NX-TZJF.

5. 569,970 households list the primary reason they do not have home broadband as "not available in area," while 3,106,247 list the primary reason as "too expensive." *NTIA Data Explorer*, Nat'l Telecomm'ens & Info. Admin. (June 6, 2024), https://perma.cc/4MQ9-NVCN (filtered by "Table," "Non-Use of Internet at Home," "Tracked Metrics," "Main Reason Not Online at Home: Not Available in Area"); *id.* https://perma.cc/D2VA-9ZTC (filtered by "Tracked Metrics," "Main Reason Not Online at Home: Too Expensive").

6. Public Library Ass'n, *Public Library Association Technology Survey* (2023) https://perma.cc/RKA6-YM77. Out of approximately 9,000 public libraries, there were about 268,000 public access computers, with around 96,000,000 public access computer user sessions. *Public Library Survey (PLS)*, Inst. of Museum & Library Servs. (2023), https://www.imls.gov/research-evaluation/

25

and nearly half lend out wi-fi hotspots for people to use at home.[7] Beyond that, broadband connectivity is vital to library services: accessing digital books and online publications, providing webinars and other online services, and internal and external communications.

Cox was rightly hesitant to terminate accounts like these. *See* Trial Tr. vol. 5 (P.M. Portion) 1085-95, 1099-1100, ECF No. 642. Given a potential $1 billion damage award, combined with the Fourth Circuit's incorrectly low threshold for contributory infringement liability, neither Cox nor other ISPs would hesitate again.

Even for residential accounts, the consequences of terminating internet access would not be confined to individual repeat infringers. In other file-sharing cases, rightsholders have estimated that 30% of the names of account holders identified as infringers were not responsible for the alleged infringement. *See, e.g.*, *Digital Sin, Inc. v. Does 1–176*, 279 F.R.D. 239, 242 (S.D.N.Y. 2012).[8] That figure is unsurprising. In 2023, more than

surveys/public-libraries-survey-pls (download "FY2023" data file and sum columns labeled "GPTERMS" and "PITUSR").

7. In 2023, 46.9% of public libraries circulated hotspots for patrons' use in their homes. *Public Library Association Technology Survey*, *supra* note 6, at 15, 22 tbl.2.

8. *See, e.g.*, Reply All: *#118 A Pirate in Search of a Judge* at 00:40–02:08, 21:40–24:05 (Apple Podcasts Mar. 15, 2018), https://podcasts.apple.com/us/podcast/118-a-pirate-in-search-of-a-judge/id9419079657?i=1000406433279 [https://perma.cc/SSM9-APE4] (recounting the case of a Comcast subscriber whose account was nearly terminated because an ex-roommate had continued to use the subscriber's login credentials).

26

eighty-two million Americans used the internet at someone else's home.[9] As one terminated Cox subscriber stated, "[o]ne cannot control what everyone does on the internet in one household or business."[10]

Multi-user accounts are especially common in shared households, a growing category.[11] And since non-white and low-income individuals are more likely to live in shared households and share broadband subscriptions,[12] stepped-up termination would worsen the racial and economic digital divide.

These effects are exacerbated by the lack of competition in the broadband market.[13] Nationwide, over

9. *NTIA Data Explorer*, Nat'l Telecommc'ns & Info. Admin. (June 6, 2024), https://perma.cc/TGH2-RYZ2 (filtered by "Table," "Internet Use," "Internet Use at Someone Else's Home").

10. *ISP Cox Hands Six Month Internet Ban to Alleged Repeat Infringer*, TorrentFreak (July 12, 2020), https://perma.cc/U5BV-YRKC; *see also*, *e.g.*, *Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d at 755.

11. *See* Rachel Cohen Booth, *Why Americans Are Moving in with Strangers Twice Their Age*, Vox (Feb. 24, 2025), https://perma.cc/R4BU-G9PJ (noting increase in the number of families sharing living spaces with non-relatives); *accord* Richard Fry, *Young Adults in U.S. Are Much More Likely than 50 Years Ago to Be Living in a Multigenerational Household*, Pew Rsch. Ctr. (July 20, 2022), https://perma.cc/ACZ5-B7C8.

12. *See* Richard Fry, *The Shares of Young Adults Living with Parents Vary Widely Across the U.S.*, Pew Rsch. Ctr. (Apr. 17, 2025), https://perma.cc/FB48-C8UB.

13. Skip Descant, *A Lack of Competition Among ISPs Can Cause Ripple Effects*, GovTech (Sept. 26, 2024), https://perma.cc/

27

a third of Americans have access to one or no providers.[14] In these areas, termination by a single ISP means loss of broadband access entirely. Mobile broadband services are incomplete substitutes for wireline broadband.[15] Aside from lower average speeds, mobile broadband plans often come with low monthly data caps that users quickly exceed if they use mobile data for necessary day-to-day functions like telecommuting or remote education.[16] Users must then choose between paying overages (a financial strain on low-income subscribers in particular) or losing access.[17] Finally, many critical uses of the internet, such as filling out job applications, are difficult, if not impossible, on a smartphone.

---

T9NJ-TCKQ (noting "areas with poor . . . broadband service also suffer from a lack of competition").

14. *More Than a Third of Americans Have Access to One or No Broadband Provider*, Benton Inst. for Broadband & Soc'y (Jan. 4, 2025), https://perma.cc/P84F-6XTQ (citing *Communications Marketplace Report*, 39 FCC Rcd. 14116, ¶ 3 (Dec. 31, 2024), https://perma.cc/T2XB-PXJ3); *accord* Cierra Noffke, *My Internet Provider Is a Monopoly and Yours Probably Is Too. Here's What it Means for Your Broadband Bill*, CNet (May 29, 2025), https://perma.cc/LJ5P-HZ9J (estimating that eighty-three million Americans have internet access through just one provider).

15. *2020 Broadband Deployment Report*, 35 FCC Rcd. 8986, ¶ 12 (Apr. 24, 2020), https://perma.cc/3A4L-8JEW.

16. Sarah Gottlieb, *What Internet Speed Do You Need to Work From Home?*, BroadbandNow (Jan. 13, 2025), https://perma.cc/DFA5-KY7Q.

17. *Data Caps in Consumer Broadband Plans*, 39 FCC Rcd. 11752, ¶ 2 (Oct. 15, 2024), https://perma.cc/L6CN-7NC7; *see also* Fed. Commc'ns Comm'n, *What People Are Saying About Data Caps* (2024), https://perma.cc/GX7Y-2FYW (collecting six hundred consumers' experiences with data caps).

28

Disparities in the market for internet services are felt in states like Virginia, where 13% of residents lack access to any type of broadband internet.[18] This lack of options puts many "on the wrong side of the 'digital divide,'" which "affects low-income families and communities of color the most."[19] Rural areas, including tribal lands, have particularly limited ISP options,[20] often because providers have little economic incentive to build out services in sparsely populated places.

Further, the record demonstrates that ISPs would be especially likely to terminate "low-return" subscribers. Pet. App. 120a ("[Cox] looked at the total revenue coming from each subscriber when considering possible . . . termination."). Many such users rely upon state and federal subsidies for internet access[21] and cannot afford to sign up for expensive "bundled" accounts that ISPs may be more reluctant to terminate.

---

18. *Internet Service Providers in Virginia*, BroadbandNow, https://perma.cc/P6FQ-EPUV; *see also Does Your State Need More Broadband?*, Benton Inst. For Broadband & Soc'y (Apr. 30, 2021), https://perma.cc/6KC4-C56L (estimating that over a third of Virginians in 2021 had access to only one ISP).

19. Vincent Le & Gissela Moya, *On the Wrong Side of the Digital Divide: Life Without Internet Access, and Why We Must Fix it in the Age of COVID-19*, Greenlining Inst. (June 2, 2020), https://perma.cc/EGY8-ZZLH.

20. *2020 Broadband Deployment Report*, 35 FCC Rcd. 8986, 8990, ¶ 9 (Apr. 24, 2020), https://perma.cc/3A4L-8JEW.

21. *See Bridging the Digital Divide for Low-Income Consumers*, 34 FCC Rcd. 10886, ¶ 3 (Nov. 19, 2019) (Fifth Report & Order), https://perma.cc/SGT8-VJY6.

29

### B.  Losing Internet Access Is an Extreme Public Harm.

Loss of internet access "imposes a massive deprivation of liberty,[]" *United States v. Ellis*, 984 F.3d 1092, 1104 (4th Cir. 2021), now that so much civic and economic activity has moved online. Accordingly, the public has a strong interest in preserving that access.

### 1.  Internet Access Is Essential to Participation in Economic, Cultural, and Social Activity

As one court stated when reviewing supervised release conditions, "the internet is crucial in finding jobs, paying bills, and navigating life in this digital age." *United States v. Hamilton*, 986 F.3d 413, 421 (4th Cir. 2021). The Federal Communications Commission concurs, noting that internet connection is "essential to modern life" necessary to participate in "day-to-day activities" such as "work, healthcare services, education, and social activities."[22] Congress has agreed, finding that "[a]ccess to affordable, reliable, high-speed broadband is essential to full participation in modern life." 47 U.S.C. § 1701(1). Cutting off internet access "constrains . . . freedom in ways that make it difficult to participate fully in society and the economy." *United States v. LaCoste*, 821 F.3d 1187,

---

22.  *Data Caps in Consumer Broadband Plans*, 39 FCC Rcd. 11752, ¶ 1 (Oct. 15, 2024), https://perma.cc/D2SR-GUZW; *see also Lifeline and Link Up Reform & Modernization*, 30 FCC Rcd. 7818, ¶ 4 (June 18, 2015) (Second Further Notice of Proposed Rulemaking), https://perma.cc/XP4G-ACUY ("[I]nstitutions and schools, and even government agencies, require Internet access for full participation in key facets of society.").

30

1191 (9th Cir. 2016). This Court has similarly recognized that social media "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," such that banning this subset of internet use can impermissibly burden First Amendment rights. *Packingham v. North Carolina*, 582 U.S. 98, 107-08 (2017).

### 2. The Consequences of Losing Internet Access Are Severe and Disproportionate.

Distance learning, telework, and telemedicine became essential during the COVID-19 pandemic and remain so now.

*Education.* Even before the pandemic, "a growing number of schools [were] issuing homework assignments online."[23] Increased use of free internet-based education tools during the pandemic "has sped the adoption of technology in education by easily 5 to 10 years."[24] School districts nationwide are also creating online schools "with an eye to operating them for years to come."[25] Thus, loss of broadband access could be equivalent to suspension or expulsion from school.

---

23. *See* Colby Leigh Rachfal, Cong. Rsch. Serv., *COVID-19 and Broadband: Potential Implications for the Digital Divide* 2 (2020), https://perma.cc/8U89-4NJ9.

24. *See* Natasha Singer, *Learning Apps Have Boomed in the Pandemic. Now Comes the Real Test.*, N.Y. Times (Mar. 17, 2021), https://perma.cc/4LE3-VSUQ.

25. *See* Natasha Singer, *Online Schools Are Here to Stay, Even After the Pandemic*, N.Y. Times (Apr. 11, 2021), https://perma.cc/R58A-WDJP.

31

*Employment.* COVID-19 moved many jobs online, where they remain. Terminating a residential broadband subscription because of a teenager's infringing conduct could cause their parent to lose her job.

*Health.* Connectivity has become a "life-or-death" matter for twenty million older Americans who rely on the internet for critical healthcare information.[26] Health policy experts conclude that, for all age groups, "broadband Internet access . . . must be recognized as a social determinant of health."[27] Hence the FCC waived rules in order to ease broadband providers' participation in federal telehealth programs, recognizing that broadband access "will play an increasingly critical part in treating patients and helping healthcare providers maximize their impact on their communities."[28]

---

26. *See* Kellen Browning, *Seniors Seeking Vaccines Have a Problem: They Can't Use the Internet*, N.Y. Times (Feb. 28, 2021), https://perma.cc/5UHB-5XRM.

27. *See* Natalie C. Benda et al., *Broadband Internet Access Is a Social Determinant of Health*, 110 Am. J. Pub. Health 1123 (2020), https://perma.cc/DV7N-4H7K; *see also Studies and Data Analytics on Broadband and Health*, FCC (Jan. 26, 2024), https://perma.cc/KB6X-9LDM (noting FCC Task Force's conclusion "that broadband connectivity. . . . can arguably be considered a *super* determinant of health").

28. Press Release, Fed. Commc'ns Comm'n, *FCC Waives Rural Health Care and E-Rates Program Gift Rules to Promote Connectivity for Hospitals and Students During Coronavirus Pandemic* (Mar. 18, 2020), https://perma.cc/G4KH-EXP9.

32

## CONCLUSION

To avoid liability under Plaintiffs' "material contribution" theory, an ISP such as Cox would be forced to terminate subscribers en masse upon the slightest accusations of infringement. Terminated subscribers, including innocent users who may not even know they share accounts with repeat infringers, would face near-insurmountable difficulties with fundamental parts of life as a result, from finding and maintaining work to getting an adequate education to obtaining healthcare.

The law does not compel that drastic result. Plaintiffs' "material contribution" theory finds no support in any statute, nor in any precedent of this Court. The Court should apply traditional patent law principles of secondary liability to reject that theory and reverse the decision below.

Respectfully submitted,

MICHAEL BARCLAY
   *Counsel of Record*
MITCHELL L. STOLTZ
BETELHEM Z. GEDLU
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
michael@eff.org
(415) 436-9333

*Attorneys for Amici Curiae*
  *Electronic Frontier Foundation,*
  *American Library Association,*
  *the Association of Research Libraries,*
  *and Re:Create*

Dated: September 5, 2025