Russell Greer
1100 Dumont Blvd
Apt 139
Las Vegas, NV 89169
801-895-3501
russmark@gmail.com
Pro Se Litigant

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **RUSSELL GREER** | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO STRIKE** |
| Plaintiff | Case No.:   2:24-cv-00421-DBB-JCB |
| v. | |
| **JOSHUA MOON ET AL,** | |
| Defendants | |

Defendants' opposition confirms that the disclosure of Natalie Banks is improper and should be stricken. Rather than identifying admissible testimony tied to any claim or defense, Defendants' response demonstrates that Ms. Banks is offered solely to advance subjective character narratives, stigma, and online escalation—precisely the type of collateral material Rules 26, 403, and 602 prohibit.

## I. Defendants' Disclosure Necessarily Creates a Circular Character Dispute

Defendants contend that Ms. Banks is relevant because she personally believes Plaintiff is "dangerous." That theory is self-defeating. If Ms. Banks may testify based on her subjective impressions, Plaintiff would hypothetically be entitled to present rebuttal witnesses offering contrary subjective impressions of Ms. Banks. Plaintiff has a connection to a sex worker witness who has **personally met and interacted with Ms. Banks** and would hypothetically testify that Ms. Banks is "not a nice person," hostile, and unreliable.  Unlike Ms. Banks—who has never met Plaintiff in person—this rebuttal witness possesses firsthand knowledge of Ms. Banks herself. Plaintiff has no plans to introduce any witnesses unless this Court for some reason allows Banks to testify, which as shown below, would create an absurd, circular phenomenon.

Allowing Defendants' disclosure would therefore devolve discovery into an endless loop of finger-pointing:

- "Natalie believes Russell is dangerous,"
- countered by "another witness believes Natalie is untrustworthy,"
- followed by further rebuttals and sur-rebuttals.

This is the definition of a collateral mini character trial. Courts routinely exclude such evidence because it substitutes personal animus for probative facts and risks confusing the issues before the Court. Rule 403 exists precisely to prevent litigation from becoming a forum for competing

personal grievances. The fact that Defendants' theory necessarily opens this circular dispute proves irrelevance.

**II. Ms. Banks Lacks Personal Knowledge Under Rule 602**

It is undisputed that Plaintiff has **never met Ms. Banks in person**. There was no physical interaction, no relationship, and no real-world contact beyond sporadic Instagram messages sent months apart for about a year.

Ms. Banks' opinions regarding Plaintiff's character, intent, or alleged dangerousness are therefore not based on firsthand observation. They are speculative impressions formed from limited online exchanges and third-party material, which are inadmissible under Rule 602. By contrast, Plaintiff's rebuttal witness has met Ms. Banks personally. This asymmetry further illustrates why Ms. Banks' testimony lacks the personal knowledge required for admissibility.

# III. Ms. Banks' Public Statements Demonstrate Bias and Disability-Based Animus

Ms. Banks' public content further underscores why her testimony is unreliable and prejudicial. In multiple YouTube videos, Ms. Banks publicly mocks, insults, and characterizes Plaintiff using derogatory language, including comments about Plaintiff's appearance and facial disability, referring to him as "creepy looking," and "lunatic," and framing his disability as part of the basis for her hostility. **EXHIBT A.**

These statements are not reactions to any violent conduct. Defendants do not identify a single Instagram message in which Plaintiff threatened violence or engaged in aggressive behavior. The Instagram messages were saying "hi," flirting, and eventually Ms. Banks' own descriptions instead reveal that her negative views stem from personal dislike, false research, and appearance-based judgments—not firsthand experience.

Such bias is precisely why courts exclude character-based testimony offered under the guise of relevance. Allowing a witness whose animus is intertwined with disability-based ridicule to opine on "dangerousness" would be unduly prejudicial and improper under Rule 403.

## IV. The Circularity Problem Confirms Inadmissibility

Defendants' theory collapses under its own logic. If Ms. Banks' belief that Plaintiff is dangerous is admissible, then Plaintiff's belief—based on Ms. Banks' own public conduct—that **she is dangerous** would also be admissible.

That result is absurd.

The Court would be left adjudicating:

- who fears whom,
- who dislikes whom,
- and whose subjective impressions are more persuasive.

That is not evidence. That is narrative escalation. The Federal Rules do not permit discovery to devolve into reciprocal accusations untethered from any claim or defense.

## V. Defendants Mischaracterize the Purpose and Character of the Copyrighted Work

Defendants' attempt to justify Ms. Banks' disclosure by invoking "fair use" rests on a mischaracterization of Plaintiff's book, *Why I Sued Taylor Swift* (2017). As explained in Chapter 1, the work was written to **clear Plaintiff's name**, respond to media distortion, and explain how online dogpiling can irreparably damage a private individual—particularly one with a disability.

The book is expressive, explanatory, and defensive. It does not advocate violence or harassment. Fair use analysis under 17 U.S.C. § 107 turns on Defendants' use of the work—not on whether a third party forms a hostile opinion of the author after reading it. **Exhibit B.**

A witness's subjective reaction cannot convert infringement into fair use.

## VI. Defendants' Theory Rewards Online Dogpiling

Finally, Defendants' reliance on Ms. Banks exemplifies the very phenomenon Plaintiff's book documents: online dogpiling, where accusations compound as third parties adopt and amplify prior narratives without firsthand knowledge.

Ms. Banks' involvement arose only after Defendants' conduct and reflects reputational escalation, not probative evidence. Permitting Defendants to bootstrap such escalation into admissible testimony would incentivize harassment rather than adjudicate copyright claims.

## CONCLUSION

Because Natalie Banks lacks personal knowledge, exhibits clear bias, offers only subjective character opinions, and would necessarily trigger endless collateral disputes, her disclosure violates Rules 26, 403, and 602 and should be stricken. Defendants' opposition confirms that Ms. Banks is offered not to prove copyright issues, but to inject stigma and prejudice into the case.

The Motion to Strike should be granted.

Respectfully submitted,

Russell Greer
/rgreer/
12-12-25

**CERTIFICATE OF SERVICE:**

Pursuant to FRCP 5(b), I certify that on 12-12-25, I served a true and correct copy of the attached document by ECF to all attorneys on record.

**EXHIBIT A**

## The CRAZIEST client stalking the Nevada brothel scene

**Transcribed by [TurboScribe.ai](TurboScribe.ai). [Go Unlimited](Go Unlimited) to remove this message.**

Okay, so quick disclaimer here before I start this video because the person who I'm making this video about, he is very, very litigious. Not that I'm worried. I'll explain later, okay? This is probably gonna be a multi-part series because it is a long and rambling story, but the payout at the end is very, very worth it.

I've been wanting to make this video for a really long time, but you know, since I was working in legal brothels and I didn't want to attract the rage of this unhinged lunatic towards my places of work or myself while he was in close physical proximity to me, I held back on this, okay? So yeah, since he is very litigious, I will not be using his name and I will be double, triple, and quadruple checking this video before I post it to ensure that that does not happen, okay? If the dude chooses to show up in my comment section and identify himself by freaking out and trying to defend himself, that would be on him, not on me because I'm not even going to include his real name, okay? All of the information though that I know about this guy is all public information through a bunch of different court records, news articles, his own social media posts, and interactions that I've had like via email and like Instagram DMs between the two of us, okay? So it's like none of these things are, you know, like private information, okay? Literally any person can very easily find it and maybe he should have thought about the things that he did before he did them that would later become public record if he didn't want people to think a certain type of way about him. Okay, disclaimer over, but let's get into it. This is a passion project and the brothel tea that I have been dying to spill.

Let's get into it. This story unfortunately began some point in late 2022, early 2023 when I started receiving some emails from the dude. I'll just, I'm just gonna call him the dude, fuck it.

So the dude starts emailing me and like I've been escorting independently and, you know, just doing other forms of sex work for like, you know, over like a decade at that point and I could see a time waster. I mean, I skimmed the first couple sentences of the email and I was very easily to determine, able to determine that this guy was like a waste of time, didn't really look into the emails, forgot about it, whatever. Well, flash forward a couple months and I'm like, I get off of work and I, it was like four o'clock in the morning, I'm at the brothel and I was, I'm drunk and I'm going through my phone and looking at my emails and I see that the guy reached out again, but this time I actually read the email, okay, and dude was like trying to say that he was opening another brothel in a nearby town and that he would love for me to come and work there, blah, blah, blah, blah, blah.

So the first thing I do, I'm like, oh really, what's this? You know, that's kind of weird and poachy, you know, but so anyways, I, first I look up, I believe that the, um, it was West Wendover, which is right next to Utah and right next to all of the Mormons. Okay. So for a little bit of context here, okay.

So I look up new legal brothel opening in West Wendover and all I see is articles about how they, how the city has made all these ordinances about how they will never, ever, ever do that. And so I go back and I reread the email and it's like, and you know, kind of look at a map because I'm not living in Nevada at that point. And I'm determining that it's like, bro, you want me to come out to a brothel that does not exist in the middle of the desert for why? Okay.

Red flags just going up everywhere. So I, you know, and I'm drunk, I'm feeling broggy. So I, so I emailed him back.

And also I had another important piece of information. He had his face, he has a picture of himself, like attached to his email contact, uh, contact, contact thingy. And he looks creepy as shit.

Like the face, his face is so creepy. Okay. Just our first impressions, creepy as fuck.

Okay. For two, he signed it with like, his email signature was the name of his LLC. Okay.

And so I messaged him back because my line thinking is like, I'm a smart, I think I'm a relatively smart person. I'm at least have a little bit of common sense. Right.

And I was quickly able to determine that this guy is on some bullshit and a fucking creeper who was trying to lure sex workers to the middle of the desert to work somewhere that does not exist. So what would you do when they get there? Okay. I could see this.

Maybe other girls wouldn't be able to see this and would fall for it and get hurt in some ways. So I messaged him back and I cussed him the fuck out. I'm like, you know, you creepy bitch.

Why are you trying to lure sex workers into the middle of the desert? Go fuck yourself. I'm happy where I'm working right now. You know, also very, very predatory and poachy to try to poach other brothels as employees, you know, like fuck off dude.

So I fall asleep shortly after that. And, you know, I'm, this is at the brothel. So I wake up in the morning and my boss is knocking on the door, on my room's door.

And he is like, he's like, just so you, he's like, I got an email about you. And I'm like, what? And he's like, Oh, I heard that you're really ableist. And, um, you've upset, you upset this dude.

He's like, I'm not mad at you, but that's fucking hilarious. Honestly, he's a creep. Don't worry about him.

He's been, you know, around for a while. So I'm like, what? So anyways, this guy, he goes and he had, um, emailed my boss off of the brothels website to tell my boss that I am ableist person that is discriminating against him because he has a facial disability. And this facial disability, um, is a very weird facial disability is a word that he like a term that he actually uses himself.

Okay. But very weird. I've never heard of a facial disability.

Um, I'm like, what ugly? Well, no, I come to find out that it is actually Mobius syndrome and half of his face is paralyzed and he was born that way. Okay. Um, so I, so I look back and I'm like, cause I'm like, how dare you bitch? How dare you try to get me in trouble with my job? Okay.

You stalker. So, um, I, I reopened the emails and he changed his email signature that used to be his LLC name to paralyzed face productions, just to try to be like, gotcha. And you know, to clarify, like if I had mistakenly called a disabled person who actually does have a very real disability that affects their face.

If I, at some point had called them ugly or creepy looking out of pocket, you know, I feel like this would be a whole entire different story, but I did call him a creepy looking bitch. Okay. Because he was being creepy.

Okay. And being disabled does not give you a free pass to be a fucking lunatic who tries to lure women into the middle of the desert under false pretenses. He was being creepy.

I could tell just from the very small icon size picture that he looked creepy. And so I called him a creepy bitch just to clarify. So, um, you know, after like, you know, that drama was over and I figured out that I wasn't actually in trouble.

Uh, he's very well known. I'm like, Hmm, what, what's up with this guy? Because you don't, you're stalking me. You're stalking my job.

You're trying to get me in trouble at my workplace. So what the fuck is up with this dude? So I start looking into him and the web of batshit insanity that I ended up unraveling about this guy, literally kept me occupied for like a year straight watching YouTube videos, listening podcast, um, like literally anything I could find on this guy. It was all hilarious.

I mean, I really, really had a lifetime's worth of, um, entertainment that I uncovered about this man. And that's what I'm going to get into in this video's second part. So stay tuned for that.

**Transcribed by [TurboScribe.ai](TurboScribe.ai). [Go Unlimited](Go Unlimited) to remove this message.**

**EXHIBIT B**

# WHY I SUED TAYLOR SWIFT

## and How I Became Falsely Known as Frivolous, Litigious and Crazy

## By Russell Greer

## Comic Illustrations by a Hired Ghost Illustrator

2                                    Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB    Document 415    Filed 12/12/25    PageID.2499    Page
13 of 38

Copyright © 2017 by Russell Godfrey Greer.

Copyrighted with the United States Copyright Office

All rights reserved, including the right to reproduce this book or portions
thereof in any form whatsoever.

For information: whyisuedtaylorswift@gmail.com

First Published Paperback & E-Book Editions October 2017.

Manufactured in the United States of America

10 9 8 7 6 5 4 3 2 1

ISBN: 978-0-692-97010-2

ISBN: 978-0-692-97011-9 (e-book)

The name "Taylor Swift" and pictures of Taylor Swift are used in accordance
with Fair Use, Creative Commons and information laws.

Stay up to date with the book and more:

www.whyisuedtaylorswift.com

3

Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB    Document 415    Filed 12/12/25    PageID.2500    Page 14 of 38

# Foreshadowing Epigraph:

"Either I'm dead right or I'm crazy" – Jefferson Smith,

*Mr. Smith Goes to Washington.* (1939)

4

Why I Sued Taylor Swift.   Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB     Document 415     Filed 12/12/25     PageID.2501     Page 15 of 38

# BOOK DEDICATION:

In loving memory of Bailee Barnard: a beautiful and talented girl who took her life due to events surrounding this entire incident.

(1996-2017)

Legal Disclaimer:

All depictions and representations written in this book are based on true events that happened between May 2014 to May 2017 involving the author's interactions with Taylor Swift, her agents and her family. Some events in this book have been established under the doctrine of presumption i.e. establishing non-existing facts based on existing facts and statements, but those facts have not been embellished or fictionalized. Each word, each sentence, each paragraph, each page, each claim, each statement and each depiction are all truth and have citations and evidence to support each claim and statement. All names, places, people and their likeness, and works of art are used in their originality and entirety and are protected under 17 U.S.C. 107. (Fair Use), as this book is intended for commentary, research, scholarship and establishing truth amidst media defamation about the author.

It should be noted that the author wrote Swift numerous times to her multiple houses and she did not respond. Therefore, the author is not liable for defamation or for using her likeness, as Swift had plenty of time and opportunity to oppose this book.* Her agents were also made aware of this book and they chose not to respond either.

*Some names and events have been changed for privacy or to make the story flow smoother. All events are mostly true, though.

6

Why I Sued Taylor Swift.  Russell Greer. 2017

# TABLE OF CONTENTS

Animated Introduction...........................................................................................................7

Prologue...............................................................................................................................11

Chapter 1: The Duty of Being in the Spotlight........................................................................13

Chapter 2: Russell Greer: the Man, the Myth, the Legend......................................................28

Chapter 3: The Winner Gets Taylor........................................................................................42

Chapter 4: Dirty, Rotten, No Good Agents.............................................................................54

Chapter 5: Burning Down the Forest......................................................................................85

Chapter 6: When You Mess with the Queen Bee....................................................................111

Chapter 7: Russell Greer v. Taylor Swift: the Small Claims Trial............................................132

Chapter 8: PLOT TWIST!........................................................................................................144

Chapter 9: She Chose Him Over Me.......................................................................................150

Chapter 10: The 50 Million Dollar Taylor Swift Lawsuit.........................................................155

Chapter 11: My Ultimate, Bigoted Backstage Experience......................................................158

Chapter 12: Quick Blurb on the Overhyped Colorado DJ Trial................................................162

Chapter 13: Fighting the "Taylor Swifts" in Your Life.............................................................164

Why I Sued Taylor Swift. Russell Greer. 2017





8    Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB    Document 415    Filed 12/12/25    PageID.2505    Page 19 of 38



ALL THAT RUSSELL HAD EVER WORKED FOR WAS FALLING APART.

HE SOON LIED IN THE WRECKAGE OF HIS BROKEN DREAMS.

AND NOW OUR STORY BEGINS.

# **PROLOGUE**

So there I lied amidst the wreckage of my cloud nine: metaphoric glass covered me and the flames fanned by the news media and the internet trolls surrounded me. After two years of giving all of my heart and all of my talent to impress Taylor Swift to have her help me, a disabled songwriter, in some way, I had been shafted by her agents and her; I had been left high and dry; all of my good intentions and efforts had been spat upon by them. It was like the whole thing was a reenactment from the music video for her song, "*Bad Blood*". Instead of her crashing through the window, though, it was me who was falling backwards through the glass – the cloud nine that I rode upon sputtering out of my control -- falling several stories down in slow motion, not believing what had happened. As my body was smashed and strewn across a car, so to speak, the shock set in. In my mind's eye, I could see her and her agents and her family laughing at me like wild hyenas, as they sipped wine in fancy wine glasses, toasting to my defeat and my misery. And I could see them all slowly turn away. Taylor Swift gave me a wicked smile with one side of her mouth and then she turned away, leaving me surrounded by the flames.

After weeks of slowly recovering from the aftermath of it all, with the news refusing my requests to cover the truth of what I went through (they blasted false stories of me all over the internet, though) and the trolls dragging my name through the mud, I decided to write this book to explain my side of things and to try seeking justice for myself and to reveal events that the news wouldn't cover and that the police refused to pursue. Some of those events were: the many people who tried taking my life; the death threats against my family; a girl committing suicide; the online bullying and the stalking against me; Taylor Swift slandering my intentions and how Taylor's record label tried hiding this event. This book is an attempt to clear my name and to

show that I'm not crazy or frivolous or litigious, but to show that I'm a human being who stands

on principle. This book gives an in-depth look into what really happened, and also shows how

Taylor Swift and her agents had duties to not shaft me. This book shows the plight of the

disabled who struggle to get into the entertainment industry. It also shows how elitism in

Hollywood is implicit discrimination. Most importantly, it encourages those who may have "a

Taylor Swift" in their life to not back down. It encourages those who have been wronged to not

give up, but to fight back; to scream and shout; to get on tabletops and yell from the top of your

lungs; to bring attention to your situation, and if needs be, set the situation on fire so others can

see the unjustness.

# CHAPTER 1:

# The Duty of Being in the Spotlight

If I told you that Taylor Swift destroyed my life, even though her and I never physically met, would you burst into hysteric laughter and write me off as "crazy"? What if I told you that I gave all of my money and heart to Taylor Swift because I relied on her representations, which she gave through her words and her actions, only to be left broke and broken-hearted, would you shake your head and throw this book away, not wanting to read the fanatical writings of a raving lunatic? Both rhetorical questions aren't as bizarre as they seem. Those questions also establish the thesis and the backbone for this entire story: celebrities, upon certain circumstances and in certain situations, are responsible for any misrepresentations that they give to their fans or people wanting to work with them. Celebrities owe a duty to those people. Further, no contract is required to establish this duty, given the power of influence that celebrities have. [1]



("Arrival in France following the Crossing of the English Channel". Photo Credit: David Blackwell. via Visualhunt / CC BY-ND. Photo credit: https://www.flickr.com/photos/mobilestreetlife/6951888583/ David Blackwell. Via https://visualhunt.com/re/547137" Visualhunt http://creativecommons.org/licenses/by-nd/2.0/ CC BY-ND).

---

[1] Read, *"Celebrity Endorsement: Recognition of a Duty"* by Jay Kogan, The John Marshall Law Review. (1987) (A fascinating read on why celebrities can be liable for the products that they negligently misrepresented. Also discusses how celebrities should held liable for their influential actions).

Yep, blasphemy, I know! Your face may look just like that swimmer's after reading the

above paragraph, but for this story to make any sense, I had to dedicate an entire chapter to

define duties that Taylor and other celebrities need to abide by or they could find themselves in

hot water. So before you condemn me and set the dogs on me, hear me out. For me to explain

myself clearly, I would like to present my arguments in two different sections: (1) a "layman's

context" (non-legal context) to establish a basic understanding of a duty and (2) a "legal

ramifications context" to establish how a celebrity should and could be found liable in a court of

law.

## The Layman's Context for Celebrity Duty

Let's start with defining what a "duty" is in the normal sense of the word. *Webster's*

*Dictionary* defines a "duty" as: "obligatory tasks, conduct, service or functions that arise from

one's position (as in life or in a group)."[2] These duties can be as simple as driving a car and

having the duty to observe traffic laws. Other duties become more complex with professionals

having to abide by set standards of care. *Black's Law Dictionary* puts it more simply: "Wherever

there exists a right in any person, there also rests a corresponding duty upon some other person

or upon all persons generally."[3] The keywords in these two definitions are "a right" and a

"position".

Now that we have a general understanding of what a duty is, the question still stands: do

celebrities owe any duties at all to their fans? Based upon these two dictionary definitions, yes:

celebrities, given the ***positions*** that they are in with the ***rights*** that they hold, owe a duty to their

fans for any misrepresentation (false statement or false action) that they make. Kind of like what

---

[2] Definition of "Duty". Merriam-Webster Dictionary online. (https://www.merriam-webster.com/dictionary/duty).
[3] "What is a Duty?" Black's Law Dictionary.

15                                   Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB      Document 415      Filed 12/12/25      PageID.2512      Page
26 of 38

Uncle Ben said in Tobey Maguire's *Spider-Man*: "With great power, comes great responsibility."
Some heads might be exploding right about now, but stay with me because it's true. Celebrities,
given their DNA chemistry build up of being humans and their being public figures, enjoy two
rights: the right to privacy and the right to publicity.

As stated above, since celebrities breathe, bleed, belch and get bored[4] like the rest of us
do because they are only human too -- believe it or not -- they enjoy their rights to privacy just
like us "average Joes and Janes" do. Celebrities deserve to have private dinners and
conversations with their loved ones. Celebrities deserve to sleep and live comfortably in their
lavish homes and not have to worry about trespassers. Celebrities deserve the right to stroll
around downtown and enjoy the night out without being stalked by paparazzi and obsessive fans.
These superstars and international idols deserve every right that any other human being on this
planet deserves: a little peace and quiet, if they so desire.

And since they are celebrities, they also enjoy the right to publicity: the right to choose
which products can use their images and likeness. Many megastars enjoy the right to be able to
trademark their names to be used on fragrances, jewelry and other products. For example, in
intellectual property law, a person is able to trademark his or her name when it has established a
"*secondary meaning*", which means that the name has become well-known and familiar with the
populace.[5] "Taylor Swift" is obviously a household name. At the time of this writing, a search
was conducted on the *United States Trademark* search website and Taylor Swift has trademarked
at least 62 different trademarks that bear her name or initials.[6] Obviously, Ms. Swift knows that
there is power in her name, but I'll save the legal "mumbo jumbo" for the legal section of my

---

[4] Felt like using all "B" verbs.
[5] *"What is Secondary Meaning?".* FreeAdvice Legal.
(https://law.freeadvice.com/intellectual_property/trademark_law/secondary_meanings.htm).
[6] *Trademark Electronic Search System.* United States Patent and Trademark website.

16                                    Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB    Document 415    Filed 12/12/25    PageID.2513    Page
27 of 38

arguments. Needless to say: celebrities know they've "got the power!". I use that song quote in

my best Penny Ford cover voice -- except my voice doesn't go that high.[7] I sound more like a

dying cat than doing a cover song. As a side note, you'll see that I throw in a lot of "tongue-in

cheek" pop reference jokes in this book -- I also throw in a lot of "side notes", just as a side note.

Believe it or not, it's not all fluff that celebrities possess some extraordinary power to

sway people. They know that they possess this power. Why do you think pop singer Katy Perry

actively campaigned with Democratic presidential nominee Hillary Clinton during the 2016

presidential elections? Perhaps Katy is a political junkie? Maybe Katy was concerned about the

possible direction of the country? So why didn't she do this as a private citizen? Why did she

have to perform on the campaign trail? Because Katy knew that with her popularity and level of

name recognition that she could garner more votes. Not just Katy, but many other celebrities

turned out to support Hillary Clinton: Beyonce, Jay-Z, Demi Lovato. There's even a non-profit

political group that uses celebrity spokespeople to help persuade young people to vote: *Rock the

Vote*.

With the expanding use of social media and technology, celebrities are now being dubbed

"*social media influencers".* The accounts of celebrities, either ran personally by them or by an

associate of theirs, are now identified with a blue check mark that signifies their accounts as

"verified", signifying that the accounts actually belong to them, since people, for some odd

reason, like to create duplicate, fake accounts of celebrities. On Taylor Swift's social media

platforms, she has 77 million followers on her Facebook; 103 million followers on Instagram; 25

million YouTube subscribers and 85 million followers on her Twitter. Combined, that's around

290 million people she's influencing -- give or take the duplicate and fake accounts that follow

---

[7] It's a song. "I've Got the Power" by Snap! (1990).

17                              Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB    Document 415    Filed 12/12/25    PageID.2514    Page
28 of 38

her.[8] One of those two hundred ninety million people is bound to be influenced in a way Taylor

Swift may not have meant. Ahem...right here...yours truly…

One may think, "So? It's just a celebrity. Let them post and do what they want." On the

contrary, *Growing Pains* actor Kirk Cameron once said in an interview, "With the privilege of a

platform, comes great responsibility." Cameron went on to say that when any celebrity is in the

spotlight, "you're going to be held to a higher standard -- and we should be held to a higher

standard -- because we're influencing more people than others might be."[9] Cameron went onto

say that a celebrity should be careful of what they do and say. Since Cameron is indeed a

celebrity and a public figure, his statement validates the thesis of this chapter and entire book:

celebrities have a duty to be careful with their words and actions, as to not create a

misrepresentation. That is the duty and the point I want you to take away from this chapter and

this book. The law treats a celebrity's identity like property, and just like any other property

owner, celebrities should be held liable for the misuse of their property; their image; their stunts.

Four words: Remember Uncle Ben's Advice.

The magnitude of a celebrity representation is so strong, one could compare it to "the

Force" that Jedis from Star Wars have. The Force can be used for either good or evil-- Hey, don't

do that! I see your eyes rolling. Don't believe me? Let's take a look at the various research done

on the topic of celebrity influence. Technological company *Ace Metrix* conducted a study in

2013 and found that 45% of American adults believe that celebrities can create a large positive

difference in the issues that they are promoting.[10] In the early 2000s, Dr. Lynn McCutcheon

coined the term "*Celebrity Worship Disorder*" after studying those who appeared to have a form

---

[8] I'm just that good with math.
[9] *"Kirk Cameron Talks About Celebrity Standards and New Film"*. WebProNews. (2014).
[10] *"How Influential are Celebrities?"*. Marketing Charts. 2014.

18                                    Why I Sued Taylor Swift.   Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB      Document 415      Filed 12/12/25      PageID.2515      Page
                                    29 of 38

of *Obsessive Compulsive Disorder* in regards to celebrity admiration.[11] In 2017, a peer-review

study compiled economical, psychological and sociological research and found 14 different

celebrity "mechanisms" that affected health behavior. Some of these mechanisms included

signals, herd behavior, social networks and other influencing mechanisms. The study went on to

show how easy celebrities can sway and entice the populace and their followers.[12] So the writing

is definitely on the wall with celebrity power. But heck, don't take my word for it! Hop on

Google and you can find exactly what I'm talking about.


## Taylor Swift's Misrepresentations

Since this book is about why I sued Taylor Swift, I wanted to share a few examples of her

misrepresentations so that the upcoming legal argument of this chapter makes sense. Some of her

misrepresentations have been done verbally in interviews, while other misrepresentations have

been made through her actions. Naturally, as an internationally famous celebrity, her

misrepresentations are carried around the world through the news, which influences her

followers and those that admire her. A few of her misrepresentations that directly influenced me

are as follows:

1.  Taylor Swift accepting a wedding invitation from a random girl. Swift accepted

    this and performed without compensation at the wedding. She even posted

    pictures of the event on her Instagram. This stunt influenced me and created a

---

[11] *"Celebrity Worship Syndrome".* Psychology Today. (2013).

[12] *"Celebrities' Impact on Health-Related Knowledge, Attitudes, Behaviors, and Status Outcomes: Protocol for a Systematic Review, Meta-Analysis, and Meta-Regression Analysis".* BioMed Central. (2017).

19                                         Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB    Document 415    Filed 12/12/25    PageID.2516    Page
30 of 38

representation that it would be fine to send correspondence to Taylor Swift and that she would be welcoming to my efforts.[13]

2.   In 2014, Swift accepted many different prom dates from boys who reached out to her. These boys did lousy things to reach out to Swift, but she was flattered and accepted each date. This influenced me and created a representation that if I were to reach out to her doing something unique, she would welcome it. This not only influenced me, but it apparently influenced many other people who asked her to prom, including a boy confined to a wheelchair.

3.   The music video for Taylor's song, "*New Romantics*" begins with a voice over of Swift saying: "The fans are the best part of this tour." This influenced me when I watched the video and I felt that since I was a fan of Taylor Swift, her appreciation for her fans extended outside of tours. I felt that she would be so happy and flattered to hear the story and the efforts of a disabled songwriter who toiled away on a song meant to make her happy; a song written ABOUT her.[14]

4.   In 2015, Taylor's mom, Andrea, came down with cancer. For some odd reason, two girls in Utah made 1,989 paper cranes for Taylor and her mom. I'm still unsure what paper cranes are meant to do for a terminally ill person and still unsure what said person is supposed to do with one thousand nine hundred eighty-nine of them, but the Swifts were overjoyed and these two girls were able to meet

---

[13] *"Taylor Swift Just Crashed a Fan's Wedding -- and She Even Brought a Gift!"*. Brides.com (2016).
https://www.brides.com/story/taylor-swift-crashes-wedding-and-performs-song
[14] *"New Romantics -- Taylor Swift"*. Youtube.com (2014).

Taylor backstage. This created a representation that if I did something unique for

Taylor, it would be met with admiration. [15]

5. In 2013, a movie about Paul Potts, a winner on *Britain's Got Talent*, was released.

Taylor Swift wrote and performed the theme song for the movie. In an exclusive

interview to promote the movie, Taylor Swift stated: "The struggles and triumphs

of someone who never stopped chasing what he was after really inspired me." Her

statement not only influenced me, but it also inspired me to give all of my heart

and talent with impressing her. Her statement created a representation that she

would be open to my story of triumphs against the odds.[16]


Do you see the pattern I'm setting up here? Taylor Swift has made many

misrepresentations that influenced me to act and those representations harmed me when I

realized she didn't actually mean what she represented, whether she was just reading a script for

the promotion of a movie or she felt like doing a publicity stunt for somebody who was throwing

a lavish wedding, but had no intention of doing anything else with any other person who wrote to

her. Whatever the reason may be, Swift has a duty to not create misrepresentations. So what's a

girl to do, you may think? How can Taylor Swift not lead people on? Well, that leads us to our

next section.

## **Legal Ramifications**

Realizing that not all of my readers have a legal education like I do, I'll try to make this

section as coherent as possible. For starters, let's establish the United States' legal system. The

---

[15] "*1,989 Paper Cranes for Taylor Swift's Mother*". KSL News.
(https://www.ksl.com/?sid=34416212&nid=148&title=slc-girls-fold-1989-paper-cranes-for-taylor-swiftrsquos-mom).
[16] "*One Chance -- EXCLUSIVE First Look with Taylor Swift*". Youtube.com (2013).

legal system of the United States is referred to as a "common law" legal system, which means
that the courts and the practice of law is based upon precedent.[17] Precedent, not to be confused
with the president[18], essentially means that lower courts must follow the rulings of higher courts.
In the United States' legal system, there are three levels of courts: (1) district court/trial court, (2)
appeals court and (3) the high court. Each of the 50 states have their own version of the three
court system, as does the United States' federal government, with the United States Supreme
Court being the highest court in the country.[19] So, as an example, if an appeals court says that it's
unconstitutional (goes against the United States' Constitution) for a house to be built in the
middle of a busy street intersection, a lower court must abide by that ruling, unless the lower
court can show why it should disregard the appeals court's ruling. That's basically the low-down
of precedent. Now we can continue on to celebrity misrepresentation liability.

You, my reader, may be thinking, "There's no precedent that says Taylor Swift can't say
or do what she wants." I care to disagree. Let me explain. There are two types of precedent:
*mandatory* and *persuasive authority*. With mandatory authority (from the Supreme Court, direct
appeals courts), lower courts and agencies, etc, must follow the rulings. With persuasive
authority (different appeals courts in different jurisdictions; agency rulings and policy settings),
lower courts aren't bound to follow, but they can choose to if so persuaded. When it comes to
persuasive authority and precedent, courts like to look for a "robust consensus" of said
precedent.[20] Courts want to see that there is a lot of argument towards allowing the persuasion.
The majority of my arguments against Taylor Swift and for her liability are admittedly only

---

[17] *"Common Law Systems"*. TransLegal. (2017). (https://www.translegal.com/lesson/8161).
[18] Hardy har har har LOL. I'm so funny!
[19] *"Introduction to the Federal Court System"*. Justice.gov (2017) (https://www.justice.gov/usao/justice-101/federal-courts).
[20] *Morgan v. Swanson,* 659 F. 3d 359 (5th Circuit 2011).

22                                 Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB      Document 415      Filed 12/12/25      PageID.2519      Page
33 of 38

persuasive authority, but there is a robust consensus with what I argue. The *Federal Trade
Commission* is my saving grace and makes my seemingly insane comments sane.

The Federal Trade Commission (abbreviated "FTC") was established in 1914 by
President Woodrow Wilson. The FTC's sole purpose is to protect the little guys like you and me.
Since the 1930s and earlier, the FTC has been cracking down on misrepresentations.[21] A lot of
these misrepresentations have had to do with celebrities and public figures misrepresenting
products they advertised and endorsed. For instance, in 1978, the FTC went after 1950s singer
Pat Boone after he negligently endorsed acne medicine, saying that his daughters used it, when
in fact they did not use the product. The FTC slammed Mr. Boone and said that he did not make
a "reasonable inquiry into the truthfulness" of his statements or of the product that he endorsed.[22]
In April 2017, the Federal Trade Commision sent out letters to 47 different celebrities, warning
them about their use of their social media profiles containing potentially misleading
representations. No, Taylor Swift was not on the list, but some of the celebrities included Sean
Combs, Luke Bryan, Heidi Klum and 44 other big to small name celebrities.[23] If anything, this is
the knock out punch that shows celebrities can be held liable for their misrepresentations. This
FTC precedent can extend from the endorsement of products to celebrities' publicity stunts.

Unfortunately, only the FTC can bring lawsuits against celebrity endorsers for their
misrepresentations of products under the *Fair Trade Commission Act* or *15 U.S. Code § 41-57,*
as the legislation does not allow private causes of action. But these arguments and cases do form
persuasive authority against celebrities for one to sue in a regular court of law, under a
*negligence* cause of action. As was seen in a few of the FTC cases, the FTC berated the celebrity

---

[21] *Federal Trade Commission v. Standard Education Society* (1930).
[22] *In re Cooga Mooga,* 92 F.T.C. 310, 321 (1978).
[23] *"All 47 Celebrities Who Received Warnings From the Government About Their Instagrams".* Cosmopolitan (2017).
(http://www.cosmopolitan.com/entertainment/celebs/a9624256/celebrities-list-ftc-warnings-sponsored-social-
media/).

endorsers for failing to provide disclosures and disclaimers with their social media posts and the
products that they advertised. A person that felt wronged and misguided by a celebrity for their
misrepresentation (like moi), could easily cite these cases as persuasive authority. While they
couldn't argue anything under the FTC laws to find the celebrity liable, they could argue that the
celebrity, or in my case: Taylor Swift, failed to provide adequate disclaimers that her publicity
stunts did not create invitations to encourage others to invest time and money into impressing her
because how was I supposed to know without any warnings? Blame the whole "Celebrity
Worship Disorder" thing. And if you're wondering: no, I did not have a shrine of Taylor Swift --
I did have a trophy room of her, though. I'M KIDDING!

     A "Duty to Warn"; a "Failure to Warn"; however you want to word it, is indeed a cause
of action that many people sue under in the courtroom for many different things. Since we are
comparing a celebrity's right to publicity as a piece of property, one could easily cite property
law. As is common knowledge, property owners can be held liable if they fail to warn of
potential hazards on their property. That's why many homes have different signs that say:
"Beware of Dog"; "24 Hour Surveillance"; "Alligators and Snakes in Area"; "No Lifeguard on
Duty" for the homes with pools. The same kind of risks and harms could befall a follower of a
celebrity relying on said celebrity's intellectual property -- like this book's author relied on Swift
and her image.

     As I explained earlier, there are many sociological and mental effects that celebrity
influences can have on a person, so that would be another reason for a celebrity to be urged to
warn of any dangers her influence and her stunts may have on a person. In the psychological and
psychiatry community, psychologists have a duty to warn the police and others if their patient is

24                                    Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB     Document 415     Filed 12/12/25     PageID.2521     Page
35 of 38

going to harm himself or others.[24] A California Supreme Court case highlighted the importance

of the duty that counselors have to protect society, with Justice Matthew O. Tobriner writing:

"...We conclude that the public policy favoring protection of the confidential character of patient-

psychotherapist communications must yield to the extent to which disclosure is essential to avert

danger to others. The protective privilege ends where the public peril begins." In comparison,

while Taylor Swift and other celebrities may enjoy the right of being able to sway and create

publicity stunts, that privilege must be checked with a balance of a disclaimer to protect the

public from potential peril stemming from celebrity influence. Said perils could include possible

suicides stemming from disappointment or mass hysteria, as seen with Orson Welles and the

"War of the Worlds" radio broadcast. To be fair, Welles did give a disclaimer at the beginning of

his broadcast, but it apparently wasn't enough. Go see the video of the girl crying over Justin

Bieber if you don't believe that celebrities have mental effects on the public.

It's not an uncommon thing for the entertainment industry to have disclosures. At the end

of movies that have animals doing stunts, there are usually disclaimers saying, "No animals were

harmed during the production of this movie" and those disclaimers have a *PETA* stamp of

approval to validate their authenticity. This is the movie studio's way of avoiding animal cruelty

lawsuits. In other instances, disclaimers will be at the end of movies denying that the events were

based on any real people or situations. This is commonly known as an "*All Persons Fictitious*"

disclaimer, which was actually created in response to a libel lawsuit from 1932.[25] Such a

disclaimer is the production company's form of due diligence to show that they have taken all

precautions possible to avoid libel. So it's not far-fetched for celebrities to have disclaimers and

---

[24] *"Ethical Principles of Psychologists and Code of Conduct: Including 2010 and 2016 Amendments".* American
Psychological Association. (2016).
[25] *"Any Resemblance to Persons Living or Dead: Film and the Challenge of Authenticity".* Stanford.edu. (2016).
(https://web.stanford.edu/dept/HPS/HistoryWired/Davis/DavisAuthenticity.html).

25                          Why I Sued Taylor Swift.  Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB      Document 415      Filed 12/12/25      PageID.2522      Page
36 of 38

disclosures with their publicity stunts. In fact, with everything explained in this chapter, Taylor

Swift and other celebrities would be wise to have them, in the form of the "*Not All Buyers Will*

*Qualify" disclaimers.*

Lastly, people often scoff and argue that one (Taylor Swift) must be in a contract with

another to be found liable for any damage she inflicts on another or that the damage must be

direct physical damage like an assault or a car wreck. Not true. The law is no stranger to harms

suffered by "third persons". In fact, since 1789, courts have held that those who make

misrepresentations can be held liable for the damages inflicted on third persons, as was

illustrated in an English case of a man being found liable for deceit because his

misrepresentations influenced a person he never meant to influence.[26] Negligent statements

published and carried in the media have found misrepresenters liable when they influence a class

or group of people.[27] Fans and followers of Taylor Swift would constitute as a group of people,

as she is directly influencing them; they follow Swift's words, moves and actions. A *Metallica*

fan would probably not be a fan of Taylor Swift, so Swift's disclosures would not need to apply

to him or her.

One court case that particularly reinforces this chapter was a case that came out of

California in the 1960s. A woman was reading through a catalog magazine and saw a stamp of

approval for a certain pair of shoes. When the lady bought the shoes, though, they were actually

defective and she fell and hurt herself. The court ruled that because the publisher had

independently placed its stamp of approval on the shoes, it showed that it had a chance to

discover the truth of whether the shoes were defective or not. The court also held that because

the stamp was meant to attract customers, the magazine should have known that customers

---

[26] *Palsey v. Freeman,* 3 Term Rep. 51, 100 Eng. Rep 450 (K.B. 1789).
[27] Willcox v. Harriman Securities Corp., 10 F. Supp. 532 (S.D.N.Y. 1933); Holloway v. Forsyth, 226 Mass. 358, 115 N.E. 483 (1917).

26                                                    Why I Sued Taylor Swift.   Russell Greer. 2017

Case 2:24-cv-00421-DBB-JCB      Document 415      Filed 12/12/25      PageID.2523      Page
37 of 38

would rely on the representation, writing, "Hearst ... placed itself in the position where public

policy imposes upon it the duty to use ordinary care in the issuance of its seal ... so that members

of the consuming public who rely on its endorsement are not unreasonably exposed to the risk of

harm."[28] Further, the court held that no privity of contract was required, based on the position of

trust and influence the publication had on the public. This case has been cited in many different

courts in many different jurisdictions involving many different situations. Dozens, if not

hundreds, of other cases have been ruled on throughout the years since this case and they have all

came to the same conclusion: persons or companies or products who give misrepresentations to

third persons, even if they are not in a contract with those persons, and who are in influential

positions, can be held liable for their misrepresentations.

      In comparison to the *Hanberry* case and the other cases that followed it, Taylor Swift is

in a position where public policy (society's expectations) dictates she uses careful judgement and

disclaimers with her publicity stunts and statements. After all, she is, in a way, placing her

"stamp of approval" on the publicity stunts and social causes and wedding crashes she partakes

in. It's not like she's unaware of what she's doing. Taylor isn't clueless to the fact that she's

loved and adored by millions. She knows she's sought after. The liability is on her hands for any

misrepresentations that she gives that leads to harm. Some say, "Don't sweat the small stuff."

Well, when a celebrity has the power to cause a person to invest thousands of dollars into

impressing him or her because of their being a celebrity, said celebrity should definitely sweat

the small stuff.

      I realize that there is much more to a lawsuit than I have explained, so this chapter was

just a cursory glance at celebrity liability for their misrepresentations. I only touched the "tip of

---

[28] *Hanberry v. Hearst Corp.,* 276 Cal.App.2d 680,  683  (Cal. Ct. App. 1969)

the iceberg", if you will, to demonstrate how Taylor Swift could be held liable if I were to sue

her again in federal court -- which I almost did. But the takeaway from this chapter is: celebs, be

less careless and more cautious with your publicity stunts. You have no idea how much you

influence the public.