Russell Greer
1100 Dumont Blvd
Apt 139
Las Vegas, NV 89169
801-895-3501
russmark@gmail.com
Pro Se Litigant

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **RUSSELL GREER** | **PLAINTIFF'S RESPONSE TO ECF 438** |
| Plaintiff | Case No.:   2:24-cv-00421-DBB-JCB |
| v. | |
| **JOSHUA MOON ET AL,** | |
| Defendants | |

Defendants' Notice is exactly why Plaintiff has taken the approach of not responding to Defendants' belligerent emails because every explanation from Plaintiff becomes an accusation.

A. ***Schulte* is a very real case.**

1. It is an UNPUBLISHED case from the 10th Circuit, where several other cases cite it, but it's on the Google Scholar website and is cited exactly as *Schulte v. Potter*, 218 F. App'x 703, 709 (10th Cir. 2007). **EXHIBIT A.** Greer had to to find the actual case on Justia. **EXHIBIT B.**

2. For the record, Plaintiff doesn't have access to West Law. He uses Google Scholar. So maybe the citation Defendants look up looks different in West Law, but Exhibit A proves it's indeed a real case and that's how it's cited.

3. If anything, Defendants failed to consult more than one reporting database before shooting off their baseless notice. A simple Google search would have confirmed it was indeed a real case.

4. As stated to Defendants in a 1-12-25 email, he misread and thought they cited *Schulte.*

5. Regardless, the point plaintiff's reply was trying to make was that Defendants claim that plaintiff didn't meet and confer isn't fatal to his Rule 37 Motion because a meet and confer would have been futile.

6. Ironically, it is Defendants who failed to conduct due diligence before writing their reply.

B. ***Obannon* DOES INDEED EXIST**

1. Plaintiff will admit that he incorrectly cited the WL number, but the underlying case is real and exists on PACER**.**

2. The O'Bannon order appears on the District of Kansas docket as ECF No. 49 in Case No. 24-2060-JWB-ADM, dated November 26, 2024. **EXHIBIT C** (true and correct copy of the order).

3. This proves the case is not fabricated or invented. The citation error was limited to the WL identifier, not the existence of the case.

4. Defendants' Notice is based on searching the wrong case number. Defense counsel searched **"22-2060"**, a completely different case (Saili v. Waste Management), and then concluded that O'Bannon "does not exist." The correct case number is **2024cv2060**, not **22-2060**. This mistake explains why Defendants told the Court the case "does not exist."

5. Defendants also ignored the PACER link Plaintiff sent them on January 12, 2026**.** Plaintiff explicitly provided Mr. Hardin with the direct docket link to the O'Bannon order. Defendants' Notice does not acknowledge that link or explain why they did not review it. **EXHIBIT D.**

6. Instead of reviewing the provided citation, Defendants persisted with the assertion that the case "does not exist." This omission creates a misleading impression for the Court.

7. Plaintiff relied on the O'Bannon order in good faith for its reasoning, not for its WL citation. The O'Bannon order discusses **futility of conferral under Rules 16/30**, which is the exact reasoning Plaintiff relied on.

8. The substance was quoted accurately. The only error was the WL number and defendant —an ordinary, non-sanctionable citation mistake.

**C. Defendants mischaracterize Plaintiff's email correspondence**

1. In their Notice, Defendants state that Plaintiff "did not explain how he thought Schulte is a real case that exists." Respectfully, this misstates both Hardin's question and Plaintiff's answer.

2. Mr. Hardin did not ask Plaintiff to prove the existence of *Schulte*. Hardin asked **why Plaintiff believed Defendants had relied on Schulte** in their Opposition. Plaintiff answered that question directly:

   - Plaintiff misread Defendants' motion

   - the arguments Defendants made mirrored the Schulte futility framework

   - Plaintiff mistakenly attributed that reliance to Defendants

3. Plaintiff has nevertheless provided the actual *Schulte* decision through Google Scholar and Justia in this response.

4. Defendants' claim that Plaintiff "did not explain how Schulte exists" is therefore inaccurate and shifts the goalposts from the question counsel actually asked.

Plaintiff researches and verifies each citation he puts his documents. Defendants' notice should be ignored.

Respectfully submitted,

Russell Greer
/rgreer/
1-12-26

**CERTIFICATE OF SERVICE:**

Pursuant to FRCP 5(b), I certify that on 1-12-26, I served a true and correct copy of the attached document by ECF to all attorneys on record.

**EXHIBIT A**

6:21    .ıll 5G 🔋

**Brent v. TG BAKER TRUCKING, INC., Dist. Court, D. Ne…**

Fed.(a)(1). The Court's Order Adopting Joint Status Report and Provisional Discovery Plan and Setting Case Management Deadlines and Discovery Parameters (Doc. 24) (hereinafter, "Scheduling Order") provides further guidance. The Scheduling Order warns that "[t]he Court will not entertain" a motion to compel discovery responses "unless the attorney for the moving party has conferred or has made reasonable effort to confer with opposing counsel concerning the matter in dispute prior to filing the motion." Doc. 24 at 3; *Schulte v. Potter*, 218 F. App'x 703, 709 (10th Cir. 2007) (unpublished) (affirming magistrate judge's denial of a motion to compel for failure to meet and confer). "A `reasonable effort to confer' means more than mailing or faxing a letter to the opposing party." Doc. 24 at 3; *see also Rogers v. 3Bear Energy, LLC*, No. 21-376 KG/SCY, 2023 WL 6065303, at *2 (D.N.M. Sept. 18, 2023) (holding that counsel's "lengthy email detailing his position" was an inadequate attempt to meet and confer). "Absent exceptional circumstances, parties should converse in person or telephonically." Doc. 24 at 3.

Here, the only effort defense counsel took to confer with opposing counsel is a letter to which he received no response. Doc. 41 at 1-2; Doc. 41-2 (Exh. B). To the Court's knowledge, the parties never "converse[d] in person or telephonically," regarding the disputed discovery. *See* Doc. 24 at 3. By the plain language of the scheduling order, defense counsel did not make a "reasonable effort to confer" with opposing counsel. *See id.* ("A `reasonable effort to confer' means more than mailing or faxing a letter to the opposing party."). Accordingly, the Court "will not entertain" defendant's motion. *See id.*

De~~fendant's motion~~ ☐ ⟨ ⟩  ☐  ar.google.com ↻  po ⋯

(Doc. 41) is hereby DENIED without prejudice. Notably, the Court has reviewed the contents of the motion and

**EXHIBIT B**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 26, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

KAREN K. SCHULTE,

        Plaintiff-Appellant,

v.

JOHN E. POTTER, Postmaster
General, USPS,

        Defendant-Appellee.

No. 05-5209
(D.C. No. 03-CV-361-K(M))
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

---

After a bench trial in this age discrimination suit, the district court entered judgment in favor of defendant John E. Potter, Postmaster General of the United States Postal Service (USPS or Postal Service). Plaintiff Karen K. Schulte appeals. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## Background[1]

Schulte was born on June 9, 1941, and has worked for the USPS since 1994, primarily as a rural route carrier.  According to her testimony, she applied for twenty-five supervisory positions over a thirty-eight month period.  Three of those positions are particularly relevant to our discussion.  In July 2000, when Schulte was fifty-nine, she applied for a promotion to a supervisory position through the Postal Service's Associate Supervisor Program (ASP).  In the ASP selection process, a committee of postal officials reviews applications in which the identity, age, and certain other identifying characteristics of the applicants are redacted.  In addition, the application contains a section referred to as "Knowledge, Skills, and Abilities," or "KSAs," in which applicants provide narrative responses concerning their achievements in six different areas such as leadership and decision making.  Applicants whose KSA answers the committee deems adequate move on to an interview.

The position for which Schulte applied in 2000 was in processing and distribution, involving work on the "plant" side of the USPS, which concerns the behind-the-scenes movement of the mail.  Schulte's KSAs were deemed adequate and she was interviewed, but she was not selected for the position.  She initiated a claim of gender discrimination through the Postal Service's Equal Employment

---

[1]    The background facts are drawn largely from the district court's written findings of fact and conclusions of law.

Opportunity (EEO) process.  The parties entered into a settlement agreement by which the Postal Service offered Schulte a temporary supervisory position (204-B position) in early 2001.  Her tenure in that position ended in November 2001, and she returned to working as a rural route carrier.

In March 2002, Schulte, who was then sixty years old, applied for another ASP position, this time in customer service.  An entirely different committee composed of Susan Beck, the postmaster of Tulsa, George Frame, the postmaster of Oklahoma City, Elizabeth Inman, then postmaster of Muskogee, and Jacqueline Bouffard, then manager of training, conducted the hiring process.  Schulte was notified in June 2002 that she was not selected for an interview because her KSA answers were deficient, in particular her decision-making KSA.

Meanwhile, on March 5, 2002, Schulte was accused of recirculating mail during a mail count at the Chimney Hills Postal Station in Tulsa, Oklahoma.  To understand this accusation, some background is necessary.  The pay of a rural route carrier such as Schulte is based in part on how much mail she delivers.  To make that determination, the USPS periodically counts the actual number of pieces of mail that are distributed, or "thrown," to a carrier's route, or "scheme." Mail that is thrown to the wrong scheme is referred to as a "misthrow."  When a carrier finds a misthrow in her "case," she is supposed to bring it to the "misthrow case" for redistribution by the clerks through the "hot case."  During a mail count, a carrier is supposed to inform the person counting the mail if they

-3-

receive a misthrow that was counted.  But if, as alleged here, a carrier places into the misthrow case properly sorted mail that has already been counted and does not tell the counter, it would be counted again when it is thrown back to that carrier's scheme, thereby inflating the number of pieces of mail that are counted and increasing her annual salary.  Fifteen or sixteen extra pieces of mail can inflate an annual salary by as much as $1,600.

With this understanding we may turn to the events of March 5, 2002.  On that day, Pam Cameron, a USPS clerk who had developed familiarity with Schulte's scheme over a twenty-year period, was sorting mail to the carriers at Chimney Hills.  Cameron noticed that some misthrows were coming through more than once, even after she had paid particular attention to sorting the mail to the correct scheme through the hot case.  She marked those pieces with a small "x" and sorted them to the correct route only to have them come back again through the misthrow case.  Cameron observed Schulte return the marked mail to the misthrow case at least once and concluded that Schulte must be taking it from the hot case and placing it in the misthrow case.

Cameron brought this to the attention of Schulte's supervisor, Lila Lawrence.  Lawrence confronted Schulte with the marked mail and informed her of the nature of the accusation.  Schulte acknowledged that some of the marked mail (approximately thirteen pieces) belonged to her scheme but denied the charge.  Lawrence excluded several pieces of mail Schulte claimed did not belong

-4-

to her scheme and conducted an investigation, after which she submitted a report to a USPS labor relations specialist, Jeffrey Dalton, recommending termination. Schulte filed a union grievance that went to arbitration, and Dalton represented the USPS.  The arbitrator found that Schulte had recirculated mail but imposed a twenty-two month unpaid suspension rather than termination.

Schulte also filed an EEO complaint of discrimination with the Postal Service.  Initially she alleged only retaliation for an earlier EEO filing, not age discrimination.  She later amended her EEO complaint to include a claim of age discrimination.  Obtaining no relief, Schulte filed the action underlying this appeal.  Some of her claims were dismissed during pretrial proceedings, including her claim that the denial of her 2000 ASP application and her removal from the 204-B position were because of her age and in violation of the Age Discrimination in Employment Act, 42 U.S.C. §§ 621-634 (ADEA).  Two of her other ADEA claims, those based on the proposed termination and resultant discipline for recirculating mail and on the denial of her 2002 ASP application, proceeded to a four-day bench trial.  After trial, the district court issued thirty-one pages of detailed findings of fact and conclusions of law and entered judgment in favor of the USPS on both of Schulte's claims.  This appeal followed.

### Analysis

Schulte's statement of the issues presented on appeal is somewhat unclear. As we see it, she raises three issues:  (1) the district court erred in denying one of

her discovery motions; (2) the district court erred by excluding certain evidence at trial; and (3) the district court did not properly consider certain evidence at trial. We address each point in turn.

### 1. Discovery error

Schulte propounded two requests for the production of documents that are at issue, Request Nos. 44 and 45, that in essence demanded the production of documents showing the makeup of the USPS workforce according to age for the previous ten years both nationally and in the Oklahoma and/or Tulsa region. *See* Aplt. App., Vol. I at 306. The USPS objected on overbreadth and relevance grounds and also claimed that it did not have any responsive documents and would have to write and install a new computer program to extract the information from its computerized databases. Schulte filed a motion to compel, which was her second in the case (Second Motion to Compel). A magistrate judge held a hearing and, on July 2, 2004, issued a written order denying the motion because there were "no responsive documents in existence," and stating that he would not require the USPS to create reports based on "statistics concerning the age of Defendant's work force." *Id.* at 230. In reaching his decision on the merits, the magistrate judge excused Schulte's counsel's "failure to confer in good faith" prior to filing the motion, a requirement under the court's local rule, LCvR 37.1. *Id.* at 226-27.

-6-

Schulte did not file any objections to the magistrate judge's order with the district court. Instead, on September 29, 2004, less than three months before the scheduled trial date, she filed a motion styled as a motion to reopen discovery and strike all scheduled dates. The motion was based on allegedly newfound "evidence that calls into question the veracity of the discovery answers of Defendant USPS . . . concerning the availability of . . . statistical data [of its promotion practices]." *Id.* at 231. The new evidence was an affidavit from a USPS employee, Gus Reinolds, who claimed to be familiar with USPS computer systems and who averred that those systems contained data about the age of promoted employees. In the motion, Schulte asked the district court to "reopen discovery for the limited purpose of pursuing the statistical data the availability of which she has apparently been misinformed by Defendant USPS." *Id.* at 233.

The magistrate judge held a hearing at which Schulte presented two witnesses, Reinolds and F. Bennett Callicoat, an attorney with computer database experience who testified that databases ordinarily can be queried quickly and easily, without writing a new program, in order to extract information of the type Schulte sought, namely, the age of employees when they were promoted. Callicoat, however, had no first-hand knowledge of the USPS's databases.

The magistrate judge treated the motion as one to compel rather than one to reopen discovery and denied it on two alternate grounds, the first being Schulte's counsel's failure to comply with the meet-and-confer requirements of Fed. R. Civ.

-7-

P. 37(a)(2)(B)[2] and LCvR 37.1.[3]  In reaching this decision, the magistrate judge

specifically noted that it was not the first time Schulte's counsel had failed to

comply with these rules, Aplt. App., Vol. I at 304,[4] and he rejected the futility

argument Schulte's counsel had presented at the hearing because LCvR 37.1 did

not list futility as an exception, *id.* at 305.

---

[2]     Federal Rule of Civil Procedure 37(a)(2)(B) requires any motion to compel discovery to "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action."

[3]     At the time of the magistrate judge's decision in November 2004, LCvR 37.1A. provided as follows:

> Regarding all motions relating to discovery pursuant to Rules 26 through 37, Federal Rules of Civil Procedure, the court will refuse to hear any such motion, unless counsel for movant first advises the court in writing that the lawyers have personally met and conferred in good faith, but that, after a sincere attempt to resolve differences has been made, they have been unable to reach an accord.  However, no personal conference shall be required where the movant's counsel represents to the court in writing that counsel have conferred by telephone and the distance between counsels' offices renders a personal conference not feasible.  An exchange of correspondence alone does not satisfy this requirement.

*See* Aplee. Supp. App. at 81.  The rule also listed two exceptions not relevant here.  The rule was amended as of March 2, 2005, but we apply the rule in effect at the time the magistrate judge rendered his decision.  *See United States v. 51 Pieces of Real Property*, 17 F.3d 1306, 1310 n.6 (10th Cir. 1994) (applying procedural rule in effect at time of relevant event in district court rather than amended version).

[4]     The magistrate judge also noted that Schulte had failed to comply with LCvR 7.1E, which extends the meet-and-confer requirement to all nondispositive motions.  However, it does not appear the magistrate judge's first basis for denying Schulte's motion was grounded in that rule, so we need not consider it.

Alternately, the magistrate judge denied Schulte's motion on the merits. He compared the language of the written requests seeking documents pertaining to "the makeup of the USPS's workforce according to age" with Schulte's contention that she was seeking "statistical data of [USPS] promotion practices," *id.* at 307, and concluded that Schulte's "current motion seeks to rewrite Requests 44 and 45 to obtain information that was not previously requested," *id.* at 309. The magistrate judge declined to "accept a broad construction of [Schulte's] inartfully drafted discovery requests," noting that she had "more than adequate time to develop her case, but has not been diligent in doing so. She has repeatedly failed to follow Court rules, has not properly sought discovery of the information she now seeks, and has offered only speculation that the information she now seeks would assist her case." *Id.* at 310. The magistrate judge also stated that Reinolds's affidavit presented no new information because the court, in its ruling on Schulte's Second Motion to Compel, had previously acknowledged the existence of "age-related data, but ruled that it would not require [the USPS] to create reports to respond to Request Nos. 44 and 45." *Id.* at 309. Schulte filed a motion asking the district court to review the magistrate judge's order, which the district court denied.

As an initial matter, we conclude that the magistrate judge properly treated the motion as one to compel rather than one to reopen discovery. The relief Schulte requested was a court order directing the USPS to produce the requested

reports on the grounds that it was easy to do and would not require writing a new computer program. Indeed, in this court, despite claiming that her motion was not one to compel, Schulte states that at the hearing before the magistrate judge, she "argued that . . . production *should be compelled*" for these very reasons. Aplt. Opening Br. at 53 (emphasis added). Accordingly, the meet-and-confer requirement of both Fed. R. Civ. P. 37(a)(2)(B) and LCvR 37.1 applied.

We review the denial of a motion to compel for abuse of discretion. *Norton v. City of Marietta*, 432 F.3d 1145, 1156 (10th Cir. 2005) (per curiam). "Under this standard, we will not disturb a trial court's decision absent a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (quotation omitted). We review a district court's application of its local rules for abuse of discretion. *See Hernandez v. George*, 793 F.2d 264, 266 (10th Cir. 1986).

To reiterate, the magistrate judge denied Schulte's motion to compel because futility was not a listed exception to the meet-and-confer requirement of LCvR 37.1. Schulte argues that futility is an appropriate exception and cites to one district court opinion, *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 351, 356 (N.D. Ill. 2005), that acknowledged that the futility doctrine was applicable to meet-and-confer requirements of the local rule.

Assuming that the futility doctrine is applicable, a matter we need not decide, we conclude that compliance with the meet-and-confer requirement would

-10-

not have been futile in this instance. Schulte's motion was based on allegedly

new information, the Reinolds affidavit, and she supported her motion with

Callicoat's testimony. The magistrate judge could not understand how Schulte

could be simply "rehashing" the same discovery request (and thus claiming

futility) when she had information of which the USPS allegedly was unaware

concerning the ease with which the requested information could be drawn from

USPS databases. Aplt. App., Vol. I at 240:5-8. We agree. Had Schulte presented

this information to opposing counsel prior to filing her motion, the USPS may

have reconsidered its position or argued that Schulte's new information was

erroneous, either of which in turn may have avoided the need for court

intervention and fulfilled the purpose of the meet-and-confer requirement.

Futility therefore was not an appropriate reason for noncompliance. The

magistrate judge's order denying the motion to compel on the ground that Schulte

did not comply with the meet-and-confer requirement was not an abuse of

discretion, particularly in view of the fact that the magistrate judge previously

had excused Schulte's failure to comply with the requirement in connection with

her Second Motion to Compel and the magistrate judge's reference to Schulte's

repeated failure to follow court rules and lack of diligence in developing her case.

Accordingly, we affirm the magistrate judge's order on this basis and need not

address the alternate basis on which the magistrate judge relied.

### 2. Exclusion of evidence

Schulte contends that the district court wrongly excluded evidence from Steve Lundak, who was the station manager at the Chimney Hills Postal Station at the time she worked the temporary 204-B position. "We review a district court's exclusion of evidence for an abuse of discretion." *Cartier v. Jackson*, 59 F.3d 1046, 1048 (10th Cir. 1995).

At trial, Schulte's attorney asked Lundak if he knew what factors typically cause the termination of a 204-B position. The district court sustained an objection by the USPS because Schulte's claim as to that job action had been dismissed. Schulte's counsel then made an offer of proof, stating that Lundak's testimony would show that he did not want Schulte removed because she did a good job for him but that "he had to have that happen," and that his evaluation of her work performance in her 204-B position was relevant to her performance just a few months later in connection with the allegation that she had recirculated the mail. Aplt. App., Vol. II at 546:22 to 547:7. The court noted that counsel had just asked Lundak about his view of her performance, which he had answered, repeated that the objection would be sustained, *see id.* at 547:8-12, and sustained further objections as counsel continued to question Lundak about the termination of Schulte's 204-B position, *see id.* at 547:14 to 550:4.

Schulte now claims that Lundak's testimony would have revealed the role that Susan Beck, postmaster of Tulsa, played in the decision to remove Schulte

-12-

from her 204-B position, which would have put "into a very different light" Beck's role in Schulte's discipline and the denial of her 2002 ASP application. Aplt. Opening Br. at 29-30. This theory differs from the offer of proof counsel made at trial, which concerned only Lundak's opinion of Schulte's performance and the fact that he did not want her removed. We ordinarily do not consider new theories on appeal, even one "that falls under the same general category as an argument presented at trial or . . . a theory that was discussed in a vague and ambiguous way." *Bancamerica Comm'l Corp. v. Mosher Steel of Kan., Inc.*, 100 F.3d 792, 798-99 (10th Cir.) (quotation omitted), *opinion amended on other grounds*, 103 F.3d 80 (10th Cir. 1996). But even considering Schulte's argument, it fails because Schulte has made no showing that Beck's role in Schulte's removal from her 204-B supervisory position was motivated by age bias. Lundak's testimony, therefore, if indeed it would have encompassed Beck's role in that removal, as Schulte argues on appeal, would have been irrelevant to whether any role Beck might have played in either of the later employment actions was motivated by age bias. We therefore conclude that the district court did not abuse its discretion when it refused to permit Lundak to testify about Schulte's removal from her 204-B position.

### 3. The district court's consideration of the evidence

The bulk of Schulte's appellate argument concerns her view that the district court overlooked or mischaracterized certain evidence presented at trial. She

-13-

suggests that properly construed, the evidence is so overwhelmingly in her favor that this court should enter judgment in her favor.[5]  To the extent Schulte challenges the district court's findings of fact, we review for clear error, giving due regard to the trial court's opportunity to judge the credibility of the witnesses. *See* Fed. R. Civ. P. 52(a).  "[T]he question for this court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *N.L.R.B. v. Viola Indus.-Elevator Div., Inc.*, 979 F.2d 1384, 1387 (10th Cir. 1992) (quotations and alteration omitted) (en banc). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).  Further, it is not our function "to infer material facts." *Transport Equip. Co. v. Guaranty State Bank*, 518 F.2d 377, 383 (10th Cir. 1975).

---

[5]    The Postal Service argues that by failing to move for judgment as a matter of law under Federal Rule of Civil Procedure 50 in the district court, Schulte has waived appellate review of the sufficiency of the evidence insofar as she repeatedly suggests that this court may enter judgment in her favor because the evidence weighs so strongly in her favor.  Rule 50 by its express language applies only to jury trials, not bench trials.  The applicable rule in bench trials provides that "[w]hen findings of fact are made in actions tried without a jury, the sufficiency of the evidence supporting the findings may be later questioned whether or not in the district court the party raising the question objected to the findings, moved to amend them, or moved for partial findings." Fed. R. Civ. P. 52(b).  *See also Colonial Penn Ins. v. Market Planners Ins. Agency, Inc.*, 157 F.3d 1032, 1036-37 & nn.2-3 (5th Cir. 1998) (failure to file post-trial motion after bench trial does not preclude appellate challenge to sufficiency of the evidence).  Accordingly, Schulte's arguments concerning the sufficiency of the evidence are not waived.

And we may not make a controlling inference that the trial court did not make
"and which, if done, would in effect constitute a trial de novo." *Id.*

Schulte's contention that the court overlooked evidence is based in large
part on the fact that the district court stated a number of times in its decision that
she had presented "no evidence" (or some variant of that phrase) on a certain
point. *See, e.g.,* Aplt. App., Vol. I at 360, ¶ 32; 364, ¶50; 366, ¶60; 366, ¶62;
373, ¶88; 377, ¶97; 378, ¶104; 380, ¶109; 382, ¶114. Schulte concludes that these
types of statements mean that the district court based its ruling only on her failure
to present any direct evidence of discrimination when in fact, according to her,
she presented a large quantity of indirect evidence that supported her claims such
"that judgment may be entered [in her favor] on the strength of the omitted
evidence alone," Aplt. Opening Br. at 9. To this extent, Schulte in effect
contends that the district court committed a legal error. We review the district
court's application of legal standards de novo. *Sinajini v. Bd. of Educ.*, 233 F.3d
1236, 1240 (10th Cir. 2002).

As we proceed to discuss with reference to the district court's treatment of
the evidence, Schulte's reading of the court's use of the phrase "no evidence" and
its variants is flawed. The court's use of that phrase encompassed direct or
indirect evidence, or both, depending on the context. It is clear that on certain
points Schulte had presented no competent evidence, direct or indirect, while on
others she presented no persuasive evidence either because the witness was not

-15-

credible or less credible than another witness, the testimony was irrelevant, immaterial, speculative, or nonprobative, or the testimony conflicted with other testimony that the court considered persuasive. As to still other points, the district court was not required to discuss particular testimony for reasons we have explained as follows:

> The exclusion of certain testimony from the findings is not necessarily an error. In making findings under [Rule 52], a trial court is not a dictating machine. Its findings do not have to contain evidence supporting every possible viewpoint. The judge weighs the evidence and ascertains what the facts are. Nor need the trial court make findings as to every detail. [Rule 52] does not require the making of elaborate findings extending into minute and unnecessary detail on every feature of the case, but is met in full measure if the findings cover in clear, definite and concise language the contested issue or issues in the case. Findings of fact are sufficient if they indicate the factual basis for the court's general conclusion as to ultimate facts and are broad enough to cover all material issues.

*Nulf v. Int'l Paper Co.*, 656 F.2d 553, 561 (10th Cir. 1981) (internal citations and quotation marks omitted). With these prefatory remarks in mind, we now turn to Schulte's specific arguments concerning witness testimony.

**Thomas Stone.** Stone testified as an expert witness for Schulte. Schulte argues that his function was not to establish age discrimination but to establish that the method used to select a candidate for the 2002 ASP position was unreliable. Nevertheless, as Schulte acknowledges, Stone discussed the comparative qualifications of Schulte and Jorge Torrico. Both Schulte and Torrico had applied for the 2000 and 2002 ASP positions. In 2000, when Schulte

-16-

was fifty-nine and Torrico was thirty-eight years of age, each candidate had similar KSA scores but Schulte scored higher in the interview process.  Neither was selected.  In the 2002 process, each of their KSA answers were substantially similar to the answers each gave in 2000, yet Torrico's scores stayed the same or went up while Schulte's score went dramatically down on the KSA concerning decision-making, which led to her disqualification from consideration.  Stone concluded that the disparity in scores could not be explained by anything other than age bias.  *See* Aplt. App., Vol. II at 415:24 to 416:1; 424:22 to 425:5.

Stone further discussed documents he reviewed, which, according to Schulte, show that both candidates for the 2000 ASP position over fifty were eliminated quickly and only one candidate over forty made it past the first stage of review and even then was rated fifth out of six.  Aplt. Opening Br. at 16.[6]  And also according to Schulte, the documentation shows that in 2002, candidates over forty-six years of age were eliminated in the first round, including Schulte, and the successful candidates were ranked in reverse order by age (i.e., youngest first, oldest last).  *See id.*

The district court found that Stone's opinion concerning age bias in the 2002 ASP application process was unsupported because he could not offer any

---

[6]    We note that this summation of the documentary evidence does not appear to account for Schulte's selection for an interview for the 2000 ASP position.  *See* Aplt. App., Vol. IV at 1034 (letter informing Schulte that she was selected for interview).

empirical data that the hiring system was infected with age bias, could not exclude other biases, failed to review relevant evidence such as testimony or statements by the ASP decision-makers or the guidelines they used, was unaware that the 2000 ASP position was in the plant side of operations and the 2002 ASP position was in customer service (ostensibly requiring different skill sets), and made no allowance for innocent differences of opinion between the 2000 and 2002 ASP committees. Aplt. App., Vol. I at 368-69, ¶ 71-72, 74. The court also noted several of Stone's admissions about the deficiencies in his opinion that can best be summed up by an excerpt from his own testimony: "I don't have the kind of evidence I would need for a clear finger that points to age bias. I know there must have been some kind of bias because the qualifications were so equal yet the outcome was so different." *Id.*, Vol. II at 448:18-21.

We conclude that the district court's findings of fact as to Stone are not clearly erroneous. Contrary to Schulte's argument, the court did not "shut its eyes" to the evidence of age bias that Stone presented or the supporting documentation in the record, Aplt. Opening Br. at 17. The court heard Stone's extensive testimony, considered its shortcomings, and found considerable flaws in it. Nothing in Stone's testimony or the documentation required the district court to find otherwise. Even if we agreed with Schulte that Stone's testimony established that the 2002 ASP committee "could" eliminate older workers if it

wanted to do so because the selection system was flawed, *see id.* at 42, Stone's
speculation did not require the district court to find that the committee did so.

In its conclusions of law, the district court noted that Schulte had offered
Stone's opinion, as well as her own, that she was qualified for the 2002 ASP
position, but concluded that the relevant consideration was the USPS's perception
of her abilities.  *See* Aplt. App., Vol. I at 379, ¶ 108.  Schulte contends that this
was a legal error because the evidence is relevant to the legitimacy of the Postal
Service's asserted perception under *Tyler v. RE/MAX Mountain States, Inc.*,
232 F.3d 808 (10th Cir. 2000).  As we explained in *Tyler*, "evidence indicating
that an employer misjudged an employee's performance or qualifications is, of
course, relevant to the question whether its stated reason is a pretext masking
prohibited discrimination."  *Id.* at 814 (quotation and brackets omitted).  We
agree therefore that the evidence of Schulte's qualifications was relevant, but the
district court further stated that even if the committee's assessment of Schulte's
qualifications was incorrect, there was no reason to believe that the committee
had acted in bad faith or that their decision was the result of age bias, *see* Aplt.
App., Vol. I at 380, ¶ 109.  Schulte takes issue with that statement, which is a
factual finding although not denominated as such, *see Sanchez v. Philip Morris
Inc.*, 992 F.2d 244, 247 (10th Cir. 1993) (whether discrimination is intentional is
a factual question), by asserting that "[t]he evidence is overwhelming that the
2002 committee did not act in good faith."  Aplt. Opening Br. at 42.  The district

court disagreed with Schulte's evaluation of the evidence, and we see no clear error in that disagreement.  As discussed below, the evidence was not overwhelming that the 2002 committee acted in bad faith.

**Gus Reinolds.**  Reinolds had worked in human resources for the USPS in Tulsa in the early 1980s and later held USPS positions in Texas related to transportation services and contracts.  Although the district court found that he had no involvement with Schulte's employment or her 2002 ASP application, *see* Aplt. App., Vol. I at 369, ¶¶ 75-76, which implicitly suggests the court found his testimony to be irrelevant, the two were socially acquainted.  Schulte told him that she was concerned that her nonselection for the 2002 ASP position was due to age bias.  The only portion of Reinolds's testimony that Schulte references is the following, which she contends is evidence of the Postal Service's pattern and practice of age bias:  "Myself personally, . . . at age 59, that's kind of late to be putting in for that type of position because if you want to go higher, you've got to put some time into those positions. . . . [I]f I've got 30 applicants, I'd say younger versus older."  *Id.*, Vol. II at 465:11-18.  The district court sustained a relevancy objection to that testimony.  *Id.* at 465:22.

While pattern or practice evidence may be relevant to a disparate treatment case, the evidence must relate to the employer's practice.  *See Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 449 (10th Cir. 1981).  Contrary to Schulte's argument, the preface to Reinolds's statement, "[m]yself personally," Aplt. App.,

Vol. II at 465:11, clearly indicates that regardless of whether or not his past work experience was in a managerial capacity, as Schulte contends, he was providing his own views, not those of the Postal Service. The district court did not err in determining that Reinolds's statement was irrelevant.

**Paula Quinn.** Quinn worked with Pam Cameron sorting mail at the Chimney Hills Postal Station. Her testimony primarily concerned innocent ways mail could be recirculated and Cameron's work ethic and sorting accuracy. The district court discounted Quinn's testimony because she could not remember if she was present on the day Schulte allegedly recirculated the mail and because her description of scenarios in which there could be continued errors in recognizing a scheme did not exist on the date in question and could not apply where "Schulte acknowledged, on sight, that the mail in question belonged to her route." *Id.*, Vol. I at 362, ¶ 41. We see no clear error in the district court's treatment of Quinn's testimony as it relates to Cameron.

**Lynn Jones.** Jones, who worked as a postmaster for twenty years in several Oklahoma communities and was retired at the time of trial, testified that she had been discriminated against in a number of ways because of her age. In particular, she stated that younger postmasters were able to secure various supervisory assignments while she was not, and that after she turned fifty, her requests for support staff and funding went unfulfilled while younger postmasters' staffing requests were fulfilled and she experienced budget cuts.

-21-

The district court determined that her ambiguous testimony failed to exclude nondiscriminatory explanations and also was irrelevant because there were no decision-makers common to, and no similarity between, the adverse employment actions Jones alleged were due to age bias and Schulte's nonselection for the 2002 ASP position. *See id.* at 369-70, ¶¶ 77-79; 381, ¶ 114.

Schulte argues that the district court overlooked Jones's testimony and that the testimony was relevant. We disagree. Contrary to Schulte's argument, the district court did not overlook Jones's testimony—the court expressly discussed it, although perhaps not in as much detail as Schulte would have liked. *See id.* And while Jones's testimony may have been relevant despite the fact that there were no common decision makers, it was of little persuasive value. In *Mendelsohn v. Sprint/United Mgmt. Co.*, 466 F.3d 1223 (10th Cir. 2006), we declined to extend the "same supervisor" requirement to contexts other than those involving discriminatory discipline, in particular to a case where a plaintiff claims to be a victim of a company-wide discriminatory reduction in force. *See id.* at 1226-28. This reasoning applies equally to a failure to promote claim. An inference that an employer maintains a broad discriminatory policy can be drawn from evidence that an employer refused to promote other employees who are in the same protected class as the plaintiff. Such evidence therefore may be relevant to the plaintiff's individual claim that a particular failure to promote is discriminatory regardless of whether the same decision makers were involved in

the various decisions.  On that score, the district court properly admitted Jones's testimony over objection.  But when testimony like Jones's is, as the district court concluded, "so ambiguous as to wholly fail to eliminate nondiscriminatory explanations for any disparate treatment she may have observed," Aplt. App., Vol. I at 382, ¶ 114, it would be unreasonable to draw an inference that the employer maintains a broad discriminatory policy, particularly when the employer is as large as the Postal Service and the plaintiff presents only one witness complaining of allegedly similar treatment.  Accordingly, Jones's testimony, although marginally relevant, was not persuasive evidence in support of Schulte's claims, and we see no clear error in the district court's conclusion.

**Steve Lundak.**  Schulte asserts that the district court failed to consider certain "critical facts in its deliberations."  Aplt. Opening Br. at 21.  The first of these purportedly critical facts is the relative length of time Lundak and Lawrence had supervised her.  Schulte contends that because Lundak supervised her for a much longer period (seven years) than Lawrence (three months), the district court erred in not weighing Lundak's positive assessment of her performance for him against the negative assessment Lawrence provided in an evaluation related to Schulte's 2002 ASP application.  We disagree.  Lundak's testimony about Schulte's job performance and the length of time he had supervised Schulte were of little probative value in deciding whether Lawrence's own evaluation of Schulte's performance was genuine or motivated by an improper factor.

-23-

Schulte also notes the discrepancy between Lundak's testimony that there
were a small number of employees who were over fifty when they were promoted
to a supervisory position and her own testimony that none of those employees
were over fifty.  She then criticizes the Postal Service for not producing any
employees over the age of fifty who were promoted.  Schulte has provided no
legal authority for the proposition implied in her argument—that the Postal
Service was required to identify employees over the age of fifty who were
promoted in order to prevail at trial—and we have found none.  Whether or not
Lundak's testimony concerning the age of promoted employees was incorrect,
therefore, concerns a detail that is of little import in the overall analysis of the
evidence, and the district court had no reason to discuss it.

Schulte further takes issue with the district court's treatment of a comment
she alleges Lundak made to her in February 2002, that there are no 204-B
temporary supervisors over the age of fifty nor are such persons entered into ASP
training.  *See* Aplt. App., Vol. II at 621:1-3.  Lundak testified that he had never
made any such age-related comment to Schulte.  *See id.* at 551:22.  The court
found that Schulte failed to establish any nexus between the alleged comments
and the 2002 ASP selection process, in particular because Lundak did not know
the identity of any of the members of the 2002 ASP committee.  *Id.*, Vol. I at 367,
¶ 66.  Schulte offers only her own view that Lundak offered his alleged comments
in order to advise her "of the postal pattern and practice of refusing promotion to

-24-

its older workers." Aplt. Reply Br. at 9. We agree with the district court that if Lundak made the alleged comment, Schulte failed to establish any nexus between it and her nonselection for the 2002 ASP position.

The court further stated that Schulte's initial EEO claim of discrimination, filed three months after Lundak's alleged comment, was "wholly inconsistent with her testimony about Lundak's statements" because she did not assert age discrimination as a basis for her claim until later. Aplt. App., Vol. I at 367, ¶ 65. This was a proper inference for the district court to draw, albeit one of minimal importance.

**Jeffrey Dalton.** Dalton, the USPS investigator, testified that when he first received Lawrence's report recommending that Schulte be removed for recirculating the mail, his opinion was that the report did not support removal. He sent a fax to O.D. Curry, a USPS labor relations specialist, to this effect. *See id.*, Vol. IV at 1063. Dalton further testified that after receiving copies of the allegedly recirculated mail and interviewing witnesses, he agreed that removal was proper. Schulte, however, contends that Dalton initially received copies of the marked mail because the report Lawrence sent indicated that the letters were attached and Lawrence testified to that effect at trial. By this assertion, Schulte apparently would have us conclude that Dalton's original opinion—that removal was not warranted—was based on all the evidence and his later, contrary position

-25-

is the sort of inconsistency that undermines the Postal Service's asserted nondiscriminatory reason for disciplining her.

The district court's resolution of these two plausible versions of events cannot be clearly erroneous. *See Anderson*, 470 U.S. at 574. Contrary to Schulte's contention that the district court "glossed over this evidence merely because it did not contain a direct admission of age discrimination," Aplt. Opening Br. at 22, the district court found that Dalton did not receive copies of the mail until later in his investigation, and that receipt of those letters eliminated innocent explanations. Aplt. App., Vol. I at 361, ¶ 35. In reaching this finding, the court also considered Curry's corroborating testimony that early on, he and Dalton did not have copies of the letters. *See id.*, ¶ 36. Moreover, the district court acknowledged Dalton's testimony that he needed more particular information from witnesses, not just copies of the mail pieces, *see id.*, ¶ 35, which undermines Schulte's theory that his initial opinion represented his true opinion of the case simply because he already had seen the mail pieces.

**Lila Lawrence.** Schulte notes contradictions in the witness statements Lawrence obtained from other Postal Service employees in connection with her investigation, such as who had marked the mail and whether the mail was marked with an "x" or either an "x" or a checkmark. Schulte concludes that the statements formed an unreliable basis for Lawrence's conclusion that Schulte had recirculated mail, which apparently suggests that the Postal Service's explanation

for why it disciplined Schulte was implausible.  Schulte also points to Lawrence's

testimony that she did not include in the report she sent to Dalton a witness

statement from Quinn that was beneficial to Schulte.  While these points might

support a finding that the investigation was imperfect, they are too minor to show

that Lawrence's belief that Schulte had recirculated mail was not genuine.  *See*

*Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000) (inquiry is not

whether employer was right to think an employee engaged in misconduct but

whether the belief was genuine).

Lawrence also testified that she had actually seen Schulte recirculate mail.

Schulte asserts that this was the first time Lawrence had ever mentioned this,

implying that Lawrence fabricated the statement.  Even if Schulte is correct, the

alleged fabrication does not exclusively suggest age bias such that we might see

clear error in the trial court's conclusion that Lawrence had a good-faith belief

that Schulte had recirculated the mail, *see* Aplt. App., Vol. I at 373, ¶ 88.

Schulte's final contention, that the failure to inquire into whether or not the

recirculated mail would have actually increased her salary, appears irrelevant.

Lawrence's testimony suggests that the mere attempt would have been a sufficient

basis for termination because it "could inflate her count."  *See id.*, Vol. II

at 751:11.

**George Frame and Susan Beck.**  As noted, Frame and Beck, postmasters

of Oklahoma City and Tulsa, respectively, were members of the 2002 ASP

-27-

committee.  The district court found that Schulte "presented no evidence that any committee member in the 2002 ASP application review process calculated or estimated Ms. Schulte's age or the age of any other applicant."  *Id.*, Vol. I at 364, ¶ 50.  Schulte takes issue with Beck's claim that she did not identify Schulte from the redacted application form submitted for the 2002 ASP position, comparing it with the testimony of Lynn Jones that, while Jones was a postmaster, all promotion applications came to her unredacted.  To the extent Jones's testimony suggests that as a general matter postmasters always receive unredacted application forms and therefore Beck must have, it supports one of two plausible findings, and the district court's choice between them cannot be clearly erroneous.  *See Anderson*, 470 U.S. at 574.

Schulte also places much stock in the purportedly conflicting explanations she received concerning why her answer to the decision-making KSA led to her nonselection for the 2002 ASP position.  She claims that she was told both that she did not describe making a decision at all and that she described making a decision that she did not have the authority to make.  She compares this with the 2000 ASP committee's approval of the substantially same answer she submitted then and concludes that the reason for her nonselection in 2002 was a fabrication. *See* Aplt. Opening Br. at 49-50.

Again, evidence that an employer misjudged an employee's qualifications is relevant to whether its stated reason is a mask for prohibited discrimination.

-28-

*See Tyler*, 232 F.3d at 814.  But as the district court found, different committees
and committee members could reach different results concerning qualifications.
*See* Aplt. App., Vol. I at 365-66, ¶¶ 59-60.  We agree even if, as Schulte
contends, her authority to make the decision she described in her KSA presented a
factual question that each committee should have answered in the same way.
Inconsistencies that may be attributable to differences in employer representatives
or human error are of insufficient probative value to render the district court's
findings in this case clearly erroneous.

Schulte further contends that she was given conflicting answers about the
number of KSAs on which she failed to demonstrate adequate achievement.  *See*
Aplt. Opening Br. at 30-31.  The record, however, does not unequivocally support
this contention.  Two letters written by Gwen O'Brien showed that she had not
demonstrated proficiency in five of the KSAs.  Aplt. App., Vol. IV at 1073, 1075.
A later email from Jackie Bouffard, one of the 2002 ASP committee members,
discussed only one of the KSAs because, as Bouffard wrote, the failure to
demonstrate one KSA required no further evaluation.  *See id.* at 1077.  That email
does not indicate whether Schulte's answers to the other KSAs were deficient or
not.  The perceived "conflict" among these letters therefore is minimal at best,
and the district court was not required to address it.

**Jackie Bouffard.**  Bouffard testified that the 2002 ASP committee worked
to build consensus about each applicant's answers to the KSAs.  Schulte argues

-29-

that Bouffard's testimony tended to support that there was undue influence on the committee and that the district court ignored that testimony. Again, the district court found that each testifying board member stated that no undue influence occurred. *Id.*, Vol. I at 364, ¶ 50. Schulte's reading of Bouffard's testimony as suggesting otherwise is contrary to the record. Bouffard did not recall anyone talking about the age of the applicants, particularly as might be gleaned from the listed dates of high school graduation on the redacted application form. *See id.*, Vol. III at 893:15-22. She further stated that "[a]ge has no bearing on these applications" and is "not necessarily something you discuss." *Id.* at 894:1-5. When asked if she would change her evaluation about the answer to a particular KSA if another committee member brought up the applicant's age, Bouffard stated that she looks at "what's written. You're not looking at those other factors." *Id.* at 899:5-9. She further testified that she would be unable to know if another committee member had a bad motive if it was not communicated to her. *Id.* at 899:20 to 900:3. Nothing in her testimony suggests that the district court's factual finding was clearly erroneous.

**O.D. Curry.** Schulte contends that Curry's testimony shows that another Postal Service employee who also was accused of recirculating mail during the March 2002 mail count, Sherry Birt, was not treated similarly to Schulte because Birt was offered a settlement and Schulte allegedly was not. This contention overlooks the district court's primary reason for rejecting it—that the only

-30-

evidence of Birt's age was Schulte's own assessment.  *See id.*, Vol. I at 376, ¶ 95; *see also id.*, Vol. II at 666:12-13 (Schulte's testimony that Birt was "a number of years younger than" her).  No reasonable inference as to Birt's age may be drawn from Schulte's ambiguous testimony.  *See Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 (10th Cir. 1987) (reasonable inferences must be more than speculation and conjecture).[7]  We need not address the district court's alternate basis for rejecting the Postal Service's treatment of Birt as a comparator case, that Schulte did receive the same offer but refused it, and we decline to address the remainder of Schulte's arguments concerning Curry's testimony because they raise matters of no consequence.

**Pam Cameron.**  Schulte takes issue with a perceived discrepancy between Cameron's testimony that she saw Schulte return marked mail to the misthrow case, which the district court noted in its findings, *see* Aplt. App., Vol. I at 355, ¶ 12, and the omission of this detail from the contemporaneous witness statement Cameron had given to Lawrence.  When asked about this discrepancy, Cameron testified that she was only required to write a short statement about what happened, which did not require her to include her observation of Schulte, and

---

[7]     Schulte points to the testimony of another witness who was forty-seven at the time of trial, Randy Robinson.  When asked if Birt was about his same age, Robinson replied "I don't—I guess."  Aplt. App., Vol. III at 866:25 to 867:2.  To the follow up query, "More or less?," he replied, "Uh-huh."  *Id.* at 867:3-4.  Like Schulte's testimony, Robinson's is so ambiguous as to offer no support for her claim.

that she wrote a very short statement because she had never dealt with anything like this in her twenty years with the Postal Service. *Id.*, Vol. III at 978:4-9. This suggests a credibility issue on which sufficient evidence existed for the district court to find Cameron credible.

Schulte points to Cameron's description of other ways the marked letters could have been sent through the misthrow case in support of her disagreement with the district court's finding that she offered no innocent explanation for the same mail pieces coming through as misthrows multiple times, *see id.*, Vol. I at 355, ¶ 13. This presents a factual question implicating Cameron's repeated testimony that those methods would not account for the same mail being recirculated multiple times. *See id.*, Vol. III at 966:19-22; 972:23. The district court apparently resolved that question against Schulte, and we see no clear error.

**Karen Schulte.** Schulte's primary discontent with the district court's findings as to her testimony is the following: "Schulte admitted at trial that she has absolutely no evidence of any kind to support her allegation that Ms. Lawrence's actions in proposing her removal were motivated by age bias." *Id.*, Vol. I at 360, ¶ 32. Schulte argues that at most, this admission concerns only direct evidence, then concludes that the court's finding indicates its disregard of indirect evidence. Aplt. Opening Br. at 12. We see nothing improper about the district court's accurate finding as to Schulte's express agreement that she had not presented any "incidents" or other "anecdotal evidence" that showed Lawrence

was motivated by age bias.  *See* Aplt. App., Vol. II at 663:19-22.  And as we noted above, this finding does not indicate that the court was looking for only direct evidence of discrimination or based its decision exclusively on the absence of direct evidence.

Schulte further takes issue with the district court's treatment of evidence that she applied for and did not receive a number of other supervisory positions, which the court admitted as pattern or practice evidence.  The court noted only that Schulte admitted she was not qualified for some of the positions for which she had applied.  *Id.*, Vol. I at 368, ¶ 69.  She artfully claims that "[t]he Court did not consider the far more numerous positions which [I] was denied, although [my] eligibility for them was never challenged."  Aplt. Opening Br. at 40.  Schulte's testimony regarding those other positions does not show that she was qualified for them.  In presenting pattern or practice evidence to bolster her case, the burden was on her to present evidence from which an inference could be drawn that age bias was the reason she did not receive any promotions.  She only established that she had applied for a variety of positions and that she was either not contacted about her application, overlooked for an unspecified reason, or denied for a nondiscriminatory reason.  *See, e.g.*, Aplt. App, Vol. II at 599:16-23; 604:11 to 605:6; 606:9-18.  Nothing suggests that she was qualified for any of those positions or overlooked or denied because of her age.

-33-

Schulte also offered testimony about Tom Mullins, a USPS human-relations employee who worked as a mail counter for Schulte's route in March 2002. According to Schulte, Mullins introduced himself a day or two before the mail count and asked her about her retirement plans. *Id.* at 628:4 to 629:9. She further testified that Mullins took mail pieces to a clerk to inquire whether they belonged to her scheme and later completed a witness statement accusing her of recirculating mail. *Id.* at 629:18 to 630:5. She contends that Mullins's comment about her retirement was not a stray remark lacking any nexus to the employment decision, as the district court stated, *see id.*, Vol. I at 358-59, ¶ 28; 374, ¶ 91, but part of a "mosaic of evidence that, taken together, creates an inference of age discrimination," ostensibly under the "cat's paw" theory of liability, *see* Aplt. Reply Br. at 8-9.

As we recently explained, the "cat's paw" theory of liability (also referred to as the "rubber stamp" or "subordinate bias" theory) requires "a plaintiff [to] establish more than mere 'influence' or 'input' in the decisionmaking process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 487 (10th Cir. 2006), *cert. granted*, 75 U.S.L.W. 3106 (U.S. Jan. 5, 2007) (No. 06-341). We further explained that "an employer can avoid liability by conducting an independent investigation of the allegations against an employee." *Id.* at 488. Here, assuming

-34-

that Mullins's remark about Schulte's retirement plans was evidence of his own age bias, any discriminatory animus he may have had toward Schulte could be a factor under the cat's paw theory if it caused Lawrence to recommend termination.  But because there was sufficient evidence to show that Lawrence conducted an independent investigation, Schulte may not avail herself of the cat's paw theory of liability, and Mullins's alleged comment is irrelevant.

In addition to the foregoing, we have reviewed the remainder of Schulte's arguments and find that they either are presented in a conclusory fashion or, like many of those we have expressly considered, concern immaterial matters even when considered in the aggregate.  We also have considered the points set forth in Schulte's supplemental authority and find them unpersuasive.

The judgment of the district court is AFFIRMED.

Entered for the Court


Stephen H. Anderson
Circuit Judge

**EXHIBIT C**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

TIMOTHY O'BANNON, *as Durable* )
*Power of Attorney for Tamara O'Bannon*, )
                      )
                Plaintiff, )
                      )
       v. )       Case No. 24-2060-JWB-ADM
                      )
RECOVER-CARE MEADOWBROOK )
REHABILITATION LLC, et al., )
                      )
            Defendants. )

## MEMORANDUM AND ORDER

    This is a medical malpractice case alleging negligence by defendants Recover-Care Meadowbrook Rehabilitation LLC and MRC SNF Management LLC ("Defendants") surrounding a fall suffered by Tamara O'Bannon at Defendants' acute care hospital, which resulted in a permanent disability. (ECF 10.) This matter is now before the court on plaintiff Timothy O'Bannon's ("O'Bannon") Motion for Sanctions. (ECF 27.) By way of this motion, O'Bannon seeks sanctions on two grounds: (1) pursuant to Fed. R. Civ. P. 16(f)(1)(C) for Defendants' failure to provide a complete medical chart (including a progress note regarding Tamara O'Bannon's fall) as part of their initial or supplemental disclosures; and (2) pursuant to Fed. R. Civ. P. 30(d)(2) for frustrating a deposition by providing the witness documents from which to answer a pending deposition question without O'Bannon's counsel's knowledge. For these actions, O'Bannon asks the court to order Defendants to pay for the costs of the deposition and the subsequent reopening of that deposition, as well as the costs associated with O'Bannon's retained experts' expedited review of the additional documents that Defendants disclosed during the deposition. (ECF 27, at 16.) O'Bannon also suggests that the court, in its discretion, should award attorneys' fees if

warranted.  (*Id*.)  For the reasons explained below, O'Bannon's motion is granted in part insofar as the court finds that Defendants' incomplete document production frustrated and impeded the witness's deposition and therefore orders Defendants to pay the court reporter fees and costs incurred by O'Bannon for that deposition.

## I.    RELEVANT BACKGROUND

The parties exchanged Rule 26(a)(1) disclosure documents in early April.  (ECF 27, at 2.) Defendants' early Rule 26(a)(1) document production included a hospital medical chart consisting of 1,328 pages.  (*Id*.)  The court entered a scheduling order on July 30 that included an August 8 deadline for the parties to exchange copies of the documents described in their Rule 26(a)(1) disclosures.  (ECF 18, at 4.)  The docket does not reflect any exchange of Rule 26 disclosures on that date.  But the parties later filed certificates of service stating that O'Bannon and Defendants served their Rule 26 disclosures on September 16 and 20, respectively.  (ECF 25, 26.)

O'Bannon deposed Defendants' Chief Nursing Officer Carmen Patty ("Patty") on September 6, beginning at 2:31 in the afternoon, via Zoom videoconference.  (ECF 27-2, at 2, 6.) Patty was deposed in her individual capacity, not in the capacity of a Rule 30(b)(6) witness.  After less than an hour of questioning, Defendants' counsel requested a break.  (*Id*. at 46.)  When the deposition reconvened, Defendants' counsel told O'Bannon's counsel that records had been provided to the witness on counsel's iPhone in case she wanted to refer to them, and further explained that the iPhone was needed because the iPad normally used to view such records was being used for the Zoom deposition.  (*Id*. at 46-47.)  Patty then acknowledged that she had made "some significant mistakes" in her earlier testimony when she was going on memory alone.  (*Id*. at 47.)  O'Bannon's counsel noted for the record that Patty had brought some hard-copy documents with her following the break and asked her to identify the records, which she did, noting that one

2

was a progress note and the other was one page of a care plan. (*Id.* at 47-48.) O'Bannon's counsel began questioning the witness about the "significant" errors she wanted to correct, and she responded by reading from the progress note, which was not Bates-labeled and did not appear to have been included in the in the medical chart defendants had previously produced. (*Id.* at 48-50.) After another break during which Defendants' counsel emailed the document to O'Bannon's counsel, the parties confirmed that this progress note was not included in the Bates-labeled medical chart Defendants had previously produced. O'Bannon's counsel therefore requested "a copy of the medical chart that has every entry in it, regardless of what it is," and Defendants' counsel agreed to produce the complete chart. (*Id.* at 51.)

After yet another break, the deposition continued. So did the problems. O'Bannon's counsel continued questioning the witness as to her understanding of Tamara O'Bannon's fall incident and turned back to the progress note. (*Id.* at 56-59.) At one point, O'Bannon's counsel asked Patty a question about where Tamara O'Bannon fell and, clearly frustrated, asked what document "in this world on Planet Earth" would provide that answer. (*Id.* at 59.) When Patty answered, O'Bannon's counsel became irritated because the witness was not talking about the progress note any more but was referencing a different document to answer the question, which led to Defendants' counsel expressing his own irritation and blaming the Zoom format for the confusion. (*Id.* at 59-60.) O'Bannon's counsel then declared that he was "going to pause this deposition" and "take this up with the court." (*Id.* at 61.) The deposition ended at 4:13pm. (*Id.* at 62.)

On September 11, Defendants made a supplemental document production of 7,049 pages of Tamara O'Bannon's medical chart. (ECF 27, at 8.) Patty's September 6 deposition and

Defendants' September 11 supplemental production are the focus of O'Bannon's Motion for Sanctions filed on September 23.

## II.    ANALYSIS

### A.    Meet and Confer

O'Bannon's motion begins by arguing that he is under no obligation to meet and confer with opposing counsel pursuant to D. Kan. Rule 37.2 regarding a motion for sanctions under Fed. R. Civ. P. 16 and 30 "as this motion is not related to a discovery dispute." (ECF 27, at 1 n.1 (citing cases).) Without deciding whether D. Kan. Rule 37.2 applies to this dispute, the court finds that a meet-and-confer in this instance would have been futile because the issues raised in this motion are clearly disputed.[1]

### B.    Sanctions for Late Document Production

O'Bannon seeks sanctions pursuant to Fed. R. Civ. P. 16(f)(1)(C) for Defendants' failure to provide a complete medical chart (including a progress note regarding the fall suffered by Tamara O'Bannon) when they served their Rule 26(a)(1) initial disclosure documents in April or by the scheduling order's August 8 deadline to disclose documents described in their Rule 26(a)(1) disclosures. (ECF 27, at 5-6, 10-12.) O'Bannon contends that Defendants "committed two sanctionable offenses" under Rule 16. First, O'Bannon contends the scheduling order required Defendants to provide the complete medical chart as part of their initial disclosures served in April, and Defendants intentionally excluded from their initial disclosures "a single progress note that hurt the defense of their case and helped the Plaintiff." Second, O'Bannon contends that

---

[1] O'Bannon's motion is over the page limit provided in D. Kan. Rule 7.1(d) regardless of whether the motion is a "discovery-related" motion (limited to 10 pages) or "other" motion (limited to 15 pages). In the future, the court expects parties to abide by the page limits set forth in the Local Rules.

Defendants violated the scheduling order when they produced 7,049 pages of additional pages of Tamara O'Bannon's medical chart after the Scheduling Order's August 8 deadline to exchange all Rule 26 documents.  (ECF 27, at 10-11 (citing FED. R. CIV. P. 16(f)(1)(C) (providing for sanctions for failing to obey a scheduling order)).)

The court is not persuaded that sanctions under Rule 16(f)(1)(C) are warranted here.  Although Rule 16(f)(1) does authorize certain sanctions set out in Rule 37, and Rule 16(f)(2) requires the court to "order the party, its attorney, or both to pay the reasonable expenses— including attorney's fees—incurred because of any noncompliance with this rule," it also exempts a person from such sanctions if "the noncompliance was substantially justified or other circumstances make an award of expenses unjust."  FED. R. CIV. P. 16(f)(2); *see also Williamson v. Metro. Prop. & Cas. Ins. Co*., No. 15-0958, 2018 WL 3421327, at *4 (D.N.M. July 13, 2018) (the award is mandatory in the absence of substantial justification or a finding that other circumstances make an award unjust).  "The purpose of this provision is two-fold: (1) to ensure efficient case management and disposition and (2) to compensate opposing parties for the inconvenience and expense resulting from an adversary's noncompliance with these objectives." *G.J.B. & Assocs., Inc. v. Singleton*, 913 F.2d 824, 831 (10th Cir. 1990).  Courts have broad discretion under Rule 16(f) to "use sanctions where necessary to insure not only that lawyers and parties refrain from contumacious behavior, already punishable under the various other rules and statutes, but that they fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial."  *Matter of Sanction of Baker*, 744 F.2d 1438, 1440 (10th Cir. 1984) (en banc); *see also* FED. R. CIV. P. 16(f) advisory committee's note to 1983 amendment ("[E]xplicit reference to sanctions reinforces the rule's intention to encourage forceful judicial management.").

Here, Defendants have explained why the medical chart they originally produced inadvertently excluded some types of records. They explain that, unbeknownst to them at the time, their EMR system software update reverted to default settings. This suffices to show that Defendants did not intentionally withhold documents from their initial disclosures. (ECF 31, at 1-2, 4.) Defendants also explain that they did not know the medical chart produced with Defendants' initial disclosures was incomplete until Patty's deposition on September 6. Defendants therefore did not know on August 8 that their initial disclosures document production was incomplete and needed to be supplemented. Once Defendants learned at Patty's September 6 deposition that their prior production of the medical chart was incomplete, they promptly supplemented their production on September 11. (*Id*. at 4, 6-7.) Moreover, O'Bannon is not prejudiced by the late production (other than as explained below) given that the court extended the schedule at O'Bannon's request so that his experts could have time to review the new medical records and O'Bannon could depose additional witnesses whose testimony became relevant following the production of these new documents. (ECF 36.) Under these circumstances, the court will not award sanctions under Rule 16(f)(1)(C) for Defendants' September 11 production of 7,049 pages of Tamara O'Bannon's medical chart.

### C.    Sanctions for Conduct During Patty's Deposition

O'Bannon's secondly contends that sanctions are warranted under Fed. R. Civ. P. 30(d)(2) because Defendants' counsel provided Patty with a medical record not previously produced to O'Bannon and allowed her to reference this document to answer a pending deposition question without O'Bannon's counsel's knowledge. (ECF 27, at 6, 12-14.) Rule 30(d)(2) permits the court to "impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the

deponent." According to the Advisory Committee's Note to the 1993 Amendments to Fed. R. Civ. P. 30(d), sanctions may be authorized "not only when a deposition is unreasonably prolonged, but also when an attorney engages in other practices that improperly frustrate the fair examination of the deponent . . . ."

To show that Defendants' counsel engaged in such practices, O'Bannon contends that his counsel had no knowledge that Defendants' counsel was showing this medical record to Patty on his iPhone out of view of the camera during Patty's deposition. (ECF 27, at 12-14.) The record demonstrates otherwise. The record shows that, when the deposition reconvened after a break, Defendants' counsel alerted O'Bannon's counsel that he had provided records to the witness on his iPhone in case she wanted to refer to them. (ECF 27-2, at 46-47.) O'Bannon's counsel then noted on the record that Patty had brought some hard-copy documents with her following the break and asked her to identify the records, which she did. (*Id*. at 47-48.) O'Bannon's counsel did not object or request that the documents not be used by the witness. Rather, O'Bannon's counsel began questioning the witness about the progress note (which was not Bates-labeled) and, after a break during which Defendants' counsel emailed the two documents to O'Bannon's counsel, they discovered that this progress note was not included in the medical chart previously produced. O'Bannon's counsel requested "a copy of the medical chart that has every entry in it, regardless of what it is" and Defendants' counsel agreed to produce the complete chart. (*Id*. at 48-51.) The deposition continued. At one point O'Bannon's counsel asked Patty a question about where Tamara O'Bannon fell, and O'Bannon's counsel became irritated because the witness was not talking about the same document he was asking about, and then Defendants' counsel became irritated because the confusion stemmed from the Zoom format. (*Id*. at 59-60.) O'Bannon's counsel then "paused" the deposition to take up the issue with the court. (*Id*. at 61.)

7

Depositions taken via Zoom videoconference have become increasingly common since the COVID pandemic, and attorneys have adjusted to the requirements and limitations of such a deposition. Had the deposition occurred live, some of the conflicts that arose during the Patty deposition may have been avoided. But O'Bannon chose to conduct the deposition by Zoom, and Defendants' counsel did not object to the Zoom deposition when it was noticed or raise an objection with the court before the deposition was conducted via Zoom. In fact, Defendants' counsel did not object to Patty's deposition being conducted via Zoom until the parties were over an hour into the deposition and O'Bannon's counsel started raising questions as to the documents the witness was looking at. Because Defendants did not object to the use of Zoom in advance of the deposition, it was incumbent upon counsel to appropriately handle documents to be utilized by the witness during the Zoom deposition, e.g., by notifying opposing counsel of the witness's use of such documents. Based on the record, Defendants' counsel appears to have done this. The court therefore will not sanction Defendants for counsel's actions in openly providing documents to Patty to reference during her deposition without objection.

That said, the court recognizes that Defendants' blunder in not producing the complete medical chart before Patty's deposition was compounded by Defendants' counsel's mistake in allowing Patty to review native (not Bates-labeled, previously-produced) documents on his iPhone—all of which led to a squandered deposition. Fed. R. Civ. P. 30(d) allows the court to "impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays or frustrates the fair examination of the deponent." FED. R. CIV. P. 30(d)(2). The court holds Defendants responsible for impeding Patty's deposition by having the witness reference documents that Defendants had not previously produced. For this reason, the court finds an award of sanctions under Fed. R. Civ. P. 30(d)(2) to be appropriate here.

### D.    Sanctions Award

An "appropriate sanction" leaves the court much discretion to determine the appropriate sanction under the facts presented.  "Courts generally use Rule 30(d)(2) when someone other than the deponent—like an attorney—interrupts the deposition."  *Leininger v. United States*, No. 16-2627-DDC, 2020 WL 6395469, at *3 (D. Kan. Nov. 2, 2020) (imposing sanctions under Fed. R. Civ. P. 30(d)(2) because plaintiff's counsel frustrated and impeded the fair cross-examination of the witness by his objections and comments to defense counsel's questions); *Layne Christensen Co. v. Bro–Tech Corp.*, No. 09-2381-JWL-GLR, 2011 WL 4688836, at *8 (D. Kan. Oct. 6, 2011) (applying Fed. R. Civ. P. 30(d)(2) to counsel who violated Fed. R. Civ. P. 30(c)(2) by directing the deponent not to answer); *see also Deville v. Givaudan Fragrances Corp.*, 419 F. App'x 201, 209 (3d Cir. 2011) (affirming magistrate judge's imposition of sanctions pursuant to Fed. R. Civ. P. 30(d)(2) upon finding that attorney "testified on behalf of her witness by way of suggestive speaking objections"); *Craig v. St. Anthony's Med. Ctr.*, 384 F. App'x 531, 533 (8th Cir. 2010) (affirming district judge's award of sanctions pursuant to Fed. R. Civ. P. 30(d)(2) due to "a substantial number of argumentative objections together with suggestive objections and directions to the deponent to refrain from answering questions without asserting a valid justification").  "The district court has discretion to impose appropriate sanctions when a person 'impedes, delays, or frustrates the fair examination of the deponent,' but the district court in no way is obligated to do so."  *Nebeker v. Nat'l Auto Plaza*, 643 Fed. App'x 817, 826 (10th Cir. 2016).

As a sanction for Defendants' conduct in failing to timely produce the complete medical chart, thereby frustrating the fair examination of Patty, O'Bannon asks the court to order Defendants to pay (1) the costs of the deposition and the subsequent reopening of that deposition; (2) the costs associated with O'Bannon's retained experts' expedited review of the additional

documents that Defendants disclosed during the deposition; and (3) attorneys' fees if the court determines such an award is warranted—promising "to follow up with a motion itemizing the hours incurred and what rate appears reasonable" if the court should grant attorneys' fees. (ECF 27, at 16.) The court finds that O'Bannon is entitled to recover the court reporter fees and costs incurred for the Patty deposition on September 6 in the amount of $2,041.40 and orders Defendants to tender payment of these fees and costs within 14 calendar days from the date of this order. The court will not award costs associated with O'Bannon's retained experts' expedited review of the additional medical records because the court finds that Defendants' supplemental production was not a violation of Rule 16(f)(1)(C), the experts would have had to review the medical records regardless of when they were produced, and the court extended the schedule so the review did not need to be expedited. The court also will not award attorneys' fees. O'Bannon's motion presented no grounds for granting such an award—no amount or estimate of hours expended on the matter, billing rate, or total attorneys' fees incurred by O'Bannon in connection with this matter. Moreover, the court is not going to expand this dispute between the parties by ordering briefing on attorneys' fees. The court's ruling today aims to temper relations between the parties, not add fuel to the fire.

   **IT IS THEREFORE ORDERED** that plaintiff Timothy O'Bannon's Motion for Sanctions (ECF 27) is granted in part and denied in part, as set forth above.

   **IT IS FURTHER ORDERED** that Defendants must pay the court reporter fees incurred by O'Bannon during the first deposition of Carmen Patty within 14 calendar days from the date of this order.

**IT IS SO ORDERED.**

Dated November 26, 2024, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge

**EXHIBIT D**



6:46    5G 21

‹ 2

**RG**  Russell Greer    5:22 PM
To: Matthew & 1 more... ›

# Rule 11 ?

Good evening, sir.

Ok, a few things:

I misread parts of your motion and thought you cited that case and so I was arguing it based on that curation. Human goof!

That said: my argument still fits into the broader scope of what you were arguing.

Third: my Kansas citation was not a fabrication. You can find it here: https:// ecf.ksd.uscourts.gov/cgi-bin/ show_public_doc?2024cv2060-49

Fourth: your opposition has a fabrication itself. You said I wanted to meet to transfer the case. I never once said that. In fact, I asked you twice what you wanted to meet about because that email chain was very long and I couldn't find exactly what you wan... Your last email to me, sa... the ... you sent me ... XX, finally gave me clarity to know where and what I was looking for. So unless you're