Electronically Filed
1/22/2026 8:11 AM
Steven D. Grierson
CLERK OF THE COURT

**EXHIBIT A**

Russell Greer
3930 University Center
Apt 103
Las Vegas, NV 89119
801-895-3501
russmark@gmail.com
Pro Se Litigant

CASE NO: A-26-937678-C
Department 13

---

## IN THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

## OF CLARK COUNTY

---

| | |
|---|---|
| **RUSSELL GREER**, an individual, | **COMPLAINT FOR DAMAGES & DECLARATORY RELIEF** |
| Plaintiff | **JURY TRIAL DEMANDED** |
| v. | Case No.: |
| **VIATRON, INC,** a corporation, | |
| Defendant | Judge: |

# I. INTRODUCTION

1. This action arises from an employment dispute between Plaintiff **Russell Greer** and his former employer, **Viatron, Inc.**The claims concern events occurring between October and November 2025 and include: (1) breach of an accepted $20,000 settlement agreement; (2) breach of a subsequent implied-in-fact agreement formed through the parties' communications and conduct; (3) involuntary unpaid leave and failure to pay earned wages; and (4) false and defamatory accusations of "extortion" made in connection with Plaintiff's employment and separation.

2. Plaintiff initially attempted to resolve these matters through arbitration, but was informed by Defendant that it does not arbitrate employment disputes and was instead directed to pursue relief through litigation or government agencies.

3. Related administrative matters are currently pending before **OSHA** for retaliation under the Affordable Care Act and before the **EEOC** for discrimination and retaliation under the Americans with Disabilities Act. Those proceedings are separate and distinct from this civil action.

4. This culmination of events is particularly ironic, given that Defendant's president, **Geoff Erwin**, expressly sought to keep these matters "off the books," yet through Defendant's own actions and escalation, forced Plaintiff into formal litigation and public proceedings that could have been avoided.

# II. JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court pursuant to NRS 3.010**,** which grants Nevada district courts original jurisdiction over all civil actions where jurisdiction is not otherwise limited by statute.

6.   This Court has authority to grant declaratory relief pursuant to NRS 30.010–30.160, and injunctive and equitable relief, pursuant to the Court's inherent equitable powers and NRS Chapter 33.

7.   Venue is proper in this judicial district pursuant to NRS 13.010 because:

> a. Plaintiff is a resident of the State of Nevada;
> b. A substantial part of the events and injuries giving rise to Plaintiff's claims occurred in Nevada; and
> c. Defendant conducts business in Nevada and maintains an office with staffed employees within the State of Nevada.

8.   Defendant has purposefully availed itself of the privilege of conducting business in Nevada, and the exercise of jurisdiction by this Court is consistent with due process and traditional notions of fair play and substantial justice.

## III. PARTIES

8.   Plaintiff Russell Greer resides in Las Vegas, Clark County, Nevada.

9.   Defendant Viatron Systems is a document storage company that does business in Nevada.

## IV. FACTUAL BACKGROUND

10.   Plaintiff is a disabled male with congenital facial paralysis (Moebius Syndrome).

11.   Plaintiff began working for ViaTRON Systems, Inc. in December 2024 in its Las Vegas facility.

12.   During Plaintiff's employment at ViaTRON, he repeatedly disclosed his disability to management, requested accommodations, and reported discrimination and related workplace issues.

13.   Throughout 2025, Plaintiff raised concerns about discriminatory treatment, removal of an approved privacy barrier, selective discipline, threats of demotion tied to disability-related schedule, lack of health insurance access under the Affordable Care Act (ACA), and the absence of paid leave required under Nevada law.

14.   The ACA complaints were shared by several co-workers at ViaTRON.

3

15.    Coworkers initially corroborated that Plaintiff was being discriminated, but later reversed themselves after speaking with management.

16.    Discrimination under the ADA and retaliation for reporting ACA violations are **only passing mentions in this complaint,** as they are currently being litigated through OSHA and the EEOC.

17.    The complaints of discrimination and internally whistleblowing ACA violations are why Plaintiff asked for a paid settlement severance.

18.    On top of that, Viatron operates like a sweatshop factory.

19.    The CEO Kala Devan offers little compensation in exchange for the demand he expects.

20.    Aside from enduring discrimination himself by company managers, Plaintiff found it was illegal what Viatron was doing (having over 100 employees, but not offering health insurance or PTO benefits), so Plaintiff decided to write a settlement proposal.

**October 1, 2025 – Internal Settlement Proposal**

21.    On October 1, 2025, Plaintiff sent a confidential internal settlement letter to ViaTRON.

**EXHIBIT A.**

22.    In that letter, Plaintiff outlined the disability discrimination, hostile work environment, and ACA/PTO issues he had experienced and proposed a **$20,000** net severance payment, plus certain non-monetary terms, as an internal, private resolution.

23.    Plaintiff expressly framed the letter as a good-faith settlement proposal and stated he preferred to resolve the matter internally rather than immediately going to outside agencies or regulators.

24.    Following employment law guidance, Plaintiff included these words, "If we cannot reach agreement within **10 business days** of this letter, I will have no choice but to pursue my rights through the EEOC, the Nevada Equal Rights Commission, the Department of Labor, and, if necessary, litigation in court." *Id.*

25.    That wording was identical to wording offered by a law firm: "If I do not hear from you by

this date, I will consider other actions." *What is a Demand Letter?* Spiggle Law Firm (2017).

(https://spigglelaw.com/demand-letter-demanding-demand-letters-part-1/).

26.    The letter was not a resignation letter. It was a settlement proposal.

**B. October 6, 2025 – Paid Leave and Promise of Two Weeks' Pay**

27.    On October 6, 2025, Viatron company president Geoff Erwin called Plaintiff while he was

at work and wanted to talk about Plaintiff's concerns and Plaintiff's settlement proposal.

28.    As a result of that conversation, Plaintiff was placed on paid leave, while the situation was

supposedly being reviewed.

29.    Erwin  told Plaintiff there would be a two-week paid period, while the claim was looked

into and that Erwin would meet Plaintiff 10/20/2025, when Erwin was in Las Vegas.

**C. October 13, 2025 – $20,000 Acceptance and Revised Addendum**

30.    On October 13, 2025, Erwin emailed Plaintiff and **explicitly accepted** Plaintiff's $20,000

settlement proposal.

31.    In that email, Erwin stated that ViaTRON "agrees to your $20,000 cash payment,"

explained that Erwin was arranging the payment, and described concrete terms:

      a.    a $20,000 "off the books" cash payment,
      b.    continued employment at ViaTRON,
      c.    a private workstation with dividers, upgraded equipment, and a flexible schedule,
            and
      d.    company-paid health insurance. **EXHIBIT B.**

32.    Erwin indicated he was making arrangements, so this could be handled on **October 20**,

when the meeting was scheduled, but Erwin wanted Plaintiff to return to the office the next day,

**October 14th.**

33.    Later on **October 13**, Plaintiff sent Erwin a **Revised Settlement Addendum** and cover

letter. In that packet, Plaintiff:

      a.    thanked Erwin for the time he had taken and for extending the $20,000 offer,

   b. explained that, after reviewing Plaintiff's rights and the statutes involved, Plaintiff had come to believe that $20,000 significantly undervalued the harm and the legal exposure, and

   c. Plaintiff proposed a **higher, negotiable settlement range ($100,000–$200,000 net)** to be handled **through the company's EPLI/insurance**, not as a secret off-books cash payout. **EXHIBIT C.**

33.   Plaintiff's revised offer was expressly framed as an **addendum and counter-proposal (an inquiry)** for Erwin's consideration.

34.   Plaintiff did **not** write that he rejected the accepted $20,000 or that $20,000 was no longer acceptable under any circumstance and repeatedly emphasized his goal was a **private, good-faith resolution** that would allow the company to correct problems internally and avoid regulatory escalation.

35.   Plaintiff further wrote: "Given that this remains an **open negotiation**, I'll await our planned meeting next week to discuss the proposal. If it's ok, I would like to wait until **Monday, October 20th**, as we originally planned, rather than returning to the office tomorrow. A staff member already reached out asking where I'm at (I didn't reply), and I believe it would be best to wait until the matter is resolved, so there's no confusion or discomfort for anyone in the workplace." *Id.* Plaintiff never once resigned.

**D. October 14–16, 2025 – Shift to Insurance and Conversion to Unpaid Leave**

36.   On **October 14, 2025**, Erwin replied that ViaTRON "does not plan or have the means to pay your $200,000 demand," and described that higher figure as "almost like extortion money."

**EXHIBIT D**

37.   In the same email, Erwin also stated that:

   a. ViaTRON had spoken with its insurance company,

   b. the insurance would cover ADA employment matters, and

   c. the insurer would "make the ADA payout" in about **three weeks**. *Id.*

38. Erwin asked for ADA-related details, so he could send them to the claims agent.

39. That same day, Plaintiff responded that he

- apologized if any wording had been misunderstood,

- reiterated that his letters were intended only as good-faith internal settlement proposals, not threats,

- explained that he had drafted several versions, specifically to keep the tone respectful and lawful, and

- provided detailed ADA information (disability, dates, witnesses, prior disclosures, and the events involving the privacy barrier and demotion threat). **EXHIBIT E.**

40. On **October 15, 2025**, Erwin emailed Plaintiff, saying he would send the ADA claim information to the **insurance claims agent** and laid out a short summary of the disability facts and witnesses. **EXHIBIT F**

41. In the same email, Erwin informed Plaintiff: "The claims agent mentioned this disability claim will include time out of work. For this reason, I will instruct the payroll staff to only include in your next paycheck the actual hours you worked at ViaTRON up to 10-06-25." *Id.*

42. This instruction effectively **converted Plaintiff's leave from paid to unpaid**, and did so **retroactively to October 6**, despite Erwin's earlier representation that Plaintiff would receive roughly two weeks of paid leave, while the claim was processed.

43. From that point forward, Plaintiff was left with **no active income**, even though Plaintiff remained an employee and had not resigned, been terminated, or been formally suspended.

44. Plaintiff immediately responded on October 15, thanking Erwin for forwarding the information and adding clarifying ADA facts. **EXHIBIT G.**

45. Plaintiff also pointed out that:

- Erwin had previously told Plaintiff there would be a **two-week paid leave period,** while the claim was processed,

- Plaintiff's last workday had been October 6, and

- "that two week pay appears to not being applied anymore, but rather being applied to the pay out itself," leaving Plaintiff without active income. *Id.*

46.     Plaintiff asked Erwin to ensure the insurer marked the claim as "**expedited**", since Plaintiff would otherwise have no active income.

47.     On **October 16, 2025**, Erwin sent another email stating that:

- ViaTRON had thought the original $20,000 cash payment plus continued employment and accommodations was a "fair and speedy solution,"

- Erwin stated that "you were the person who rejected this offer and increased your demand to $200,000," and

- Because of that, ViaTRON was "forced" to put the claim through its insurance company.

    **EXHIBIT H.**

48.     Erwin further wrote that $200,000 is "a lot of money," that the insurer would investigate extensively, and since they told ViaTRON Plaintiff's back pay was covered in the payout, ViaTRON "cannot double pay you" or "go around the insurance company" — framing the withholding of wages as a way to avoid perceived "double dipping" or insurance fraud.

49.      Later on October 16, Plaintiff responded to clarify that:

- His revised figure was **not** intended as a **"take-it-or-leave-it"** demand,

- He had not rejected the $20,000 in the sense of withdrawing it, and

- His intent was simply to open a dialogue about what a fair settlement should be.

    **EXHIBIT I.**

50.     Plaintiff again thanked Erwin for moving the claim forward and asked for an expedited timeline.

**E. October 21–23, 2025 – Repeated Follow-Ups and Detailed Clarification**

51.    On **October 21, 2025**, Plaintiff emailed Erwin, asking him to confirm whether the ADA claim had actually been forwarded to an insurance adjuster and, if so, to provide the adjuster's name, company, and claim number, and to request a target resolution within about three weeks, so Plaintiff could plan for rent and essential bills. **EXHIBIT J.**

52.    On **October 23, 2025**, Erwin replied that he was "buried in work" and traveling, and said the insurance company wanted clear information, documents, and witnesses. He asserted that:

- He had spoken to employees Plaintiff had identified,

- Plaintiff's witnesses Les and Denise allegedly told Erwin they did not witness discrimination,

- Former manager Aaron denied ever approving a special partition or knowing about Plaintiff's disability documentation,

- Erwin claimed he could not find documents supporting various aspects of Plaintiff's claim.

53.    Essentially, Erwin was playing investigator, instead of letting the actual trained insurance investigators do their jobs. **EXHIBIT K.**

54.    Erwin concluded that he had no evidence to send the insurer and asked Plaintiff what else he had.

55.    Later that same day, Plaintiff sent a detailed email response. He

- explained the **Final Written Warning** and how it reflected unequal enforcement,

- described Aaron's demotion threat and Plaintiff's August 20, 2025 email invoking the ADA,

- explained that camera footage and the observations of Jonah and others would contradict Les and Denise's denial of prior conversations about discrimination,

- described the circumstances of the privacy barrier being removed by Noel/Andrea without an interactive process. **EXHIBIT L.**

56.    Plaintiff also reminded Erwin that Plaintiff had previously raised separate **ACA/PTO compliance issues** in good faith, that Erwin had acknowledged the ACA oversight, and that Plaintiff requested those ACA/PTO matters be resolved **internally and fairly (through a payout)**, while the **ADA claim proceeded to the insurer without further delay**.

57.    Plaintiff confirmed that he had already given Erwin all the documents Plaintiff had.

**F. October 29–30, 2025 – Plaintiff's Offer to Return to Work and Continued Good-Faith Negotiations**

58.    On **October 29, 2025**, Plaintiff emailed Erwin a follow-up with an organized **Evidence List** for the insurer, breaking evidence into:

- hard evidence (emails, logs, photos),

- circumstantial evidence (timeline/context), and

- internal evidence the company could retrieve (camera footage, schedules, etc.).

   **EXHIBIT M.**

59.    Plaintiff again expressed that he was open to an **internal ADA settlement,** if a reasonable resolution became available.

60.    In the same October 29 email, Plaintiff made clear that he was **ready to return to work** starting the next day, while remote arrangements were explored.

61.    Plaintiff pointed out that he had previously worked remotely for other employers and could perform well once a proper setup was in place.

62.    Plaintiff also asked if back pay or missing PTO could be deposited by Friday because he had been left with a significantly reduced paycheck, due to time out of the office.

63.    That afternoon, Erwin replied that:

- managers were concerned they did not know Plaintiff's "exact disability" and did not want to risk future problems,

- they wanted to consult a **disability professional** and/or DETR VR before Plaintiff returned, and

- the **insurance company would cover all ADA work-related matters and time off.** **EXHIBIT N.**

64.    Erwin stated that Plaintiff's PTO balance of $341.34 would be direct deposited the next day, but **said nothing about restoring wages** or ending the unpaid status that had begun after October 6.

65.    That evening, Plaintiff emailed again, authorizing DETR VR to speak directly with ViaTRON and confirming he fully supported consulting a disability professional. **EXHIBIT O.**

66.    Plaintiff reiterated that he was **prepared to return to the office the next day,** while remote work was being evaluated and again asked when back pay would be addressed. *Id.*

67.    On **October 30, 2025**, Erwin wrote that managers did not want to supervise Plaintiff and wanted Kala Devan to handle supervision instead. Erwin again tied Plaintiff's situation to the insurance claim and ADA requirements, and again did not restore wages. **EXHIBIT P**

68.    On October 30, Plaintiff sent multiple follow-up emails:

- clarifying that he did **not** have personal issues with Jonah or Andrea (beyond previous concerns about them not remembering conversations and metrics),

- attaching a bounced September email Plaintiff had attempted to send to Andrea, explaining Plaintiff's disability and the barrier issue, showing he had tried to go through proper channels,

- raising whether some **internal recognition or award (payout)** might be appropriate for his good-faith ACA whistleblowing that helped the company correct its compliance,

- explaining that a **remote position** would resolve many of the physical setup issues at the office, and

- requesting that his supporting emails be included in the insurer's file. **EXHIBIT Q.**

69.    Later on October 30, Plaintiff sent an addendum, making clear that he was **open to waiving the insurance and EEOC claim rights,** if the company modestly adjusted the off-the-books payout amount to reflect the value of the ADA claim and the rights he would be waiving. He asked for clarity on **payment method and timeline** and said he was revisiting this option in good faith to simplify and to speed up an internal resolution. **EXHIBIT R.**

70.    Plaintiff also sent a separate message that day, asking directly whether if he accepted the original $20,000 payment, he would be forced to **waive his ADA claims**, or whether the $20,000 could be treated separately. He emphasized that he brought value to the company, that he had spent his life being discriminated against because of his disability, and that he was simply trying to **make whole the harms he suffered,** while remaining open to returning to work, preferably remotely. *Id.*

## G. November 3–4, 2025 – No Insurance Submission, "Extortion" Accusations, and Threats of Prison

71.    On **November 3, 2025**, Erwin emailed Plaintiff from vacation, saying he had "limited access" to emails. He wrote that:

- it was Plaintiff's choice whether to still pursue the ADA insurance claim,

- Erwin could send the claim package to the insurer when he returned,

- Erwin was "having problems" with the Jerry Leach letters and asked Plaimtiff to be "honest" about whether Jerry had actually written them, warning that sending them could be "insurance fraud," and

- Erwin had sent all communications to company attorneys and was concerned about his own legal situation for making a cash payoff outside the company books, because he did not want to be arrested — *even though that had been Erwin's suggestion.* **EXHIBIT S.**

72. This confirmed that, despite Erwin's earlier statements, the ADA claim had **not actually been submitted** to an insurer by early November.

73. Plaintiff was shocked. While Erwin was off somewhere on vacation, Plaintiff was worried about money and on an unpaid leave that he had not accepted.

74. Later on November 3, Plaintiff replied, confirming that he had already forwarded him the **original email thread with Jerry Leach** to show that Jerry himself wrote the letter. Plaintiff then asked four reasonable questions:

   A. Whether Plaintiff could communicate directly with the assigned ADA adjuster, once the process began,

   B. Whether there was still a possibility of an internal payout handled directly by the company,

   C. How the **ACA whistleblower portion** of the situation (tied to good-faith reporting and prior payout discussions) would be handled internally, if not covered by insurance, and

   D. What standards the insurer would apply, referencing EEOC precedent on **adverse inferences,** when employers fail to maintain proper records.

76. Plaintiff closed by saying he appreciated the updates and would wait for guidance.

**EXHIBIT T.**

77. On **November 4, 2025**, Erwin sent Plaintiff a long, highly charged email stating that company attorneys had reviewed Plaintiff's materials and concluded that:

- Plaintiff's very first October 1st letter was a "textbook case" of **blackmail and extortion**,

- Every subsequent letter and email was "confirmation" of that supposed extortion,

- Because the initial letter was sent by FedEx across state lines, this could now be a **federal criminal case** with potential **20-year prison penalties**,

- Erwin had been advised to file a **police report** in California against Plaintiff, and

- ViaTRON would file a separate **civil blackmail/extortion case** to recover damages. **EXHIBIT U.**

78.    In the same November 4 email, Erwin:

- accused Plaintiff of deliberately withholding ACA information from the company to profit personally (even though such an assertion was absurd because Indeed reviews showed the company was NOT paying health insurance as required by law. **EXHIBIT V**)

- claimed Plaintiff had used his paralegal knowledge to "cleverly" disguise extortion in legal wording,

- framed reference to ACA penalties and whistleblower provisions as part of a "blackmail and extortion scam," and

- declared that any **future whistleblower reporting** by Plaintiff would itself be treated as a **crime** because Plaintiff supposedly "held back" information.

79.    Erwin also asserted that the ACA and PTO issues had been fully fixed and that there were "no outstanding issues" (because plaintiff had let the company know), even though Plaintiff's workplace status and wages remained unresolved and he had not been paid since October 6.

80.    Later on **November 4**, Plaintiff sent a short, calm response. He:

- apologized that the matter had intruded on Erwin's vacation (which shows Plaintiff's continued good-faith tone),

- **firmly disputed** Erwin's characterization of Plaintiff's correspondence as blackmail or extortion,

- reiterated that every message Plaintiff sent was written in good faith to resolve workplace and disability concerns, **internally and lawfully**,

14

- explained that Plaintiff never demanded any unlawful payment or issued any threat, and that hie goal had always been to discuss a normal, lawful severance arrangement, and

- stated that, because his intent had been so badly misunderstood and "taken far beyond its original purpose," Plaintiff was **withdrawing from further settlement discussions.**

    **EXHIBIT W.**

81.     Plaintiff's November 4 response was a direct reaction to being accused of serious crimes and threatened with federal prison. It did **not** rescind the already-accepted $20,000 settlement, did not waive any statutory rights, and did not change the fact that Plaintiff had been left on **unpaid leave** since October 6 while ViaTRON continued to withhold wages and shift explanations.

82.     Plaintiff offered a clarification on 11/6/25 and told Erwin that he still considered the $20,000 acceptance as binding and that Plaintiff still wanted that money. **EXHIBIT X.**

**H**. **Plaintiff Tried Reaching out to Erwin for Resolution**

83.     On 11/14, Greer tried very politely resolving the issue and getting the $20,000 Erwin accepted on 10/13.

84.     Erwin said that Greer's life "was about to get messy" and Erwin even admitted he had in fact accepted the $20,000, but wasn't going to pay it out. **EXHIBIT Y.**

**I. ViaTRON's Resignation Claim Is False and Contradicted by the Record**

85.     Because Erwin was refusing to honor the agreement, Plaintiff wrote to Human Resources to try to resolve this ongoing mess.

86.     On 11/24/25, HR representative Angela stated that she believed Plaintiff had resigned because Erwin "has a letter from you dated October 1st that shows you resigned from your position and requested a severance check." **EXHIBIT Z.**

87.   As shown in Exhibit A, the October 1st letter was a formal ADA/ACA complaint and request for resolution. It did not contain any language of resignation, intent to resign, or separation.

88.   Angela further wrote that Erwin claimed Plaintiff had "refused or reject[ed] an offer to return to work on October 14th."

89.   As shown in paragraph 35 and Exhibit C, this statement is false. Plaintiff clearly said he would prefer to wait until the 20th of October to return and Erwin canceled the meeting and shipped the claim off to insurance, which was apparently never filed.

90.   The timeline demonstrates that Plaintiff did not resign. From October 6th through early-November, Plaintiff continued engaging in active settlement discussions with Erwin and attempting to finalize the agreement. A resigning employee does not negotiate or pursue a settlement.

91.   Plaintiff also attempted multiple times to return to work—conduct wholly inconsistent with resignation. For example, on October 27, Plaintiff asked Erwin whether Plaintiff could resume work or work remotely, and on October 29, Plaintiff stated in writing that he was "prepared to return to the office tomorrow."

92.   A genuine resignation triggers specific employer obligations, including separation paperwork, final wages, COBRA notices, and written acceptance of the resignation. As Plaintiff explained to HR, he never received any of those documents because no resignation occurred. HR was unable to identify any such paperwork.

93.   On November 24th, Plaintiff expressly clarified in writing: "I never resigned, and at no time did I communicate any intention to resign," and Plaintiff asked HR to identify the specific document or date they believed constituted resignation. HR did not provide any such document because none exists. **EXHIBIT AA.**

94.   ViaTRON's "resignation" narrative appears only after three events:

(1) Plaintiff's protected ADA/ACA complaint on October 1,

(2) Erwin's unlawful placement of Plaintiff on unpaid leave on October 15th, and

(3) Plaintiff's request for arbitration and unpaid wages on November 24th.

95.    The timing shows that the "resignation" claim was manufactured as a post hoc pretext, not a legitimate employment action to avoid any liability.

## J. ViaTRON Refusing Arbitration

96.    Done with Viatron's games, Plaintiff filed a demand for arbitration with JAMS on 12/1/25 because he remembered signing an arbitration agreement during his onboarding, but Angela would not hand over the document.

97.    Greer spent $100 mailing the demand and documents to Viatron. **EXHIBIT BB.**

98.    Nancy, in Human Resources, told Greer that Viatron doesn't do arbitration and that he would have to file a lawsuit.

99.    The situation had become ridiculous.

100.   Viatron wanted a lawsuit and so here we are.

## K. Clarification Concerning a July 2025 Conversation Later Raised on October 23

101.   Because ViaTRON will try using this event as an affirmative defense, Plaintiff might as well explain it here.

102.    In July 2025, Plaintiff had a brief off-work, outside of work, conversation with coworker Andrew (last name unknown). Because Andrew frequently discussed his gender transition, hormone therapy, and personal matters openly in the workplace break room, Plaintiff believed he was someone who was comfortable sharing personal things openly.

103.    In that context, Plaintiff mentioned his lawful involvement in Nevada's licensed brothel industry.

104.    This discussion was informational and political in nature. Plaintiff did not solicit, recruit, or encourage Andrew or any other employee to work at *any* brothel. Plaintiff merely explained how Nevada's legal brothel system operates, which is a matter of public law and political policy.

105.    Andrew later engaged in gossip about this conversation with other coworkers and spread misinformation.

106.    As a result, supervisor Aaron Parkin informally spoke to Plaintiff.

107.    Aaron did not claim that Plaintiff violated any policy or that any HR complaint existed. He simply stated that some people "felt uncomfortable" and advised Plaintiff not to discuss sensitive topics at work.

108.    Aaron explicitly confirmed that this was not an HR issue. He issued no write-up, warning, performance note, or formal counseling. The matter was treated as minor, verbal guidance and nothing more.

109.    Despite this advice, Aaron did not address other employees who regularly engaged in far more controversial or inappropriate conversations in the workplace. For example, coworker Les Rogers openly discussed 9/11 conspiracy theories at work without consequence, and Andrew himself openly discussed his transition process and took hormone medication in the break room without any managerial intervention. A female employee would vape in the break room and still no reprimand.

110.    Plaintiff was the only one who was singled out and that incident compounded why he felt discriminated and is one of the reasons why he sought a settlement.

111.    The July conversation was never documented. There were no emails, no HR notes, no warnings, no personnel file entries, and no indication that the matter was considered serious or ongoing by management.

112.    From July through October 23rd, 2025, the conversation was never raised again by anyone at ViaTRON. It played no role in any employment action, discussion, or communication

until after Plaintiff was placed on unpaid leave on October 15, 2025 and the insurance settlement was agreed to.

113.     The July conversation only resurfaced on October 23, 2025, in an email, in which Erwin solicited comments and gossip from employees.

114.     Supposedly, Erwin was trying to find witnesses to Plaintiff's discrimination claims. It felt like he was holding an "open mic" night and letting anyone bash Russell.

115.     The claim was that a few females felt harassed that Plaintiff had allegedly recruited people into prostitution.

116.     This was absolutely absurd. As stated, Plaintiff did not do anything like that. It was Andrew, who was gossiping and lying.

117.     Although the allegation was never brought up again by Geoff after October 23rd  (he claimed he shot the rumor down), it was brought up by Viatron during OSHA proceedings.

118.     Plaintiff feels Viatron will try inserting it here as a defense and so Plaintiff wanted to nip it in the bud.

119.     The sudden revival of a months-old, previously dismissed issue reflects pretext and retaliation rather than any legitimate or contemporaneous concern.

120.     It felt like Erwin was using the information to get out of paying Plaintiff.

**L**. **No Morality Clause was Ever Signed**

121.     At no point at Plaintiff's time at Viatron did he ever sign a morality clause.

122.     Plaintiff acknowledges that Nevada is an at-will state, but at-will does not give Viatron authority to breach a contract. This is enshrined in Nevada case law. *Vancheri v. GNLV,* 777 P.2D 366 (NV 1989).

123.      Based on the foregoing facts, Plaintiff alleges the following causes of action.

# Causes of Action

## CAUSE OF ACTION 1 — BREACH OF CONTRACT ($20,000.00) (A)

124.    Plaintiff incorporates paragraphs 1-123.

**A. A Valid Settlement Contract Was Formed on October 13, 2025**

125.    On October 13, 2025, ViaTRON President Geoff Erwin accepted Plaintiff's October 1st, 2025 written settlement offer of $20,000. His acceptance was unconditional, unequivocal, and directly communicated to Plaintiff.

126.    Under Nevada law, a binding contract exists when there is: (1) an offer, (2) acceptance, (3) a meeting of the minds, and (4) either consideration or a legally recognized substitute. *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005).

127.    All elements were present: the parties agreed on terms, and Plaintiff provided valid consideration by agreeing to forgo EEOC and ADA litigation. Alternatively, Plaintiff's detrimental reliance provides a substitute to consideration under *Vancheri v. GNLV,* 777 P.2D 366 (NV 1989).

128.    Furthermore, under Nevada law, a series of emails constitutes the formation of a valid contract. *Ray Motor Lodge Inc v. Shatz,* 390 P.2d 42 (NV 1964). (a "note or memorandum may satisfy the statute [of frauds] even though it consists of separate writings.").

**B. Plaintiff's October 14 Email Was Not a Rejection**

129.    On October 14, Plaintiff made a conditional inquiry about modifying the settlement in light of broader legal rights being waived. This was not a rejection, counteroffer, or withdrawal of the $20,000 settlement.

130.    *Restatement Second of Contracts §39* confirms that only a clear, incompatible counteroffer extinguishes an offer. "A mere inquiry regarding the possibility of different terms, a request for a better offer, or a comment upon the terms of the offer, is ordinarily not a counter-offer" and does not nullify the existing agreement.

131.    Plaintiff never stated that the $20,000 was rejected or withdrawn. Accordingly, the agreement remained enforceable.

**C. The $20,000 Was the Binding Baseline; Insurance Was Conditional**

132.    Plaintiff's communications consistently described the $20,000 as the baseline agreement. The insurance alternative was contingent, subject to additional steps and third-party approval.

133.    Under *Malagon v. Domino's Pizza LLC*, 141 Nev. Adv. Op. ___, No. 88603 (NV 2025), a response that includes modified or additional terms, does not revoke or replace an original agreement, unless it constitutes a clear and incompatible counteroffer. No such clear counteroffer or mutual rescission occurred here.

134.    The baseline $20,000 agreement remained intact and enforceable throughout.

**D. Plaintiff Maintained the $20,000 as an Active Settlement Option**

135.    From October 14 through October 30, Plaintiff consistently treated the $20,000 agreement as an active and available settlement option. At no point did Plaintiff withdraw or revoke it. Instead, Plaintiff:

- Clarified that his higher proposal was not a demand or rejection but a basis for continued dialogue,

- Thanked Erwin for moving the ADA claim forward while reiterating openness to internal resolution, and

- Expressly inquired whether the original $20,000 could still be finalized as a standalone resolution, separate from ADA rights and insurance.

136.    Plaintiff's communications framed the insurance process and any revised figures as contingent paths — not as a rejection of the baseline settlement. His inquiries and clarifications, including the October 30th message explicitly revisiting the $20,000, show that he remained ready to finalize that figure, if the company preferred that route.

137.     In multiple emails, Plaintiff asked to confirm logistics and payment terms, offered to
waive claims if modest adjustments were made, and asked for clarity on whether the $20,000
could proceed without interfering with the ADA process. These communications reflected a
standing offer, not a rejection.

138.     Plaintiff also made repeated efforts to collaborate: offering to meet, call, clarify terms,
authorize disability professionals, and return to work. Erwin declined or delayed nearly all
engagement, while converting Plaintiff's leave to unpaid status and withholding back pay.

139.     Under *Malagon v. Domino's Pizza LLC*, 141 Nev. Adv. Op. ___, No. 88603 (2025), a
party's expression of alternative or conditional terms, does not nullify an existing agreement
unless those terms clearly operate as a rejection or counteroffer. Plaintiff's conduct reflected
negotiation, not revocation.

140.     The $20,000 remained Plaintiff's default proposal throughout this period and was
repeatedly referred to as a valid and open option for resolution.

**E. ViaTRON's Conduct Confirmed That the $20,000 Offer Remained Active**

141.     After extending the $20,000 cash settlement on October 13, ViaTRON never issued a
revocation of the offer.

142.     This is demonstrated on October 30th. In a message on October 30, Mr. Erwin stated: "I
simply cannot put this payment through our company books."

143.     Erwin did not say the offer was revoked or unavailable — only that it could not be
processed formally. This language implied that the offer itself was still viable, subject to
informal payment handling, which mirrors what Erwin originally offered on October 13th: an
"off-the-books payment."

144.     Relying on that statement, Plaintiff responded the next day — October 31st — expressing
a willingness to waive ADA and EEOC rights, if the company modestly increased the off-the-
books payout. Plaintiff was not proposing a new offer; he was continuing the discussion under

the belief that the original $20,000 remained on the table, as Erwin's message had reasonably

suggested, and was simply trying to streamline the payout.

145.    At no point did ViaTRON respond by revoking or disclaiming the offer. The parties

continued to refer to the $20,000 as a workable baseline, and Mr. Erwin engaged with Plaintiff's

clarifying questions and follow-ups rather than rejecting them outright.

146.  Under these circumstances, ViaTRON's conduct confirmed that the $20,000 proposal

remained open and available. Mr. Erwin's October 30th message acknowledged the offer and

negotiated around its implementation — not its existence. Plaintiff's continued engagement on

October 31th shows that both parties understood the original settlement to still be active.

147.  Under Restatement (Second) of Contracts §50, "[a]cceptance by performance occurs when

the offeree begins conduct clearly referable to the offer." Here, Erwin's comments were referable

to the $20,000 agreement — not merely a general ADA claim.

148.  In *Certified Fire Prot. v. Precision Constr.*, 128 Nev. 371, 378 (2012), the Nevada

Supreme Court held that conduct constitutes the existence of a valid contract. Erwin's conduct

here moved the parties toward execution — not continued negotiation — and therefore affirmed

the existence of an enforceable contract.

### F. The November 4 "Pause" Email Was Not a Revocation

 149.  On November 4th, Mr. Erwin vaguely stated that he was "pausing everything." This fails

to meet the legal standard for revocation, which requires clarity, finality, and

timing *before* reliance or partial performance. *Restatement §§17, 35.*

### G. Even If Viewed As Revocation, It Was Legally Ineffective — Plaintiff Had Already Relied

 150.  By November 4th, Plaintiff had:

- Continued unpaid leave,
- Withheld legal filings,
- Provided requested documentation,
- Deferred alternative employment opportunities.

151.  *Restatement §90* and Nevada law bar a party from withdrawing a promise after another has reasonably relied. See *Vancheri v. GNLV Corp.*, 105 Nev. 417, 777 P.2d 366 (1989) (reliance can be a substitute for consideration).

**H. Plaintiff Consistently Treated the $20,000 Offer as Active and Reaffirmed It on November 6**

152.   On October 16th, in direct response to Mr. Erwin's suggestion that Plaintiff had rejected the $20,000 offer, Plaintiff clarified that his revised figures were not intended as a "take-it-or-leave-it" demand. Plaintiff emphasized that he had not rejected the $20,000 and was only seeking to open a dialogue about fair resolution. This communication made clear that Plaintiff continued to treat the $20,000 as an active and available agreement, not a withdrawn or superseded offer.

153.   On November 6th, Plaintiff reaffirmed this position in writing, stating:

- "I never rejected the $20,000…"
- "I'm withdrawing only from the insurance process…"
- "I would still like to honor it [the $20,000] if it remains on the table."

154.   This language unambiguously confirmed Plaintiff's ongoing intent to finalize the $20,000 agreement. It also clarified any prior uncertainty as to Plaintiff's position.

155.   Under Nevada law, a party's clarification may cure any earlier ambiguity regarding contract formation. In *Fleischer v. August*, 103 Nev. 242, 737 P.2d 518 (1987), the Nevada Supreme Court upheld a settlement agreement where an ambiguous offer was clarified through a subsequent phone call, confirming that the offer included all costs. Similarly, in *Aguilar v. Lucky Cab Co.*, Opinion No. 85538 (NV 2024), the Court reiterated that later clarifying statements could resolve ambiguities in settlement communications.

156.   Here, Plaintiff's October 16th and November 6th messages reflect clear, consistent intent to accept and enforce the $20,000 agreement. No mutual rescission occurred, and Plaintiff's reaffirmation confirms that the offer remained active and enforceable.

**I. Geoff Reaffirmed the Agreement Again on November 17th**

157.   On November 17th, Mr. Erwin sent a written message stating:

"I agreed to pay you $20,000…"

"I did so to get rid of this matter and treat it as a 'nuisance business expense.'"

"I clearly spelled out the payoff terms with the offer for you to return to work."

158.   These statements reflect a clear acknowledgment of a completed agreement. Mr. Erwin did not describe the $20,000 as tentative or under negotiation. He stated affirmatively that he had already agreed to pay that amount and explained both the reason and the linked performance terms — resolution of the matter and return to work.

159.   Under *Grisham v. Grisham*, 128 Nev. Adv. Op. 60 (2012), the Nevada Supreme Court enforced an unsigned settlement agreement where both parties made clear, on-the-record admissions of assent. The Court held that when essential terms are acknowledged by the parties themselves, such admissions constitute binding evidence of contract formation.

160.   While Mr. Erwin's November 17th statements occurred outside of court, they meet the same standard: they confirm mutual assent, consideration, and defined terms. They also align with his prior October 13th message, where he had stated: "ViaTRON agrees to your $20,000 cash payment."

161.   On the same day of October 13th, Plaintiff responded to confirm that understanding and requested to return to work on Monday, October 20, writing:

> "If it's ok, I would like to wait until Monday, October 20th, as we originally planned, rather than returning to the office tomorrow."

162.   The October 13th message reflected Plaintiff's reliance on the $20,000 settlement and his intent to perform under its terms — including returning to work.

163.    Mr. Erwin never responded to or acknowledged that October 13th message. He neither

objected to the proposed return date nor revoked the agreement. Instead, he later shifted the

process toward insurance handling, but even then, he did not reject the $20,000 arrangement.

165.    Accordingly, Mr. Erwin's November 17th statements constitute binding party-opponent

admissions, confirming contract formation, and his earlier silence in response to Plaintiff's

October 13 message further supports that the offer remained active and understood to be in

effect.

**J. Even If Described as "History," It Still Proves Formation**

166.    Even if Mr. Erwin's November 17th remark is treated as a mere recitation of events, it

contains no statement of rescission or revocation. Silence on revocation is legally significant.

**K. Neither "At-Will" Nor "Extortion" Justifies Breach**

167.   Viatron has said in the OSHA retaliation proceedings that because Nevada is "at-will,"

Viatron isn't bound to honor anything. Because Viatron is sure to repeat that here, Plaintiff

brings this up to undercut their defense.

168.    Nevada's at-will employment doctrine does not override separate contractual agreements.

At-will governs termination of employment—not breach of settlement contracts. See *Vancheri*,

supra.

169.   ViaTRON had no contractual clause—explicit or implied—permitting withdrawal based

on perceived reputation or morality. No "morality clause" was included or referenced at any

time. So if the brothel gossip or the lies Andrew spread that made undisclosed females

uncomfortable at work caused Viatron to not want to pay out, there was no morality clause that

allowed such a breach.

170.   Additionally, it appears Viatron relied on online troll defamation, misinformation and

prior lawsuits, that Greer has been trying to scrub,[1] to not want to pay Greer out (which is odd

because Greer disclosed this on 10-28-25 that he had in fact been in prior lawsuits, but they were

unrelated to company pay outs). Again; no morality clause was signed.

171.   Further, labeling Plaintiff's settlement proposals as "extortion"—one month after

acceptance, without any demand for clarification—is a post hoc defense unsupported by Nevada

law. Extortion claims do not void otherwise valid contracts, unless actual duress or criminal

conduct is proven. See *Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir. 1998) ("Simply

alleging that one was duped into signing the contract is not enough….and it does not mean that

any time a dispute arising out of a transaction is based upon an allegation of fraud the clause is

unenforceable.")

172.   As seen in subsection I, Erwin clearly admitted to agreeing to pay out because he felt the

settlement was a "nuisance," not because he felt extorted or defrauded.

**L. ViaTRON Breached the Agreement**

173.   Despite express acceptance, performance, Plaintiff's reliance, multiple reaffirmations, and

Mr. Erwin's own admissions, ViaTRON:

- Failed to pay the $20,000,
- Reversed its position without legal basis,
- Asserted bad-faith justifications unsupported by law.

174.   This constitutes a clear breach under Nevada contract law.

**M. RELIEF REQUESTED**

- $20,000 in damages under the accepted settlement
- Reliance damages (housing costs, missed income, deferred litigation)
- Pre- and post-judgment interest
- Arbitration or filing costs
- Declaratory judgment confirming breach and enforceability

---

[1] Ironically, some of the $20,000 was going to be used to hire an online reputation manager to help clean up Greer's image, so that he could find better work.

# CAUSE OF ACTION 2 — BREACH OF IMPLIED-IN-FACT CONTRACT

## (Breach of the Revised Settlement Agreement)

175.    Plaintiff incorporates paragraphs 1-174.

## A. Plaintiff Submitted a Revised Settlement Proposal in Mid-October 2025

176.    After ViaTRON accepted Plaintiff's October 1, 2025 settlement offer of $20,000, Plaintiff submitted a revised proposal reflecting broader statutory waivers (ADA, ACA and hostile work environment).

177.    This revised proposal was structured to be processed through ViaTRON's insurance carrier and offered in good faith to streamline final resolution.

178.    Critically:

- The revised proposal was not a rescission of the $20,000 agreement,

- It was presented as a conditional enhancement,

- It was framed as a mere inquiry, and did not withdraw the original offer.

Nevada law recognizes **implied-in-fact contracts** when a mutual intent to contract is shown through conduct rather than explicit words. *Certified Fire Prot. Inc. v. Precision Constr.*, 128 Nev. 371, 378–79, 283 P.3d 250, 255–56 (2012). (An implied-in-fact contract must be "manifested by conduct."

## B. ViaTRON Accepted the Revised Settlement Through Words and Conduct

179.    ViaTRON, through President Geoff Erwin, accepted the revised proposal both expressly and through performance. On October 14, Erwin wrote: "We have spoken to our insurance company and ***told them we want to settle this matter out of court.*** I want as little publicity as possible. They confirmed that our insurance will cover ADA employment matters. They will make the ADA payout. It will take 3 weeks to process this claim."

180.    On October 15, he further stated: "I will send to the insurance claims agent the information you provided."

181.   In addition, Erwin:

- Requested supporting documents (including emails from Jerry Leach),

- Indicated company counsel was reviewing Plaintiff's submissions,

- Provided an estimated 3-week turnaround for processing.

182.   This conduct demonstrates affirmative acceptance by performance, as required by *Restatement (Second) of Contracts* §50: "Acceptance by performance requires that at least part of what the offer requests be performed." See also *May v. Anderson*, 121 Nev. 668, 672 (2005).

183.   Through these actions, ViaTRON formed a second binding contract, distinct from the $20,000 baseline.

**C. The Parties Entered a Conditional but Enforceable Implied-in-Fact Settlement**

184.   The revised agreement consisted of:

- Payment through ViaTRON's ADA insurance,

- Submission of supplemental documents,

- Claim review and processing through insurance channels,

- Coordination with ViaTRON's legal team.

185   This was a conditional settlement agreement: binding upon commencement of performance or reliance. Nevada courts uphold such agreements, even when performance is subject to third-party approval.

186.   Plaintiff reasonably relied on the agreement by:

- Remaining on unpaid leave,

- Withholding legal escalation,

- Submitting sensitive personal documentation at ViaTRON's request.

**E.  ViaTRON Breached the Revised Agreement on November 3, 2025**

187.    Despite repeated assurances that the claim was in process, Mr. Erwin admitted on November 3 that:

- He had never submitted the claim,

- He questioned the validity of Jerry Leach's letter — despite receiving the original email thread as verification.

- He was essentially acting as investigator, instead of letting properly trained insurance investigators investigate.

188.    This constituted an anticipatory repudiation. Under *Restatement of Contracts §250*, a repudiation occurs when a party refuses performance or invokes a fabricated defense.

189.    By undermining the agreement without merit, ViaTRON committed a total breach of the implied-in-fact contract.

**E. ViaTRON Breached Again on November 4, 2025**

190.    On November 4, Mr. Erwin escalated his repudiation by:

- "Pausing everything,"
- Accusing Plaintiff of "extortion,"
- Referencing "20 years in prison,"
- Not even bothering to ask Plaintiff about anything.

191.    This conduct amounted to a second, retaliatory breach tied to Plaintiff's protected ADA/ACA activity. Nevada recognizes a duty of good faith and fair dealing in every contract. *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 109 Nev. 1043 (NV 1993).

192.    Weaponizing false criminal accusations to evade obligations, violates that duty and reflects bad-faith breach.

**F. Plaintiff's Withdrawal from the Insurance Process Was Under Duress**

193.    On November 4, under threat of imprisonment and reputational harm, Plaintiff withdrew only from the insurance-processing method — not the settlement itself.

194.  Plaintiff's withdrawal was made under emotional duress and was not a knowing, voluntary waiver. *Restatement of Contracts §175* states: a contract modification made under improper threat is not binding.

195.  On November 6th, Plaintiff reaffirmed that the $20,000 agreement remained enforceable and that resolution was still desired. Plaintiff only stated he was withdrawing from the insurance to try calming Geoff and ViaTRON down. He never truly meant to withdraw.

**G. ViaTRON's Dual Breaches Caused Substantial Harm**

196.  ViaTRON's breach of the revised settlement resulted in:

- Non-payment of all amounts owed,

- Prolonged unpaid leave,

- Severe financial disruption and housing instability,

- Lost opportunities and legal preparation costs,

- Emotional and reputational harm caused by threats, delays, and bad-faith conduct.

197.  Reliance and consequential damages are recoverable where a party breaches a promise upon which the other has reasonably relied.

**H. RELIEF REQUESTED**

198.  Plaintiff respectfully requests:

- Full revised settlement amount processed through insurance,
- Reliance and consequential damages,
- Compensation for emotional distress and reputational injury,
- Pre- and post-judgment interest,
- Legal costs,
- Declaratory judgment affirming breach and liability.

### CAUSE OF ACTION 3 — PROMISSORY ESTOPPEL

**A. ViaTRON Made Clear, Definite, and Unconditional Promises on October 13 & 15, 2025**

199.  Plaintiff incorporates paragraphs 1-198.

200.  On October 13th, 2025, ViaTRON President Geoff Erwin expressly accepted Plaintiff's $20,000 settlement proposal. His acceptance was:

- Clear,

- Definite,

- Unconditional, and

- Communicated in writing.

201.  On October 15, 2025, Mr. Erwin further confirmed that Plaintiff's revised insurance-based proposal would be processed, stating that ViaTRON's insurer would handle the ADA-related payout.

202.  Under *Restatement (Second) of Contracts* §90(1), "[a] promise which the promisor should reasonably expect to induce action or forbearance... and which does induce such action or forbearance is binding, if injustice can be avoided only by enforcement of the promise."

203.  The October 13 and October 15 statements qualify as enforceable promises under this standard.

### B. ViaTRON Intended—or Should Have Reasonably Expected—Plaintiff to Rely

204.  After these promises, ViaTRON took actions that clearly signaled Plaintiff was expected to rely:

- Forwarded documents to the insurer between October 14–16,

- Requested additional materials (e.g., wage records, letters),

- Noted that legal counsel was "reviewing everything,"

- Coordinated with DETR/VR for ADA accommodations,

- Instructed Plaintiff to remain on leave,

- Reassured Plaintiff that a payout was being processed.

205.  These acts conveyed, both explicitly and implicitly, that the settlement was active and being carried out.

206. Under *§90*, intent to induce reliance can be inferred from conduct. ViaTRON's sustained actions made Plaintiff's reliance:

- Reasonable,

- Foreseeable,

- And inevitable.

## C. Plaintiff Reasonably Relied and Suffered Detriment

207. In reliance on ViaTRON's promises, Plaintiff:

- Remained on unpaid leave from October 6th to present ,

- Deferred applying for other employment, due to belief settlement was imminent,

- Submitted documents specifically requested for the insurance settlement,

- Incurred rent arrears and faced housing instability,

- Delayed other income-generating options,

- Structured all decisions around the expectation of resolution.

208. This reliance was not speculative — it was precisely the kind of reliance ViaTRON's words and actions encouraged.

209. Nevada law recognizes reliance damages under *§90,* when the promisee acts to their detriment, based on reasonable expectations created by the promisor's conduct.

## D. The November 4 "Pause/Extortion" Email Cannot Undo That Reliance

210  On November 4th, 2025, ViaTRON attempted to retroactively disavow the agreement by:

- Accusing Plaintiff of "extortion,"

- Referencing "20 years in prison,"

- Announcing a general "pause."

211  The November 4th email:

- Did not constitute a valid revocation under Nevada law,

- Was delivered after three weeks of induced reliance,

- Followed multiple internal confirmations that insurance was reviewing Plaintiff's file,

- Came just one day after Plaintiff forwarded the updated DETR/VR documentation.

212. Once reliance has occurred, revocation is legally ineffective. *Restatement §90* holds that injustice from reliance prevents unilateral withdrawal of a promise.

### E. Both Parties Reaffirmed the Promise After November 4th

213. On November 6th, Plaintiff wrote:

- That the $20,000 offer was never rejected,

- That only the insurance-based track was withdrawn — and only due to threats of criminal prosecution,

- That Plaintiff still sought to honor the original agreement.

214. On November 17th, Mr. Erwin explicitly admitted: "I agreed to pay you $20,000…" He made this admission, not because he felt extorted, but because he considered the settlement request a "nuisance" (effectively retroactively rewriting events).

215. This statement is a direct reaffirmation of the promise and its continued validity. It serves as a post-reliance admission, per *Grisham v. Grisham*, 128 Nev. Adv. Op. 60 (2012).

216. A promise acknowledged after reliance cannot be extinguished retroactively — especially when the promisor confirms its continued relevance.

### F. Enforcement Is the Only Way to Avoid Injustice

217. Plaintiff's reliance on ViaTRON's promises resulted in:

- Three months of lost wages (he still considers himself employed with Viatron),

- Cascading financial consequences (housing risk, hits on credit score),

- Loss of professional momentum,

- Severe emotional distress caused by threats and abrupt reversals,

- Inability to plan or stabilize financially while settlement was pending.

218.    Under Nevada law and *Restatement §90*, when a promise induces reliance of this magnitude, equity demands enforcement. See also *Vancheri v. GNLV Corp.*, 105 Nev. 417, 777 P.2d 366 (1989).

219.  To allow a party to induce reliance, then reverse course by invoking false criminal accusations, would allow bad faith and punish the vulnerable, employee party for trusting explicit commitments.

## G. RELIEF REQUESTED

220.  Plaintiff respectfully requests

- Enforcement of the $20,000 settlement and later  insurance-related promises,

- Reliance damages (lost wages, financial and housing losses),

- Statutory penalties where applicable,

- Pre- and post-judgment interest,

- Filing fees and costs,

- Any additional equitable relief required to prevent injustice.

### CAUSE OF ACTION 4 — UNLAWFUL WAGE WITHHOLDING

### (NRS 608.016; NRS 608.100; NRS 608.190; NRS 608.140)

## A. ViaTRON Promised Paid Leave and Plaintiff Remained an Active Employee

221.    Plaintiff incorporates paragraphs 1-220.

222.    On October 6th, 2025, after receiving Plaintiff's October 1st settlement proposal, ViaTRON President Geoff Erwin called Plaintiff and unilaterally placed Plaintiff on leave.

223.    During that call, Erwin expressly stated that the leave would be **paid,** while the matter was being reviewed. This was not a voluntary leave, not a disciplinary action, and not tied to any insurance process. It was an employer-directed status with a clear promise of continued pay.

224.    Plaintiff received no written notice altering his pay rate, compensation terms, or employee classification. No HR documentation, leave form, payroll change, or notice of any kind was issued. Plaintiff was simply told that pay would continue.

225.    Plaintiff never resigned and never abandoned his position. Throughout October 2025, Plaintiff repeatedly told ViaTRON he remained willing and able to return to work, including stating directly that he could resume work on October 20th.

## B. ViaTRON Retroactively Reclassified Paid Leave as Unpaid, in Violation of Nevada Wage Law

226.   On October 15th, 2025—two days after accepting Plaintiff's $20,000 settlement—Erwin abruptly informed Plaintiff that his leave had been reclassified as **unpaid**, retroactive to October 6th, and that payroll had been instructed to stop payment because the revised settlement was being sent to the insurance.

227.    Erwin justified this by stating that Viatron can't double dip during an insurance claim and that Plaintiff would be paid back pay.

228.   This back pay never happened. The only pay Plaintiff received was work from September 30-October 6th in the amount of $252.38 and then accrued PTO of $341.34 (which ViaTRON wasn't even paying, Greer's whistleblowing had to force the company to start paying PTO).

**EXHIBIT CC.**

229.    Plaintiff even asked on October 29th, how he would get the back pay. So Greer was still expecting the owed back pay. (**Page 10, EXHIBIT M**).

230.    Nevada law does not permit employers to withhold wages, based on anticipated insurance recovery or other internal contingencies.

231.    This retroactive change violated NRS 608.100(3), which requires employers to give employees at least **seven days' written notice** before decreasing compensation.

232.    ViaTRON provided only same day notice.

## C. Nevada Statutes Prohibit Withholding Earned or Promised Wages

233. Under NRS 608.016, employers must pay all wages **earned and agreed upon** when due.

234. Once ViaTRON promised paid leave and kept Plaintiff in employee status, those wages became owed.

235. Under NRS 608.100(1), an employer may not pay an employee less than the amount "agreed upon" or reduce wages retroactively. Reclassifying paid leave as unpaid after-the-fact violates this statute directly.

236. Under NRS 608.190, it is unlawful for an employer to willfully refuse or delay wage payment through excuses or pretext.

237. Conditioning wage payment on speculative insurance reimbursement, falls squarely within conduct prohibited by this statute.

238. Nevada Supreme Court precedent confirms these rights. In *Neville v. Terrible Herbst, Inc.*, the Court held that Chapter 608 creates a direct private cause of action for unpaid wages and must be interpreted to protect employees. *Neville v. Terrible Herbst, Inc,* 133 Nev. 34 (NV 2017).

239. Plaintiff never resigned, was never terminated, and repeatedly indicated willingness to work. ViaTRON remained obligated to pay wages that it promised.

## D. Damages

240. As a direct result of ViaTRON's unlawful withholding of wages, Plaintiff has suffered:

• Loss of income from October 7, 2025 to the present;

• Emotional distress;

• Ongoing economic harm.

## E. Relief Requested

241. Pursuant to **NRS 608.016, 608.100, 608.190, and 608.140**, Plaintiff requests judgment for:

a. All unpaid wages owed from October 7, 2025 through the date of judgment;

b. Statutory penalties where applicable;

c. Pre- and post-judgment interest;

d. Attorney fees and costs as mandated by NRS 608.140;

e. Any other equitable relief necessary to remedy ViaTRON's wage violations.

**CAUSE OF ACTION 5 — DEFAMATION (INTERNAL WORKPLACE DEFAMATION)**

## A. False Accusations of Criminal Extortion and Blackmail

242.    Plaintiff incorporates paragraphs 1-242.

242.    Beginning on November 4th, 2025, ViaTRON President Geoff Erwin made repeated written accusations that Plaintiff had committed criminal extortion and blackmail —offenses punishable by decades in prison.

243.    Specifically, Erwin wrote that Plaintiff's letter was a "textbook case of blackmail and extortion," that Plaintiff was engaged in a "scam," and that a "judge would find these letters to be clear extortion."

244.    On November 17th, Erwin escalated this language, stating:

- "You were clearly blackmailing and extorting $20,000"

- "No employee earning $14/hour gets that unless it's extortion"

- "You got greedy and increased your extortion demands by ten times"

- "This will cost you a hundred times more than your original extortion"

- "Once the complaint is filed… your life is going to get very messy"

245.  These are not rhetorical flourishes or vague impressions. They are factual accusations of felony-level criminal conduct, with specific reference to federal statutes and consequences. As such, they meet the definition of defamatory statements under Nevada law.

## B. Internal Publication and Reputational Harm

246.    Erwin admitted to sharing these accusations with shareholders, executives, legal counsel, and insurer representatives.

247.    Under *Simpson v. Mars*, 929 P.2d 966 (Nev. 1997), even internal communications constitute "publication" for defamation purposes, when shared beyond a strict need-to-know context.

248.    Multiple publications occurred, making ViaTRON liable for each publication.

## C. Defamation Per Se

249.    Under Nevada law, statements imputing a crime—especially felonies—are defamation per se. *Nev. Indep. Broad. v. Allen*, 664 P.2d 337 (Nev. 1983).

250.    Erwin repeatedly accused Plaintiff of extortion and blackmail and said that the conduct warranted "20 years" of federal prison time.

251.    These are presumed-damage offenses under Nevada defamation law.

## D. Koziol Precedent: Koziol Precedent: Plaintiff's Settlement Letter Was Lawful, Not Extortionate

252.    The Ninth Circuit's decision in *United States v. Koziol,* 993 F.3d 1160 (9th Cir. 2021) sharply distinguishes *legitimate pre-litigation settlement communications* from extortionate sham-litigation threats.

253.    *Koziol* sets out the controlling framework for analyzing when a pre-litigation demand crosses the line.

254.    In *Koziol*, the defendant was convicted of attempted extortion—because he *knew he had no lawful claim*, fabricated evidence, lied about the existence of evidence, and attempted to obtain $1,000,000 through reputational threats. The Ninth Circuit affirmed that conviction, holding that threats of "sham litigation" are "wrongful" when the defendant knows he lacks any lawful claim to the property demanded.

255.    The court explained that "wrongfulness" is evaluated under a means–ends test:

- a threat is extortion if the *means* are inherently wrongful (violence, obstruction, deceit), or

- the *ends* are wrongful because the defendant seeks property he knows he has no lawful claim to. See *Koziol*, 993 F.3d at 1169–1171 (applying *Enmons*, *Dischner*, and *Villalobos*).

256.  Under this test, Koziol's threats were criminal because:

- He fabricated and falsified evidence;

- He repeatedly lied about having video proof;

- He targeted multiple victims;

257.  And Koziol demanded money he knew he had no right to.

258.  On the other hand, Plaintiff's conduct bears none of these hallmarks. Plaintiff had—and still has—good-faith, legally recognized claims, confirmed by outside authorities:

• The EEOC accepted and docketed Plaintiff's charge.

• OSHA determined Plaintiff stated a prima facie whistleblower complaint.

• A Nevada Legal Services attorney agreed the claims had merit.

• Two independent LLM legal models concluded Plaintiff had viable claims.

259.  This record destroys any suggestion that Plaintiff "knew" he lacked a lawful claim.

260.  Koziol further emphasized that a failure to file litigation may indicate a sham when the speaker never intended to litigate. See *Koziol*, 993 F.3d at 1171–1172 (citing *Rock River*).

261.  Again, Plaintiff is the opposite:

- Plaintiff gave ViaTRON 10 days' notice on October 1st, 2025.

- Plaintiff filed with the EEOC the same day he was threatened on November 4th.

- Plaintiff filed with OSHA on November 7th.

- Plaintiff initiated arbitration on December 1st, documented via USPS delivery on December 8th.

40

262.    Plaintiff repeatedly followed through, exactly as promised. This is textbook good-faith petitioning, not extortion.

263.    *Koziol* also rejected the argument that threats of litigation are categorically lawful; instead, the court reaffirmed that only **sham litigation**—objectively baseless claims asserted with improper motive—falls outside First Amendment and *Noerr-Pennington* protection. See *Sosa v. DIRECTV*, 437 F.3d 923, 936–938 (9th Cir. 2006).

264.    Plaintiff's claims were neither baseless nor made with improper motive.

265.    Plaintiff's letter did not demand money "or else." It simply stated that, if ViaTRON declined settlement, Plaintiff would file administrative charges with EEOC, NERC, OSHA, and proceed through litigation. Such warnings are lawful and routine components of protected pre-litigation communications.

266.    Plaintiff sought only compensation tied to:

(1) documented ACA violations,

(2) months of discrimination, and

(3) a resolution that both parties could accept.

These are **lawful claims of right**, not extortionate property demands.

267.    Under the Ninth Circuit's binding framework, Plaintiff's conduct is fully protected. *Koziol* confirms that **only those who demand money they know they are not entitled to** cross into criminal extortion. Plaintiff is not such a person.

## E. Malice and Koziol's Application to Internal Accusations

268.    The *Koziol* court cautioned that wrongly labeling good-faith legal threats as "extortion" could chill constitutional litigation activity.

269.    Erwin's November 17th accusations were made after accepting Plaintiff's two offers, showing inconsistency and a post hoc retaliatory motive—strong circumstantial evidence of actual malice.

270.    Additionally, Plaintiff sent clarifying emails on November 6th explaining:

- The October 1st letter was based on legal guidance,

- No unlawful threats were made,

- The word "extortion" was a retaliatory mischaracterization.

271.    Erwin **ignored** these clarifications and escalated the attacks, satisfying the malice

standard laid out in *Circus Circus Hotels v. Witherspoon*, 657 P.2d 101 (Nev. 1983).

## F. Privilege Does Not Apply

272.    Nevada recognizes a conditional privilege for internal workplace communications, but

this is lost when made with knowledge of falsity or reckless disregard. *Gallues v. Harrah's Club*,

491 P.2d 1276 (Nev. 1971).

273.    Given *Koziol*'s clear holding and Plaintiff's consistent explanations, Erwin either knew or

recklessly disregarded the truth. Therefore, any qualified privilege is forfeited.

## G. Damages and Relief

274.    As this is **defamation per se**, Plaintiff need not prove actual damages. Nevertheless,

Plaintiff suffered:

- Loss of professional credibility,

- Emotional distress and reputational harm,

- Loss of income and standing,

275.    ViaTRON is vicariously liable for Erwin's statements made in his official capacity.

**RELIEF REQUESTED**

276.    Plaintiff respectfully seeks:

1. General (presumed) and special damages,
2. Punitive damages for actual malice,
3. Legal fees and related costs,
4. Declaratory finding that the "extortion" accusations were false, retaliatory, and unsupported by law, per *Koziol* and Nevada precedent.

**CAUSE OF ACTION 6 — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

277.    Plaintiff incorporates paragraphs 1-276.

**A. ViaTRON's Conduct Was Extreme, Outrageous, and Recklessly Indifferent to Known Harm**

278.    Under Nevada law, conduct is "outrageous" when it exceeds all bounds of decency and is "utterly intolerable in a civilized community." *Miller v. Jones*, 970 P.2d 571, 577 (Nev. 1998).

279.    Throughout November 2025, ViaTRON President Geoff Erwin engaged in conduct so extreme and unconscionable that no reasonable person should be expected to endure it. This included:

- threatening Plaintiff with federal criminal prosecution,

- declaring Plaintiff's conduct punishable by "20 years in federal prison,"

- falsely accusing Plaintiff of felony extortion,

- cutting off income with no explanation,

- ignoring Plaintiff's financial vulnerability,

- intentionally creating ambiguity about employment status,

- and escalating accusations after receiving clarifying and exculpatory information.

280.   Nevada courts have sustained IIED claims where an employer abuses authority and uses false accusations to intimidate or control. See *Nelson v. Las Vegas*, 665 P.2d 1141, 1146 (Nev. 1983); *Miller*, supra.

281.  In the context of ADA discussions and wage negotiations, falsely accusing a disabled, low-wage employee of a federal felony—while simultaneously withholding pay—is a textbook example of conduct that surpasses "mere insult" or workplace conflict. It is actionable IIED.

**B. The November 4th Threats Were Knowingly False and were Reckless**

282. On November 4th, 2025, Erwin falsely declared that Plaintiff's October 1st letter constituted criminal extortion punishable by 20 years in prison. This threat was made:

- after accepting Plaintiff's $20,000 settlement offer on October 13 and the subsequent insurance payout on the 15th,

- without any basis in law (as shown by *Koziol*, 993 F.3d 1160),

- after Plaintiff submitted supporting documentation (October 14th – November 3rd),

- and in the midst of Plaintiff's unpaid leave.

283.  These threats were **not careless remarks** — they were **calculated, retaliatory, and designed to provoke fear**.

284.  *Miller v. Jones* held that threatening criminal prosecution as leverage in a civil dispute—especially when unfounded—is outrageous and supports an IIED claim.

285.  Erwin's conduct, coming from a company president, carried credible force and was reasonably perceived as a threat of real legal danger.

## C. Erwin Acted with Reckless Disregard for the Known Impact of His Action

286.  Plaintiff's disability and emotional susceptibility were **known to ViaTRON**, as shown in prior emails and disability accommodation discussions.

Despite this, ViaTRON:

- abruptly cut Plaintiff's income,

- withheld basic information about employment status,

- forced Plaintiff into prolonged uncertainty,

- ignored explanations and clarifications, and

- doubled down on criminal threats even after receiving exculpatory evidence.

287.   Nevada law requires reckless disregard for IIED liability as an option—not only specific intent to harm. A defendant is liable where they act with knowledge of a high probability of emotional injury, but proceed anyway. *Olivero v. Lowe*, 995 P.2d 1023, 1026 (Nev. 2000).

288.   Erwin's continued escalation—after knowing Plaintiff's distress, financial dependence, and disability status—satisfies this reckless standard.

## D. Plaintiff's Distress Was Severe, Documented, and Proximate

289.  The Nevada Supreme Court has held that the less extreme the outrage, the more appropriate it is to require evidence of physical injury or illness from the emotional distress. *Nelson v. Las Vegas*, 665 P.2d 1141, 1146 (Nev. 1983).

290.  The inverse is true here: the more extreme the outrage, the less need for physical evidence.

291  Plaintiff truthfully experienced:

- repeated panic attacks,

- insomnia,

- inability to eat or sleep,

- fear of law enforcement involvement,

- anxiety around eviction and basic survival,

- humiliation and shame,

- inability to function professionally or personally.

292.  These symptoms were contemporaneously documented in OSHA filings and emails to ViaTRON.

293.  Nevada's severity requirement is met where a reasonable person could not be expected to endure the distress imposed. *Barmettler v. Reno Air*, 956 P.2d 1382, 1387 (Nev. 1998). Plaintiff's reaction exceeds this threshold.

## E. Causation and Liability

294.  The distress began immediately after the November 4th email threatening federal prosecution and continued through the unresolved unpaid leave and severance negotiations.

295.  Erwin's conduct—made in his capacity as ViaTRON's president—directly caused Plaintiff's injury.

296.  ViaTRON is vicariously liable for the acts of its executives under settled Nevada law.

## F. Relief Requested

297.   Plaintiff respectfully requests:

- compensatory damages for severe emotional distress,
- punitive damages for emotional distress,
- costs of legal proceedings,
- and any other relief the Court deems just.

### FINAL PRAYER FOR RELIEF

298.   **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in
Plaintiff's favor and award the following relief:

## I. Contract-Based and Wage-Based Relief

1. **Enforcement of the October 13, 2025 Settlement Agreement**, including payment of
the full **$20,000** accepted by Defendant.
2. **Damages for breach of the revised settlement agreement**, including:
a. the full value of the revised agreement (estimated at **$100,000–$200,000**);
b. or, in the alternative, the amount the insurer would have awarded but for Defendant's
breach;
c. plus expectation, consequential, and reliance damages permitted under Nevada law.
3. **All unpaid wages owed** from **October 7, 2025 through the date of judgment**, as
Plaintiff was never terminated, never resigned, and remained ready and able to work.
4. **Statutory wage remedies** under **NRS 608.016, 608.100, and 608.140**, including:
a. statutory wage penalties;
b. liquidated damages;
c. statutory interest.
5. **Pre-judgment and post-judgment interest** on all monetary awards.
6. **Consequential damages** resulting from Defendant's conduct, including but not limited
to:
a. losses caused by remaining on unpaid leave at Defendant's direction;
b. lost opportunities to obtain alternative employment;
c. financial harm caused by Defendant's misrepresentations and delays.
7. **Attorney's fees and costs** pursuant to **NRS 608.140**, contract principles, and any other
applicable Nevada authority.

## II. Tort-Based Relief

1. **Defamation damages**, including:
a. presumed damages for defamation per se;
b. actual and special damages for reputational, professional, and economic harm.
2. **Emotional distress damages**, including:
a. **Intentional Infliction of Emotional Distress (IIED)**;

3. **Punitive damages** pursuant to **NRS 42.005**, where Defendant's conduct was intentional, malicious, oppressive, fraudulent, or carried out in conscious disregard of Plaintiff's rights.

## III. Equitable & Declaratory Relief

1. **Declaratory findings** that:
   a. the **$20,000 settlement** was valid, accepted, and enforceable;
   b. Defendant subsequently **breached** that agreement;
   c. Defendant engaged in **bad-faith conduct** regarding both settlement agreements;
   d. Plaintiff was **wrongfully placed on unpaid leave**;
   e. Plaintiff committed **no criminal conduct**, and accusations of "extortion," "fraud," or wrongdoing were false;
   f. Defendant misrepresented the existence and status of any alleged insurance submission;
   g. Defendant's conduct violated Nevada wage statutes and contract principles.
2. **Any further legal or equitable relief** the Court deems just, proper, and necessary.

## IV. Total Damages Sought (Supported by Nevada Law and Mathematical Calculation)

Plaintiff seeks total damages consistent with Nevada law, including compensatory and punitive damages calculated as follows:

1. **Contract and wage-related damages** (not eligible for punitive multiplication):
   • Settlement losses and unpaid wages totaling approximately **$190,000**.
2. **Tort compensatory damages** (eligible for punitive damages under NRS 42.005):
   • Emotional distress (IIED/NIED): approximately **$200,000**;
   • Defamation per se: approximately **$100,000**;
   • **Subtotal tort compensatory: $300,000**.
3. **Punitive damages** under **NRS 42.005(1)(a)**, which authorizes punitive damages of up to **three times** tort compensatory damages where compensatory exceeds $100,000.
   • $300,000 × 3 = **$900,000**.

**Accordingly, Plaintiff seeks a total damages award of up to approximately $1,390,000.**

**REQUEST FOR TRIAL BY JURY**

Truthfully submitted.

Russell Greer

/rgreer/

1-8-25

## Exhibit Table

Exhibit A – October 1 Letter

Exhibit B – October 13 Acceptance

Exhibit C – Revised settlement proposal

Exhibit D – Geoff's 10/14 Reply

Exhibit E – Plaintiff's 10/14 Reply

Exhibit F – Geoff's insurance promise

Exhibit G — Plaintiff 10-15 Response

Exhibit H — Geoff 10/16 Email

Exhibit I.  —  Plaintiff's "not a take it or leave it" email

Exhibit J —.  Plaintiff 10/21 Email

Exhibit K —. Erwin 10/23 Email

Exhibit L.  —  Plaintiff 10/23 Email

Exhibit M —  Plaintiff Evidence List Email

Exhibit N — Erwin wanting to consult a disability professional

Exhibit O —. Plaintiff prepared to return to office

Exhibit P — Erwin saying managers don't want to supervise him

Exhibit Q —.Plaintiff 10/30 email

Exhibit R — Plaintiff revisiting the $20,000 payout

Exhibit S —. Erwin suddenly saying he has a problem with the payout

Exhibit T —. Plaintiff 11/3 Email

Exhibit U —. Geoff Extortion Accusation Email

Exhibit V —. Indeed Reviews

Exhibit W —. Plaintiff's duress email

Exhibit X —.  Plaintiff's clarification email

Exhibit Y —.  Erwin's 10/17 Admission

Exhibit Z —.  Angela 11/24 Email

Exhibit AA —. Plaintiff saying he never resigned

Exhibit BB —. Plaintiff arbitration demand

Exhibit CC — Viatron October pay receipts

# EXHIBIT A

## October 1st, 2025 Settlement Proposal

**Russell Greer**
 , #█████
Las Vegas, NV 89119
████████████

**10-01-25**

Viatron
**Human Resources Department**
18233 S Hoover Street
Gardena, CA 90248

**Re: Severance and Resolution of Legal Claims**

Dear HR Department,

I have been employed with Viatron since December 2024. During my tenure, I have experienced and observed practices that raise serious concerns under Nevada and federal law. These include, but are not limited to:

- **Health insurance violations:** Under the **Affordable Care Act (26 U.S.C. § 4980H)**, any "applicable large employer" (defined as averaging 50 or more full-time employees) must offer health insurance to its full-time employees and their dependents. Federal regulations (**26 C.F.R. § 54.4980H-1**) make clear that all employees across controlled entities and locations are aggregated together — meaning Viatron cannot evade its obligations by splitting staff across offices in Las Vegas, Los Angeles, Allentown, and the Philippines. In addition, **NRS 608.1555** requires Nevada employers to provide health insurance in accordance with federal law. Despite employing well over 50 full-time employees across its offices, Viatron has failed to provide the legally mandated coverage.

- **Disability discrimination and hostile work environment:** I have a documented disability with an approved accommodation for a flexible schedule while attending university. A prior manager (Aaron) approved the use of a Styrofoam barrier at my workstation, which was later discarded by management (Andrea and Noell) on September 24th, revoking my accommodation without discussion. When management discarded the barrier, they even photographed it for HR, further confirming both the existence of the accommodation and its abrupt revocation without any discussion of alternatives. I had put it up because Emily Hall and others have openly laughed at me for having a facial paralysis. Taking it away was discrimination in violation of the **Americans with Disabilities Act (42 U.S.C. § 12112(a), § 12112(b)(5)(A))** and **Nevada law (NRS 613.330, NRS 613.335)**, which both prohibit disability-based discrimination and require employers to provide and maintain reasonable accommodations.

- Further, new management has repeatedly questioned why I am present during certain hours, despite my schedule being pre-approved, forcing me to re-justify my accommodation each time management changes. I was approved to have a modified schedule because I am a disabled student at the university and my schedule was approved

to accommodate it. Former HR staff (Heidi) also incorrectly required me to reapply for accommodation each semester — an unlawful burden under the **ADA** and **NRS 613.335**, which require that once a reasonable accommodation is in place, it must be maintained unless an undue hardship is demonstrated.

- **Unreasonable productivity expectations and faulty equipment**: Management's rigid quota of two to three hours per box ignores the reality that boxes vary in complexity. I have repeatedly been assigned scanners that jam, with documented delays of months before repair service is provided. Holding me accountable under these circumstances is unreasonable and evidence of pretextual discipline. I also feel discriminated against because Jonah has refused to allow me to use functioning scanners, while Elijah, Anna, and a newer employee have all been permitted to work on scanners that operate properly. This unequal treatment violates **the Americans with Disabilities Act (42 U.S.C. § 12112(b)(5)(A)) and Nevada law (NRS 613.330, NRS 613.340),** which require reasonable accommodation and prohibit discrimination or retaliation in the terms and conditions of employment**.**

- **Disparate discipline and retaliation:** I was issued a final written warning for having work-related conversations with my coworker, Les Rogers. Meanwhile, other employees have engaged in far more serious conduct — including failing to show up for two to three consecutive days or arriving over an hour late — without receiving any discipline. This clear disparity in enforcement is evidence of selective discipline and retaliation, in violation of the **Americans with Disabilities Act (42 U.S.C. § 12203)**, **Title VII (42 U.S.C. § 2000e-2)**, and **Nevada law (NRS 613.330, NRS 613.340)**, which prohibit discrimination and retaliation in the terms and conditions of employment. Notably, the manager who issued this "final written warning" resigned from Viatron only two weeks later, further undermining the credibility of the discipline and highlighting the instability of management at the company.

- **Improper reliance on "data" to avoid obligations**: Kala has stated that "the data doesn't support" providing bonuses. This same rationale appears to extend to the denial of legally required benefits such as health insurance and time off. Business metrics cannot override statutory obligations. The **Affordable Care Act (26 U.S.C. § 4980H)** requires health insurance coverage for applicable large employers, and **NRS 608.1555** mandates Nevada employers follow that law— not simply cite "data." Viatron's decision to invest in opening a new office in Nashville, while refusing to provide existing employees with bonuses or legally required health insurance, demonstrates a willful disregard for compliance and employee welfare.

- **Workers' compensation noncompliance**: When a former manager sustained a broken hand, the company refused to provide workers' compensation coverage, in direct violation of Nevada law requiring all employers to carry such insurance. This further demonstrates Viatron's ongoing pattern of ignoring statutory employee protections.

- **Hostile work environment and unsafe expansion:** The decision to bring on more employees, despite an already overcrowded break room, highlights misplaced priorities and disregard for employee welfare, further contributing to an intolerable work environment. Since I have been with Viatron, three managers — Sam, Aaron, and Adam — have quit, underscoring the instability of leadership and dysfunction within the workplace. Compounding this, the men's restroom has only two stalls and one urinal for at least 14 male employees on the day shift, creating unsanitary and unsafe conditions.

This confusion is worsened by leadership statements — for example, on 9-26-25, Kala told employees he is "not a manager, but more of an analyst," despite actively setting policies and directing workplace operations. These conditions not only contribute to a hostile work environment prohibited by the **ADA (42 U.S.C. § 12112)** and **Nevada law (NRS 613.330)**, but also raise concerns under the **OSHA Sanitation Standard (29 C.F.R. § 1910.141)** and **Nevada workplace safety law (NRS 618.375)**, which require employers to maintain safe, sanitary, and orderly facilities.

- **Whistleblowing:** These issues — including violations of the ADA, the Affordable Care Act, Nevada labor law, workers' compensation requirements, and whistleblower protections — give me valid legal claims before the EEOC, NERC, and in court. Under **42 U.S.C. § 12203 (ADA)** and **NRS 613.340**, I am protected against retaliation for opposing disability discrimination and unlawful practices. Under **29 U.S.C. § 218C (ACA)**, I am protected against retaliation for raising concerns about denial of legally required health insurance. In addition, both **federal law (29 U.S.C. § 660(c))** and **NRS 618.445** protect employees who file complaints or raise concerns about workplace safety or compliance. My actions in identifying these violations are fully protected whistleblowing activity, and retaliation would constitute a separate legal violation.

I am willing to resolve this matter privately. To that end, I propose the following resolution:

1. A severance payment in an amount sufficient to result in **$20,000 net after applicable withholdings and taxes**;
2. Written confirmation that my unemployment insurance benefits will not be contested; and
3. A good-faith commitment that Viatron will bring its health insurance coverage and other legally required benefits into compliance for all current, eligible employees.

If we cannot reach agreement within **10 business days** of this letter, I will have no choice but to pursue my rights through the EEOC, the Nevada Equal Rights Commission, the Department of Labor, and, if necessary, litigation in court.

Please also note that retaliation against me for asserting these rights is itself unlawful and would constitute an additional legal violation.

I believe resolving this matter privately is in the best interests for all parties, and I look forward to your prompt response.

Sincerely,
Russell Greer

**EXHIBIT B**

**Geoff's October 13th, 2025 Acceptance**

From: Geoff Erwin Ge
Subject: VT25 – VIATRON Follow Up
Date: Oct 13, 2025 at 12:03:39 PM
To:

Hello Russell,

I have been traveling extensively and have not had a chance to follow up on our October 6th conversation.  Your letter listed several grievances.  I want to make sure I address every one of your concerns.

To start, ViaTRON agrees to your $20,000 cash payment.  However, I would like you to continue working at ViaTRON.  I will be giving you additional benefits because of your disability.  Please read the benefits below.

**ViaTRON Healthcare Program.**
ViaTRON has had a companywide group healthcare program with Kaiser (Insu. No. 7905932361) for over twenty-five years.  This program is administered by Kaiser and ADP, similar to ViaTRON's employee retirement 401K program administered by ADP and Fidelity Funds.  Normally ADP or the provider sends out the medical application forms directly to the newly hired employees.  For unknown reasons, some of the staff in the ViaTRON Vegas office did not receive the enrollment forms.

<u>I have attached your enrollment form.</u>  **<u>Please complete, sign and email the attached form back to me as soon as possible.</u>**  <u>I will make sure your coverage starts immediately.  The company will pay 100% of your premium because of your disability.</u>

Starting December 1st, all ViaTRON employees will be moving from Kaiser to Anthem Blue Cross.  Anthem has better coverage than Kaiser.  We will send you and all the employees the paperwork once we make the move.

- **Why did you not call/email ViaTRON HR when you did not receive your medical application from HR office or from Kaiser directly?**

**ViaTRON Workers Compensation.**
ViaTRON has Workers Compensation Insurance with ADP/Travelers Insurance (Insu. No.  UB-5N337853) since ViaTRON has been in business.  ViaTRON has coverage of over a $1,000,000 per incident.  This is why I am surprised about your statement.

In order to investigate this incident, I will need the following information.
1. What is the name of the employee who was injured?

2. When did this incident happen?
3. Did you witness this incident?
4. Which management staff did the employee report his or her injury?

I can only act on reported information.  <u>Please send me any information that will help me investigate this workers compensation matter.</u>

- **Why did you not ask the employee who was injured to talk/email to ViaTRON's HR office or for you to contact us as soon as you learnt about the injury?**

**OSHA Violation.**
I am not concerned about OSHA because ViaTRON just had a full inspection on another matter by Nevada OSHA in April 2025 and found ViaTRON to be in compliant.

**Employee Harassment.**
You mentioned that there were several employees who had harassed you.

Please send me the details.
1. When did this harassment take place?
2. Who are the employees who harassed you?
3. What harassing statements were said to you?
4. Do you have witnesses who saw these harassments?

**<u>The above information is important for me to investigate and take action on your complaint.  Once I can verify the incident, I will terminate these employees immediately.</u>**

**Separate workspace.**
I have asked the supervisors to set up a separate work area, away from other employees, with dividers because of your disability.  I will also make sure you are set up with the newer workstation and production scanner.  We do not have a separate private office, but we will make special arrangements for you to be as far away from other employees because of your disability.

**Modified Work Schedule.**
You mentioned, because of your health disabilities you have requested a special

modified work schedule.  I will make sure ViaTRON's HR department sets a work schedule that meets your health disability and school classes.  You don't need to worry about Kala; I will talk to him.

**Please send me your complete healthcare application.  Also, email me the answers to all my questions above as soon as possible.  I will be able to set up all the special arrangements by Tuesday, October 14th for your return back to the office.**

I am making arrangement for the $20,000 cash.  This matter will be kept off the books and handled privately.  You mentioned this sum should not include taxes, so it is better we handle this payment in cash.

I am traveling all this week on business. I plan to be in Vegas next week.  I would like to meet with you personally to settle this matter.

Call me if you have any questions.


**Geoff Erwin**

**ViaTRON Systems, Inc.**
Paper Scanning l Microfiche/Film Scanning l Large Format Scanning l Document Management


**MEDICAL APPLICATION .pdf**
173 KB

**EXHIBIT C**

**Plaintiff's Revised Settlement Offer**

From: Russell Greer <span style="background:black">████████████████████</span>
Subject: Re: VT25 – VIATRON Follow Up
Date: Oct 13, 2025 at 2:36:40 PM
To: Geoff Erwin <span style="background:black">████████████████████</span>

Hi Geoff,

Thank you for your message and for outlining your proposed resolution. I was preparing this updated settlement packet to place into FedEx when your email arrived. I've attached my **Revised Settlement Addendum** and cover letter.

The addendum includes additional documentation and identifies witnesses who can corroborate certain events, so you'll have a complete record when reviewing it.

Given that this remains an open negotiation, I'll await our planned meeting next week to discuss the proposal. If it's ok, I would like to wait until **Monday, October 20th**, as we originally planned, rather than returning to the office tomorrow. A staff member already reached out asking where I'm at (I didn't reply), and I believe it would be best to wait until the matter is resolved so there's no confusion or discomfort for anyone in the workplace.

Thank you again for your time and for your willingness to address this in good faith.

Best regards,
**Russell**



**Viatron Revised Offer .pdf**
2.5 MB

On Oct 13, 2025, at 12:03 PM, Geoff Erwin ███████████████████ e:

**Hello Russell,**

I have been traveling extensively and have not had a chance to follow up on our October 6th conversation.  Your letter listed several grievances.  I want to make sure I address every one of your concerns.

To start, ViaTRON agrees to your $20,000 cash payment.  However, I would like you to continue working at ViaTRON.  I will be giving you additional benefits because of your disability.  Please read the benefits below.

**ViaTRON Healthcare Program.**
ViaTRON has had a companywide group healthcare program with Kaiser (Insu. No. 7905932361) for over twenty-five years.  This program is administered by Kaiser and ADP, similar to ViaTRON's employee retirement 401K program administered by ADP and Fidelity Funds.  Normally ADP or the provider sends out the medical application forms directly to the newly hired employees.  For unknown reasons, some of the staff in the ViaTRON Vegas office did not receive the enrollment forms.

I have attached your enrollment form.  **Please complete, sign and email the attached form back to me as soon as possible.**  I will make sure your coverage starts immediately.  The company will pay 100% of your premium because of your disability.

Starting December 1st, all ViaTRON employees will be moving from Kaiser to Anthem Blue Cross.  Anthem has better coverage than Kaiser.  We will send you and all the employees the paperwork once we make the move.

- **Why did you not call/email ViaTRON HR when you did not receive your medical application from HR office or from Kaiser directly?**

**ViaTRON Workers Compensation.**
ViaTRON has Workers Compensation Insurance with ADP/Travelers Insurance (Insu. No. UB-5N337853) since ViaTRON has been in business.  ViaTRON has coverage of over a $1,000,000 per incident.  This is why I am surprised about your statement.

In order to investigate this incident, I will need the following information.
1. What is the name of the employee who was injured?
2. When did this incident happen?
3. Did you witness this incident?
4. Which management staff did the employee report his or her injury?

I can only act on reported information.  Please send me any information that will help me investigate this workers compensation matter.

- **Why did you not ask the employee who was injured to talk/email to ViaTRON's HR office or for you to contact us as soon as you learnt about the injury?**

**OSHA Violation.**
I am not concerned about OSHA because ViaTRON just had a full inspection on another matter by Nevada OSHA in April 2025 and found ViaTRON to be in compliant.

**Employee Harassment.**
You mentioned that there were several employees who had harassed you.

Please send me the details.
1. When did this harassment take place?
2. Who are the employees who harassed you?
3. What harassing statements were said to you?
4. Do you have witnesses who saw these harassments?

**The above information is important for me to investigate and take action on your complaint.  Once I can verify the incident, I will terminate these employees immediately.**

**Separate workspace.**
I have asked the supervisors to set up a separate work area, away from other employees, with dividers because of your disability.  I will also make sure you are set up with the newer workstation and production scanner.  We do not have a separate private office, but we will make special arrangements for you to be as far away from other employees because of your disability.

**Modified Work Schedule.**
You mentioned, because of your health disabilities you have requested a special modified work schedule.  I will make sure ViaTRON's HR department sets a work schedule that meets your health disability and school classes.  You don't need to worry about Kala; I will talk to him.

**Please send me your complete healthcare application.  Also, email me the answers to all my questions above as soon as possible.  I will be able to set up all the special arrangements by Tuesday, October 14th for your return back to the office.**

I am making arrangement for the $20,000 cash.  This matter will be kept off the books and handled privately.  You mentioned this sum should not include taxes, so it is better we handle this payment in cash.

I am traveling all this week on business. I plan to be in Vegas next week.  I would like to meet with you personally to settle this matter.

Call me if you have any questions.


**Geoff Erwin**

**ViaTRON Systems, Inc.**
Paper Scanning I Microfiche/Film Scanning I Large Format Scanning I Document Management

<MEDICAL APPLICATION.pdf>

October 13, 2025

ViaTRON Systems, Inc.
Attn: Geoff Erwin, President
18233 S. Hoover Street
Gardena, CA 90248
Re: Confidential Settlement Addendum – Revised Proposal

Dear Geoff,

I received your recent email just as I was preparing this packet for FedEx. I truly appreciate the time you've taken to address my concerns and to extend a $20,000 payment as a way to close this matter.

When I first mentioned that figure, my intention was the same as you expressed—something small and simple to resolve things quickly. Since then, as I've continued my studies at UNLV and reflected on my paralegal training from my first college degree, I've taken a closer look at the statutes and circumstances involved. The more I reviewed what has occurred during my ten months with ViaTRON—the removal of my privacy barrier, the differential treatment coworkers themselves recognized, and the pressure of a potential demotion tied to my disability accommodations—the clearer it became that my original request understated the seriousness of the situation.

Accordingly, I've prepared a **Revised Settlement Addendum** that outlines my reasoning and proposes a counteroffer for your consideration. It explains the applicable law, comparable case outcomes, and why a higher, good-faith resolution would more fairly reflect the impact of what happened while still allowing ViaTRON to close this matter privately and amicably.

My goal is to leave the company better for the remaining staff. I genuinely hope the issues I experienced lead to positive changes in workplace culture and oversight. At the same time, I believe that with certain members of current leadership—particularly Kala—true improvement may be difficult to achieve, and I do have concerns about possible retaliation or future "gotcha" situations if I were to remain employed after accepting any settlement. For that reason, I believe a confidential separation agreement and fair severance represent the cleanest, most constructive path forward for both sides.

I also want to reassure you that I have no interest in writing publicly or speaking about my experience. My intention is to resolve this quietly and move on. From what I understand, settlements of this nature are typically handled through a company's **Employment-Practices Liability (EPLI) insurance**, which allows the matter to be resolved through normal channels without burdening the company's operations.

I look forward to discussing this with you during our upcoming meeting. Thank you again for your attention and for the opportunity to resolve this in good faith.

Respectfully,
**Russell Greer**
██████████████████03
Las Vegas, NV 89119
██████████████████

**CONFIDENTIAL SETTLEMENT ADDENDUM MEMO**
**For Internal Review by ViaTRON Systems, Inc. Executive Management Only**
**Not for Public Disclosure or External Distribution**

**Date:** October 13th, 2025
**From:** Russell Greer
**To:** Geoff Erwin, President – ViaTRON Systems, Inc.
**Subject:** Addendum – Revised Settlement Proposal and Supporting Context

# I. Overview

This addendum supplements my prior correspondence and outlines new information relevant to my settlement discussions with ViaTRON Systems, Inc. Since my initial demand, additional context has further demonstrated the systemic nature of the issues raised — including public, verifiable data regarding ViaTRON's longstanding pattern of employee mistreatment, benefits noncompliance, and ADA violations.

These concerns extend beyond my personal experience, revealing an organizational failure that warrants not only remedial workplace reform but an adjusted settlement consistent with the gravity of these findings.

# II. Evidence of Systemic Noncompliance and Hostile Environment

Independent employee reviews posted publicly on Indeed.com from **2020–2025** confirm that my concerns are not isolated, but rather reflect an ongoing pattern of serious workplace deficiencies. These accounts corroborate a persistent disregard for employee well-being, compliance, and safety (**EXHIBIT A**):

- **No benefits or PTO provided** ("no benefits or PTO or anything").
- **Toxic and inconsistent management** ("owner only cared about money and held raises over everyone's heads").
- **Wage misrepresentation** ("lie about pay on job listings and pay the lowest wage possible").
- **Hostile, unsafe work culture** ("no leadership, constant yelling, bizarre environment").
- **Unsanitary conditions** ("the entire place smells like sewage… the Department of Health really needs to look at the place").

This publicly available evidence demonstrates that ViaTRON has been on notice of chronic compliance failures for years, yet has failed to take corrective action — validating my own experiences and supporting my ADA and whistleblower claims.

# III. More evidence/facts I forgot to Mention Earlier

- **Threatened with demotion:** in my earlier letter (10/01/25), I briefly mentioned the schedule (how it was approved because I'm a UNLV student admitted into the school via the Nevada Disability & Rehabilitation Program. **EXHIBIT B)**. Well, Aaron had threatened me with demotion in August to "accommodate" my schedule, yet Les Rogers, his sister Denise and Kimmy all have Fridays off every week simply because they want that. Les is a hard working guy and so I don't fault him for wanting Fridays off, but Aaron never once went after those 3, yet I was the only one targeted with demotion. How do I know? Les told me.
- **Co-worker corroboration:** Les Rogers and his sister Denise explicitly told me in August that I was being discriminated against and urged me to involve the State EEOC and NERC. I refrained at that time only because I was trying to keep my position while finishing my university degree. What finally prompted my severance request was the **September incident** in which my privacy barrier—a disability accommodation—was thrown away without notice or discussion of alternatives.
- **Selective enforcement of attendance and conduct rules:**
  - Anna (scanning) calls out once or twice per week without repercussion.
  - Alexis and Steven likewise call out or idle excessively (Steven often spent 20 minutes per hour in the restroom) without discipline.
  - Yet I faced written and verbal warnings and the threat of demotion for requesting the same flexibility others freely receive.
- **Open-floor environment hostile to a person with a facial disability:** Emily Hall wasn't an outlier. Since I started in December, I would frequently hear laughs about my disability. I even wrote letters to Jonah complaining about different people and he claimed he would go and tell them to stop. I don't know what he did or didn't do. I would be forced to wear my face mask to hide who I am on the floor because it was apparently such a big deal having my mouth open. When I was hired, I even told Angela I have a disability.
- The privacy barrier was a result of Emily Hall's open laughs and other people in doc prep who would stare at me. I even had a person in doc prep (a female with brown hair who I don't think works there anymore) mutter "ewww" as she walked by.
- Emily Hall even laughed loudly at me when she was with Aaron. Arron looked back at me, but didn't reprimand her.
- **Exposed to cold and heat:** because the break room is incredibly small, I had to sit outside during the cold winter and outside during summer months. There was literally no where else to sit. Not the hallway because that's too small. Can't sit by the lockers because that's an off limit area. So the idea that Kala wants to bring in 14 more people just isn't realistic. Les told me when he started, Kala indeed brought on many people (through a temp agency) and it was a mad house and very crowded. Les and his sister sit in their car.
- **Wage misrepresentation:** I can echo those Indeed reviews. When I was hired, the Indeed ad had said after 90 days, I would receive a raise to $15. That never happened.

- **Verbal Warnings from Aaron.** Aaron would call us over individually to his computer and tell me I'm below productivity and I would tell him it was my scanner that was having issues. The repair guy would never come out or they claimed he was the only authorized contractor in the area and so I was being reprimanded for an issue beyond my control. As I said before: it's telling that the disabled guy gets stuck on the worst machine in the office, yet newer hires were put on newer machines.

Taken together — the threat of demotion, revoked accommodation, unequal discipline, hostile environment, and denial of promised pay — form a clear pattern of discrimination, retaliation, and mismanagement that fully supports my request for severance.

## IV. ADA Emphasizes "Effect," Not Employer Intent or Later Fixes

Under the Americans with Disabilities Act, liability is determined not by whether an employer *intended* to discriminate, but by whether its actions **had the effect** of denying a qualified individual with a disability equal access to employment and reasonable accommodation.

Even if Viatron later claims that:

- Aaron is no longer employed,
- a new privacy barrier could be provided, or
- my flexible schedule will be "honored going forward,"

those corrections do not negate the prior harm or the retaliatory effect of:

1. Revoking an established accommodation without discussion,
2. Threatening demotion for exercising accommodation rights, and
3. Creating a work environment where harassment went unchecked.
4. Issuing a final written warning, when others engaged in the same conduct; likewise, issuing a final warning to only one participant of the conversation because the final warning stemmed from Les talking to me (he left his table to ask me a question, I didn't approach him), yet Aaron only wrote me up.

The *EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship (2002)* makes clear that "failure to provide a reasonable accommodation at the time it is needed is itself a violation, regardless of whether the employer later provides one." (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada).

Likewise, the ADA's retaliation provisions (42 U.S.C. § 12203) prohibit any adverse action or coercion connected to accommodation requests — meaning the damage occurs **the moment** the threat, revocation, or denial happens, not only if termination follows.

In this case, the impact on my mental health, sense of safety, and ability to perform duties was already realized when my barrier was discarded, my schedule was questioned, the final warning was issued and the demotion threat was issued. Any subsequent offer to "make things right" cannot undo that injury or the stress caused by months of hostility.

Therefore, any claim that future improvements or personnel changes resolve these violations is legally and ethically insufficient.

## IV. Legal and Regulatory Exposure

### 1. ADA and Retaliation Liability

- My accommodation was verbally approved by prior management and then unlawfully revoked when my workstation privacy barrier was discarded.
- Threat of demotion**:** Former manager *Aaron* explicitly stated that my school schedule could only be accommodated if I accepted a demotion, implying termination if I refused. This constitutes coercion under the ADA and serves as evidence of constructive discharge pressure.
- Unequal access to working equipment and selective enforcement of quotas further establish discriminatory treatment and retaliation in violation of 42 U.S.C. §§ 12112, 12203 and 29 C.F.R. § 1630.2(o).

### 2. Affordable Care Act (ACA) and IRS Exposure

- **Governing Law:** 26 U.S.C. § 4980H; 26 C.F.R. § 54.4980H-1 et seq.
- Public employment data and internal company sources confirm that Viatron employs between **66 and 200 workers** across its offices in Las Vegas, Los Angeles, Allentown, and the Philippines—well above the statutory threshold of 50 full-time or full-time-equivalent employees.
- While Viatron has maintained a group health plan through Kaiser Permanente (Policy No. 7905932361), multiple employees—including myself—were **never provided enrollment materials or notified of how to enroll.**
- In his October 2025 email, President Geoff Erwin expressly admitted that "some of the staff in the Viatron Vegas office did not receive the enrollment forms."
- Independent employee reviews posted publicly on Indeed.com from **2020 through 2025** likewise confirm that employees across multiple offices reported that Viatron "offers no benefits or PTO" and "does not provide health insurance," demonstrating a long-standing pattern of noncompliance rather than an isolated administrative oversight. **(Exhibit A).**
- The IRS treats knowledge held by HR or management as knowledge of the corporate entity. A lack of personal awareness by executives does not excuse liability under the doctrines of willful blindness and the corporate duty of oversight.
- Failure to offer affordable, minimum-essential coverage to at least 95 percent of full-time employees exposes Viatron to assessable payments of roughly $2,000 per employee (after the first 30) under §4980H(a), which equates to approximately $200,000 per year and $1.8–$2.0 million in cumulative exposure for the 2015–2024 period.

- Under **26 U.S.C. §7623(b)**, whistleblowers may receive **15–30% awards** of collected penalties, meaning a potential payout of roughly **$270,000 on $1.8 million in assessed penalties.**

**Summary:**
Although a health plan existed on paper, Viatron's failure to provide enrollment access to all eligible full-time employees constitutes an **incomplete offer of coverage** under the ACA. This continuing pattern of noncompliance creates measurable IRS and whistleblower exposure, reinforcing the reasonableness of a confidential, good-faith settlement.

## 3. Nevada Labor Law Violations

- **Governing Law:** NRS 608.0197; NRS 608.020–608.050.
- While Viatron's Las Vegas office alone may employ fewer than 50 workers, its total workforce—when **aggregated across offices in Los Angeles, Allentown, and the Philippines under common ownership and management**—exceeds the statutory threshold for Nevada's paid-leave requirement.
- As an employer meeting that aggregated threshold, Viatron is required to provide **accrued paid leave** at a minimum rate of **0.01923 hours per hour worked** (equivalent to roughly 40 hours per year for full-time employees).
- **No evidence of any paid-leave benefit or accrual policy** has been communicated or made available to Nevada-based staff, constituting a direct violation of NRS 608.0197.
- Reports from employees and internal records also indicate **inconsistent pay calculations and misrepresentation of earned compensation**, suggesting additional violations of Nevada's **wage-payment and misrepresentation statutes** (NRS 608.020–608.050).
- These omissions expose the company to **civil penalties of up to $5,000 per violation**, as well as liability for **back-accrual of leave time and unpaid wages** owed to current and former Nevada employees.

**Summary:**
Even if the Las Vegas office individually falls below 50 workers, Viatron's multi-office structure subjects it to Nevada's paid-leave and wage-compliance requirements through workforce aggregation. The absence of any paid-leave policy and irregular wage practices further evidence systemic noncompliance, reinforcing the need for a confidential, corrective settlement.

## 4. Comparable Settlement Benchmarks

Recent public severance and discrimination resolutions demonstrate that six-figure settlements are routinely achieved when employees experience discrimination, retaliation, or hostile-environment conditions, even without litigation.

For example:

- $160,000 for a transgender nonprofit employee subjected to prolonged harassment.
- $195,000 for a nonprofit executive terminated after complaining of age discrimination.
- $225,000 for a media employee misled during hiring (fraudulent inducement).

• $250,000 for an executive assistant who endured gender-based harassment.
• $330,000 for a race-discrimination case resolved after mediation.

Source: https://nyemployeelaw.com/severance-and-separation/

   These cases involved individual acts of misconduct. In contrast, my circumstances combine
both direct personal discrimination **and** the discovery of systemic ACA non-compliance that
carries potential federal liability. Accordingly, a settlement in the $100,000 – $200,000 range is a
proportionate and responsible resolution when compared to these benchmarks.

## V. Revised Settlement Offer

Given the combined liability under federal and state law — and the pattern of neglect evidenced
by Exhibit A — the revised offer remains the most efficient, private, and cost-effective means to
resolve this matter, as explained in **Exhibit C.**

• **Net Settlement Payment: I would ask for $100,000 up to $200,000 (after taxes),** but am
open to negotiating.
• **Employer Tax Adjustment:** ViaTRON to gross up the total amount to ensure the employee
receives the full $100,000 to $200,000 net. To be paid out by company's ELPI.
• **Terms:** Confidentiality, mutual non-disparagement, and a written commitment to ADA and
ACA compliance reforms.

While my preferred resolution is $150,000 up to $200,000, the lowest acceptable settlement
amount is $100,100, because it's comparable to similar severances, as reported by that law firm
link. This figure should not be viewed as arbitrary, but as the absolute threshold of fairness that
acknowledges both the tangible and intangible harm sustained.

This amount reflects a compromise significantly below the potential liability if matters proceed
through the EEOC, IRS Whistleblower Division, or state enforcement bodies.

This amount also reflects the current job market and Viatron's overall work environment. I'm
effectively being pushed to leave a low-paying but steady position and face a difficult
employment landscape. Because I would be asked to sign a release of my legal claims, the
severance amount needs to fairly reflect both the value of those rights and the financial
uncertainty of transition.

**In addition, this proposed amount can reasonably be viewed as a recognition award rather
than an adversarial demand.** By bringing these compliance and discrimination issues directly
to your attention rather than to outside regulators, I have given the company the opportunity to
correct its course internally and avoid further exposure. This proposed severance, therefore,
serves as both a good-faith resolution and an acknowledgment of my role in identifying issues
that could otherwise have triggered formal investigations or penalties.

Neither of us benefits from years of drawn-out litigation, and it is in both parties' interests to
bring this matter to a close swiftly and privately.

The previous $20,000 demand would be unfair to accept, given that Exhibit C shows that by accepting the previous asked for $20,000, I would be waiving statutory rights that afford me more than $100,000.

This revised proposal represents my good-faith effort to reach an equitable resolution while honoring those legal and ethical realities.

## VI. Requested Action

To resolve this matter amicably and without escalation or surprise, I provide this memorandum in anticipation of our **October 20, 2025** meeting.

My goal remains a fair and efficient resolution that avoids unnecessary proceedings while ensuring compliance and accountability going forward.

Respectfully,
**Russell Greer**

███████████████████████

████████

**Las Vegas, NV 89119**

████████████████████

█████████████

# EXHIBIT A



7:03 🌙                                    ▪️ 5G 77

**indeed**        Open app    💬    🔔    ☰

### ViaTRON Systems, Inc.
66 🍀  ·  2.8 ⭐

| Follow | Write a review |
|--------|----------------|

‹   **Reviews** 20   Salaries   Jobs   Q&A 24   Interviews

### Overall rating

## 2.8 ★

Based on 20 reviews

5
4
3
2
1

### Detailed ratings

Work-life balance    Pay and benefits    Job secu
3.0 ★                2.4 ★                2.3 ★

### What people are saying

✅ Time and location flexibility

❌ Sense of belonging    ❌ Support from manager

❌ Trust in colleagues



indeed.com    ↻

‹    ›      ⬆️      📖      ⧉

7:03 🌙                                    ▪▪▪ 5G 77

‹        **20**
        **Reviews**    Salaries    Jobs    **24**    Interviews
                                  Q&A

Sort

## 20 reviews

Newest ⌄

★☆☆☆☆  June 16, 2025

### Toxic

**Anonymous**

This workplace is toxic and disorganized. Leadership lacks direction, communication is poor, and incompetence runs unchecked. Stress levels stay high with no support or growth.

👍  👎                                    •••

7:03 ☾    ▪▪▪▪ 5G 77

| | 20 | | | 24 | |
|---|---|---|---|---|---|
| ‹ | **Reviews** | Salaries | Jobs | Q&A | Interviews |

★★★☆☆ May 9, 2025

### Warehouse environment

**Doc Prep**

The work itself was decent. Got to wear headphones, you don't deal with the public. But pay was low, zero benefits, owner was always angry. For some reason, ran out of work at times, so no paycheck.

👍 👎                    •••

★★★☆☆ April 25, 2025

### Decent start

**Wide Format Scanner**  📍 Las Vegas, NV

This is not a long term job or at least it wasn't for me. There is no insurance, no holiday pay, no sick leave, or any benefits. It is a good place to get some work experience if you are just starting out.

👍 👎                    •••

★☆☆☆☆ December 16, 2024

### Bizarre and toxic work environment

**Doc Prep**  📍 Las Vegas, NV

Do yourself a favor and stay far away from this place. The pay on the job listings is completely inaccurate --

**indeed.com**

11



7:03 🌙     ▓▓▓ 5G 77

**20**
**Reviews**   Salaries   Jobs   24 Q&A   Interviews

★☆☆☆☆ December 16, 2024

### Bizarre and toxic work environment

**Doc Prep** 📍 Las Vegas, NV

Do yourself a favor and stay far away from this place. The pay on the job listings is completely inaccurate -- everyone gets paid minimum wage. Full-time schedule but no benefits, no PTO, no paid holidays, nothing. Owner comes into the office once in...**Show more**

👍 👎      •••

★☆☆☆☆ October 15, 2024

### Management don't appreciate their workers

**Document Prepper** 📍 Las Vegas, NV

Do not work for this company. The pay is low and they don't I appreciate their employee. They expect you to do more work then you're able too. I was only there for a month and was let go for poor performance. Don't waste your time working there....**Show more**

👍 👎      •••

★☆☆☆☆ May 22, 2024

### Unless your good with not being introduced to anyone and your quiet and Spanish you'll be fine



**indeed.com**

12



7:04 🌙                    ⊿ 5G 77

‹    20              Salaries    Jobs    24      Interviews
     **Reviews**                            Q&A

★☆☆☆☆  May 14, 2021

**Warehouse**

**DCS staff ( Doc, Prep, scanning, indexing, and QC)**

📍 Las Vegas, NV

This company uses a lot of California's laws in Nevada.
They cheat their employees out of earned wages.
They have a sweatshop working environment.
And they are a company I will not give referrals to any
of my friends who are looking for work.

**Pros** ✅

Off on weekends

**Cons** ❌

No real Bookkeeper to record hours worked and how to
use excel spreadsheets.…**Show more**

👍  👎                                    •••

★☆☆☆☆  April 6, 2021

**Worst job I had in my entire life**

**Document Scanning Specialist**  📍 Las Vegas, NV

Scan scan and more scanning
No teamwork
Boring job
Repetitive
Low pay


indeed.com

13



7:05 ☾                                     �everything 5G 76

‹        20                           24
    **Reviews**    Salaries    Jobs    Q&A    Interviews

---

★☆☆☆☆    April 6, 2021

**Worst job I had in my entire life**

**Document Scanning Specialist**    📍 Las Vegas, NV

Scan scan and more scanning
No teamwork
Boring job
Repetitive
Low pay
No paid time leave
I was put on call longer than I worked there
What a joke

**Pros** ✅

They bought staff pizza for Halloween

**Cons** ❌

Lame hours ....no growth...**Show more**

👍    👎                                    •••

---

★☆☆☆☆    September 15, 2020

**This job is not truthful**

**Office Administration**    📍 Las Vegas, NV

Work-life balance
Job starts too early

Pay & benefits

**indeed.com**

14



7:05 🌙           📶 5G 76

| 20 **Reviews** | Salaries | Jobs | 24 Q&A | Interviews |

★☆☆☆☆   September 15, 2020

**This job is not truthful**

**Office Administration**   📍 Las Vegas, NV

Work-life balance
Job starts too early

Pay & benefits
It's a sad job really

Overall
This company sucks! The managers there never answered back Serious questions OR their emails and leave their employees confused on what's going on. I was promised...**Show more**

👍   👎             •••

★★★★★   July 13, 2017

**great job**

**Office Staff, Scanners**   📍 McKinney, TX

great job with great people, I was working here and I never hear a complained for any employed, serious company, nice coworkers, nice place to work in McKinney Texas....**Show more**

👍   👎             •••

indeed.com

15



7:06 🌙                          📶 5G 76

**indeed**          Open app   💬   🔔   ☰

Viatron Systems, Inc.
1.0 ⭐

Follow          Write a review

Snapshot    Why Join Us    1         97         1
                          Reviews   Salaries   Job  ›

Viatron Systems, Inc. Careers and Employment

## About the company

| Industry | Link |
|---|---|
| Information Technology Support Services | Viatron Systems, Inc. website ↗ |

Learn more

## Jobs





indeed.com    ↻

‹    ›    ⬆    📖    ⧉



**Sort**

**1 review**

Newest ∨

★☆☆☆☆  January 19, 2025

### Unpleasant and unconventional

**Scanner Operator**  📍 Las Vegas, NV

When I worked here, management and shift leads absolutely did not care about anyone or anything. They sabotaged everyone's work performances by not being helpful and not addressing any concerns. The owner only cared about money and held raises over everyone's heads with no intention of increasing wages. They lie about the pay on the job listings; they will pay you the lowest wage they possibly can and it's very inconsistent amongst all the employees. Some get paid more than others for no reason. No talking and no teamwork allowed. No benefits or PTO or anything. I can't think of anything positive about this company. Not sure how they've been getting away with swindling their employees for all these years.

**Pros** ✅

Literally nothing



indeed.com

17



7:07 🌙                          ▪︎▪︎▪︎▪︎ 5G 76

‹      **Reviews**   Salaries   Jobs   Q&A   Interviews
         ¹                         ²

## 1 review                    Newest ⌄

★☆☆☆☆   April 23, 2025

### Job is only beneficial for short term, not long term

**Small Format Scanning Specialist**   📍 Las Vegas, NV

I work in the Small Format Scanning section in the Las Vegas location. The location is near many places to eat and shop. The work is basic and simple; just repetitive and can be very boring. Management is non-existent. No leadership. A new manager was hired recently and he seems like a likeable person. Before that, and even now, there's no leadership and direction. The GM, the one that's really in charge, only cares about the numbers and not the issue of high turnover (many good employees resigned/quit), scanners being broken/needs servicing and expected to continue to use them and meet unrealistic productivity numbers, the work environment is toxic, e.g. morale of the employees is low and the work environment is dusty and dirty all the time which caused many people to be ill/sick. You do need to wear a mask and work on keeping your workstation clean due to the poor air circulation. That's is probably why people are getting sick all the time due to air filters are not being cleaned and the warehouse not being cleaned reasonably to keep air borne illness at bay. The pay is low; after three months, I did get a 2 dollar raise to $14 an hour which is still at minimum wage. Several employees that I know that do still work there, work extra jobs to make ends meet. Each section has different pay. The document

indeed.com

18

**EXHIBIT B**



JOE LOMBARDO
GOVERNOR

CHRIS SEWELL
DIRECTOR

DRAZEN ELEZ
ADMINISTRATOR

RE:  Russell Greer

To whom it may concern:

Russell Greer is a current and ongoing client at Nevada Bureau of Vocational Rehabilitation since 8/29/2014. Currently, we are developing a plan for employment which includes support for college/university education.  The Bureau of Vocational Rehabilitation seeks to establish individuals in long-term careers.

Should you have any questions, please contact me.

Jerry Leach, MA, CRC
3016 West Charleston BLVD, Suite 200
Las Vegas, NV 89102-1973



At Work for Disability Inclusion

Phone: (702) 486-0371
Fax: (702) 486-5088

jlleach@detr.nv.gov
VRNevada.org

3016 W. Charleston Blvd, Suite 200
Las Vegas, NV 89102








Nevada Department of Employment,
Training and Rehabilitation

# EXHIBIT B — Viatron Compliance Facts Summary & Settlement Valuation

Prepared by: **Russell Greer**
Date: **October 2025**

This document summarizes statutory compliance failures under federal and Nevada law and quantifies Viatron's estimated exposure to demonstrate the reasonableness of the proposed $100,000 – $200,000 good-faith settlement award.

## *I. Affordable Care Act (ACA) – Incomplete Offer of Coverage*

**Governing Law:** 26 U.S.C. § 4980H; 26 C.F.R. § 54.4980H-1 et seq.

- Viatron employs more than 50 full-time and full-time-equivalent workers when its Las Vegas, Los Angeles, Allentown, and Philippines offices are aggregated under 26 U.S.C. § 414(b)–(o).
- Viatron appears to have maintained a group health plan through Kaiser Permanente (Policy No. 7905932361), yet multiple employees – including myself – were never provided enrollment materials or informed of the procedure for joining the plan.
- Under § 4980H, an employer of 50 or more full-time or full-time-equivalent employees must offer affordable, minimum-essential coverage to at least 95% of eligible staff. Failing to deliver or communicate enrollment options effectively constitutes a failure to "offer" coverage.
- In Geoff Erwin's October 2025 email, he acknowledged that "some of the staff in the Viatron Vegas office did not receive the enrollment forms." That admission indicates an incomplete offer of coverage and a breakdown in the required administrative process.
- Independent employee reviews posted publicly on Indeed.com from 2020 through 2025 consistently state that Viatron "offers no benefits or PTO" and "does not provide health insurance." These accounts span multiple offices and years, demonstrating that the absence of effective health-coverage communication has been a long-standing pattern rather than an isolated clerical oversight.
- Estimated IRS exposure: ≈ $200,000 per year since 2015 ("assessable payment" = $2,000 × number of FT employees after 30).
- Cumulative potential liability: ≈ $1.8 – $2.0 million (2015–2024).
- Whistleblower context: 26 U.S.C. § 7623(b) authorizes 15 – 30% awards to informants reporting tax noncompliance. Even a 15% share on a $1.8 million penalty equals ≈ $270,000.

**Summary:** While a policy may have existed, the failure to ensure that all full-time employees actually received and could enroll in coverage still exposes the company to ACA penalties. Resolving this matter privately through a fair severance mitigates that risk without the expense or publicity of federal review.

## *II. Nevada Paid Leave Violations*

- Governing Law: NRS 608.0197
- Employers with 50+ workers must provide 0.01923 hours of paid leave per hour worked.
- No evidence of any paid leave benefit offered to Nevada staff.

- Exposure: Civil penalties up to $5,000 per violation plus back-accrual of leave value for all current and former employees.

## III. ADA and Retaliation Violations

- Governing Law: 42 U.S.C. §§ 12112, 12203; 29 C.F.R. § 1630.2(o)
- Approved accommodation (privacy barrier and flex schedule) revoked without interactive process.
- Threat of demotion and selective discipline created constructive pressure to resign.
- Unequal access to functioning equipment and inconsistent enforcement of quotas further demonstrate disparate treatment.
- Remedy range: Compensatory and punitive damages up to $300,000 for employers with > 500 employees (42 U.S.C. § 1981a(b)(3)(D)) plus attorney's fees.

## IV. Workplace Safety and OSHA Concerns

- Governing Law: 29 U.S.C. § 654; 29 C.F.R. § 1910.141 (General Sanitation)
- Overcrowded break room forcing employees to eat outside amid smoke and heat.
- Restroom facilities below OSHA minimum (> 15 male employees but only 2 stalls + 1 urinal).
- Exposure: $15,625 per serious violation (2025 OSHA schedule).

## V. Pattern of Neglect and Turnover

- Three managers resigned within ten months.
- Employee reviews (Exhibit A) document years of unsanitary conditions, harassment, and ignored complaints.
- These patterns reflect systemic noncompliance and justify a confidential resolution to avoid regulatory and reputational damage.

## VI. Settlement Valuation and Good-Faith Resolution Rationale

- Aggregate potential exposure: > $2.3 million (federal and state liabilities combined).
- Proposed Resolution: Good-faith award in the range of $100,000 – $200,000.
- Purpose: This award balances the financial impact of employment transition with the value of the legal rights being waived and the good-faith benefit to Viatron for internal disclosure rather than external reporting.
- Rationale: This range reflects a measured compromise that spares Viatron the expense, delay, and public exposure of EEOC, IRS, and state labor proceedings while recognizing the claimant's integrity in reporting these issues internally and in good faith.

**EXHIBIT D**

**Geoff's 10/14/2025 Reply**

From: Geoff Erwin ▇▇▇▇▇▇▇▇▇▇▇▇▇
Subject: RE: VT25 – VIATRON Follow Up
Date: Oct 14, 2025 at 7:51:29 AM
To: Russell Greer ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**Hello Russell,**

We want to be upfront with you.  ViaTRON does not plan or have the means to pay your $200,000 demand.  This amount is almost like extortion money.

We have carefully read your letters, and we are confident ViaTRON has done nothing wrong.

**ACA Employee Healthcare.**  ViaTRON has healthcare group insurance.  According to our healthcare insurance agent, we have a healthcare group coverage, and employees are covered.  If we failed accidentally to provide a few employees with the enrollment form, then it is an administrative error.  The first violation is just a warning letter from the agency to correct procedures.
We are not worried about ViaTRON's ACA problem.

**Employee Paid-Time-Off (PTO).**  ADP Payroll administrates ViaTRON's PTO program for all locations as part of the payroll processing services.  ViaTRON pays ADP an extra "no fault fees" similar to payroll insurance in the event of payroll calculation errors.  Our main office has spoken to ADP.  ADP said they will investigate this matter and take care of it.  Because ViaTRON pays ADP the "no fault fees" ViaTRON is not responsible for any cost.  ADP is a professional payroll processing company and manages our PTO.
We are not worried about ViaTRON's PTO problem.

**Workers Compensation.**  ViaTRON has a well-placed employees' Workers Compensation insurance.  The Employee is responsibility to report any injury incurred at the office.  ViaTRON is not aware of any injuries taking place at ViaTRON that were not reported to the insurance company.  If the employee fails to do so, then the employee takes full responsibility.
We are not worried about ViaTRON's Workers Compensation problem.

**Wild Internet Accusations.**  The internet is full of crazy, frustrated, terminated ex-employees deadset on taking revenge on the previous employer.  This is common knowledge/joke that the only way these failed individuals can get back at their old employers is by hiding behind the internet and making wild fantasized nasty "made-up" stories to make themselves feel good.  Everyone knows these are pathetic individuals when they read their sad stories.  None of these statements can be used in a court of law or in any other situation.

We are not worried about internet "made-up" statements or ludicrous comments.

Russell, we are tired of your threats!  Your letters clearly read like blackmail and extortion.  Please proceed with your blackmail of reporting ViaTRON.

The only area we are concerned about is your disability status and what happened during your employment at ViaTRON.

We have spoken to our insurance company and told them we want to settle this matter out of court.  I want as little publicity as possible.  They confirmed that our insurance will cover ADA employment matters.  They will make the ADA payout.  It will take 3 weeks to process this claim.

They asked us to send them information on these questions.
1. When did the injury start?
2. Who did you report these injuries to at ViaTRON?
3. Have you presented ViaTRON's HR written ADA documents of your disability?
4. What type of disability do you have?

Our insurance claims agent assured me that these are normal for some companies, and we do not need to worry.  He has begun the claim's process.

I have cancelled my trip to Vegas because of these new developments.  At this point we just have to wait for the insurance agent to call me back.  The sooner you send me the above information; the sooner we can conclude this matter.

Geoff Erwin

---

**From:** Russell Greer █████████████████████
**Sent:** Monday, October 13, 2025 5:36 PM
**To:** Geoff Erwin █████████████████████
█████████████████ - VIATRON Follow Up

Hi Geoff,

Thank you for your message and for outlining your proposed resolution. I was preparing this updated settlement packet to place into FedEx when your email

arrived. I've attached my **Revised Settlement Addendum** and cover letter.

The addendum includes additional documentation and identifies witnesses who can corroborate certain events, so you'll have a complete record when reviewing it.

Given that this remains an open negotiation, I'll await our planned meeting next week to discuss the proposal. If it's ok, I would like to wait until **Monday, October 20th**, as we originally planned, rather than returning to the office tomorrow. A staff member already reached out asking where I'm at (I didn't reply), and I believe it would be best to wait until the matter is resolved so there's no confusion or discomfort for anyone in the workplace.

Thank you again for your time and for your willingness to address this in good faith.

Best regards,
**Russell**

**CAUTION:** Email was not from ViaTRON Network!

On Oct 13, 2025, at 12:03 PM, Geoff ███████████████ ██rote:

███████████

I have been traveling extensively and have not had a chance to follow up on our October 6th conversation.  Your letter listed several grievances.  I want to make sure I address every one of your concerns.

To start, ViaTRON agrees to your $20,000 cash payment.  However, I would like you to
continue working at ViaTRON.  I will be giving you additional benefits because of your
disability.  Please read the benefits below.

**ViaTRON Healthcare Program.**
ViaTRON has had a companywide group healthcare program with Kaiser (Insu. No.
7905932361) for over twenty-five years.  This program is administered by Kaiser and
ADP, similar to ViaTRON's employee retirement 401K program administered by ADP
and Fidelity Funds.  Normally ADP or the provider sends out the medical application
forms directly to the newly hired employees.  For unknown reasons, some of the staff in
the ViaTRON Vegas office did not receive the enrollment forms.

I have attached your enrollment form.  **Please complete, sign and email the attached
form back to me as soon as possible.**  I will make sure your coverage starts
immediately.  The company will pay 100% of your premium because of your disability.

Starting December 1st, all ViaTRON employees will be moving from Kaiser to Anthem
Blue Cross.  Anthem has better coverage than Kaiser.  We will send you and all the
employees the paperwork once we make the move.

- **Why did you not call/email ViaTRON HR when you did not receive your
  medical application from HR office or from Kaiser directly?**

**ViaTRON Workers Compensation.**
ViaTRON has Workers Compensation Insurance with ADP/Travelers Insurance (Insu.
No.  UB-5N337853) since ViaTRON has been in business.  ViaTRON has coverage of
over a $1,000,000 per incident.  This is why I am surprised about your statement.

In order to investigate this incident, I will need the following information.
1. What is the name of the employee who was injured?
2. When did this incident happen?
3. Did you witness this incident?
4. Which management staff did the employee report his or her injury?

I can only act on reported information.  Please send me any information that will help
me investigate this workers compensation matter.

- **Why did you not ask the employee who was injured to talk/email to ViaTRON's HR office or for you to contact us as soon as you learnt about the injury?**

**OSHA Violation.**

I am not concerned about OSHA because ViaTRON just had a full inspection on another matter by Nevada OSHA in April 2025 and found ViaTRON to be in compliant.

**Employee Harassment.**

You mentioned that there were several employees who had harassed you.

Please send me the details.
1. When did this harassment take place?
2. Who are the employees who harassed you?
3. What harassing statements were said to you?
4. Do you have witnesses who saw these harassments?

**The above information is important for me to investigate and take action on your complaint.  Once I can verify the incident, I will terminate these employees immediately.**

**Separate workspace.**

I have asked the supervisors to set up a separate work area, away from other employees, with dividers because of your disability.  I will also make sure you are set up with the newer workstation and production scanner.  We do not have a separate private office, but we will make special arrangements for you to be as far away from other employees because of your disability.

**Modified Work Schedule.**

You mentioned, because of your health disabilities you have requested a special modified work schedule.  I will make sure ViaTRON's HR department sets a work schedule that meets your health disability and school classes.  You don't need to worry about Kala; I will talk to him.

**Please send me your complete healthcare application.  Also, email me the answers to all my questions above as soon as possible.  I will be able to set up all**

**the special arrangements by Tuesday, October 14th for your return back to the
office.**

I am making arrangement for the $20,000 cash.  This matter will be kept off the books
and handled privately.  You mentioned this sum should not include taxes, so it is better
we handle this payment in cash.

I am traveling all this week on business. I plan to be in Vegas next week.  I would like to
meet with you personally to settle this matter.

Call me if you have any questions.


**Geoff Erwin**

**ViaTRON Systems, Inc.**
Paper Scanning I Microfiche/Film Scanning I Large Format Scanning I Document Management

<MEDICAL APPLICATION.pdf>

**EXHIBIT E**

**Plaintiff's 10/14/2025 Reply**

**From:** Russell Greer ████████████████████
**Subject:** Re: VT25 - VIATRON Follow Up
**Date:** Oct 14, 2025 at 9:32:25 AM
**To:** Geoff Erwin ████████████████
**Bcc:** Russell Gre ████████████████████

Hi Geoff,

Thank you for your email and for forwarding this matter to your insurance carrier. I want to be clear that my earlier letters were intende settlement proposal made in good faith and within my rights under federal and state employment laws.

My intent has always been to resolve these issues privately and professionally. Two coworkers, Les and Denise, even urged me to co specifically chose to keep this internal. If any of my wording came across the wrong way, I apologize. I drafted several versions over th ensure my tone stayed respectful and sincere. I'm sorry if it came off as anything other than a sincere request.

Per your request, here are the ADA-related details for the insurer's review:

- **Disability:** Congenital facial paralysis (Moebius Syndrome).

- **When it began:** At birth.

- **Reported to:**
  · Angela (HR) at the time of hire in December 2024 (via zoom interview recording that she might still have)
  · Jonah around February 2025 when coworkers were harassing me.
  · Aaron on multiple occasions in 2025 regarding schedule and accommodation issues.
  · Les Rogers was aware and commented that I was being mistreated by Aaron; he repeatedly suggested I involve outside agenci avoid escalation.

- **Written documentation:**
  · August 20 2025 email to Angela and Aaron reaffirming my disability after Aaron threatened demotion or termination over my sc
  · State documentation verifying disability status.
  · Disability status indicated on my employment application.

**Additional context of discrimination and retaliation:**

- Aaron issued a written final warning targeting me yet he didn't target anyone else for talking or having work related  conversatio

- Aaron threatened demotion or termination for my class schedule, while other employees received flexibility without penalty. Afte email to Aaron, he backed off after that and approved my privacy barrier (but the harm was already felt by being "given the weel demotion or termination).

- My approved privacy barrier was later discarded a month later by Andrea and Noel when they should have known from Aaron th

- Several coworkers remarked that I was treated differently because of my disability, showing the behavior was apparent within th

I appreciate you initiating the insurer's review and will await contact from their representative to continue the process.


**Russell Greer**

**EXHIBIT F**

**Geoff's Insurance Promise**

From: Geoff Erwin ▆▆▆▆▆▆▆▆▆▆
Subject: RE: VT25 – VIATRON Follow Up
Date: Oct 15, 2025 at 7:21:07 AM
To: Russell Greer ru▆▆▆▆▆▆▆▆▆▆▆▆▆

**Hello Russell,**

I will send to the insurance claims agent the information you provided in your last email.

**Disability Discrimination Insurance Claim**

**Point 1.**
In December 2025, you first reported your disability to Angela during your job interview.  You also provided Angela will documentation about your disability and your limitations in certain areas of work.  In your job application form you stated your disability and your job requirements/ limitation.

**Point 2.**
In February 2025, Jonah witnessed a coworker harassing you.

**Point 3.**
In August 2025, you spoke to Aaron multiple times about accommodating your work schedule with your school schedule.

**Point 4.**
In August 2025, Les Rogers witnessed Aaron mistreatment of you and Les suggested you contact outside agencies to resolve your scheduling problem.  You decided not to report this matter to the authorities.

**Point 5.**
In August 2025, you sent Angela and Aaron emails about your disability after Aaron threatened you with demotion or termination over your school schedule.

**Point 6.**
In??? 2025, work barriers were removed from your workspace.

**Evidence 1.**  "Disability status indicated on my employment application."

**Evidence 2.**  Letter from Aaron regarding your demotion or termination.
**Evidence 3.**  State documentation verifying disability status.
**Evidence 4.**  Email to Aaron dated 08-20-25.
**Evidence 5.**  .???

**Witness 1.**  Les Rogers
**Witness 2.**  Denise Rogers
**Witness 3.**  Jonah Padua
**Witness 4.**  ?

Do you want to add any additional information to the above points, evidence or witnesses before I send it to the insurance company?

The claims agent mentioned this disability claim will include time out of work.  For this reason, I will instruct the payroll staff to only include in your next paycheck the actual hours you worked at ViaTRON up to 10-06-25.

I will contact you as soon as the claims agent has further information.


**Geoff Erwin.**

---

**From:** Russell Greer <russellgreer27@icloud.com>
**Sent:** Tuesday, October 14, 2025 12:32 PM
**To:** Geoff Erwin <Gerwin@viatron.com>
**Subject:** Re: VT25 - VIATRON Follow Up


Hi Geoff,

Thank you for your email and for forwarding this matter to your insurance carrier. I want to be clear that my earlier letters were intended only as a formal settlement proposal made in good faith and within my rights under federal and state employment laws.

**EXHIBIT G**

**Plaintiff's 10-15 Reply**

From: Russell Greer <del>russellgreer27@icloud.</del>com
Subject: Re: VT25 – VIATRON Follow Up
Date: Oct 15, 2025 at 8:18:21 AM
To: Geoff Erwin ████████████████████
Bcc: Russell Greer ████████████████████om

Hi Geoff,

Thank you for compiling the ADA claim summary. I reviewed the points and wanted
to add a few details before you forward it to the insurer.

**Additional facts and evidence**

- Aaron approved the privacy barrier late August.
- The privacy barriers that Aaron approved were later discarded by Andrea and
  Noel, who said they were against company policy.

- I was consistently assigned to the oldest, noisiest scanner. Newer hires
  received better machines. When I asked Jonah about switching, he declined,
  and Les witnessed that conversation and witnessed Aaron's discriminatory
  actions to me.

- The final written warning remains in my locker (31).

- Aaron initially approved the barriers after my accommodation request, which
  shows that the company recognized them as a reasonable accommodation
  before they were removed.

  No other witnesses besides it was common knowledge in the office that my
  machine was the least reliable.

**Regarding payroll and claim timing**

When we spoke earlier, you mentioned a two-week paid leave period while the
claim was being processed. Since my last workday was October 6, that two week
pay appears to not being applied anymore, but rather being applied to the pay out
itself. Could you please confirm that the insurer can mark this claim for expedited
review? I can provide any documents or signatures needed right away. I will just be
left without active income.

Thank you again for forwarding the information to the insurance agent and for keeping me updated. I appreciate your help in ensuring this moves efficiently.

Best regards,
**Russell Greer**


Sent from my iPhone

On Oct 15, 2025, ██████████████████████████████████:


**Hello Russell,**

I will send to the insurance claims agent the information you provided in your last email.

**Disability Discrimination Insurance Claim**

**Point 1.**
In December 2025, you first reported your disability to Angela during your job interview. You also provided Angela will documentation about your disability and your limitations in certain areas of work.  In your job application form you stated your disability and your job requirements/limitation.

**Point 2.**
In February 2025, Jonah witnessed a coworker harassing you.

**Point 3.**
In August 2025, you spoke to Aaron multiple times about accommodating your work schedule with your school schedule.

**Point 4.**
In August 2025, Les Rogers witnessed Aaron mistreatment of you and Les suggested you contact outside agencies to resolve your scheduling problem.  You decided not to report this matter to the authorities.

# EXHIBIT H

## Geoff 10-16 Email

From: Geoff Erwin G██████████████
Subject: RE: VT25 – VIATRON Follow Up
Date: Oct 16, 2025 at 5:26:58 AM
To: Russell Greer rus███████████████

**Hello Russell,**

We fully understand your financial situation and will assist in every possible way to
expedite the claim process.

We thought we had a fair and speedy solution for you in my first email to you.  We were
going to make a cash payment of $20,000 on October 20th.  In addition, I was going to
give you continuous employment with your special workspace, new computer and newer
scanner, and a flexible work schedule.

You were the person who rejected this offer and increased your demand to $200,000,
which is 10x times your original demand.  I am not sure why or what motivated you to
dramatically increase your demand.  ViaTRON simply cannot afford to make this kind of
payment and was forced to put this through our insurance company.

Now that we have opened a formal $200,000 disability discrimination insurance claim, all
of us are now constrained by the insurance company's rules.  $200,000 is a lot of
money.  We have no choice but to follow the claim's instructions.  If they tell us that your
backpay is covered in the payout, we need to follow their instructions and not go around
the insurance company.  We cannot double pay you.  These insurance companies are
very serious about insurance fraud.

However, we understand your difficult situation and will work to speed up your claim.
They mentioned they will have a firm timeline by next week after we submit your full
claim's information.

The insurance company seems to have a million questions about you and your claim.
They wanted your personnel file.  They want your full background information.  Are Les
and Denise reliable witnesses?  What are their backgrounds?  What is their relationship
with you?  Have you filed any other work-related claims in the past?  Have you ever filed
any other disability discrimination claims with insurance companies or any other
organizations/companies including any government agencies.  Do you have any existing
lawsuits?  Have you ever claimed discrimination in any other matter?  Are you currently
collecting unemployment benefits?

$200,000 is a lot of money and they are taking this claim very seriously and will

investigate it.

We do not have any other information for the insurance company other than your personnel file at ViaTRON.  We have asked them to directly ask you these questions.  We have experience and know this insurance companies take a nonsense approach in their investigations.  I will try to talk to Les and see what he knows about your incident.  I hope he can give the investigators the necessary information.

In any case, I will make sure to expedite your claim.  I will be in touch next week.

**Geoff Erwin**

---

**From:** Russell Greer <russellgreer27@icloud.com>
**Sent:** Wednesday, October 15, 2025 11:18 AM
**To:** Geoff Erwin <Gerwin@viatron.com>
**Subject:** Re: VT25 - VIATRON Follow Up

Hi Geoff,

Thank you for compiling the ADA claim summary. I reviewed the points and wanted to add a few details before you forward it to the insurer.

**Additional facts and evidence**

- Aaron approved the privacy barrier late August.
- The privacy barriers that Aaron approved were later discarded by Andrea and Noel, who said they were against company policy.
- I was consistently assigned to the oldest, noisiest scanner. Newer hires received better machines. When I asked Jonah about switching, he declined, and Les witnessed that conversation and witnessed Aaron's discriminatory actions to me.
- The final written warning remains in my locker (31).
- Aaron initially approved the barriers after my accommodation request, which shows that the company recognized them as a reasonable accommodation before they were removed.

**EXHIBIT I**

**Not a take it or leave it email**

From: Russell Greer rus█████████████████

Subject: Re: VT25 - VIATRON Follow Up

Date: Oct 16, 2025 at 5:58:25 AM

To: Geoff Erwin█████████████████

Bcc: Russell Greer ru███████████████████om

Hi Geoff,

Thank you for your message and for forwarding the claim details to the insurer. I just want to clarify one point — the figure I mentioned earlier wasn't intended as a "take-it-or-leave-it" demand. My intent was to open a dialogue about a fair settlement.

I was simply trying to convey that I valued a fair resolution given the circumstances, not to present an unrealistic number.

I appreciate your continued efforts to move the claim forward and look forward to hearing from the insurer soon.

Best regards,
**Russell**

Sent from my iPhone

> On Oct 16, 2025, at 5:26 AM, Geoff █████████████████████
>
> **Hello Russell,**
>
> We fully understand your financial situation and will assist in every possible way to expedite the claim process.
>
> We thought we had a fair and speedy solution for you in my first email to you.  We were going to make a cash payment of $20,000 on October 20th.  In addition, I was going to give you continuous employment with your special workspace, new computer and newer scanner, and a flexible work schedule.

**EXHIBIT J**

**Plaintiff 10-21 Email**

From: Russell Greer r███████████████████
Subject: Re: VT25 - VIATRON Follow Up
Date: Oct 21, 2025 at 7:23:41 AM
To: Geoff Erwin ███████████████████

Hi Geoff,

I wanted to follow up regarding the ADA claim. Could you please confirm whether it has been forwarded to the insurance adjuster and, if so, share the adjuster's name, company, and claim or reference number?

If possible, please also ask the adjuster to target a resolution within the next three weeks (ideally by November 11th, just because I'm trying to figure out covering certain bills).

Thank you again for your time and for keeping me updated on the process.

Best regards,
Russell


Sent from my iPhone

On Oct 16, 2025, at 5:58 AM, Russell Greer ███████████████████ ███████████:



Hi Geoff,

Thank you for your message and for forwarding the claim details to the insurer. I just want to clarify one point — the figure I mentioned earlier wasn't intended as a "take-it-or-leave-it" demand. My intent was to open a dialogue about a fair settlement.

I was simply trying to convey that I valued a fair resolution given the circumstances, not to present an unrealistic number.

**EXHIBIT K**

**Erwin 10-23 Email**

From: Geoff Erwin ██████████████
Subject: RE: VT25 – VIATRON Follow Up
Date: Oct 23, 2025 at 5:35:50 AM
To: Russell Greer ██████████████

**Hello Russell,**

I am absolutely buried in work this week and will not be able to get back to you until next week when I am back in my office.  I am traveling through several cities.

The insurance company wants clear information on this disability discrimination claim.  In our last conversation, they asked us to simply layout what, who, when, and where.  They want documents and witnesses before they proceed.   We gathered the names of people you mentioned in your letters.  I also tried to gather any documents Aaron may have sent you.

**Witnesses to the discrimination incidents.**
I tried to speak to all the employees who may have witnessed your discrimination incidents before the insurance agent talks to them.  I could not find any person who said they witnessed discrimination against you or the incidents with Aaron, Jonah or any other supervisor.  Les and Denise Rogers said they did not witness any discrimination against you.  I personally spoke with Les to try to get more information from him to support your claim.  He was direct, he said he did not witness any discrimination.

**Work area special partition for disable employees.**
We contacted Aaron to get more information on Aaron's approval of your special work area partition.  Aaron mentioned that he did not agree with any special partition in an open work area office environment.  This special setup was not in the company manual.  He said, you never gave him any documents which mentioned that you were disable and specifically needed this barrier/partition setup around your desk.  He never approved the setup of this partition.  Was this partition a special requirement as part of your disability approved by your doctor?  I was also not able to find any documents from Aaron or any other supervisor regarding this special arrangement to send to the insurance company.

**You were singled out and experienced discrimination.**
I tried to find evidence that any of the company supervisors deliberately discriminated against you.  I did find Aaron's communications during this time - reprimanding staff.  I found Aaron had reprimanded 10 employees including you for poor performance and attendance.  In reviewing these documents further, I found Aaron terminated 5 of the employees for attendance and performance.  Aaron terminated other employees but did not terminate you.  Aaron's actions were part of his standard job duties and did not show any discrimination against you.  Other employees were terminated when you were not.

**Reduction of your wages.**
Aaron said he never threatened to reduce your wages.  Aaron does not have the authority to discuss wages with employees.  To start, Aaron does not know how much you are paid.  I could not find any documents that were sent to you regarding pay reduction.  Your wages were not reduced.  The company terminates employees for performance and conducts but does not reduce wages.

**Reassign Tasks.**
The company routinely reassigns employees to different tasks.  Jonah, Andrea and Aaron are reassigning employees to different tasks daily.  This reassignment is done to optimize the workload at slow work periods or peak production time.  This is standard practice.  We need all equipment functioning at full capacity during work hours.

Russell, I have to be very direct with you.  I am trying to assist you by putting your disability discrimination claim through our insurance carrier.  I am unable to substantiate any of the discrimination you are claiming.  I want to support you and complete this insurance claim.  However, after all the research, I still do not have a single witness, document, or any kind of evidence to send to the insurance company.

In my research we found that a number of women employees want to file a sexual harassment complaint against you.  Something about you trying to recruit them for some program/campaign involving prostitution, etc.  This matter got so bad, I had to stop them from further discussing it.  This is not going to go well with the insurance company when they interview these employees.

Again Russell, I do not have anything I can send the insurance company as evidence or witnesses to your disability discrimination claim.

I need you to help me to help you.  What do you have that I can send the insurance company to get this claim quickly settled.

Geoff Erwin.

---

**Sent:** Tuesday, O██████████████████
**To:** Geoff Erwin <███████████████

**EXHIBIT L**

**Plaintiff 10-23 Email**

From: Russell Gree███████████████████████
Subject: Re: VT25 - VIATRON Follow Up
Date: Oct 23, 2025 at 8:17:47 AM
To: Geoff Erwin G███████████████████
Bcc: Russell Greer ████████████████████

Hi Geoff,

Thank you for your message. I want to clarify several factual points and summarize the documentation I've already provided so the insurer has a complete and accurate record.

1. **Final Written Warning (Unequal Enforcement and Disparate Treatment)**
   I received a Final Written Warning for "talking to coworkers," even though other employees routinely conversed during work hours without discipline. Employees such as Les and Denise took Fridays off or talked freely without any formal write-ups. This demonstrates unequal enforcement of company policy and inconsistent application of discipline.

   The Final Written Warning occurred before any demotion discussion or formal accommodation request, showing that I was being singled out even before raising ADA concerns. I had verbally told Aaron in conversations I'm disabled and it's pretty obvious because my face is paralyzed.

   Around this same time, Aaron's behavior toward me changed after a misunderstanding involving a private comment he made about corporate surveillance. After that, his actions toward me became increasingly arbitrary, leading directly to the later demotion threat and accommodation issues.

   If you don't have the copy of the final warning, it should be in my locker.

2. **Demotion Threat and 8-20-25 Email to Aaron (Retaliation and ADA Disclosure)**
   Shortly after the Final Written Warning, Aaron threatened me with demotion over my school schedule (because I believe he was targeting me over a power trip and dislike because of my disability). The email explicitly references his "demotion threat".

My 8-20-25 email to him documents that I referenced my disability and
explicitly invoked ADA protections. That email reconfirms that Aaron already
knew of my disability (because I told him verbally and I was reminding him
through email), links the demotion threat directly to my schedule, and shows I
attempted to resolve matters through proper ADA channels. After I sent that
message, Aaron backed off the demotion threat and allowed the privacy
barrier at my desk—confirming he understood my accommodation request.

3. **Witness Contradictions and Camera Footage (Les and Denise
   Statements)**
   Les and Denise told you they did not witness discrimination. However,
   camera footage from June through September will show the three of us
   regularly leaving together for breaks and talking after work near the
   employee parking structure. On one occasion, we stood next to Les's vehicle
   (a black dodger) and discussed the discrimination and office treatment I was
   experiencing. Those recordings confirm that we interacted frequently and
   that workplace issues were openly discussed. My knowledge of where he
   parks and his car color further proves I'm telling the truth.

   In addition to the video evidence, Jonah and his brother Jeremy were outside
   vaping every break time and frequently saw me, Les, and Denise together.
   Their observation further confirms that these interactions occurred and that
   Les and Denise's statements to you are inaccurate.

   Furthermore, Denise told me she personally witnessed Noel and/or Andrea
   taking photos while removing my privacy barrier. That means she knew the
   barrier existed and saw management take action against it. If she now claims
   otherwise, the existence of that photo would directly contradict her denial
   and raise serious questions about the motivation behind both her and Les's
   statements, and why they chose to misrepresent what actually happened to
   you.

I feel Les and Denise are lying to you because they were offended I didn't say goodbye to them. On my last day in the office, you can see on cameras that after I got off the call with you (I thought you said not to tell anyone about our conversation), I put my stuff up and they were gesturing at me like "how did the call go?" (Because they knew I was complaining of discrimination after they urged me to). Since I thought I couldn't answer them, I ignored them and I can see how in hindsight that would offend them. But I'm offended and hurt that they are denying actual reality.

4. **Quality-Control Logs and September Time Sheets (Unequal Equipment Assignment)**
Logs show I repeatedly reported a malfunctioning scanner that remained assigned to me for months while others were moved to working units. Reviewing the day the office layout was changed will confirm I was the only scanner left isolated in the corner when others were reassigned to functioning stations.

5. **Privacy Barrier (Failure to Engage in Interactive Process)**
After I informed Aaron that coworkers were harassing me about my disability, he verbally approved my request to use a privacy barrier at my workstation. The barrier remained in place for a time, confirming management's acceptance of the accommodation. Later, the barrier was removed by Noel or Andrea without any discussion of alternatives or attempt to engage in the ADA-required interactive process.

Denise personally witnessed Noel and/or Andrea taking photographs while the barrier was being removed and told me afterward. If those photos exist, they confirm the barrier's existence, management's knowledge of it, and the fact that it was removed without engaging me in any ADA discussion. They also show that staff who now claim they never witnessed discrimination were present for an act that directly affected my accommodation. You can confirm

this with Noel, who at the time remarked that the barriers were "against company policy." He told this to Les after I asked Les to ask Noel why he removed them. Company policy can't override ADA statutes.

These verifiable facts substantiate my account and demonstrate that the accommodation was recognized before being withdrawn.

6. **Harassment Allegation (Unrelated and Retaliatory in Timing)**
   This harassment allegation did not appear until after I filed my ADA complaint internally with you. I categorically deny harassing anyone. In fact, I was the one who experienced harassment, which is part of why I requested a privacy barrier accommodation. This has no bearing on my ADA discrimination case and I categorically deny harassing anyone.

7. **Separate ACA/PTO Compliance Issue (Good-Faith Reporting)**
   In addition to the ADA discrimination matter, if you recall in my official written letters to you on 08-01-25 and 08-14-25, I also raised a separate issue related to the company's Affordable Care Act compliance. As you noted previously, you were unaware of the health-insurance oversight until I brought it to your attention, which helped correct no coverage for many employees. Because that reporting was made in good faith and benefited the company's compliance standing, I respectfully ask that my ACA/PTO-related complaint be reviewed and resolved internally, independent of the ADA claim now being handled by the insurer.

The two matters—ADA and ACA/PTO—are distinct. I politely request that the ADA claim should proceed to the insurer without further delay, while the ACA issue remains an internal matter that deserves a fair resolution for having been brought forward in good faith.

If you need the documents again, I can resend, but I gave you all that I have.

Thank you for your attention and for ensuring both matters move forward
appropriately.

Best regards,
Russell Greer


Sent from my iPhone

> On Oct 23, 2025, at 5:35 AM, Geoff Erwin ███████████████ wrote:
>
>
> **Hello Russell,**
>
> I am absolutely buried in work this week and will not be able to get back to you until
> next week when I am back in my office.  I am traveling through several cities.
>
> The insurance company wants clear information on this disability discrimination claim.
> In our last conversation, they asked us to simply layout what, who, when, and where.
> They want documents and witnesses before they proceed.   We gathered the names of
> people you mentioned in your letters.  I also tried to gather any documents Aaron may
> have sent you.
>
> **Witnesses to the discrimination incidents.**
> I tried to speak to all the employees who may have witnessed your discrimination
> incidents before the insurance agent talks to them.  I could not find any person who said
> they witnessed discrimination against you or the incidents with Aaron, Jonah or any
> other supervisor.  Les and Denise Rogers said they did not witness any discrimination
> against you.  I personally spoke with Les to try to get more information from him to
> support your claim.  He was direct, he said he did not witness any discrimination.
>
> **Work area special partition for disable employees.**
> We contacted Aaron to get more information on Aaron's approval of your special work
> area partition.  Aaron mentioned that he did not agree with any special partition in an
> open work area office environment.  This special setup was not in the company

**EXHIBIT M**

**Plaintiff Plaintiff Evidence List Email (10/29)**

From: Russell Greer ru⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛m
Subject: Follow-Up Addendum: Evidence List, Remote Work & PTO
Date: Oct 29, 2025 at 11:25:34 AM
To: Geoff Erwin G⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

Hi Geoff,

Just a quick addendum to my earlier message:

I've attached my **organized Evidence List**, which categorizes and summarizes the
different types of materials supporting my ADA claim — including
contemporaneous emails, quality control logs, internal workplace images, the
parking garage photo with timestamp, and supporting communications with DETR.
It's organized into three sections:

- **Hard Evidence** (e.g., dated emails, logs, photos)

- **Circumstantial Evidence** (e.g., timeline–based indicators, corroborating
  context)

- **Internal Evidence** (that the company or insurer could retrieve independently,
  such as footage or scheduling records)

The goal is to give a clear, accessible view of what's already been submitted and
what could help further bolster the claim. I hope this helps reinforce the timeline
and credibility of the concerns I've raised.

Also, I want to express that I'm **open to an internal ADA settlement,** should a
structured and reasonable resolution become available. My goal remains a fair,
professional resolution.

In the meantime, I'm happy to **return to the office starting tomorrow** while we
explore remote arrangements. For background, I've successfully worked fully
remote for **three years at Willis Towers Watson (WTW)** and also at **Verisys**, so I
know I can deliver strong results once the setup is in place.

Lastly, if possible, could we also finalize **any back pay or PTO** owed from the past
few weeks and deposit by Friday, if possible, as I was missing a huge chunk of my

last paycheck because I was out of office. That would be a big help as I prepare to return and stay engaged throughout this process.

Thanks again for your time and continued efforts.

Best regards,
Russell

 **Viatron_Evidence_List_R Greer_FINAL_BOLDED 2...**
6 KB

**EXHIBIT N**

**Erwin Denying Plaintiff's Return**

From: Geoff Erwin ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Subject: RE: Follow-Up Addendum: Evidence List, Remote Work & PTO
Date: Oct 29, 2025 at 3:21:46 PM
To: Russell Greer ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Hello Russell,**

In your previous communications, you mentioned there are a number of work area special setup you will need as a disabled person.  I had a meeting with the managers to determine the best way to accommodate your special needs.  The managers are very concern that they really don't know your exact disability.  You have not provided any documentation or guidelines for your condition.  The managers do not want to run into future problems by not providing for all your unknown disability needs.  They have asked for the company to consult a disability professional about your specific disability.  You may also have DETR VR directly contact us to discuss your disability and work arrangements.

I will discuss this matter further with the company's attorneys and try to find you a solution.  The insurance company will cover all ADA work related and time-off matters.

We have resolved all PTO matters.  Your PTO balance is $341.34.  The accounting department will make a direct bank deposit tomorrow.

I will get back to you as soon as I hear from our attorneys and DETR VR.

**Geoff Erwin**

**From:** Russell Greer ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Wednesday, October 29, 2025 2:25 PM
**To:** Geoff Erwin ▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓ Addendum: Evidence List, Remote Work & PTO

Hi Geoff,

Just a quick addendum to my earlier message:

I've attached my **organized Evidence List**, which categorizes and summarizes the different types of materials supporting my ADA claim — including contemporaneous emails, quality control logs, internal workplace images, the parking garage photo with timestamp, and supporting communications with DETR.

**EXHIBIT O**

**Plaintiff Prepared to Return to Office**

From: Russell Greer ru███████████████████om
Subject: Re: Follow-Up Addendum: Evidence List, Remote Work & PTO
Date: Oct 29, 2025 at 4:02:33 PM
To: Geoff Erwin ███████████████████
Bcc: Russell Greer ru███████████████████om

Hi Geoff,

Thank you for the update — I appreciate your continued efforts to work through this carefully.

I completely support consulting a disability professional, and I'm happy to authorize DETR VR to speak directly with you or the company to clarify my work-related accommodation needs. My disability has been on file with DETR VR, and they are well-positioned to explain what adjustments are appropriate. I've also sent them a heads-up yesterday, so they can expect to hear from you.

In the meantime, I'm still prepared to return to the office tomorrow while we explore longer-term arrangements like remote work. Please let me know if that plan has changed.

Lastly, thank you for confirming the PTO deposit. Please let me know when the back pay would be paid or how that will work.

Best regards,
Russell


Sent from my iPhone

> On Oct 29, 2025, at 3:21 PM, Geoff Erwi █████████████████████
>
>
> **Hello Russell,**
>
> In your previous communications, you mentioned there are a number of work area special setup you will need as a disabled person. I had a meeting with the managers to determine the best way to accommodate your special needs. The managers are very

**EXHIBIT P**

**Managers Don't Want to Supervise Plaintiff**

From: Geoff Erwin ~~Gerwin@vistron.com~~
Subject: RE: Follow-Up Addendum: Evidence List, Remote Work & PTO
Date: Oct 30, 2025 at 8:19:34 AM
To: Russell Greer ru▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Hello Russell,**

You had listed several ADA preconditions you need before you can begin work.  I am
trying to make sure all your ADA disability requirements are met so we do not have a
repeat of previous issues.  You also mentioned that you have issues working with Jonah
and Andrea.  Jonah and Andrea have asked if another manager can supervise your
work.  I will ask Kala if he can directly supervise you, this way you can avoid getting work
instructions from Jonah or Andrea.

I want to talk to DETR VR before you begin your job because you mentioned they have
a list of ADA work area requirements you will need.  You can expedite your return to the
office by having someone from DETR VR contact me directly.  We want to follow all
Nevada Equal Rights Commission (NERC) and all ADA requirements you will need to do
your job.

**Geoff Erwin**

**From:** Russell Gre▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Wednesday, October 29, 2025 7:02 PM
**To:** Geoff Erwin ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Subject:** Re: Fo▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓t, Remote Work & PTO

Hi Geoff,

Thank you for the update — I appreciate your continued efforts to work through
this carefully.

I completely support consulting a disability professional, and I'm happy to
authorize DETR VR to speak directly with you or the company to clarify my work-
related accommodation needs. My disability has been on file with DETR VR, and
they are well-positioned to explain what adjustments are appropriate. I've also sent
them a heads-up yesterday, so they can expect to hear from you.

In the meantime, I'm still prepared to return to the office tomorrow while we

**EXHIBIT Q**

**Plaintiff 10-30 Email**

From: Russell Greer <span style="background:black">████████████████</span>
Subject: Re: Follow–Up Addendum: Evidence List, Remote Work & PTO
Date: Oct 30, 2025 at 9:25:45 AM
To: Geoff Erwin <span style="background:black">████████████████</span>
Bcc: Russell Greer <span style="background:black">████████████████</span>

Hi Geoff,

Thank you for your message. I wanted to clarify a few points and offer some additional documentation.

First, I want to confirm that my willingness to return to work is a good faith gesture and **not a waiver of my ADA insurance claim**. I continue to stand by the evidence and believe it deserves fair consideration by the insurer. My hope remains that the full claims package — including what we receive from DETR VR — will present a complete and compelling picture of the events.

Also, I want to clarify that I never said I had "issues" with Jonah or Andrea. My only concern was that Jonah seemed to not recall conversations I had with him earlier this year about being mocked in the office. As for Andrea, never had a problem with her either. My only thing I had said was that  (1) this new good/bad metric system was going to get me terminated because I was on the worst machine and (2) it was exhausting that I had to keep re-explaining schedules, etc, to every new manager who came on because nobody ever kept notes. It's apparent Aaron wrote nothing down.

To further support that I tried to go through proper channels, I've attached a **September email I attempted to send to Andrea** to explain i have a disability and that I was out of the office during certain hours because she gave me a weird glare when I came back from class. I also was going to tell her about the barrier she threw away but because the email to her wasn't working, I couldn't ask it.

The message bounced, but it shows that I was trying to initiate a conversation about it. I didn't resend it because, honestly, I felt confused and discouraged — especially after how visible and public the disposal was. I began to fear that maybe Aaron hadn't documented anything at all, and I wasn't sure how to proceed.

I tried emailing this to her because i wasn't sure how much English she knew and if she could understand me with my paralysis.

Lastly, while all of this continues to play out, I'd like to raise the question of whether **an internal award or acknowledgment for raising the ACA compliance issue** might be appropriate as a separate payment to the ADA payout. I brought a serious oversight to the company's attention, and my hope is that this step — which ultimately benefits the company and its staff — can be viewed constructively. That was part of my original letter. Usually when employees internally whistle blow, they get awarded for it.

Lastly, this hassle about the office set up could be mitigated if we just place me in a remote position, which I know you're working on.

Please include the attached emails in the insurer case.

Thanks again for your continued communication and support.

Best,
Russell

From: Russell Greer ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Subject: Schedule
Date: Sep 25, 2025 at 1:06:51 PM
To: ▓▓▓▓▓▓▓▓▓▓▓▓om

Hi Andrea

**EXHIBIT R**

**Plaintiff Open to Off Books Payment like Erwin Wanted**



warmly,

**3:04**

◀ Files

Sent from my iPhone

On Oct 30, 2025, at 12:47 PM, Russell Greer ▓▓▓▓▓▓ wrote:

Hi, Geoff

I understand.

On 10/14, you agreed to a $20,000 cash payment. If I accepted that, would I be forced to waive my ADA claims too?

Because I acknowledge it was crappy of my witnesses to not follow through, hence it sort of weakens my claim (even though circumstantial evidence is valid), which is why I'm cautious about the insurer possibly rejecting it and why I'm open to the original offer, but I just wanted to hear your thoughts on if you would still do the $20,000 and if

it wouldn't affect my ADA claim?

Im even flexible with the ADA claim too.

I have lived 34 years being discriminated against and please Just understand from my view, I was being targeted heavily than others.

But I'll emphasize ever since everyone disavowed me after you called them, I would much prefer remote work. It's hard to work with people who backed me, only to turn on me.

I bring a lot to the company and I was just trying to make whole the harms I suffered.

Happy to jump on a call.

Sent from my iPhone

On Oct 30, 2025, at 11:51 AM, Geoff Erw▓▓▓▓▓▓

**Hi Russell,**

I simply cannot put this payment through our company books.

**Geoff Erwin**

From: Russell Greer ▓russellgreer27@icloud.com▓
Sent: Th▓▓▓▓
To: Geoff ▓▓▓▓
Subject: ▓▓▓▓▓▓▓▓▓▓

Hi Geoff,

Thank you for your message. I wanted to clarify a few points and offer some

From: Russell Greer r███████37@i█████████

Subject: Re: Follow–Up Addendum: Evidence List, Remote Work & PTO

Date: Oct 30, 2025 at 7:05:40 PM

To: Geoff Erwin G█████@v█████.com

Bcc: Russell Greer r█████████37@icloud.com

Addendum:

Just for clarification: I'd be fully open to waiving the insurance and EEOC claim rights if the company is open to modestly adjusting the off the books payout amount to reflect the value of waiving ADA statute claims, while also honoring a reasonable accommodation of remote work.

I'm revisiting this approach in good faith — aiming to streamline the process and resolve this internally, constructively, and without unnecessary delay or exposure.

I'd also appreciate clarity on the payment method and expected timeline.

Thank you again for your time and consideration.

Warmly,
Russell


Sent from my iPhone

On Oct 30, 2025, at 12:47 PM, Russell Greer ███████████████████ wrote:

Hi, Geoff

I understand.

On 10/14, you agreed to a $20,000 cash payment. If I accepted that, would I be forced to waive my ADA claims too?

Because I acknowledge it was crappy of my witnesses to not follow through, hence it sort of weakens my claim (even though circumstantial evidence is valid),

**EXHIBIT S**

**Erwin Has Issues, Admits He Never Submitted Claim & is on Vacation**

From: Geoff Erwin ███████████████████

Subject: RE: Follow–Up Addendum: Evidence List, Remote Work & PTO

Date: Nov 3, 2025 at 6:39:01 AM

To: Russell Greer ████████████████████████

**Hello Russell,**

I am currently on vacation with limited access to my emails.  I wanted to send you a quick email to update you on events.

It is your choice if you still want to pursue the ADA insurance claim.  I can send the insurance company your claim package as soon as I return.  I am having problems with one of the documents you sent me.  I got a message that there was a problem with the Jerry Leach letters.  Please be honest with me.  Did Jerry Leach write those letters?  It will be insurance fraud if we send this document and the insurance company tries to verify it.

I have sent the company attorneys all our communications, letters, emails, and your ADA claim package for their professional and legal review.  I will meet with them when I return to get their final blessing.  I am concerned about my personal legal situation for making a cash payoff outside the company books.  I don't want to be arrested for doing something illegal.  Our attorneys will be able to advise me on the best approach.

I will keep you informed.

**Geoff Erwin**

**From:** Russell Greer <█████████████████████

**Sent:** Thursday, Octob███████████████████

████████████   ███   ██████████████

███████████████████: Evidence List, Remote Work & PTO

Addendum:

Just for clarification: I'd be fully open to waiving the insurance and EEOC claim rights if the company is open to modestly adjusting the off the books payout amount to reflect the value of waiving ADA statute claims, while also honoring a reasonable accommodation of remote work.

I'm revisiting this approach in good faith — aiming to streamline the process and

**EXHIBIT T**

**Plaintiff 11/3 Email**

From: Russell Greer r███████ ─────────────────
Subject: Re: Follow-Up Addendum: Evidence List, Remote Work & PTO
Date: Nov 3, 2025 at 7:43:38 AM
To: Geoff Erwin G██████@█████████████
Bcc: Russell Greer ██████████████████████████

Hi Geoff,

I wanted to confirm that I forwarded you the original email thread with Jerry Leach
so you have the unedited correspondence for your records to show you that Jerry
himself actually wrote the letter.

When you have a moment, could you please clarify a few points for me?

1. If the ADA portion of the claim is being reviewed by the company's insurance
   carrier, may I communicate directly with the assigned adjuster once that
   process begins?

2. If there's still a possibility of an internal payout or resolution handled directly
   by the company (rather than through insurance), when should I expect an
   update on that?

3. Portions of my situation involve **ACA whistle-blower protections**, relating to
   my **good-faith reports and disclosures** and the corresponding **payout
   discussions** we've had. Since you mentioned that the insurance carrier may
   not cover that aspect, could you please clarify how this portion will be
   handled internally?

4. Regarding the **standards** the insurance  will be applying in reviewing the ADA
   claim — could you please outline those? I ask because some of the issues
   raised in earlier discussions appear to be addressed in EEOC precedent. For
   example, in *Nakesha D. v. General Services Administration*, EEOC Appeal No.
   2022003095 (Feb. 2, 2023), the Commission reaffirmed that when
   management fails to maintain or respond to proper records, **an adverse
   inference** may be drawn in favor of the employee. I'd like to ensure **the
   process aligns with EEOC evaluation standards.**

I appreciate you keeping me updated and will wait for guidance from you.

**EXHIBIT U**

**Geoff Extortion Accusation Email**

From: Geoff Erwin ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
Subject: RE: Follow-Up Addendum: Evidence List, Remote Work & PTO
Date: Nov 4, 2025 at 7:29:47 AM
To: Russell Greer ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

**Russell,**

I am extremely angry and frustrated because I am on a long-awaited vacation, but I have been interrupted by disturbing emails related to your claims from our attorneys and others.

I understood and sympathized with your disabled situation and so I wanted to help you in every way I could.

I was trying to help you with your many claims, but you kept pushing and pushing to a point where I had to get our attorneys' advice.

I have learnt a lot from our attorneys since your last email.  Things have gone from bad to worse and I am losing control of your situation.

I received several urgent correspondences from our attorneys about you.  You have an extensive troubling legal history.  They have asked me to put everything on hold until they meet with me and other shareholders.  According to the attorneys, what you have done is a textbook case in law of blackmail and extortion of a company.  They said the very first letter you FedEx ViaTRON was an extortion letter, and every other letter and email was confirmation of the first extortion letter.

They have asked me not to make any decision until speaking to them.  They insist this is both a clear criminal and civil case.  They advised me that since the original blackmail letter was FedEx across state lines, this is now a federal criminal case that includes 20-year prison penalties.

**Clear case of blackmail and extortion.**  Apparently, when you learnt of the company's oversight or error, you did not go to the authorities and ask for whistle-blower protection and report this matter.  You clearly understood the law and included it in all your blackmail emails to me.  Instead, you held on to this information for your personal profits.  You chose to use this information to blackmail and extort $20,000 from ViaTRON.  When the company quickly agreed to pay off your extortion money, you became greedy and your demands increased ten folds to $200,000, according to the attorney.

**Paralegal document editing experience.**  Our attorney told me you knew exactly what

you were doing.  You used your past paralegal experience to cleverly work on your wording to mask your extortion demands.  You may have fooled a regular street person, but anyone with legal knowledge can see you wrote an extortion letter. The attorney said, how you wrote your letters is a straightforward giveaway of how you try to hide your blackmail and extortion.  In all your letters and emails you used the same underlying threat but with different wording.  Any attorney or judge will see it for what it is – blackmail and extortion.  Pay the extortion money or else.

**ViaTRON's honest attempt to correct administrative oversight/error.**  In one of my emails, I wrote to you that the company does have a master company healthcare program for over 20 years, but due to administrative oversight – did not send enrollment forms to everyone.  Since then, this administrative error has been fixed including the PTO errors.  As an example, you received all your PTO money.  In other words, ViaTRON has made genuine efforts to fix this admin problem and there are no outstanding issues.

**Your Extortion Plans Made Clear.**  My attorney said that **I clearly asked you to report this matter to the authorities** in my email to you on October 14th, if you were compelled by your conscience.  In my email to you, I told you that $200,000 was an excessive sum of money and this was blackmail and extortion which we simply could not afford to pay.  You still chose to keep this information and matter quiet and not report to the authorities after receiving my email.  You had other money-making ideas.  You mentioned in your email for ViaTRON to file this demand through our insurance company because they can afford to pay more ($200,000 more).  In your very next email, you threaten to report this information if the company did not pay you.  Any whistle-blower statements after today will be treated as a crime for withholding information and using it for your blackmail and extortion plans.

**Police Report.**  My attorney has asked me to file a police report on the first blackmail and extortion letter dated October 1st from you.  Anyone, even a police officer, who reads your letter will see it is a blackmail and extortion letter.  He wants this California police report on you for his federal and civil case file regardless of when we report it. **Federal Crime.**  Since this letter was sent FedEx across the state lines to California, this money extortion is now a federal criminal case with 20-year prison.

**Civil Damages.**  He also told me that the company will be filing a separate civil blackmail and extortion case against you to recover all damage you will cause the

company through your blackmail and extortion scam.

I wanted to help you with your situation, but matters have got messier with this blackmail
and extortion.  I am on vacation, but you can email me.

**Geoff**

**From:** Russell Greer <r⬛⬛⬛⬛⬛⬛⬛⬛ om>
**Sent:** Monday, November 3, 2025 10:43 AM
**To:** Geoff Erwin ⬛⬛⬛⬛⬛⬛⬛⬛
**Subject:** Re: Follow-Up Addendum: Evidence List, Remote Work & PTO


Hi Geoff,

I wanted to confirm that I forwarded you the original email thread with Jerry Leach
so you have the unedited correspondence for your records to show you that Jerry
himself actually wrote the letter.

When you have a moment, could you please clarify a few points for me?

1. If the ADA portion of the claim is being reviewed by the company's insurance
   carrier, may I communicate directly with the assigned adjuster once that
   process begins?
2. If there's still a possibility of an internal payout or resolution handled directly
   by the company (rather than through insurance), when should I expect an
   update on that?
3. Portions of my situation involve **ACA whistle-blower protections**, relating to
   my **good-faith reports and disclosures** and the corresponding **payout
   discussions** we've had. Since you mentioned that the insurance carrier may
   not cover that aspect, could you please clarify how this portion will be
   handled internally?
4. Regarding the **standards** the insurance  will be applying in reviewing the ADA
   claim — could you please outline those? I ask because some of the issues

**EXHIBIT V**

**Viatron Indeed Reviews**







7:03

.ill 5G 77

<     **Reviews**    Salaries    Jobs    Q&A    Interviews
     20               24

★☆☆☆☆ December 16, 2024

**Bizarre and toxic work environment**

Doc Prep 📍 Las Vegas, NV

Do yourself a favor and stay far away from this place.
The pay on the job listings is completely inaccurate --
everyone gets paid minimum wage. Full-time schedule
but no benefits, no PTO, no paid holidays, nothing.
Owner comes into the office once in....**Show more**

👍 👎                 ...

★☆☆☆☆ October 15, 2024

**Management don't appreciate their workers**

Document Prepper 📍 Las Vegas, NV

Do not work for this company. The pay is low and they
don't I appreciate their employee. They expect you to
do more work then you're able too. I was only there for
a month and was let go for poor performance. Don't
waste your time working there....**Show more**

👍 👎                 ...

★☆☆☆☆ May 22, 2024

**Unless your good with not being introduced to
anyone and your quiet and Spanish you'll be
fine**

indeed.com

12



# ViaTRON Systems, INc.

1.0 ★☆☆☆☆ (1) · 🚗 6 min

Information services · ♿

**Open** · Closes 11 PM

**Directions**    **Start**    **Call**



**Overview**    Photos    Updates    About

🕐 **Open** · Closes 11 PM

📍 3634 S Maryland Pkwy, Las Vegas, NV 89169

**EXHIBIT W**

**Plaintiff 11/4 Email**

From: Russell Greer r█████████████.com
Subject: Re: Follow-Up Addendum: Evidence List, Remote Work & PTO
Date: Nov 4, 2025 at 8:19:45 AM
To: Geoff Erwin @████████████

Geoff,

I'm sorry that this matter reached you while you're on vacation; that was never my intent.

I respectfully but firmly dispute your characterization of my correspondence as blackmail or extortion. Every message I sent—including my first letter—was written in good faith to resolve workplace and disability concerns internally and lawfully. I write to you as a disabled person who experienced harm and was seeking an internal resolution rather than public or external action.

I never demanded any unlawful payment, nor did I issue any threat. My goal was only to discuss a potential severance arrangement, which is a normal and lawful method of resolution in workplace matters.

I have no desire for this matter to escalate further and therefore withdraw from any settlement discussions, as my intent has been misunderstood and taken far beyond its original purpose.

— Russell

> On Nov 4, 2025, at 7:29 AM, Geoff ████████████████████te:
>
>
> **Russell,**
>
> I am extremely angry and frustrated because I am on a long-awaited vacation, but I have been interrupted by disturbing emails related to your claims from our attorneys and others.
>
> I understood and sympathized with your disabled situation and so I wanted to help you in every way I could.

# EXHIBIT X

**Plaintiff 11/6 Email**

From: Russell Greer ~~russellgreer27@icloud.com~~
Subject: Clarification regarding message
Date: Nov 6, 2025 at 7:38:24 AM
To: ████████████.com
Bcc: ~~russellgreer27@icloud.com~~

Hi Geoff,

I wanted to clarify my earlier note. When I said I was withdrawing, I meant from the insurance claim process—not from the original $20,000 settlement you accepted on October 13. I've never rejected that offer and would still like to honor it if it remains on the table.

After our October 6 conversation, it dawned on me that I would be waiving my ADA statutory rights as part of any settlement. That realization is what led me to offer the revised proposal on October 13. I simply asked afterward whether you might consider a slightly higher amount handled through insurance to reflect the value of those rights. If you had said no, I would have been completely fine with that and genuinely grateful that you even considered my request. I always viewed it as a question, not a demand.

In my first letter, the ten-day response timeframe was never meant as pressure. Viatron has sometimes been slow to act, and my intention was only to prevent the matter from falling into limbo, as had happened before with my schedule requests. It was just to ensure timely communication, not to threaten or demand anything.

To be clear, I wasn't masking or scheming anything. Yes, I have a paralegal degree, but I'm not a manipulative person. I've experienced real harm, and at the time, I didn't believe I could continue working under those conditions. That's why I asked for severance.

I also want to emphasize that **extortion requires intent**, and my intent was never to threaten or coerce. My goal was simply to sit down and talk openly about a fair resolution—we were supposed to meet on October 17. I never forced you to do anything and would have accepted any decision you made. I was grateful for your initial acceptance, and I'm sorry for even trying to counter; I only thought that's how proposals normally worked.

If the offer is still available, I would like to resolve this for the $20,000 you originally accepted, along with my unpaid back pay, and move on amicably. I never declined that offer, and I'm sorry for even exploring a higher figure—it came from fear of being homeless again and from trying to match the value of my ADA rights. I was homeless for three months in 2024 because I had tried doing ride share full time and it was a disaster, and that experience left me extremely anxious about stability.

This was never extortion or blackmail. It was a genuine severance request made in good faith, and if it's still agreeable, I would like to accept it and close this matter peacefully.

I sincerely apologize if my messages were interpreted in any other manner.

Thank you for your understanding,
**Russell**

**EXHIBIT Y**

**Geoff's Threats & Admissions**

**Date:** November 17, 2025 at 9:40:28 AM PST
**To:** Russell Greer
**Subject: RE: Req**


**Russell,**

I am back in my office.  As mentioned, I will try my best to help you.

However, you have made my job of helping you very difficult.  The other shareholders
want the attorneys to file a civil blackmail and extortion complaint in California.  In
addition, to filing a criminal extortion complaint.  They have asked me to assess the
damages.  I don't think you are taking this matter seriously.  You will need to find an
attorney in California to defend your case.  If you ignore the case, you will lose by
default.  All of this will cost you a hundred time more than your original extortion, not
to mention the outcome of the criminal trial.

Russell, you need to be honest with yourself.  In your first letter you were clearly
blackmailing and extorting $20,000 out of ViaTRON.  I knew this the moment I read
your letter.  No employee earning $14 an hour is going to get a $20,000 severance
unless it is extortion.  Moreover, you were not asking, you were demanding with a
deadline.  You knew exactly what you were doing and now, the other shareholders
and our attorneys know what you were doing because of your greed.

I agreed to pay you $20,000 only because I wanted to get rid of this matter and treat
it as a "nuisance business expense".  All companies from time-to-time payoff
"nuisance claims" to quickly get rid of unpleasant business matters.  I clearly spelled
out the payoff terms with the offer for you to return to work.

Again, Russell be honest with yourself.  In your response letter, you clearly rejected
the $20,000 payoff and the offer to return to work – read your letter!  You got greed
and increased your extortion demands by 10 times.  You said in your letter that you
will not accept any money less than $200,000.   You should have known that this
outrages amount will require other shareholder approvals.  Now that the other
shareholders are involved, you have made my job very difficult.

The other shareholders are very angry at you and are demanding the attorneys file a suit for blackmail and extortion.  They are willing to take the extra step and spend the money to prove you were blackmailing and extorting money.

I am trying to help you by talking to the other shareholders out of any legal actions against you.  Once the complaint is filed in California, your life is going to get very messy.  You will need tens of thousands of dollars, not to mention travelling over long periods of time to California to defend your case.  Only very, very bad things are going to come to you from this.

I will email you when I have more information.

**~ Geoff**

**From:** Russell Greer <r ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, November
**To:** Geoff Erwin < ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Request to resolve by the 21st

Hi Geoff,

I'm following up because I've now been on unpaid leave for over a month without any update, and this has created a significant hardship for me. I know you've been out of office recently.

Back on October 15th, you agreed to the severance and confirmed that both the severance and the three missed pay periods could be processed through insurance. I'm still willing to finalize everything on that basis, with a standard no-fault agreement.

It would help me greatly if we could finalize by the 21st of November. If not, I would like to return to work by Wednesday the 19th, since I cannot remain in unpaid status indefinitely. I have rent due by the 30th.

Happy to hop on a phone call.

Thank you,
Russell


**CAUTION:** Email was not from ViaTRON Network!

**Subject: RE: Clarification regarding message**

**Russell,**

I am still out of the office with limited access to my emails.  I fully understand your financial situation and hope something can be done.

The last email I received from our attorneys was very bad against you.   According to them, your blackmail-extortion intentions was clearly spelled out in your first letter sent to ViaTRON's corporate office in California.  You made your intentions very clear in written evidence and signed by you – pay me or else.

You could have gone straight to the authorities without sending ViaTRON your letter.  You would have easily reported ViaTRON's admin error and been fully and automatically protected by the whistle-blower protection law.  That would have been the end of your responsibilities.  In all your letters, you mention that you have very good knowledge of this whistle-blower law.  So, you knew exactly what you were doing.  The attorney said, instead you used the whistle-blower protection law to extort $20,000 from the company.  Your intentions are spelled out in your letter.  You put on paper what you were thinking.  Now, this whistle-blower law will work against you because you used it while committing a crime.

The attorneys were clear; this is a very serious matter against you.   Federal law, state law, any attorney, or any judge will easily conclude that your first letter is a blackmail-extortion letter and every communication following the first letter supported the evidence of the blackmail-extortion intend.  I am concern for you.  You need to contact an attorney and get legal advice on this criminal matter.

You have put me in a very difficult position with the other shareholders.  When your payoff demands increased and you attempted to negotiate a $200,000 payoff, you forced me to get the other shareholders and our attorneys involved.  The payoff you demanded was outrageously unreasonable.  It could only be read as an extortion-payoff.

I have no idea how this is going to go forward.  I am out of the office but also waiting for further instructions from our attorneys.

I will help you the best way I can, but don't expect much from me.  Many other people
are now involved.  I strongly urge you to meet with a good attorney and review these
matters.

**Geoff**

**From:** Russell Greer <r███████████████████>
**Sent:** Thursday, November 6, 2025 10:38 AM
**To:** Geoff Erwin <G██████████████████>
**Subject:** Clarification regarding message

Hi Geoff,

I wanted to clarify my earlier note. When I said I was withdrawing, I meant from
the insurance claim process—not from the original $20,000 settlement you
accepted on October 13. I've never rejected that offer and would still like to
honor it if it remains on the table.

After our October 6 conversation, it dawned on me that I would be waiving my
ADA statutory rights as part of any settlement. That realization is what led me to
offer the revised proposal on October 13. I simply asked afterward whether you
might consider a slightly higher amount handled through insurance to reflect the
value of those rights. If you had said no, I would have been completely fine with
that and genuinely grateful that you even considered my request. I always viewed
it as a question, not a demand.

In my first letter, the ten-day response timeframe was never meant as pressure.
Viatron has sometimes been slow to act, and my intention was only to prevent
the matter from falling into limbo, as had happened before with my schedule
requests. It was just to ensure timely communication, not to threaten or demand
anything.

To be clear, I wasn't masking or scheming anything. Yes, I have a paralegal degree, but I'm not a manipulative person. I've experienced real harm, and at the time, I didn't believe I could continue working under those conditions. That's why I asked for severance.

I also want to emphasize that **extortion requires intent**, and my intent was never to threaten or coerce. My goal was simply to sit down and talk openly about a fair resolution—we were supposed to meet on October 17. I never forced you to do anything and would have accepted any decision you made. I was grateful for your initial acceptance, and I'm sorry for even trying to counter; I only thought that's how proposals normally worked.

If the offer is still available, I would like to resolve this for the $20,000 you originally accepted, along with my unpaid back pay, and move on amicably. I never declined that offer, and I'm sorry for even exploring a higher figure—it came from fear of being homeless again and from trying to match the value of my ADA rights. I was homeless for three months in 2024 because I had tried doing ride share full time and it was a disaster, and that experience left me extremely anxious about stability.

This was never extortion or blackmail. It was a genuine severance request made in good faith, and if it's still agreeable, I would like to accept it and close this matter peacefully.

I sincerely apologize if my messages were interpreted in any other manner.

Thank you for your understanding,
**Russell**


**CAUTION:** Email was not from ViaTRON Network!

**EXHIBIT Z**

**Angela Falsely Claiming Plaintiff Resigned**

From: Angela Repayo ████████@██████
Subject: Re: Addendum to Friday's Message
Date: Nov 24, 2025 at 1:10:49 PM
To: Russell Greer r██████████████████

Hi Russell,

Please see attached the documents you requested.

Mr. Geoff Erwin mentioned that he has a letter from you dated October 1st that shows you resigned from your position and requested a severance check. If you asked for a severance check, I assume you resigned.

Mr. Erwin also said he has a letter from you showing you refused or reject an offer to return to work on October 14th.

Since there are two clear incidents showing your intention to leave the company, there is very little I can do for you.

I suggest you take all the communication you have between you and Mr. Erwin to the DETR, OSHA, and ADA, and explain your situation. The best option is for these agencies to read both of your communications. DETR may be able to better advice you on the best course of action. My hands are tied if there are two letters showing you resigned and rejected employment. Mr. Erwin will most likely ask me to forwards these letters.


**Thank you and Stay Safe!**

**Angela Repayo**

**HR** ████████████████

**ViaTRON Systems, Inc.**[www.viatron.com](www.viatron.com)

---

**From:** Russell Greer ████████████████████

**Sent:** Sunday, November 23, 2025 2:45 PM
**To:** Angela ███████████████████████
**Subject:** Ad

Hi Angela,

I wanted to follow up on my message from Friday with two documents that provide additional context for your review tomorrow. These documents confirm the timeline I described and clarify how the discussions with Geoff unfolded.

**1. Attached: "10-15-25 Merged"**
This PDF shows the October 15 email where Geoff placed me on unpaid leave effective October 6 and instructed payroll to stop my pay as of that date. This confirms I have been without income since 10/6/25.

**2. Attached: "Fwd–VT25 Follow Up"**
This PDF contains the full settlement dialogue from early October. It confirms:

- On October 13, Geoff stated in writing that ViaTRON **accepted the $20,000 amount**.

- Although he expressed caution about my revised proposal, he still forwarded the matter to the insurer.

- I never received a claim number or confirmation that anything was actually filed.

- I never rejected the $20,000; I was ready to resolve at that amount.

The documents also show a clear contradiction: although Geoff stated he had forwarded my ADA/ACA concerns to the insurer, he later acknowledged that the claim was never actually filed. This left me with no income, no claim number, and no clarity—despite my repeated follow-ups.

Additionally, because I have not received any income since October 6, I filed an unemployment claim with DETR. As required, I reported my status as "leave of absence," since that is the status Geoff placed me under. However, UI will not pay me while I remain officially employed, which has left me without any support for nearly two months.

The documents also show that Geoff's later "extortion" allegation contradicts his own conduct. He negotiated with me for nearly a month, accepted the $20,000 in writing, and treated this as a routine settlement/insurance matter before abruptly shifting tone.

Given that:

- I have been on unpaid leave since October 6,

- the company accepted the $20,000 resolution on October 13,

- no claim was ever filed,

- and no progress has occurred despite my attempts to resolve this internally,

I am respectfully requesting that HR honor the company's previously accepted $20,000 and restore my unpaid wages since 10-6-25.

I appreciate your help and look forward to hearing from you tomorrow.

Thank you,
Russell

**CAUTION:** Email was not from ViaTRON Network!



**HR08. SECURITY & CONFIDENTIALITY RULES...**
101 KB



**HR07. POLICIES & PROCEDURES.pdf**
87 KB

**EXHIBIT AA**

**Plaintiff Saying He Never Resigned**

From: Russell Greer 
Subject: Addendum to Friday's Message
Date: Nov 24, 2025 at 1:27:42 PM
To: Angela Repayo a█████████████████
Bcc ████████████████████████████

Hi Angela,

Thank you for your response.

I need to correct one major point:
**I never resigned, and at no time did I communicate any intention to resign.**

In fact, the written record shows the opposite.

## 1. I continued negotiating the $20,000 settlement for weeks

As recently as **two weeks ago**, I told Geoff that:

"I am fully open to the $20,000."

We were still in ongoing settlement discussions well into November. He kept saying he will get back to me.

If I had resigned, there would have been **no reason** for me to continue negotiating the payout Geoff accepted on October 13 and scheduled for October 20.

## 2. I repeatedly tried to return to work

Examples:

- **October 27:** I asked about returning and requested a temporary remote assignment.

- **October 29:** I stated in writing that I was "**prepared to return to the office tomorrow.**"

A resigning employee does not schedule a return date.

## 3. I was placed on unpaid leave without notice

Geoff told me on October 15 that payroll was instructed to stop my pay *retroactive* to October 6.
I never asked for this.
I never agreed to this.
I repeatedly asked when my pay and position would be reinstated.

## 4. No resignation acceptance exists

I never received:

- an acceptance of resignation

- exit paperwork

- separation documents

- COBRA information

- or any confirmation of separation

Because none exists.

## Next Steps

For my records, please identify:

1. **The date** you believe I resigned.

2. **The specific document** you believe constitutes resignation.

3. **When ViaTRON accepted** this alleged resignation.

These are important clarifications before I proceed with **JAMS arbitration for wage and settlement issues**, including unpaid wages since October 6 and ViaTRON's written acceptance of the $20,000 resolution.

And yes, I am requesting arbitration ASAP.

OSHA has already docketed the case. NERC and the EEOC are well aware of Geoff's illegal  retaliation.

Thank you,
Russell

 **HR07. POLICIES & PROCEDURES.pdf**
87 KB

 **HR08. SECURITY & CONFIDENTIALITY RULES...**
101 KB

 **HR07. POLICIES & PROCEDURES.pdf**
87 KB

 **HR08. SECURITY & CONFIDENTIALITY RULES...**
101 KB

# SWORN DECLARATION OF RUSSELL GREER

**Re: False Claim of Resignation / Request for Immediate Reinstatement**

I, **Russell Greer**, declare under penalty of perjury under the laws of the United States and the State of Nevada that the following is true and correct:

## 1. I never resigned — not verbally, not in writing, and not through conduct.

At no point on or after October 1, 2025 did I resign from ViaTRON.
I never stated any intention to resign, nor did I use any language consistent with a voluntary separation.
No resignation occurred.

## 2. My October 1, 2025 letter is a legal complaint and settlement proposal — not a resignation.

The letter is titled **"Severance and Resolution of Legal Claims."**
It identifies ADA, ACA, OSHA, and Nevada violations and proposes a **private settlement**.

It expressly states:

"If we cannot reach agreement within 10 business days, I will have no choice but to pursue my rights through the EEOC… and litigation."

*(10-1-25 Viatron letter)*

This is **standard legal demand language**, not a resignation.

## 3. No language of resignation appears anywhere in the October 1 letter.

I never said:

- "I resign."
- "I quit."
- "This is my last day."
- or anything implying voluntary separation.

A valid resignation must be **clear, unambiguous, and voluntary**. None of those elements exist here.

# 4. The employer treated me as an active employee throughout October.

If ViaTRON believed I resigned on October 1, it would have:

- ended ADA claim processing
- ceased scheduling meetings
- stopped reviewing evidence
- stopped discussing remote work
- provided separation paperwork

Instead, the opposite occurred.

Throughout October 1–31, the employer:

- Confirmed my scanner position "is still open for you."
- Asked if I wanted my PTO paid out.
- Requested updated ADA/VR documentation.
- Worked on remote-access arrangements.
- Asked for witnesses and evidence.
- Scheduled an October 20 meeting to finalize the ADA insurance package.

These are the actions of an employer engaging a **current** employee, not a former one.

# 5. I repeatedly asked to return to work — in writing.

## October 23:

"Let me know if I can return tomorrow to the office."

*(Re- Contextual Evidence – Augus…)*

## October 27:

"I never rejected working… can you approve a temporary remote position?"

*(Re- Contextual Evidence – Augus…)*

## October 29:

"I'm also willing to return to the office tomorrow…"

*(Re- Contextual Evidence – Augus…)*

A resigning person does not ask to return three separate times.

# 6. I was on involuntary unpaid leave, which is why I asked to return.

On October 15, Geoff instructed payroll to stop my pay retroactive to October 6.
I never requested leave. I never agreed to it.
This forced me to seek reinstatement for income stability.

# 7. Geoff falsely reframed settlement negotiation as "refusing" to work.

On October 16, Geoff wrote:

"You were the person who rejected this offer and asked for a bigger payoff…"

*(Fwd- VT25 - VIATRON Follow Up)*

He conflated **settlement negotiations** with **refusing employment** — two entirely different matters.

I immediately corrected him:

"The figure wasn't intended as a take-it-or-leave-it demand… my intent was to open dialogue."

*(Fwd- VT25 - VIATRON Follow Up)*

This demonstrates his misunderstanding — not my resignation.

# 8. The employer did not claim I "resigned" until November 24 — three weeks after I tried to return.

Between October 29 and November 17, I followed up multiple times seeking reinstatement.

At no point did anyone at ViaTRON:

- tell me I resigned
- process a separation
- issue exit paperwork
- provide COBRA information
- acknowledge any resignation

The employer only asserted "resignation" on **November 24, 2025**, long after my repeated requests to return.

Such retroactive reframing is a hallmark of **retaliatory pretext**.

# 9. OSHA has already ruled on tactics like this.

OSHA's Administrative Review Board has held:

"An employer's unilateral decision to treat ambiguous conduct as a voluntary resignation — without clarifying the employee's intent — may itself constitute a discharge."
(*Ass't Sec'y & Becker v. Smithsonian Materials, LLC*, ARB No. 15-081 (2017))

Here, ViaTRON:

- never asked if I resigned
- never clarified my intent
- ignored multiple reinstatement requests
- only labeled my actions "resignation" after protected complaints

This is retaliation, not a legitimate separation.

# 10. Geoff wrongly mischaracterized my lawful 10-day response window as extortion.

The October 1 letter included a **10-business-day** response period — standard attorney-template language used in legal demand letters across employment law.

Despite this, Geoff portrayed the 10-day window as "extortion."
This is legally incorrect.

Two independent language-model legal evaluators (ChatGPT and Gemini) analyzed the letter and concluded:

- It contains **no threats**
- No coercion
- No quid-pro-quo
- No unlawful leverage
- And **no extortion elements** under any jurisdiction.

This misinterpretation further reflects the employer's pattern of reframing protected activity as misconduct.

# 11. The October 1 letter was tested against California, Nevada, and federal extortion statutes — and it satisfies none of the legal elements.

The October 1 letter was analyzed line-by-line against:

- **California Penal Code §§ 518–524**
- **Nevada NRS 205.320**
- **Federal Hobbs Act (18 U.S.C. §1951)**
- **Federal blackmail statute (18 U.S.C. §873)**

Across all three:

Extortion requires a **threat**, **coercion**, or a **"pay or suffer" demand**.

My letter contains:

- no threat,
- no coercive demand,
- no quid-pro-quo,
- no unlawful leverage,
- and only legally protected statements of intent to pursue administrative remedies if settlement is not reached.

Both legal evaluators independently confirmed:

"The letter does not meet any statutory definition of extortion under California, Nevada, or federal law."

This makes the employer's accusation demonstrably false.

# 12. Demand for Immediate Reinstatement

Based on the facts above, I respectfully demand:

1. **Immediate reinstatement** to my prior position or a remote temporary assignment, as previously discussed;
2. **Restoration of all wages** withheld beginning October 6, 2025;
3. Written confirmation of my employment status;
4. Assurance of no retaliation for asserting ADA, ACA, OSHA, and wage rights.

# DECLARATION (NRS 53.045)

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Executed on this 26th day of November,  2025, in Las Vegas, Nevada.

**Russell Greer**

**EXHIBIT BB**

**Arbitration Demand**



Greer, Russell vs. Viatron    Arbitration
Ref #5260001127
Show Case Information

DOCUMENTS | MESSAGES | CASE DATES | INVOICES



Search Documents

Filter by Classification

***Note, only Case Managers have access to delete uploaded documents. If you need to delete a document uploaded by you or your firm, please click "delete request" to send the request to the Case Manager.

Uploading Documents: Please log in from a desktop or



OVERVIEW | CASES | CALENDAR | INB

ccess.jamsadr.com

**EXHIBIT CC**

**Viatron Pay Receipts**



## VIATRON SYSTEM...   **+$341.34**

October 30, 2025 . Direct Deposit

### Transfer from

VIATRON SYSTEMS | SENDER

### Transaction ID

2KN4456409273862U

### Transfer to



### Additional Information



## VIATRON SYSTE...    +$252.38

October 20, 2025 . Direct Deposit - Your money arrived early

ⓘ  Enjoy your early payday!

**Transfer from**

VIATRON SYSTEMS | PAYROLL

**Transaction ID**

3X640865S91130242